1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   GREGORY F. HURLEY, Cal. Bar No. 126791
3  ghurley@sheppardmullin.com
   MICHAEL J. CHILLEEN, Cal. Bar No. 210704
4  mchilleen@sheppardmullin.com
   BRADLEY J. LEIMKUHLER, Cal. Bar No. 261024
5  bleimkuhler@sheppardmullin.com
   650 Town Center Drive, 4th Floor
6  Costa Mesa, California 92626-1993
   Telephone:  714.513.5100
7  Facsimile:  714.513.5130

8  Attorneys for Defendant,
   DOMINO'S PIZZA LLC
9

10              UNITED STATES DISTRICT COURT

11    CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13 GUILLERMO ROBLES,               | Case No. 2:16-cv-06599
                                    Hon. S. James Otero
14       Plaintiff,

15   v.                           | **DEFENDANT DOMINO'S PIZZA
                                    LLC'S MEMORANDUM OF
16 DOMINO'S PIZZA LLC,             | POINTS AND AUTHORITIES IN
                                    SUPPORT OF MOTION FOR
17      Defendant.      | SUMMARY JUDGMENT OR, IN
                                    THE ALTERNATIVE, DISMISSAL
18                                    OR STAY**

19                                  Date:    March 27, 2017
                                    Time:   10:00 a.m.
20                                  Ctrm.:  10C

21                                  Action Filed:  September 1, 2016
22                                  Trial Date:    August 29, 2017

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION .................................................................. 1

II.   FACTUAL BACKGROUND .................................................. 1

      A.    Plaintiff's Allegations. ................................................ 1

III.  ARGUMENT ........................................................................ 3

      A.    Defendant's Website and Mobile Website Should Not Be
            Treated as "Places of Public Accommodation." ....................... 3

      B.    Plaintiff's Lawsuit Violates Defendant's Constitutional Right to
            Due Process. ............................................................................. 7

      C.    Plaintiff Cannot Make An End Run Around the Department of
            Justice's Rulemaking Authority. ............................................. 12

      D.    Absent The Presence Of Applicable Standards, Plaintiff Fails To
            State A Cause Of Action Against Defendant. ........................... 16

            1.    Courts Repeatedly Dismiss ADA Lawsuits If No Standard
                  Is Violated. ........................................................................ 17

            2.    Plaintiff Has Failed To Adequately Plead That
                  Defendant's Discrimination Was Intentional. ................. 19

      E.    Plaintiff Has Failed To Provide "Fair Notice" Of The Alleged
            Barriers on Defendant's Website Or Mobile Website. ........... 20

      F.    In The Alternative, The Court Should Dismiss or Stay The Case
            Pursuant To The Primary Jurisdiction Doctrine. ................... 23

IV.   CONCLUSION ................................................................... 25

-i-

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>Cases</u>

*Access Now, Inc. v. Southwest Airlines, Co.*
  227 F. Supp. 2d 1312 (S.D. Fla. 2002)...................................................................4

*Ala. Prof'l Hunters Ass'n v. FAA*
  177 F.3d 1030 (D.C. Cir. 1999)............................................................................8

*Alexander v. Kujok*
  158 F. Supp. 3d 1012 (E.D. Cal. 2016) ................................................................6

*Blackwell v. City and County of San Francisco*
  506 Fed. Appx. 585 (9th Cir. 2013) ...................................................................18

*Botosan v. Paul McNally Realty*
  216 F.3d 827 (9th Cir. 2000) .........................................................................9, 10

*Chapman v. Pier 1 Imports (U.S.), Inc.*
  631 F.3d 939 (9th Cir. 2011) ...............................................................................11

*Clark v. Time Warner Cable*
  523 F.3d 1110 (9th Cir. 2008) .......................................................................23, 24

*Coates v. City of Cincinnati*
  402 U.S. 611 (1971) .............................................................................................11

*Coronado v. Cobblestone Village Community Rentals*
  163 Cal. App. 4th 831 (2008), *overruled on other grounds by*
  *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661 (2009) ............................................18

*Cullen v. Netflix, Inc.*
  880 F. Supp. 2d 1017 (N.D. Cal. 2012), aff'd, 600 Fed. Appx. 508
  (9th Cir. 2015) ...............................................................................................4, 20

*Disabled Americans for Equal Access, Inc. v. Compra Hospital Pavia,*
  *Inc.*
  2004 WL 5568603 (D. Puerto Rico 2004) ....................................................18, 19

*Earll v. eBay, Inc.*
  2011 WL 3955485 (N.D. Cal. Sept. 7, 2011), *aff'd* 599 Fed. Appx.
  695 (9th Cir. Apr. 1, 2015)............................................................................19, 20

*Earll v. eBay, Inc.*
   599 Fed. Appx. 695 (9th Cir. Apr. 1, 2015) ...................................................... 4, 20

*Ferrare v. IDT Energy, Inc.*
   2015 WL 3622883 (E.D. Pa. 2015) ............................................................... 24

*Forbes v. Napolitano*
   236 F.3d 1009 (9th Cir. 2000) ........................................................................ 8

*Fortyune v. Am. Multi-Cinema, Inc.*
   364 F.3d 1075 (9th Cir. 2004) ...................................................................... 11

*re. Goddard v. Harkins Amusement Enter., Inc.*
   603 F.3d 666 (9th Cir. 2010) ........................................................................ 11

*Gomez v. Bang & Olufsen America, Inc.*
   Case No. 1:16-cv-23801-JAL (S.D. Fla. Feb. 2, 2017) .................................... 4, 5

*Gray v. County of Kern*
   2015 WL 7352302 (E.D. Cal. Nov. 19, 2015) ............................................... 22

*Gray v. JP Morgan Chase Bank*
   2012 WL 1340315 (C.D. Cal. 2012) ................................................. 19, 22, 23

*Grayned v. City of Rockford*
   408 U.S. 104 (1972) ....................................................................................... 8

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*
   742 F.3d 414 (9th Cir. 2014) ........................................................................ 20

*Indep. Living Res. v. Or. Arena Corp.*
   982 F. Supp. 698 (D. Or. 1997) .................................................................... 11

*Kidwell v. Florida Commission on Human Relations*
   Case No. 2:16-cv-00403-UA-CM (M.D. Fla. Jan. 17, 2017) ............................ 4, 5

*Lara v. Cinemark USA, Inc.*
   1998 WL 1048497 (W.D. Tex. Aug. 21, 1998), *rev'd*, 207 F.3d 783
   (5th Cir. 2000) ..................................................................................... 8, 9, 15

*Marsh v. Edwards Theatres Circuit, Inc.*
   64 Cal. App. 3d 881 (1976) .................................................................... 16, 18

*MCI Comm. Corp. v. American Tel. & Tel. Co.*
   496 F.2d 214 (3d Cir. 1974) ......................................................................... 24

-iii-

*Munson v. Del Taco, Inc.*
46 Cal. 4th 661 (2009) ........................................................................ 19

*Oliver v. Ralphs Grocery Co.*
654 F.3d 903 (9th Cir. 2011) ............................................................... 21

*Pascuiti v. N.Y. Yankees*
87 F. Supp. 2d 221 (S.D.N.Y. 1999) ................................................... 11

*Paulick v. Starwood Hotels & Resorts Worldwide, Inc.*
2012 WL 2990760 (N.D. Cal. 2012) .................................................... 22

*PHH Corporation v. Consumer Fin'l Prot. Bureau*
839 F.2d 1 (D.C. Cir. 2016) ................................................................... 8

*Resnick v. Magical Cruise Co.*
148 F. Supp. 2d 1298 (M.D. Fla. 2001) ............................................... 17

*Shalala v. Guernsey Memorial Hosp.*
514 U.S. 87 (1997) ............................................................................... 15

*Strong v. Walgreen Co.*
2009 WL 3711930 (C.D. Cal. 2009) .................................................... 22

*Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*
307 F.3d 775 (9th Cir. 2002) ............................................................... 23

*U.S. Hoyts v. Cinema Corp.*
380 F.3d 558 (1st Cir. 2004) ............................................................... 15

*U.S. v. AMC Entertainment, Inc.*
549 F.3d 760 (9th Cir. 2008) ............................................... 8, 9, 15, 24

*Weyer v. Twentieth Century Fox Film Corp.*
198 F.3d 1104 (9th Cir. 2000) ............................................................... 4

*Wilson v. Pier 1 Imports (US), Inc.*
439 F. Supp. 2d 1054 (E.D. Cal. 2006) ............................................... 17

*Young v. Facebook*
790 F. Supp. 2d 1110 (N.D. Cal. 2011) ........................................... 4, 20

<u>Statutes</u>

42 U.S.C. § 12182(a) ............................................................................... 4

-iv-

42 U.S.C. § 12186(b) .............................................................................. 24

Americans with Disabilities Act ("ADA") ........................................... *passim*

California Unruh Civil Rights Act ........................................................ *passim*

Other Authorities

28 C.F.R. § 26.303(c)(1) ............................................................................ 6

28 CFR 36.401(a) ................................................................................... 13

Defendant's website, www.dominos.com ................................................. 1

https://www.w3.org/TR/UNDERSTANDING-WCAG20 ......................... 9

Notice of Proposed Rulemaking, 2010 WL 2888003 (July 26, 2010) ............... 7, 12

SMRH:480619776.5

1  Defendant Domino's Pizza LLC ("Defendant") hereby submits its

2  memorandum of points and authorities in support of its motion for summary

3  judgment or, in the alternative, dismissal or stay.

4  **I.   INTRODUCTION**

5  Plaintiff Guillermo Robles ("Plaintiff") brings this form lawsuit alleging that

6  Defendant's website, www.dominos.com, and Defendant's mobile website, are not

7  accessible to him or the visually impaired.  Plaintiff and his counsel have filed

8  numerous near-identical lawsuits against several businesses in which similar

9  allegations are made.  In his Complaint, Plaintiff seeks injunctive relief pursuant to

10  the Americans with Disabilities Act ("ADA") and statutory damages pursuant to the

11  California Unruh Civil Rights Act ("Unruh Act") based on his alleged attempts to

12  use Defendant's website and mobile website.

13  As explained below, all of Plaintiff's claims fail for several, independent

14  reasons.  First, Plaintiff's claim should be denied because Defendant's website and

15  mobile website comply with the effective communications mandate of the ADA.

16  Second, Plaintiff's claims should be denied because his lawsuit violates fundamental

17  principles of due process.  Third, Plaintiff's claims should be denied because he

18  cannot establish any violations of any applicable accessibility standards.  Fourth,

19  Plaintiff's claim under the Unruh Act should be denied because he cannot prove that

20  Defendant intentionally discriminated against him.  Fifth, Plaintiff's claim fails

21  because Defendant lacks fair notice of the barriers Plaintiff claims exist.  In the

22  alternative, Plaintiff's claims should be dismissed or stayed because the Department

23  of Justice ("DOJ") has not promulgated any accessibility regulations governing the

24  websites and/or mobile websites of private businesses.

25  **II.   FACTUAL BACKGROUND**

26  **A.   Plaintiff's Allegations.**

27  Plaintiff and his counsel, who specializes in filing these nuisance lawsuits,

28  allege that he is a "blind" person who uses screen-reading software to use the

-1-

1  internet on his computer and mobile websites on his iPhone.  (Complaint at ¶ 1).[1]

2  Plaintiff does not describe his visual impairment other than to say he meets the legal

3  definition of blindness.  (*Id*.).

4       The premise of Plaintiff's lawsuit is that Defendant's website and mobile

5  website fail to comply with version 2.0 of the Web Content Accessibility Guidelines

6  ("WCAG"), created by a non-governmental organization called W3C, and iOS

7  accessibility guidelines ("Apple Standards"), developed by Apple Inc., a California

8  corporation.  (*Id*. at ¶¶ 21-22).  Based on Plaintiff's claim that Defendant's website

9  and mobile website allegedly do not comply with these standards, Plaintiff claims

10  that Defendant has violated the ADA and California law.

11       Plaintiff does not specifically identify how he was denied access or provide

12  any specific date when he was unable to access Defendant's website or mobile

13  website.  With respect to the website, Plaintiff simply lists categories of "barriers"

14  allegedly on Defendant's website, but fails to identify any specific problems.  For

15  instance, Plaintiff does not identify a single graphical image that supposedly lacks

16  alternative text, any redundant or empty links, or any linked image missing

17  alternative text.

18       At best, Plaintiff complains that he was unable to order a customized pizza

19  online.  (*Id*. at ¶¶ 15, 27).  Instead, Plaintiff states that he "has visited Dominos.com

20  several times" most recently "in 2016."  (*Id*. at ¶¶ 27, 29).  Plaintiff does not explain

21  how the supposed "barriers" on Defendant's website prevented him from ordering a

22  pizza.  Plaintiff utterly fails to allege any nexus between the alleged barriers on

---

[1] Plaintiff, and numerous other serial plaintiffs, have begun filing form lawsuits in
California alleging that businesses have failed to design and develop websites and/or
mobile website that are accessible to the visually impaired.  Defendant disputes that
its website and mobile website are not accessible.  However, Defendant, along with
a number of other similarly situated businesses, are left without specific guidance
and are faced with the prospect of costly and serial litigation in the absence of clear
and easily testable technical standards for accessibility.

1  Defendant's website and the difficulty he claims to have alleged.  No specific

2  images, links, forms, or other issues are identified – effectively making it impossible

3  for Defendant (or anyone else) to evaluate and address what alleged problems

4  Plaintiff is complaining about.

5       Plaintiff's allegations concerning Domino's mobile website are even more

6  vague.  For instance, Plaintiff states that he "experienced accessibility problems"

7  when he used the mobile website on his iPhone with "VoiceOver" – a software

8  program developed by Apple.  (*Id*. at ¶ 30).  What "accessibility" problems Plaintiff

9  supposedly experienced are not explained.  Plaintiff then claims that, in 2015, there

10  were "unlabeled buttons" that did not comply with Apple Standards.  (*Id*. at ¶ 31).

11  Again, no buttons are identified and no explanation is provided as to how those

12  alleged issues impeded Plaintiff's ability to "place his order."  Even worse, Plaintiff

13  then goes on to say he encountered "similar" access barriers on the mobile website

14  in 2016, but utterly fails to explain what they were.  (*Id*. at ¶ 32).  It is equally likely

15  that Plaintiff's problems were caused by user error or a software bug.

16       Plaintiff concludes his allegations by stating that the alleged "barriers to blind

17  and visually-impaired people can and must be removed, by simple compliance with

18  WCAG 2.0."  (*Id*. at ¶ 33).

19  **III.**   **<u>ARGUMENT</u>**

20      **A.**   **<u>Defendant's Website and Mobile Website Should Not Be Treated</u>**

21          **<u>as "Places of Public Accommodation."</u>**

22       The premise of Plaintiff's lawsuit is that Defendant's website and mobile

23  website are subject to regulation as a "place of public accommodation."  However,

24  that is incorrect.  Defendant's websites are simply a method for communicating with

25  its customers.

26       Under Title III of the ADA, "no individual shall be discriminated against on

27  the basis of disability in the full and equal enjoyment of the goods, services,

28  facilities, privileges, advantages, or accommodations of any place of public

-3-

1   accommodation."  42 U.S.C. § 12182(a).  The Ninth Circuit has interpreted the term

2   "place of public accommodation" to require "some connection between the good or

3   service complained of and an actual physical place."  *Earll v. eBay, Inc.*,  599 Fed.

4   Appx. 695 (9th Cir. Apr. 1, 2015); *Weyer v. Twentieth Century Fox Film Corp.*, 198

5   F.3d 1104, 1114 (9th Cir. 2000).[2]

6          While Defendant does not dispute that the websites connect its customers to

7   pizza franchises, the ADA was simply not drafted with the specific regulation of

8   virtual spaces in mind.  As explained by the Southern District of Florida, "Here, to

9   fall within the scope of the ADA as presently drafted, a public accommodation must

10  be a physical, concrete structure.  To expand the ADA to cover "virtual spaces"

11  would be to create new rights without well-defined standards."  *Access Now, Inc. v.*

12  *Southwest Airlines, Co.*, 227 F. Supp. 2d 1312, 1318-19 (S.D. Fla. 2002) (declining

13  to construe "a place of public accommodation" to include Southwest's Internet

14  website); *Kidwell v. Florida Commission on Human Relations*, Case No. 2:16-cv-

15  00403-UA-CM , *11 (M.D. Fla. Jan. 17, 2017) ("Plaintiff may not claim a violation

16  of Title III based on an internet website's accessibility.   Neither Busch Gardens'

17  nor SeaWorld's online website is a physical or public accommodation under the

18  ADA. . . Hence, Plaintiff is unable to demonstrate that either Busch Gardens' or

19  SeaWorld's online website prevents his access to a specific, physical, concrete

20  space. . .") (citations omitted) (Leimkuhler Decl. Exh. A).

21         Just recently, another District Court has concluded that a visually impaired

22  plaintiff could not state a claim for violation of Title III due to a website's alleged

23  inaccessibility.  *Gomez v. Bang & Olufsen America, Inc.*, Case No. 1:16-cv-23801-

24  JAL (S.D. Fla. Feb. 2, 2017).  The Court's reasoning is illustrative here:

25  _____

26  [2] Companies such as Netflix and Facebook have used this precedent to avoid
    regulation under the ADA because they exist exclusively in the virtual space.

27  *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017 (N.D. Cal. 2012), aff'd, 600 Fed. Appx.

28  508 (9th Cir. 2015); *Young v. Facebook*, 790 F. Supp. 2d 1110 (N.D. Cal. 2011).

-4-

1        [I]t appears that the Plaintiff never intended to utilize Bang and

2        Olufsen's physical, retail location; but instead planned to order

3        audio equipment online and have it delivered to his home.

4        Plaintiff's grievance seems to be that Defendant's website does

5        not provide a blind person with the same online-shopping

6        experience as non-disabled persons.  <u>However, the ADA does</u>

7        <u>not require places of public accommodations to create full</u>

8        <u>service websites for disabled persons</u>.  In fact, the ADA does

9        not require a place of public accommodation to have a website

10       at all.  All the ADA requires is that, if a retailer chooses to have

11       a website, the website cannot impede a disabled person's full

12       use and enjoyment of the brick-and-mortar store.

13   *Id*. at *10-11 (Leimkuhler Decl. Exh. B).

14       Just as in the *Gomez* case, Plaintiff alleges that he wished to order goods

15   through Defendant's website and/or mobile website and have them delivered to his

16   home.  (Complaint ¶¶ 15, 27).  As such, Plaintiff has not alleged that he was

17   impeded in the full use and enjoyment of the brick-and-mortar store.  Therefore, his

18   claim fails.

19       Moreover, the case law that has developed in the context of an ADA facilities

20   suit is uniquely impractical here.  In such cases, it is relatively easy to determine

21   whether a particular feature complies with a technical standard established by the

22   Department of Justice ("DOJ").  Anyone with a measuring tape can determine

23   whether the ADA service counter exceeds 34 inches in height.  In addition, if a

24   feature needs to be remediated, it is a usually a construction problem that, once

25   fixed, it is reasonably likely that the feature will be compliant until a future remodel

26   or tear down.

27       By contrast, websites are complex, multi-layered lines of code that exist

28   exclusively in the virtual sphere.  It can be difficult, if not impossible, to know

-5-

1  whether a particular person was unable to access a website due to a software bug,

2  technical glitch, poor internet connection, temporary server failure, use of old or

3  outdated software, or other myriad of technical issues.  For example, a plaintiff

4  using screen reader software like JAWS can choose to adjust the extensive settings

5  on that software so that any website becomes unreadable.  Similarly, a plaintiff who

6  only needs text enlargement in a website can choose to not to use the built in text

7  enlargement functions of their browser (typically "ctrl +") or choose not to use

8  another browser add on and claim the website violates the ADA and the WCAG .

9  Furthermore, as this Court undoubtable understands much of any website is actually

10  content, routines, and links controlled by others (imbedded YouTube video, or

11  Google Maps, etc.).  Making a website a "place of public accommodation" is

12  treating the owner of the domain as if they are responsible for third party content.

13  This is uniquely important because access plaintiffs, such as Plaintiff here, seek

14  damages every time they are denied access.

15       Websites are not virtual versions of brick and mortar stores; they are a form

16  of communications with customers, like the direct mail solicitations and catalogues

17  that retailers used for 50 years before Congress adopted the ADA.  When the ADA

18  was adopted there were tens of millions of mail order catalogues for brick and

19  mortar stores sent to homes each year, yet Congress in adopting the ADA, and the

20  DOJ in adopting its regulations, chose not to require braille versions or phone

21  support for retail catalogues.  Therefore, rather than understanding websites as

22  "places of public accommodations" that should be regulated based on a yet to be

23  developed standard, they should be evaluated based upon the ADA's "effective

24  communication" provisions.  The regulations implementing Title III of the ADA

25  "require places of public accommodations to 'furnish appropriate auxiliary aids and

26  services. . .to ensure effective communication with individuals with disabilities.'"

27  *Alexander v. Kujok*, 158 F. Supp. 3d 1012, 1020 (E.D. Cal. 2016); 28 C.F.R.

28  § 26.303(c)(1).  Under the regulation, the type of alternative service will vary in

-6-

DEFENDANT DOMINO'S PIZZA LLC'S  MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT

1  accordance with the length and complexity of the communication involved.   The

2  DOJ's Title III Assistance Manual provides examples, such as a sales clerk

3  exchanging written notes with an individual who is deaf or using an usher to escort a

4  blind patron of a theater to their seat rather than providing a Brailled ticket. *See* §III-

5  4.3200 (Illustrations).

6       In this case, Defendant provides "effective communication" to its visually

7  impaired customers through a phone number.  Defendant's website and mobile

8  website contain accessibility banners that direct users who access the website or

9  mobile website with a statement that "If you are using a screen reader and are

10  having problems using this website, please call 800-252-4031 for assistance."

11  (UMF 1-2).  That number provides 24/7 support.  (UMF 3).  If a blind individual

12  calls that number, the person can provide assistance with Defendant's websites.

13  (UMF 4).  Alternatively, a customer can call their local Domino's Pizza restaurant

14  to order food, purchase goods, and/or ask questions.  (UMF 5).

15       This approach has been endorsed by the DOJ.  In a notice of advanced

16  rulemaking concerning website accessibility, the DOJ stated "The Department has

17  taken the position that covered entities with inaccessible websites may comply with

18  the ADA's requirement for access by providing an accessible alternative, such as a

19  staffed telephone line, for individuals to access the information, goods, and services

20  of their Web site."  Notice of Proposed Rulemaking, 2010 WL 2888003, at*43466

21  (July 26, 2010).

22       This is precisely what Defendant does here, and Plaintiff has not, and cannot,

23  make any claim that Defendant's website and mobile website do not provide

24  "effective communication."

25  **B.    Plaintiff's Lawsuit Violates Defendant's Constitutional Right to**

26  **Due Process.**

27       "Due process requires that the government provide citizens and other actors

28  with sufficient notice as to what behavior complies with the law.  Liberty depends

-7-

1   on no less." *U.S. v. AMC Entertainment, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008);

2   *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("Because we assume that

3   man is free to steer between lawful and unlawful conduct, we insist that laws give

4   the person of ordinary intelligence a reasonable opportunity to know what is

5   prohibited, so that he may act accordingly."); *Forbes v. Napolitano*, 236 F.3d 1009,

6   1011 (9th Cir. 2000) ("The due process clause ... guarantees individuals the right to

7   fair notice of whether their conduct is prohibited by law."); *PHH Corporation v.*

8   *Consumer Fin'l Prot. Bureau*, 839 F.2d 1, 46 (D.C. Cir. 2016) (due process requires

9   agencies to "provide regulated parties fair warning of the conduct a regulation

10  prohibits or requires."); *Ala. Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035

11  (D.C. Cir. 1999) ("Those regulated by an administrative agency are entitled to know

12  the rules by which the game will be played.").

13       The Ninth Circuit's decision in *AMC Entertainment* is instructive.  In *AMC*

14  *Entertainment*, the Ninth Circuit was confronted with the question of whether the

15  ADA required theater owners to retroactively incorporate a comparable viewing

16  angle requirement in movies theaters.  At issue was the interpretation of a regulation

17  that required "lines of sight comparable to those for members of the general public."

18  That regulation was ambiguous and it was unclear whether "lines of sight" simply

19  referenced an unobstructed view of the screen or whether that similarly required

20  comparable viewing angles.  This issue was litigated in courts throughout the

21  country.  However, the first time that the DOJ announced its position on the issue

22  was in an amicus brief in the District Court for the Western District of Texas in a

23  matter entitled *Lara v. Cinemark USA, Inc.*, 1998 WL 1048497, at *2 (W.D. Tex.

24  Aug. 21, 1998), *rev'd*, 207 F.3d 783 (5th Cir. 2000).  Ultimately, the Ninth Circuit,

25  in another opinion, announced that the regulation did require comparable viewing

26  angles for disabled patrons (the Fifth Circuit in *Lara* disagreed).  As the courts

27  grappled with the issue, the DOJ brought a lawsuit against AMC arguing that AMC

28  was required to retrofit several theaters, including those built before the DOJ

-8-

1   announced its interpretation of the regulation in the *Lara* amicus brief.  The Ninth

2   Circuit reversed the District Court's injunction on the grounds that defendants were

3   entitled to know what the law required of them.  The *AMC* Court observed:  "In

4   other words, the capacity of in-house counsel or others to read correctly legislative

5   tea leaves does not alleviate the government from its obligation to fashion coherent

6   regulations that put citizens of 'ordinary intelligence' on notice as to what the law

7   requires of them."  *Id*. at 770.[3]; *see also Botosan v. Paul McNally Realty*, 216 F.3d

8   827, 836 (9th Cir. 2000) ("The ADA would be vague only if it is so indefinite in its

9   terms that it fails to articulate comprehensible standards to which a person's conduct

10  must conform.").

11         This lawsuit is a classic example of overreach that is fundamentally unfair

12  and violates important due process principles.  Plaintiff's case is exclusively

13  premised upon Defendant's alleged failure to comply with WCAG 2.0, a set of

14  vague guidelines that have been published by private parties, and the Apple

15  Standards.  These guidelines were never intended to be "regulations" and no public

16  review or rulemaking procedure was undertaken for the WCAG.  The consortium

17  that publishes the WCAG is free to amend or change this guidance at any time, and

18  has in fact, done so several times.  The WCAG standards were never intended as

19  law and are intentionally and inherently vague.  To see this the Court need only look

20  at the WCAG 2.0 guidelines, for example:  "**3.1.6 Pronunciation:**  A <u>mechanism</u> is

21  available for identifying specific pronunciation of words where meaning of the

22  words, in context, is ambiguous without knowing the pronunciation."  *See also,*

23  **1.3.2 Meaningful Sequence:**  When the sequence in which content is presented

24  affects its meaning, a <u>correct reading sequence</u> can be <u>programmatically</u>

25  <u>determined</u>.  See https://www.w3.org/TR/UNDERSTANDING-WCAG20. The DOJ

---

[3] The Ninth Circuit remanded the case to the district court for determination of what date AMC could have fairly determined the settled meaning of § 4.33.3 – to be a date no earlier than the date on which the DOJ filed the *Lara* amicus brief.  *Id.*

has never stated that the ADA requires that private businesses that operate a website for the public to use, must comply with these standards.  There is even less support for treating the Apple Standards, developed by a private company, as legally enforceable regulations.

Whatever the merits of these standards, it is fundamentally unfair to Defendant to be hauled into federal court and sued for injunctive relief, damages, and attorneys' fees, due to its alleged failure to meet them.

In effect, Plaintiff is attempting to seamlessly apply the law that has developed for construction-related accessibility lawsuits to websites.  However, there are fundamentally stark differences.  In *Botosan*, the Ninth Circuit denied a due process challenge to the ADA because of the detailed and comprehensive regulations that had been issued.  216 F.3d at 836-37.  The Court found that the ADA was not vague as to its requirements precisely because DOJ has printed a detailed handbook containing "numerous diagrams and specifications explaining the types of modifications and auxiliary aids (e.g., handrails, grab bars, ramps) that a building must install to be ADA compliant."  *Id*. at 836-37.  The Court found that, taking the ADA "together with administrative regulations and interpretations" the readily achievable requirement was "sufficiently specific to put the owner of a public accommodation on notice of what is required by Title III."  *Id*. at 836; citing *U.S. v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir. 1992), *cert denied*, 507 U.S. 921 (1993) (explaining that administrative regulations and interpretations may provide sufficient clarification to save an otherwise vague statute).

By contrast here, the DOJ has yet to issue any standards that would apply to public or private websites.  As there are no standards, there are no specific and demonstrable means by which Defendant can hope to meet.  In other words, the law, as it currently stands, "fails to articulate comprehensible standards to which a person's conduct must conform."  *Botosan*, 216 F.3d at 836 (observing ADA would be vague if "so indefinite in its terms that it fails to articulate comprehensible

-10-

1  standards to which … to conform."); *see also Coates v. City of Cincinnati*, 402 U.S.

2  611, 614 (1971) (A statute is vague not when it prohibits conduct according "to an

3  imprecise but comprehensible normative standard, but rather in the sense that no

4  standard of conduct is specified at all.").

5     Case-law consistently re-affirms the basic principle. *E.g., Chapman v. Pier 1*

6  *Imports (U.S.), Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) ("Whether a facility is

7  'readily accessible' is defined, in part, by the ADA Accessibility Guidelines

8  ('ADAAG'). See 28 C.F.R. § 36.406(a); 28 C.F.R. pt. 36, app. A. Promulgated by

9  the Attorney General to 'carry out the provisions' of the ADA, 42 U.S.C.

10  § 12186(b), these guidelines 'lay out the technical structural requirements of places

11  of public accommodation."); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075,

12  1080-81 (9th Cir. 2004); *see also Indep. Living Res. v. Or. Arena Corp.*, 982 F.

13  Supp. 698, 714 (D. Or. 1997) ("The regulations establish a national standard for

14  minimum levels of accessibility in all new facilities.").

15     The Ninth Circuit has explained "[t]he ADAAG <u>provides the objective</u>

16  <u>contours of the standard</u> that architectural features must not impede disabled

17  individuals' full and equal enjoyment of accommodations." *Chapman*, 631 F.3d at

18  945 (emphasis added); *see also Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 225

19  (S.D.N.Y. 1999) (quoting a letter where the DOJ stated it "consider[ed] any element

20  in a facility that does not meet or exceed the requirements set forth in the [ADAAG]

21  to be a barrier to access").

22     It is insufficient for Plaintiff to point to settlement agreements that private

23  parties have agreed to or the DOJ's notice of advanced rulemaking. *E.g. Arizona ex*

24  *re. Goddard v. Harkins Amusement Enter., Inc.*, 603 F.3d 666, 674 (9th Cir. 2010)

25  ("The court has declined to give deference to Access Board guidelines that have not

26  yet been adopted by the DOJ. Moreover, we have refused to defer to a proposed

27  regulation published by the DOJ itself. The DOJ's interpretation in a notice of

28  proposed rulemaking is similarly unpersuasive.") (internal citations omitted).

-11-

1       Until there is a specific and adopted accessibility standard that the DOJ

2  requires compliance with, there can be no finding that a private entity violates a

3  specific, technical standard.  To hold otherwise would violate bedrock principles of

4  due process of law and fundamental fairness.

5       **C.**    **<u>Plaintiff Cannot Make An End Run Around the Department of</u>**

6          **<u>Justice's Rulemaking Authority.</u>**

7       Plaintiff is attempting to short-circuit the DOJ's public notice and comment

8  period for establishing technical standards and rules for website accessibility.  It is

9  inappropriate for Plaintiff to substitute his own judgment about what constitutes a

10  broadly applicable minimum standard for accessibility in place of the rigorous

11  rulemaking process, which brings together a variety of stakeholders, in fashioning

12  rules to which all can agree.

13       In July of 2010, the DOJ announced, for the first time, that it was

14  "considering revising the regulations implementing title III of the [ADA] in order to

15  establish requirements for making the goods, services, facilities, privileges,

16  accommodations, or advantages offered by public accommodations via the Internet,

17  specifically at sites on the [web], accessible to individuals with disabilities."  Notice

18  of Proposed Rulemaking, 2010 WL 2888003 (July 26, 2010).  In making that

19  announcement, the DOJ solicited public comments from the disabled community

20  and industry groups in the hopes of developing technical standards for websites.

21       Given the DOJ's position that the internet is a place of public accommodation

22  subject to coverage by the ADA, the DOJ expressly acknowledged a need for

23  government action because "the Internet ha[d] been governed by a variety of

24  <u>voluntary</u> standards or structures developed through nonprofit organizations using

25  multinational collaborative efforts" including the WCAG.  *Id*. at *43463.  The DOJ

26  recognized the necessity of a "clear requirement that provides the disability

27  community consistent access to Web sites and covered entities clear guidance on

28  what is required under the ADA."  *Id*.

      DEFENDANT DOMINO'S PIZZA LLC'S  MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR SUMMARY JUDGMENT

Frustratingly, even the WCAG contains three conformance levels: A, AA, and AAA, which define different levels of success. *Id*. Therefore, the DOJ decided to solicit comments from the general public as to whether it should adopt WCAG, and if so, what level of success criteria it should require. Among other things the DOJ was interested in knowing whether businesses could realistically meet that standard and whether that standard would adequately meet the needs of the disabled community. The need for public comment and input into any broadly applicable final rule is self-evident: the internet constitutes a highly-dynamic, constantly shifting world that is under relentless innovation. For instance, in 2008 when the WCAG standards first issued, touchscreen internet browsing was in its infancy. Now, many consumers access the internet though touchscreens – and that has changed the way that websites are designed and programmed.

Therefore, the DOJ, before mandating adherence to specific rules and regulations, sought public input. The DOJ further recognized that, once it publishes a final rule, it needed to set an effective date for the application of any new regulations requiring websites covered by the ADA to be accessible. *Id*. The DOJ's initial proposal was six months for new websites and two years for existing websites – recognizing that businesses would be entitled to a fair notice period before they would be held to that standard. *Id*.[4]

Despite this activity, and acknowledgement of the problems the lack of standards has created, the DOJ has thus far failed to issue a final rule. The latest development for regulation of Title III websites is that, on July 28, 2016, the DOJ announced an extension until October 7, 2016 for the public to submit comments on comments for Title II (state and local government) websites. As part of the

---

[4] For instance, under the 1991 regulations, new construction under Title III had to comply with the new design standards within eighteen months after the ADA standards were first published. *See* 28 CFR 36.401(a).

-13-

1   announcement, the DOJ stated that "further delays in this Title II rulemaking will,

2   therefore, have the effect of hindering Title III Web rulemaking's timeline as well."

3        This absence of regulations has, unfortunately, led to litigation abuse even

4   where defendants have voluntarily agreed to make their websites more accessible.

5   As an example, on June 3, 2016, Party City Corporation was sued in the U.S.

6   District Court for the Southern District of Florida on the grounds that its website

7   was inaccessible.  Case No. 1:16-cv-22022 (Leimkuhler Decl., Exh. C at *3).  On

8   October 10, 2016, the action was dismissed with prejudice pursuant to a settlement

9   agreement between the parties.  (*Id*.).  In the settlement agreement, Party City

10  agreed to pay certain attorneys' fees and costs and agreed to "injunctive relief" to

11  make its website more accessible.  (Leimkuhler Decl., Exh. D at *7-8).  On

12  November 8, 2016, almost immediately after that lawsuit was dismissed, another

13  Party City entity was sued on nearly identical grounds in the U.S. District Court for

14  the Western District of Pennsylvania.  Case No. 2:16-cv-01375.  (*Id*. at *8).  In the

15  absence of clear and testable standards, businesses are subject to the prospect of

16  endless serial litigation.

17       The WCAG is inherently vague and was never intended to be a regulation.

18  For instance, screen shots from different online web accessibility tools demonstrate

19  the different ways in which a website can fail WCAG 2.0 AA compliance.  Attached

20  as Exhibit E is a screenshot of the DOJ website homepage that shows 10 "errors,",

21  19 "alerts", and "7" contrast errors (among other things).  Attached as Exhibit F is a

22  screenshot of the same website through Google Chrome accessibility tool, that

23  shows 28 "severe" errors, and 20 "warnings."  As another example, Exhibit G shows

24  Plaintiff's counsel's website (which presumably has been offline for months because

25  of this precise issue) through the WAVE tool, which shows 3 "errors" and 2 "alerts"

26  – even though it has very little text.  For comparison's sake, Google's accessibility

27  audit for the same website shows 4 "warnings."  (Exh. H).

28

-14-

1    This aptly demonstrates that enforcing web accessibility through litigation is

2    inappropriate.  Courts, including the Ninth Circuit, have criticized the DOJ for

3    attempting to regulate through litigation – rather than through the tough work of

4    crafting regulations.  As examples, in *U.S. Hoyts v. Cinema Corp.*, 380 F.3d 558,

5    569 (1st Cir. 2004), the First Circuit explained that while "the [DOJ] is free to

6    interpret reasonably an existing regulation without formally amending it; but where .

7    . . the interpretation has the practical effect of altering the regulation, a formal

8    amendment – almost certainly prospective and after notice and comment – is the

9    proper course." *accord U.S. v. AMC Enter.*, 549 F.3d at 769 (sharing First Circuit's

10   frustration that "the government could have solved the [interpretation] problem,

11   without time-and cost consuming litigation, by merely clarifying . . . through

12   amendment or some other public announcement"); *Lara v. Cinemark USA, Inc.*, 207

13   F.3d at 789 (holding that in the absence of more specific regulations, the Court

14   would not side with the DOJ's "litigating position"); *see also Shalala v. Guernsey*

15   *Memorial Hosp.*, 514 U.S. 87, 100 (1997) (explaining that APA rulemaking would

16   be required if a new agency position effected substantive change in the regulations)

17   Nor is this Court bound by the DOJ's position that may be advocated by the

18   Plaintiff here.  In *Lonberg v. Sanborn Theaters, Inc.*, the Ninth Circuit disagreed

19   with the DOJ, which had intervened on behalf of a private plaintiff who was

20   attempting to hold the architect of a non-compliant building liable for a violation of

21   the ADA.  259 F.3d 1029, 1034-36 (9th Cir. 2001).  The DOJ intervened in the

22   lawsuit and argued that the language of the ADA, permitting actions against owners

23   and operators of public accommodations for "design and construct" discrimination,

24   also applied to architects of such properties – essentially a design *or* construct

25   interpretation of the statute.  *Id.* at 1033-34.  The Ninth Circuit disagreed.  The

26   Court reasoned that, given the general limitation of the remedy of injunctive relief,

27   the architect who built the building was "out of the picture" by the time an eligible

28   plaintiff would bring suit.  *Id.* at 1036.  As a result, the Ninth Circuit agreed with the

-15-

defendant that the DOJ's interpretation was inconsistent with the text of the statute because it would create liability in persons against whom there is no meaningful remedy.  *Id.*

Litigation is, quite simply, the inappropriate method by which businesses should be compelled to modify their websites to a particular technical standard.  As explained aptly by the California Court of Appeal in *Marsh v. Edwards Theatres Circuit, Inc.*:

> "The varied and distinctive nature of the numerous handicaps from which so many people suffer suggests, however, that the problem is one which the legislative branch of government is uniquely equipped to solve.  It is in the legislative halls where the numerous factors involved can be weighed and where the needs can be properly balanced against the economic burdens which of necessity will have to be borne by the private sector of the economy in providing a proper and equitable solution to the problem."

64 Cal. App. 3d 881, 888 (1975) (denying claim where disabled plaintiff brought suit where defendant's conduct not prohibited by any applicable guideline or standard).

Crafting technical standards, particularly given the complexity of the work involved here, is the proper work of the legislature and for responsible agency. Plaintiff cannot substitute his judgment, and run the risk of courts issuing conflicting guidance to businesses across the country, for the rulemaking process that is ongoing by the DOJ.

**D.**     **Absent The Presence Of Applicable Standards, Plaintiff Fails To State A Cause Of Action Against Defendant.**

As Plaintiff concedes there are no mandated design standards for Defendant's website or mobile website, Plaintiff has failed to state a cause of action against Defendant.

-16-

1.  <u>Courts Repeatedly Dismiss ADA Lawsuits If No Standard Is
Violated.</u>

One of the bedrock principles of disability access litigation is that, where Plaintiff contends that Defendant has failed to "design and construct" a facility in violation of the ADA or other applicable standard, Plaintiff must establish the existence of a standard, its applicability, and a violation.  Courts repeatedly and consistently dismiss claims where a Plaintiff cannot make this showing.

In *White v. Divine Investments, Inc.*, the Ninth Circuit addressed a claim by a Plaintiff that she "may maintain a discrimination claim under Title III of the ADA for a violation of her 'full and equal enjoyment' of River Mart, irrespective of the ADAAG."  286 Fed.Appx. 344, 346 (9th Cir. 2007).  Plaintiff argued that the ADA contained an independent cause of action that turned on "whether she subjectively enjoyed her visit" to the store.  The Ninth Circuit disagreed.  It reasoned:

> "No court has ever held that a Title III discrimination action
> based on the design of a public accommodation may be
> maintained in the absence of an ADAAG violation, nor does the
> text of the statute support such a reading.  In Title III design
> cases, the ADAAG defines the discrimination, and absent an
> ADAAG violation, no discrimination has occurred."

*Id.* at 346.  Case law is uniform in requiring Plaintiff to establish a design standard that Defendant has failed to meet in order to succeed on such a claim.  *See, e.g., Wilson v. Pier 1 Imports (US), Inc.*, 439 F. Supp. 2d 1054, 1066 (E.D. Cal. 2006) (holding that "the ADAAG constitutes the exclusive standards under Title III of the ADA"); *Resnick v. Magical Cruise Co.*, 148 F. Supp. 2d 1298, 1305 (M.D. Fla. 2001) (granting defendant's motion for summary judgment because there was "no basis under the current ADA scheme for a plaintiff to bring a claim that a cruise ship has failed to adhere to guidelines which have been declared inapplicable to cruise ships by the departments charged with promulgation of such guidelines;" as a result,

-17-

"builders, owners, and proprietors of cruise ships have not been afforded notice of the standards with which they are required to comply, and absent such standards may not be subjected to abstract suits"); *Marsh v. Edwards Theatres Circuit, Inc.*, 64 Cal. App. 3d 881, 888-89 (1976) (no cause of action under Unruh Act unless alleged barrier to access also violates a structural access standard); *Coronado v. Cobblestone Village Community Rentals*, 163 Cal. App. 4th 831, 841, 844 (2008), *overruled on other grounds by Munson v. Del Taco, Inc.*, 46 Cal. 4th 661 (2009) (cause of action for disability access based on existence of structural barrier dependent on whether violation constituted a violation of access standard).

Indeed, even when a specific access standard does exist, courts still require plaintiffs to show that the access standard actually applies to the subject property. *See, e.g. Blackwell v. City and County of San Francisco*, 506 Fed. Appx. 585, 587 (9th Cir. 2013) ("The metal elevator cover, which was installed sometime before the late 1970's, predates the adoption in 1981 of new regulations concerning requirements for handicapped accessibility…For that reason, it is not required to comply with the accessibility standards in that title.").

Likewise, in *Disabled Americans for Equal Access, Inc. v. Compra Hospital Pavia, Inc.*, 2004 WL 5568603 (D. Puerto Rico 2004), the court denied the plaintiff's unopposed motion for summary judgment because he failed to establish the construction/alteration history:

> The Magistrate concluded that the Court was not provided with the necessary information . . . to determine whether Compra's Santurce hospital is classified as an 'existing facility' or as a 'new construction,' enabling the Court to apply the correct standard.  This lack of information precludes, as a matter of law, the remedy requested.

-18-

1  *Id.* at \*8-9; *Gray v. JP Morgan Chase Bank*, 2012 WL 1340315, \*3 (C.D. Cal.

2  2012) (dismissing disability access claims because the plaintiff failed to allege any

3  facts showing which building code applied).

4        Plaintiff cannot prove the requisite history because, among other things, there

5  are no, and have never been, any legally enforceable guidelines or standards by

6  which Defendant's website and/or mobile website could be measured against.

7  Therefore, Plaintiff's ADA and related state law claims fail.

8              2.    <u>Plaintiff Has Failed To Adequately Plead That Defendant's</u>

9                    <u>Discrimination Was Intentional.</u>

10       Plaintiff's cause of action under the Unruh Act, as he cannot base it upon the

11  ADA, may only be maintained if he pleads and proves "intentional discrimination in

12  public accommodations in violation of the terms of the Act."  *Munson v. Del Taco,*

13  *Inc.*, 46 Cal. 4th 661, 668 (2009) quoting *Harris v. Capital Growth Investors XIV*,

14  52 Cal.3d 1142, 1175 (1991) ("A plaintiff seeking to establish a case under the

15  Unruh Act <u>must plead and prove intentional discrimination</u> in public

16  accommodations in violation of the terms of the Act.  A disparate impact analysis or

17  test does not apply to Unruh Act claims.") (emphasis added).

18       Therefore, in order for Plaintiff to succeed on his disability access claim, he

19  must plead and prove that Defendant intentionally discriminated against him

20  personally.  Plaintiff's claims fail because he has not adequately plead, and cannot

21  prove, any facts that would show that Defendant "intentionally" discriminated

22  against him.

23       In *Earll v. eBay, Inc.*, 2011 WL 3955485, \*3 (N.D. Cal. Sept. 7, 2011), *aff'd*

24  599 Fed. Appx. 695 (9th Cir. Apr. 1, 2015), the plaintiff alleged that defendant eBay

25  affirmatively discriminated against the deaf because (1) "eBay has gone out of its

26  way to design a system that deaf and hard of hearing persons cannot use," (2) eBay

27  refused to implement "easy and inexpensive" solutions, and (3) that she had

28  multiple communications with eBay wherein she was suggested to "enlist the help

-19-

1  of a hearing person." *Id*. at *3.  The Court found that these allegations were either

2  conclusory, and therefore, lacked the requisite factual support to make out a claim

3  for intentional discrimination, or, even if true, did not imply that eBay was unwilling

4  or unable to remedy the situation.  *Id*.  Therefore, the Court found that defendant

5  eBay's actions did not amount to an intentional denial of access to a public

6  accommodation.  The Ninth Circuit agreed and found that eBay's "failure to provide

7  a deaf-accessible alternative to its aural identification system does not amount to

8  willful, affirmative misconduct sufficient to constitute intentional discrimination

9  under the Unruh Act."  599 Fed. Appx. at 696; *see also Greater L.A. Agency on*

10 *Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014)

11 (broadly applicable policy of displaying online video without closed captioning

12 applied equally to all visitors and, therefore, did not constitute intentional

13 discrimination); *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017 (N.D. Cal. 2012),

14 aff'd, 600 Fed. Appx. 508 (9th Cir. 2015) (plaintiff failed to allege Unruh Act claim

15 because failure to caption 'meaningful amount' of streaming library not 'willful,

16 affirmative misconduct'); *Young v. Facebook*, 790 F. Supp. 2d 1110 (N.D. Cal.

17 2011) (holding that plaintiff failed to state an Unruh Act claim by alleging that

18 Facebook's customer service system was difficult for her to use due to her bipolar

19 disorder because Facebook's customer service system treated all users in the same

20 cold, automated way).

21      Here, Plaintiff's allegations do not support an inference of intentional, willful

22 discrimination against Plaintiff.  Therefore, Plaintiff may not maintain a cause of

23 action for violation of the Unruh Act separate from his cause of action under the

24 ADA for this additional reason.

25  **E.   Plaintiff Has Failed To Provide "Fair Notice" Of The Alleged**

26       **Barriers on Defendant's Website Or Mobile Website.**

27      As discussed above, Plaintiff's Complaint alleges that Defendant's website

28 and mobile websites contain "barriers" to access.  Plaintiff identifies the barriers on

-20-

the website as (1) Lack of Alternative Text, (2) Empty Links That Contain No Text, (3) Redundant Links, and (4) Linked Images Missing Alt-Text.  (Complaint ¶ 28).  Plaintiff identifies the barriers on the mobile website as (1) problems with compatibility with VoiceOver, (2) unlabeled buttons, (3) lack of alt-text, (4) inaccessible forms, (5) inaccessible image maps, and (6) lack of adequate prompting and labeling.  (Complaint ¶ 30-31).

These sorts of vague allegations utterly fail for lack of fair notice to Defendant.  In *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903 (9th Cir. 2011), the Ninth Circuit confirmed that a plaintiff must identify all alleged access barriers in his complaint in order to give the defendant fair notice.  There, the plaintiff attempted to hide the injunctive relief he was seeking to increase the nuisance value of his lawsuit and to prevent the defendant from actually remedying the barriers and mooting his claims at summary judgment.  The plaintiff identified some barriers in his complaint, others in a proposed amended complaint, others in an ENE statement, and still others in his expert report.  The Ninth Circuit chastised the plaintiff for his sharp tactics and adopted a bright-line rule that all barriers must be identified in the complaint:

> "Plaintiff's counsel later explained that his delays in identifying the barriers at the facility were part of his legal strategy:  he purposefully 'forces the defense to wait until expert disclosures (or discovery) before revealing a complete list of barriers,' because otherwise a defendant could remove all the barriers prior to trial and moot the entire case. . . a plaintiff must identify the barriers that constitute the grounds for a claim of discrimination under the ADA in the complaint itself; a defendant is not deemed to have fair notice of barriers identified elsewhere."

*Id*. at fn. 7, 909.

-21-

1    Courts routinely grant summary judgment to defendants where the alleged

2    barriers are not identified with enough specificity to allow Defendant to investigate

3    the claim.  Without this specific information, Defendants are left to speculate at

4    what was allegedly wrong with its website and where the specific alleged barriers

5    were located.  *See Gray v. County of Kern,* 2015 WL 7352302 (E.D. Cal. Nov. 19,

6    2015) (granting summary judgment to Defendant for in part due to lack of fair

7    notice because plaintiff's complaint had scant details regarding the alleged barriers

8    leaving Defendant to "guess their location and specific barriers related to plaintiff's

9    disability"); *Paulick v. Starwood Hotels & Resorts Worldwide, Inc.,* 2012 WL

10   2990760, *12-13 (N.D. Cal. 2012) (requiring that *specific* barriers had to be

11   identified in the complaint and holding that "allegations listing general categories of

12   barriers simply are not enough to provide a defendant with fair notice regardless of

13   what may be included in a plaintiffs expert report"); *Strong v. Walgreen Co.,* 2009

14   WL 3711930, *4 (C.D. Cal. 2009) (allegation "there is incorrect signage posted at

15   the handicapped van accessible parking space" was "conclusory and provided no

16   indication of how the sign is incorrect or even what the sign says" and granting

17   summary judgment to Defendant).

18   The Court's decision in the *Gray* case is illustrative. In *Gray,* the Court found

19   that the allegation "[i]naccessible and unusable restroom facilities and showers in

20   patient rooms" was conclusory and insufficient to provide fair notice because it did

21   not identify any "specific" barriers for which the plaintiff sought injunctive relief.

22   2015 WL 7352302, at * 11.

23   Here, Plaintiff's Complaint does not identify for Defendant the specific

24   images Plaintiff contends lack alternative text or lacked alternative text at the time

25   of Plaintiff's alleged attempt to access the website, the specific links that Plaintiff

26   contends are empty or redundant, or the specific problems he claims to have

27   encountered on the mobile website.  It is not clear that any of these alleged items

28   constitute "barriers" to access even if they were true.  For instance, a decorative

-22-

1  image that has no impact on the function of a website would be confusing to a blind

2  individual if it was picked up by screen reading software and spoken aloud.  This

3  forces Defendant to guess at the nature of Plaintiff's specific complaints.  Does

4  Plaintiff contend a single image lacks alternative text or 500 images?

5      Defendant's website is complex and multilayered, making specific notice

6  crucial – just as the *Gray* court did not require defendant to hunt down what specific

7  showers were inaccessible and determine what restroom facilities were unusable.

8  As a result, Plaintiff's claims fail because he has failed to provide fair notice of the

9  specific barriers he alleges exist.

10      **F.      In The Alternative, The Court Should Dismiss or Stay The Case**

11              **Pursuant To The Primary Jurisdiction Doctrine.**

12      "The primary jurisdiction doctrine allows courts to stay proceedings or

13  dismiss a complaint without prejudice pending the resolution of an issue within the

14  special competence of an administrative agency."  *Clark v. Time Warner Cable*, 523

15  F.3d 1110, 1114 (9th Cir. 2008) (affirming dismissal of case referring issue of

16  "slamming" – a novel and technical question of federal telecommunications policy –

17  to Federal Communications Commission for consideration in the first instance).

18  "The doctrine is a 'prudential' one, under which a court determines that an

19  otherwise cognizable claim implicates technical and policy questions that should be

20  addressed in the first instance by the agency with regulatory authority over the

21  relevant industry rather than by the judicial branch."  *Id.*

22      Primary jurisdiction is appropriately used only if a claim "requires regulation

23  of an issue of first impression, or of a particularly complicated issue that Congress

24  has committed to a regulatory agency" and "if protection of the integrity of a

25  regulatory scheme dictates preliminary resort to the agency which administers the

26  scheme."  *Id.*  citing *Brown v. MCI WorldCom Network Servs.*, 277 F.3d 1166 (9th

27  Cir. 2002); *see also Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307

28  F.3d 775, 782 (9th Cir. 2002) (referral to Copyright Office to determine extent of

-23-

available remedy where no detailed rules by office had been created for copyright cancellation); *MCI Comm. Corp. v. American Tel. & Tel. Co.*, 496 F.2d 214, 222 (3d Cir. 1974) (granting stay because deferral to the agency under primary jurisdiction doctrine because determining the issues involved "the comparative evaluation of complex technical, economic, and policy factors, as well as consideration of the public interest" that should be made by the agency); *Ferrare v. IDT Energy, Inc.*, 2015 WL 3622883, at *3-4 (E.D. Pa. 2015) (granting stay under primary jurisdiction doctrine because the agency promulgated the controlling regulations and had the relevant technical expertise, and the issues pending before the agency overlapped with the claims in the lawsuit).

While there is no fixed formula for applying the doctrine, the Ninth Circuit traditionally applies the doctrine when four factors are met: "(1)[a] need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Clark*, 523 F.3d at 1115.

Here, each of these factors applies. The fundamental issue in this case, website accessibility, is something that needs to be resolved and is currently in the process of being evaluated by the DOJ. Congress expressly charged the Attorney General with the task of promulgating regulations clarifying how public accommodations must meet its statutory obligations of providing access to the public. *AMC Enter.*, 549 F.3d at 763; 42 U.S.C. § 12186(b). The ADA comprehensively regulates public accommodations. There can be no doubt that website accessibility is a subject that requires significant expertise in establishing and uniformity in administration. As discussed above, problems have already arisen through defendants being sued multiple times in multiple jurisdictions for the same accessibility issues.

-24-

Plaintiff's case is premised upon the idea that WCAG and Apple have established comprehensive guidelines for regulating websites and mobile websites respectively and those guidelines should be elevated to the force of law entitling him to injunctive relief, damages, and attorneys' fees.  Left unsaid is that the DOJ has been evaluating the appropriateness of doing so for several years – a testament to the complexity of the problem.  This question is better left to the DOJ given its potential nationwide impact on the standards for web accessibility.

Therefore, in the alternative, the Court should dismiss or stay this case in favor of application of the primary jurisdiction doctrine until such time the DOJ has finalized rules for website accessibility.

## IV.   **CONCLUSION**

For all of the foregoing reasons, Defendant respectfully requests that the Court enter summary judgment in its behalf and against Plaintiff.  In the alternative, Defendant requests that the case be dismissed, without prejudice, or stayed pursuant to the doctrine of primary jurisdiction.

Dated:  February 22, 2017

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
        /s/ *Gregory F. Hurley*
        GREGORY F. HURLEY

        Attorneys for Defendant,
        DOMINO'S PIZZA LLC

-25-