1  SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   GREGORY F. HURLEY, Cal. Bar No. 126791
3  ghurley@sheppardmullin.com
   MICHAEL J. CHILLEEN, Cal. Bar No. 210704
4  mchilleen@sheppardmullin.com
   BRADLEY J. LEIMKUHLER, Cal. Bar No. 261024
5  bleimkuhler@sheppardmullin.com
   650 Town Center Drive, 4th Floor
6  Costa Mesa, California 92626-1993
   Telephone:  714.513.5100
7  Facsimile:  714.513.5130

8  Attorneys for Defendant,
   DOMINO'S PIZZA LLC
9

10                UNITED STATES DISTRICT COURT

11        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

12

13  GUILLERMO ROBLES,                  Case No. 2:16-cv-06599
                                       Hon. S. James Otero
14            Plaintiff,
                                       **DEFENDANT DOMINO'S PIZZA**
15       v.                            **LLC'S SEPARATE STATEMENT**
                                       **OF UNCONTROVERTED FACTS**
16  DOMINO'S PIZZA LLC,                **AND CONCLUSIONS OF LAW IN**
                                       **SUPPORT OF MOTION FOR**
17            Defendant.               **SUMMARY JUDGMENT OR, IN**
                                       **THE ALTERNATIVE, DISMISSAL**
18                                     **OR STAY**

19
                                       Date:    March 27, 2017
20                                     Time:    10:00 a.m.
                                       Ctrm.:   10C
21

22                                     Action Filed:  September 1, 2016
                                       Trial Date:    August 29. 2017
23

24

25

26

27

28

Defendant Domino's Pizza LLC ("Defendant") hereby submits its Statement of Uncontroverted Facts and Conclusions of Law in support of its Motion for Summary Judgment or, in the alternative, Dismissal or Stay ("Motion").

**STATEMENT OF UNCONTROVERTED FACTS**

| UNCONTROVERTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1.  Defendant's website, www.dominos.com, contains an accessibility banner that direct users who access the website using a screen reader with a statement that "If you are using a screen reader and are having problems using this website, please call 800-252-4031 for assistance." | Declaration of Mandi Galluch ("Galluch Decl.")  2-3, Exh. A. |
| 2.  Defendant's mobile website contains an accessibility banner that direct users who access the website using a screen reader with a statement that "If you are using a screen reader and are having problems using this website, please call 800-252-4031 for assistance." | Galluch Decl. ¶¶ 3-4, Exh. B. |
| 3.  The number, 800-252-4031, is staffed by a live representative 24 hours a day, 7 days a week. | Galluch Decl. ¶ 2 |
| 4.  If a blind or visually impaired individual calls the number (800-252-4031), a live representative can provide assistance with using Defendant's | Galluch Decl. ¶¶ 2, 4 |

| | |
|---|---|
| website. | |
| 5.  Customers may also directly call their local Domino's Pizza restaurant to order food, purchase goods, and/or ask questions. | Galluch Decl. ¶ 6 |

## CONCLUSIONS OF LAW

### A.   Defendant's Website and Mobile Website Should Not Be Treated as "Places of Public Accommodation."

The premise of Plaintiff's lawsuit is that Defendant's website is subject to regulation as a "place of public accommodation."  However, that is incorrect.  Defendant's website is simply a method for communicating with its customers.

Under Title III of the ADA, "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a).  The Ninth Circuit has interpreted the term "place of public accommodation" to require "some connection between the good or service complained of and an actual physical place."  *Earll v. eBay, Inc.*,  599 Fed. Appx. 695 (9th Cir. Apr. 1, 2015); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000).[1]

While Defendant's do not dispute that the website connects its customers to pizza franchises, the ADA was simply not drafted with the specific regulation of virtual spaces in mind.  As explained by the Southern District of Florida, "Here, to fall within the scope of the ADA as presently drafted, a public accommodation must

---

[1] Companies such as Netflix and Facebook have used this precedent to avoid regulation under the ADA because they exist exclusively in the virtual space. *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017 (N.D. Cal. 2012), aff'd, 600 Fed. Appx. 508 (9th Cir. 2015); *Young v. Facebook*, 790 F. Supp. 2d 1110 (N.D. Cal. 2011).

be a physical, concrete structure.  To expand the ADA to cover "virtual spaces" would be to create new rights without well-defined standards." *Access Now, Inc. v. Southwest Airlines, Co.*, 227 F. Supp. 2d 1312, 1318-19 (S.D. Fla. 2002) (declining to construe "a place of public accommodation" to include Southwest's Internet website); *Kidwell v. Florida Commission on Human Relations*, Case No. 2:16-cv-00403-UA-CM , *11 (S.D. Fla. Jan. 17, 2017) ("Plaintiff may not claim a violation of Title III based on an internet website's accessibility.   Neither Busch Gardens' nor SeaWorld's online website is a physical or public accommodation under the ADA. . . Hence, Plaintiff is unable to demonstrate that either Busch Gardens' or SeaWorld's online website prevents his access to a specific, physical, concrete space. . .") (citations omitted) (Leimkuhler Decl. Exh. A).

Just recently, another District Court has concluded that a visually impaired plaintiff could not state a claim for violation of Title III due to a website's alleged inaccessibility.  *Gomez v. Bang & Olufsen America, Inc.*, Case No. 1:16-cv-23801-JAL (S.D. Fla. Feb. 2, 2017).  The Court's reasoning is illustrative here:

> [I]t appears that the Plaintiff never intended to utilize Bang and Olufsen's physical, retail location; but instead planned to order audio equipment online and have it delivered to his home. Plaintiff's grievance seems to be that Defendant's website does not provide a blind person with the same online-shopping experience as non-disabled persons. However, the ADA does not require places of public accommodations to create full service websites for disabled persons.  In fact, the ADA does not require a place of public accommodation to have a website at all.  All the ADA requires is that, if a retailer chooses to have a website, the website cannot impede a disabled person's full use and enjoyment of the brick-and-mortar store.

*Id*. at *10-11 (Leimkuhler Decl. Exh. B).

1    Just as in the *Gomez* case, Plaintiff alleges that he wished to order goods

2    through Defendant's website and/or mobile website and have them delivered to his

3    home.  (Complaint ¶¶ 15, 27).  As such, Plaintiff has not alleged that he was

4    impeded the full use and enjoyment of the brick-and-mortar store.  Therefore, his

5    claim fails.

6    Moreover, the case law that has developed in the context of an ADA facilities

7    suit is uniquely impractical here.  In such cases, it is relatively easy to determine

8    whether a particular feature complies with a technical standard established by the

9    Department of Justice ("DOJ").  Anyone with a measuring tape can determine

10   whether the ADA service counter exceeds 34 inches in height.  In addition, if a

11   feature needs to be remediated, it is a usually a construction problem that, once

12   fixed, it is reasonably likely that the feature will be compliant until a future remodel

13   or tear down.

14   By contrast, websites are complex, multi-layered lines of code that exist

15   exclusively in the virtual sphere.  It can be difficult, if not impossible, to know

16   whether a particular person was unable to access a website due to a software bug,

17   technical glitch, poor internet connection, temporary server failure, use of an old or

18   outdated software, or other myriad of technical issues.  For example, a plaintiff

19   using screen reader software like JAWS can choose adjust the extensive settings on

20   that software so that any website becomes unreadable.  Similarly, a plaintiff who

21   only needs text enlargement in a website can choose to not to use the built in text

22   enlargement functions of their browser (typically "ctrl +") or choose not to use

23   another browser add on and claim the website violates the ADA and the WCAG .

24   Furthermore, as this Court undoubtable understands much of any website is actually

25   content, routines, and links controlled by others (imbedded YouTube video, or

26   Google Maps, etc.).  Making a website a "place of public accommodation" is

27   treating the owner of the domain as if they are responsible for third party content.

28

-4-

1    This is uniquely important because access plaintiffs, such as Plaintiff here, seek

2    damages every time they are denied access.

3        Websites are not virtual versions of brick and mortar stores, they are a form of

4    communications with customers, like the direct mail solicitations and catalogues

5    that retailers used for 50 years before Congress adopted the ADA.  When the ADA

6    was adopted there were tens of millions of mail order catalogues for brick and

7    mortar stores sent to homes each year, yet Congress in adopting the ADA, and the

8    DOJ in adopting its regulations, chose not to require braille versions or phone

9    support for retail catalogues.  Therefore, rather than understanding websites as

10   "places of public accommodations" that should be regulated based on a yet to be

11   developed standard, they should be evaluated based upon the ADA's "effective

12   communication" provisions.  The regulations implementing Title III of the ADA

13   "require places of public accommodations to 'furnish appropriate auxiliary aids and

14   services. . .to ensure effective communication with individuals with disabilities.'"

15   *Alexander v. Kujok*, 158 F. Supp. 3d 1012, 1020 (E.D. Cal. 2016); 28 C.F.R.

16   § 26.303(c)(1).  Under the regulation, the type of alternative service will vary in

17   accordance with the length and complexity of the communication involved.   The

18   DOJ's Title III Assistance Manual provides examples, such as a sales clerk

19   exchanging written notes with an individual who is deaf or using an usher to escort a

20   blind patron of a theater to their seat rather than providing a Brailled ticket. *See* §III-

21   4.3200 (Illustrations).

22       In this case, Defendant provides "effective communication" to its visually

23   impaired customers through a phone number.  Defendant's website and mobile

24   website contain accessibility banners that direct users who access the website or

25   mobile website with a statement that "If you are using a screen reader and are

26   having problems using this website, please call 800-252-4031 for assistance."

27   (UMF 1-2).  That number provides 24/7 support.  (UMF 3).  If a blind individual

28   calls that number, the person can provide assistance with Defendant's website.

-5-

1  (UMF 4).  Alternatively, a customer can call their local Domino's Pizza restaurant

2  to order food, purchase goods, and/or ask questions.  (UMF 5).

3      This approach has been endorsed by the DOJ.  In a notice of advanced

4  rulemaking concerning website accessibility, the DOJ stated "The Department has

5  taken the position that covered entities with inaccessible websites may comply with

6  the ADA's requirement for access by providing an accessible alternative, such as a

7  staffed telephone line, for individuals to access the information, goods, and services

8  of their Web site."  Notice of Proposed Rulemaking, 2010 WL 2888003, at*43466

9  (July 26, 2010).

10      This is precisely what Defendant does here, and Plaintiff has not, and cannot,

11  make any claim that Defendant's website does not provide "effective

12  communication."

13      **B.**   **Plaintiff's Lawsuit Violates Defendant's Constitutional Right to**

14           **Due Process.**

15      "Due process requires that the government provide citizens and other actors

16  with sufficient notice as to what behavior complies with the law.  Liberty depends

17  on no less."  *U.S. v. AMC Entertainment, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008);

18  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("Because we assume that

19  man is free to steer between lawful and unlawful conduct, we insist that laws give

20  the person of ordinary intelligence a reasonable opportunity to know what is

21  prohibited, so that he may act accordingly."); *Forbes v. Napolitano*, 236 F.3d 1009,

22  1011 (9th Cir. 2000) ("The due process clause ... guarantees individuals the right to

23  fair notice of whether their conduct is prohibited by law.");  *PHH Corporation v.*

24  *Consumer Fin'l Prot. Bureau*, 839 F.2d 1, 46 (D.C. Cir. 2016) (due process requires

25  agencies to "provide regulated parties fair warning of the conduct a regulation

26  prohibits or requires."); *Ala. Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1035

27  (D.C. Cir. 1999) ("Those regulated by an administrative agency are entitled to know

28  the rules by which the game will be played.").

The Ninth Circuit's decision in *AMC Entertainment* is instructive.  In *AMC Entertainment*, the Ninth Circuit was confronted with the question of whether the ADA required theater owners to retroactively incorporate a comparable viewing angle requirement in movies theaters.  At issue was the interpretation of a regulation that required "lines of sight comparable to those for members of the general public."  That regulation was ambiguous and it was unclear whether "lines of sight" simply referenced an unobstructed view of the screen or whether that similarly required comparable viewing angles.  This issue was litigated in courts throughout the country.  However, the first time that the DOJ announced its position on the issue was in an amicus brief in the District Court for the Western District of Texas in a matter entitled *Lara v. Cinemark USA, Inc.*, 1998 WL 1048497, at *2 (W.D. Tex. Aug. 21, 1998), *rev'd*, 207 F.3d 783 (5th Cir. 2000).  Ultimately, the Ninth Circuit, in another opinion, announced that the regulation did require comparable viewing angles for disabled patrons (the Fifth Circuit in *Lara* disagreed).  As the courts grappled with the issue, the DOJ brought a lawsuit against AMC arguing that AMC was required to retrofit several theaters, including those built before the DOJ announced its interpretation of the regulation in the *Lara* amicus brief.  The Ninth Circuit reversed the District Court's injunction on the grounds that defendants were entitled to know what the law required of them.  The *AMC* Court observed:  "In other words, the capacity of in-house counsel or others to read correctly legislative tea leaves does not alleviate the government from its obligation to fashion coherent regulations that put citizens of 'ordinary intelligence' on notice as to what the law requires of them."  *Id*. at 770.[2]; *see also Botosan v. Paul McNally Realty*, 216 F.3d 827, 836 (9th Cir. 2000) ("The ADA would be vague only if it is so indefinite in its

---

[2] The Ninth Circuit remanded the case to the district court for determination of what date AMC could have fairly determined the settled meaning of § 4.33.3 – to be a date no earlier than the date on which the DOJ filed the *Lara* amicus brief.  *Id*.

1  terms that it fails to articulate comprehensible standards to which a person's conduct

2  must conform.").

3       This lawsuit is a classic example of overreach that is fundamentally unfair

4  and violates important due process principles.  Plaintiff's case is exclusively

5  premised upon Defendant's alleged failure to comply with WCAG 2.0, a set of

6  vague guidelines that have been published by private parties, and the Apple

7  Standards.  These guidelines were never intended to be "regulations" and no public

8  review or rulemaking procedure was undertaken for the WCAG.  The consortium

9  that publishes the WCAG is free to amend or change this guidance at any time, and

10  has in fact, done so several times.  The WCAG standards were never intended as

11  law and are intentionally and inherently vague.  To see this the Court need only look

12  at the WCAG 2.0 guidelines, for example: "**3.1.6 Pronunciation:**  A <u>mechanism</u> is

13  available for identifying specific pronunciation of words where meaning of the

14  words, in context, is ambiguous without knowing the pronunciation." *See also,*

15  **1.3.2 Meaningful Sequence:**  When the sequence in which content is presented

16  affects its meaning, a <u>correct reading sequence</u> can be <u>programmatically</u>

17  <u>determined</u>.  See https://www.w3.org/TR/UNDERSTANDING-WCAG20. The DOJ

18  has never stated that the ADA requires that private businesses that operate a website

19  for the public to use, must comply with these standards.  There is even less support

20  for treating the Apple Standards, developed by a private company, as legally

21  enforceable regulations.

22       Whatever the merits of these standards, it is fundamentally unfair to

23  Defendant to be hauled into federal court, sued for injunctive relief, damages, and

24  attorneys' fees, due to its alleged failure to meet them.

25       In effect, Plaintiff is attempting to seamlessly apply the law that has

26  developed for construction-related accessibility lawsuits to websites.  However,

27  there are fundamentally stark differences.  In *Botosan*, the Ninth Circuit denied a

28  due process challenge to the ADA because of the detailed and comprehensive

1    regulations that had been issued.  216 F.3d at 836-37.  The Court found that the

2    ADA was not vague as to its requirements precisely because DOJ has printed a

3    detailed handbook containing "numerous diagrams and specifications explaining the

4    types of modifications and auxiliary aids (e.g., handrails, grab bars, ramps) that a

5    building must install to be ADA compliant."  *Id*. at 836-37.  The Court found that,

6    taking the ADA "together with administrative regulations and interpretations" the

7    readily achievable requirement was "sufficiently specific to put the owner of a

8    public accommodation on notice of what is required by Title III."  *Id*. at 836; citing

9    *U.S. v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir. 1992), *cert denied*, 507 U.S.

10   921 (1993) (explaining that administrative regulations and interpretations may

11   provide sufficient clarification to save an otherwise vague statute).

12        By contrast here, the DOJ has yet to issue any standards that would apply to

13   public or private websites.  As there are no standards, there are no specific and

14   demonstrable means by which Defendant can hope to meet.  In other words, the law,

15   as it currently stands, "fails to articulate comprehensible standards to which a

16   person's conduct must conform."  *Botosan*, 216 F.3d at 836 (observing ADA would

17   be vague if "so indefinite in its terms that it fails to articulate comprehensible

18   standards to which … to conform."); *see also Coates v. City of Cincinnati*, 402 U.S.

19   611, 614 (1971) (A statute is vague not when it prohibits conduct according "to an

20   imprecise but comprehensible normative standard, but rather in the sense that no

21   standard of conduct is specified at all.").

22        Case-law consistently re-affirms the basic principle.  *E.g., Chapman v. Pier 1

23   Imports (U.S.), Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) ("Whether a facility is

24   'readily accessible' is defined, in part, by the ADA Accessibility Guidelines

25   ('ADAAG').  See 28 C.F.R. § 36.406(a); 28 C.F.R. pt. 36, app. A.  Promulgated by

26   the Attorney General to 'carry out the provisions' of the ADA, 42 U.S.C.

27   § 12186(b), these guidelines 'lay out the technical structural requirements of places

28   of public accommodation."); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075,

-9-

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF
LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1  1080-81 (9th Cir. 2004); *see also Indep. Living Res. v. Or. Arena Corp.*, 982 F.

2  Supp. 698, 714 (D. Or. 1997) ("The regulations establish a national standard for

3  minimum levels of accessibility in all new facilities.").

4      The Ninth Circuit has explained "[t]he ADAAG <u>provides the objective</u>

5  <u>contours of the standard</u> that architectural features must not impede disabled

6  individuals' full and equal enjoyment of accommodations."  *Chapman*, 631 F.3d at

7  945 (emphasis added); *see also Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 225

8  (S.D.N.Y. 1999) (quoting a letter where the DOJ stated it "consider[ed] any element

9  in a facility that does not meet or exceed the requirements set forth in the [ADAAG]

10  to be a barrier to access").

11      It is insufficient for Plaintiff to point to settlement agreements that private

12  parties have agreed to or the DOJ's notice of advanced rulemaking.  *E.g. Arizona ex*

13  *re. Goddard v. Harkins Amusement Enter., Inc.*, 603 F.3d 666, 674 (9th Cir. 2010)

14  ("The court has declined to give deference to Access Board guidelines that have not

15  yet been adopted by the DOJ.  Moreover, we have refused to defer to a proposed

16  regulation published by the DOJ itself.  The DOJ's interpretation in a notice of

17  proposed rulemaking is similarly unpersuasive.") (internal citations omitted).

18      Until there is a specific and adopted accessibility standard that the DOJ

19  requires compliance with, there can be no finding that a private entity violates a

20  specific, technical standard.  To hold otherwise would violate bedrock principles of

21  due process of law and fundamental fairness.

22      **C.    <u>Plaintiff Cannot Make An End Run Around the Department of</u>**

23          **<u>Justice's Rulemaking Authority.</u>**

24      Plaintiff is attempting to short-circuit the DOJ's public notice and comment

25  period for establishing technical standards and rules for website accessibility.  It is

26  inappropriate for Plaintiff to substitute his own judgment about what constitutes a

27  broadly applicable minimum standard for accessibility in place of the rigorous

28

-10-

1    rulemaking process, which brings together a variety of stakeholders, in fashioning

2    rules to which all can agree.

3        In July of 2010, the DOJ announced, for the first time, that it was

4    "considering revising the regulations implementing title III of the [ADA] in order to

5    establish requirements for making the goods, services, facilities, privileges,

6    accommodations, or advantages offered by public accommodations via the Internet,

7    specifically at sites on the [web], accessible to individuals with disabilities."  Notice

8    of Proposed Rulemaking, 2010 WL 2888003 (July 26, 2010).  In making that

9    announcement, the DOJ solicited public comments from the disabled community

10    and industry groups in the hopes of developing technical standards for websites.

11        Given the DOJ's position that the internet is a place of public accommodation

12    subject to coverage by the ADA, the DOJ expressly acknowledged a need for

13    government action because "the Internet ha[d] been governed by a variety of

14    <u>voluntary</u> standards or structures developed through nonprofit organizations using

15    multinational collaborative efforts" including the WCAG.  *Id*. at *43463.  The DOJ

16    recognized the necessity of a "clear requirement that provides the disability

17    community consistent access to Web sites and covered entities clear guidance on

18    what is required under the ADA."  *Id*.

19        Frustratingly, even the WCAG contains three conformance levels: A, AA, and

20    AAA, which define different levels of success.  *Id*.  Therefore, the DOJ decided to

21    solicit comments from the general public as to whether it should adopt WCAG, and

22    if so, what level of success criteria it should require.  Among other things the DOJ

23    was interested in knowing whether businesses could realistically meet that standard

24    and whether that standard would adequately meet the needs of the disabled

25    community.  The need for public comment and input into any broadly applicable

26    final rule is self-evident:  the internet constitutes a highly-dynamic, constantly

27    shifting world that is under constant innovation.  For instance, in 2008 when the

28    WCAG standards first issued, touchscreen internet browsing was in its infancy.

-11-

1  Now, many consumers access the internet though touchscreens – and that has

2  changed the way that websites are designed and programmed.

3      Therefore, the DOJ, before mandating adherence to specific rules and

4  regulations, sought public input.  The DOJ further recognized that, once it publishes

5  a final rule, it needed to set an effective date for the application of any new

6  regulations requiring websites covered by the ADA to be accessible.  *Id.*  The DOJ's

7  initial proposal was six months for new websites and two years for existing websites

8  – recognizing that businesses would be entitled to a fair notice period before they

9  would be held to that standard.  *Id.*[3]

10     Despite this activity, and acknowledgement of the problems the lack of

11 standards has created, the DOJ has thus far failed to issue a final rule.  The latest

12 development for regulation of Title III websites is that, on July 28, 2016, the DOJ

13 announced an extension until October 7, 2016 for the public to submit comments on

14 comments for Title II (state and local government) websites.  As part of the

15 announcement, the DOJ stated that "further delays in this Title II rulemaking will,

16 therefore, have the effect of hindering Title III Web rulemaking's timeline as well."

17     This absence of regulations has, unfortunately, led to abuse even where

18 defendants have voluntarily agreed to make their websites more accessible.  As an

19 example, on June 3, 2016, Party City Corporation was sued in the U.S. District

20 Court for the Southern District of Florida on the grounds that its website was

21 inaccessible.  Case No. 1:16-cv-22022 (Leimkuhler Decl., Exh. C at *3).  On

22 October 10, 2016, the action was dismissed with prejudice pursuant to a settlement

23 agreement between the parties.  (*Id.*).  In the settlement agreement, Party City

24 agreed to pay certain attorneys' fees and costs and agreed to "injunctive relief" to

25 make its website more accessible.  (Leimkuhler Decl., Exh. D at *7-8).  On

---

26
27 [3] For instance, under the 1991 regulations, new construction under Title III had to
comply with the new design standards within eighteen months after the ADA
28 standards were first published.  *See* 28 CFR 36.401(a).

-12-

1   November 8, 2016, almost immediately after that lawsuit was dismissed, another

2   Party City entity was sued on nearly identical grounds in the U.S. District Court for

3   the Western District of Pennsylvania.  Case No. 2:16-cv-01375.  (*Id*. at *8).  In the

4   absence of clear and testable standards, businesses are subject to the prospect of

5   endless serial litigation.

6         The WCAG is inherently vague and was never intended to be a regulation.

7   For instance, screen shots from different online web accessibility tools demonstrate

8   the different ways in which a website can fail WCAG 2.0 AA compliance.  Attached

9   as Exhibit E is a screenshot of the DOJ website homepage that shows 10 "errors,",

10  19 "alerts", and "7" contrast errors (among other things).  Attached as Exhibit F is a

11  screenshot of the same website through Google Chrome accessibility tool, that

12  shows 28 "severe" errors, and 20 "warnings."  As another example, Exhibit G shows

13  Plaintiff's counsel's website (which presumably has been offline for months because

14  of this precise issue) through the WAVE tool, which shows 3 "errors" and 2 "alerts"

15  – even though it has very little text.  For comparison's sake, Google's accessibility

16  audit for the same website shows 4 "warnings."  (Exh. H).

17        This aptly demonstrates that enforcing web accessibility through litigation is

18  inappropriate.  Courts, including the Ninth Circuit, have criticized the DOJ for

19  attempting to regulate through litigation – rather than through the tough work of

20  crafting regulations.  As examples, in *U.S. Hoyts v. Cinema Corp.*, 380 F.3d 558,

21  569 (1st Cir. 2004), the First Circuit explained that while "the [DOJ] is free to

22  interpret reasonably an existing regulation without formally amending it; but where .

23  . . the interpretation has the practical effect of altering the regulation, a formal

24  amendment – almost certainly prospective and after notice and comment – is the

25  proper course"); *accord U.S. v. AMC Enter.*, 549 F.3d at 769 (sharing First Circuit's

26  frustration that "the government could have solved the [interpretation] problem,

27  without time-and cost consuming litigation, by merely clarifying . . . through

28  amendment or some other public announcement"); *Lara v. Cinemark USA, Inc.*, 207

-13-

1  F.3d at 789 (holding that in the absence of more specific regulations, the Court

2  would not side with the DOJ's "litigating position"); *see also Shalala v. Guernsey*

3  *Memorial Hosp.*, 514 U.S. 87, 100 (1997) (explaining that APA rulemaking would

4  be required if a new agency position effected substantive change in the regulations)

5        Nor is this Court bound by the DOJ's position that may be advocated by the

6  Plaintiff here.  In *Lonberg v. Sanborn Theaters, Inc.*, the Ninth Circuit disagreed

7  with the DOJ, which had intervened on behalf of a private plaintiff who was

8  attempting to hold the architect of a non-compliant building liable for a violation of

9  the ADA.  259 F.3d 1029, 1034-36 (9th Cir. 2001).  The DOJ intervened in the

10  lawsuit and argued that the language of the ADA, permitting actions against owners

11  and operators of public accommodations for "design and construct" discrimination,

12  also applied to architects of such properties – essentially a design *or* construct

13  interpretation of the statute.  *Id.* at 1033-34.  The Ninth Circuit disagreed.  The

14  Court reasoned that, given the general limitation of the remedy of injunctive relief,

15  the architect who built the building was "out of the picture" by the time an eligible

16  plaintiff would bring suit.  *Id.* at 1036.  As a result, the Ninth Circuit agreed with the

17  defendant that the DOJ's interpretation was inconsistent with the text of the statute

18  because it would create liability in persons against whom there is no meaningful

19  remedy.  *Id.*

20        Litigation is, quite simply, the inappropriate method by which businesses

21  should be compelled to modify their websites to a particular technical standard.  As

22  explained aptly by the California Court of Appeal in *Marsh v. Edwards Theatres*

23  *Circuit, Inc.*:

24           "The varied and distinctive nature of the numerous handicaps

25           from which so many people suffer suggests, however, that the

26           problem is one which the legislative branch of government is

27           uniquely equipped to solve.  It is in the legislative halls where

28           the numerous factors involved can be weighed and where the

-14-

1                           needs can be properly balanced against the economic burdens

2                           which of necessity will have to be borne by the private sector of

3                           the economy in providing a proper and equitable solution to the

4                           problem."

5   64 Cal. App. 3d 881, 888 (1975) (denying claim where disabled plaintiff brought suit

6   where defendant's conduct not prohibited by any applicable guideline or standard).

7         Crafting technical standards, particularly given the complexity of the work

8   involved here, is the proper work of the legislature.  Plaintiff cannot substitute his

9   judgment, and run the risk of courts issuing conflicting guidance to businesses

10   across the country, for the rulemaking process that is ongoing by the DOJ.

11       **D.**    <u>**Absent The Presence Of Applicable Standards, Plaintiff Fails To**</u>

12             <u>**State A Cause Of Action Against Defendant.**</u>

13         As Plaintiff concedes there are no mandated design standards for Defendant's

14   website or mobile website, Plaintiff has failed to state a cause of action against

15   Defendant.

16             1.    <u>Courts Repeatedly Dismiss ADA Lawsuits If No Standard Is</u>

17                  <u>Violated.</u>

18         One of the bedrock principles of disability access litigation is that, where

19   Plaintiff contends that Defendant has failed to "design and construct" a facility in

20   violation of the ADA or other applicable standard, Plaintiff must establish the

21   existence of a standard, its applicability, and a violation.  Courts repeatedly and

22   consistently dismiss claims where a Plaintiff cannot make this showing.

23         In *White v. Divine Investments, Inc.*, the Ninth Circuit addressed a claim by a

24   Plaintiff that she "may maintain a discrimination claim under Title III of the ADA

25   for a violation of her 'full and equal enjoyment' of River Mart, irrespective of the

26   ADAAG."  286 Fed.Appx. 344, 346 (9th Cir. 2007).  Plaintiff argued that the ADA

27   contained an independent cause of action that turned on "whether she subjectively

28   enjoyed her visit" to the store.  The Ninth Circuit disagreed.  It reasoned:

SMRH:481132588.3           SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1               "No court has ever held that a Title III discrimination action

2               based on the design of a public accommodation may be

3               maintained in the absence of an ADAAG violation, nor does the

4               text of the statute support such a reading.  In Title III design

5               cases, the ADAAG defines the discrimination, and absent an

6               ADAAG violation, no discrimination has occurred."

7 *Id.* at 346.  Case law is uniform in requiring Plaintiff to establish a design standard

8 that Defendant has failed to meet in order to succeed on such a claim.  *See, e.g.,*

9 *Wilson v. Pier 1 Imports (US), Inc.*, 439 F. Supp. 2d 1054, 1066 (E.D. Cal. 2006)

10 (holding that "the ADAAG constitutes the exclusive standards under Title III of the

11 ADA"); *Resnick v. Magical Cruise Co.*, 148 F. Supp. 2d 1298, 1305 (M.D. Fla.

12 2001) (granting defendant's motion for summary judgment because there was "no

13 basis under the current ADA scheme for a plaintiff to bring a claim that a cruise ship

14 has failed to adhere to guidelines which have been declared inapplicable to cruise

15 ships by the departments charged with promulgation of such guidelines;" as a result,

16 "builders, owners, and proprietors of cruise ships have not been afforded notice of

17 the standards with which they are required to comply, and absent such standards

18 may not be subjected to abstract suits"); *Marsh v. Edwards Theatres Circuit, Inc.*,

19 64 Cal. App. 3d 881, 888-89 (1976) (no cause of action under Unruh Act unless

20 alleged barrier to access also violates a structural access standard); *Coronado v.*

21 *Cobblestone Village Community Rentals*, 163 Cal. App. 4th 831, 841, 844 (2008),

22 *overruled on other grounds by Munson v. Del Taco, Inc.*, 46 Cal. 4th 661 (2009)

23 (cause of action for disability access based on existence of structural barrier

24 dependent on whether violation constituted a violation of access standard).

25        Indeed, even when a specific access standard does exist, courts still require

26 plaintiffs to show that the access standard actually applies to the subject property.

27 *See, e.g. Blackwell v. City and County of San Francisco*, 506 Fed. Appx. 585, 587

28 (9th Cir. 2013) ("The metal elevator cover, which was installed sometime before the

-16-

1   late 1970's, predates the adoption in 1981 of new regulations concerning

2   requirements for handicapped accessibility…For that reason, it is not required to

3   comply with the accessibility standards in that title.").

4        Likewise, in *Disabled Americans for Equal Access, Inc. v. Compra Hospital*

5   *Pavia, Inc.*, 2004 WL 5568603 (D. Puerto Rico 2004), the court denied the

6   plaintiff's unopposed motion for summary judgment because he failed to establish

7   the construction/alteration history:

8              The Magistrate concluded that the Court was not provided with

9              the necessary information . . . to determine whether Compra's

10             Santurce hospital is classified as an 'existing facility' or as a

11             'new construction,' enabling the Court to apply the correct

12             standard.  This lack of information precludes, as a matter of

13             law, the remedy requested.

14  *Id*. at *8-9; *Gray v. JP Morgan Chase Bank*, 2012 WL 1340315, *3 (C.D. Cal.

15  2012) (dismissing disability access claims because the plaintiff failed to allege any

16  facts showing which building code applied).

17       Plaintiff cannot prove the requisite history because, among other things, there

18  are no, and have never been, any legally enforceable guidelines or standards by

19  which Defendant's website and/or mobile website could be measured against.

20  Therefore, Plaintiff's ADA and related state law claims fail.

21       2.    Plaintiff Has Failed To Adequately Plead That Defendant's

22             Discrimination Was Intentional.

23       Plaintiff's cause of action under the Unruh Act, as he cannot base it upon the

24  ADA, may only be maintained if he pleads and proves "intentional discrimination in

25  public accommodations in violation of the terms of the Act."  *Munson v. Del Taco,*

26  *Inc.*, 46 Cal. 4th 661, 668 (2009) quoting *Harris v. Capital Growth Investors XIV*,

27  52 Cal.3d 1142, 1175 (1991) ("A plaintiff seeking to establish a case under the

28  Unruh Act <u>must plead and prove intentional discrimination</u> in public

-17-

1  accommodations in violation of the terms of the Act.  A disparate impact analysis or

2  test does not apply to Unruh Act claims.") (emphasis added).

3       Therefore, in order for Plaintiff to succeed on his disability access claim, he

4  must plead and prove that Defendant intentionally discriminated against him

5  personally.  Plaintiff's claims fail because he has not adequately plead, and cannot

6  prove, any facts that would show that Defendant "intentionally" discriminated

7  against him.

8       In *Earll v. eBay, Inc.*, 2011 WL 3955485, *3 (N.D. Cal. Sept. 7, 2011), *aff'd*

9  599 Fed. Appx. 695 (9th Cir. Apr. 1, 2015), the plaintiff alleged that defendant eBay

10  affirmatively discriminated against the deaf because (1) "eBay has gone out of its

11  way to design a system that deaf and hard of hearing persons cannot use," (2) eBay

12  refused to implement "easy and inexpensive" solutions, and (3) that she had

13  multiple communications with eBay wherein she was suggested to "enlist the help

14  of a hearing person."  *Id.* at *3.  The Court found that these allegations were either

15  conclusory, and therefore, lacked the requisite factual support to make out a claim

16  for intentional discrimination, or, even if true, did not imply that eBay was unwilling

17  or unable to remedy the situation.  *Id.*  Therefore, the Court found that defendant

18  eBay's actions did not amount to an intentional denial of access to a public

19  accommodation.  The Ninth Circuit agreed and found that eBay's "failure to provide

20  a deaf-accessible alternative to its aural identification system does not amount to

21  willful, affirmative misconduct sufficient to constitute intentional discrimination

22  under the Unruh Act."  599 Fed. Appx. at 696; *see also Greater L.A. Agency on*

23  *Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014)

24  (broadly applicable policy of displaying online video without closed captioning

25  applied equally to all visitors and, therefore, did not constitute intentional

26  discrimination); *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017 (N.D. Cal. 2012),

27  aff'd, 600 Fed. Appx. 508 (9th Cir. 2015) (plaintiff failed to allege Unruh Act claim

28  because failure to caption 'meaningful amount' of streaming library not 'willful,

-18-

affirmative misconduct'); *Young v. Facebook*, 790 F. Supp. 2d 1110 (N.D. Cal. 2011) (holding that plaintiff failed to state an Unruh Act claim by alleging that Facebook's customer service system was difficult for her to use due to her bipolar disorder because Facebook's customer service system treated all users in the same cold, automated way).

Here, Plaintiff's allegations do not support an inference of intentional, willful discrimination against Plaintiff. Therefore, Plaintiff may not maintain a cause of action for violation of the Unruh Act separate from his cause of action under the ADA for this additional reason.

### E.   Plaintiff Has Failed To Provide "Fair Notice" Of The Alleged Barriers on Defendant's Website Or Mobile Website.

As discussed above, Plaintiff's Complaint alleges that Defendant's website and mobile websites contain "barriers" to access. Plaintiff identifies the barriers on the website as (1) Lack of Alternative Text, (2) Empty Links That Contain No Text, (3) Redundant Links, and (4) Linked Images Missing Alt-Text. (Complaint ¶ 28). Plaintiff identifies the barriers on the mobile website as (1) problems with compatibility with VoiceOver, (2) unlabeled buttons, (3) lack of alt-text, (4) inaccessible forms, (5) inaccessible image maps, and (6) lack of adequate prompting and labeling. (Complaint ¶ 30-31).

These sorts of vague allegations utterly fail for lack of fair notice to Defendant. In *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903 (9th Cir. 2011), the Ninth Circuit confirmed that a plaintiff must identify all alleged access barriers in his complaint in order to give the defendant fair notice. There, the plaintiff attempted to hide the injunctive relief he was seeking to increase the nuisance value of his lawsuit and to prevent the defendant from actually remedying the barriers and mooting his claims at summary judgment. The plaintiff identified some barriers in his complaint, others in a proposed amended complaint, others in an ENE statement, and still others in his expert report. The Ninth Circuit chastised the plaintiff for his

-19-

1  sharp tactics and adopted a bright-line rule that all barriers must be identified in the
2  complaint:

> "Plaintiff's counsel later explained that his delays in identifying
> the barriers at the facility were part of his legal strategy:  he
> purposefully 'forces the defense to wait until expert disclosures
> (or discovery) before revealing a complete list of barriers,'
> because otherwise a defendant could remove all the barriers
> prior to trial and moot the entire case. . . a plaintiff must
> identify the barriers that constitute the grounds for a claim of
> discrimination under the ADA in the complaint itself; a
> defendant is not deemed to have fair notice of barriers identified
> elsewhere."

13  *Id.* at fn. 7, 909.

14       Courts routinely grant summary judgment to defendants where the alleged
15  barriers are not identified with enough specificity to allow Defendant to investigate
16  the claim.  Without this specific information, Defendants are left to speculate at
17  what was allegedly wrong with its website and where the specific alleged barriers
18  were located.  *See Gray v. County of Kern,* 2015 WL 7352302 (E.D. Cal. Nov. 19,
19  2015) (granting summary judgment to Defendant for in part due to lack of fair
20  notice because plaintiff's complaint had scant details regarding the alleged barriers
21  leaving Defendant to "guess their location and specific barriers related to plaintiff's
22  disability"); *Paulick v. Starwood Hotels & Resorts Worldwide, Inc.,* 2012 WL
23  2990760, *12-13 (N.D. Cal. 2012) (requiring that *specific* barriers had to be
24  identified in the complaint and holding that "allegations listing general categories of
25  barriers simply are not enough to provide a defendant with fair notice regardless of
26  what may be included in a plaintiffs expert report"); *Strong v. Walgreen Co.,* 2009
27  WL 3711930, *4 (C.D. Cal. 2009) (allegation "there is incorrect signage posted at
28  the handicapped van accessible parking space" was "conclusory and provided no

-20-

1   indication of how the sign is incorrect or even what the sign says" and granting

2   summary judgment to Defendant).

3       The Court's decision in the *Gray* case is illustrative. In *Gray,* the Court found

4   that the allegation "[i]naccessible and unusable restroom facilities and showers in

5   patient rooms" was conclusory and insufficient to provide fair notice because it did

6   not identify any "specific" barriers for which the plaintiff sought injunctive relief.

7   2015 WL 7352302, at * 11.

8       Here, Plaintiff's Complaint does not identify for Defendant the specific

9   images Plaintiff contends lack alternative text or lacked alternative text at the time

10   of Plaintiff's alleged attempt to access the website, the specific links that Plaintiff

11   contends are empty or redundant, or the specific problems he claims to have

12   encountered on the mobile website.  It is not clear that any of these alleged items

13   constitute "barriers" to access even if they were true.  For instance, a decorative

14   image that has no impact on the function of a website would be confusing to a blind

15   individual if it was picked up by screen reading software and spoken aloud.  This

16   forces Defendant to guess at the nature of Plaintiff's specific complaints.  Does

17   Plaintiff contend a single image lacks alternative text or 500 images?

18       Defendant's website is complex and multilayered, making specific notice

19   crucial – just as the *Gray* court did not require defendant to hunt down what specific

20   showers were inaccessible and determine what restroom facilities were unusable.

21   As a result, Plaintiff's claims fail because he has failed to provide fair notice of the

22   specific barriers he alleges exist.

23

24

25

26

27

28

SMRH:481132588.3

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1 | Dated:  February 22, 2017

2

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4

By        /s/ *Gregory F. Hurley*

5

GREGORY F. HURLEY

6

Attorneys for Defendant,

7

DOMINO'S PIZZA LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-22-

SEPARATE STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF
LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT