# EXHIBIT "C"

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, et al., | ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:15-cv-300024-MGM |
| | ) | |
| MASSACHUSETTS INSTITUTE OF TECHNLOGY, | ) ) | Leave to File Memorandum in Excess of 20 Pages Granted on June 23, 2015 |
| | ) | |
| Defendants. | ) | |

_____

<u>STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA</u>

# I. INTRODUCTION

Plaintiffs, individuals who are deaf or hard of hearing and the National Association of the Deaf ("NAD"), allege that the Massachusetts Institute of Technology ("MIT") has violated title III of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") by denying individuals who are deaf or hard of hearing equal access to MIT's thousands of free online videos and audio files ("online programming"), which includes courses, educational lectures, and topics of general interest. (Complaint at ¶¶ 1, 2, 47). Like most colleges and universities, MIT relies on websites and other Internet related technologies in the administration of its services to students and, increasingly, to members of the public. Indeed, MIT characterizes its online educational services as "open and available to the world."[1] Plaintiffs claim that despite requests that MIT provide closed captions on its online programming, MIT has failed to make its content accessible and has impermissibly denied Plaintiffs and other individuals with hearing disabilities equal access to these valuable educational opportunities. (Complaint at ¶ 8).

MIT has moved to stay or dismiss the case on jurisdictional grounds or, alternatively, to dismiss Plaintiffs' Complaint for the failure to state a claim. MIT first argues that pursuant to the primary jurisdiction doctrine the action should be stayed or dismissed until the Department of Justice issues regulations under the ADA on website accessibility. Alternatively, should this Court retain jurisdiction, MIT argues that neither the ADA nor Section 504 require the provision of captions on its online programming.

---

[1] *See* Complaint at ¶ 2; MIT's "About MIT OpenCourseWare," http://ocw.mit.edu/about/index.htm (last visited June 25, 2015).

MIT is wrong on both counts. The primary jurisdiction doctrine does not support dismissal or stay of this matter, and Plaintiffs' claim falls squarely within the protections afforded by the ADA and Section 504. Both the ADA and Section 504 *currently* obligate MIT to provide effective communication to ensure equal access to its online programming services, and resolution of Plaintiffs' claim involves a straightforward application of longstanding statutory and regulatory requirements. For more than two decades, federal courts have resolved effective communication claims brought under the ADA and Section 504 in a wide range of contexts, including claims alleging unequal access to goods, benefits and services provided through websites or other electronic media. And the Departments of Justice and Education have routinely required covered entities to ensure equal access to goods, benefits and services, electronic or otherwise, through the provision of captioning or other auxiliary aids or services. Against this backdrop, the fact that DOJ has announced its intention to issue, at some point in the future, more specific technical requirements related to website accessibility does not support invoking primary jurisdiction. As to MIT's Rule 12(b)(6) assertions, Plaintiffs' Complaint alleges sufficient facts to plead violations of the ADA and Section 504. Further, MIT's heightened rhetoric that Plaintiffs' desired remedy is impermissibly broad and unduly burdensome amounts to an assertion of fact-based defenses that MIT cannot rely on at this stage in the litigation.

Because MIT's Motion to Dismiss directly implicates the United States' rulemaking agenda and the interpretation and application of regulations already promulgated by the Department of Justice under title III of the ADA and by the Department of Education under

Section 504, the United States has a substantial interest in this matter.[2]  Accordingly, the United

States respectfully submits this Statement of Interest to correct MIT's misapplication of the

primary jurisdiction doctrine and its misunderstanding of the ADA and Section 504.[3]

## II. STATUTORY AND REGULATORY BACKGROUND

### A.  Title III of the Americans with Disabilities Act of 1990.

Title III of the ADA prohibits discrimination by public accommodations, prescribing

generally that no individual shall be discriminated against on the basis of disability in the full and

equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of

any place of public accommodation by any person who owns, leases (or leases to), or operates a

place of public accommodation.  42 U.S.C. § 12182(a); 28 C.F.R. § 36.201(a).  A public

accommodation includes an "undergraduate, postgraduate private school, or other place of

education," such as MIT.  42 U.S.C. § 12181(7)(J).  Title III prohibits public accommodations

from denying individuals with disabilities the opportunity to participate in or benefit from goods,

services, privileges or advantages or from affording individuals with disabilities an unequal

opportunity to participate and benefit from the goods, services, privileges or advantages afforded

to other individuals.  42 U.S.C. § 12182(b)(1)(A)(i) and (ii); 28 C.F.R. §§ 36.202(a) and (b).

---

[2] Both the Departments of Justice and Education are entitled to deference in their interpretation of the regulations they promulgate – title III regulations of the ADA for Justice and Section 504 regulations for Education.  *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 196 (2011) (court must defer to "an agency's interpretation of its own regulation . . . unless that interpretation is 'plainly erroneous or inconsistent with the regulation'") (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *Olmstead v. L.C.*, 527 U.S. 581, 598 (1999) ("The well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance") (internal quotation marks omitted); *K.M. v. Tustin*, 725 F.3d 1088, 1100 (9th Cir. 2013)("[w]e afford ... considerable respect" to the DOJ's interpretation of the ADA effective communication regulation, as expressed in its amicus brief to this court (quoting *M.R. v. Dreyfus*, 697 F.3d 706, 735 (9th Cir.2012)).

[3] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any . . . district in the United States to attend to the interests of the United States in a suit pending in a court of the United States . . . ."  The Department of Justice ("Department" or "DOJ") is the federal agency with primary responsibility for enforcing title III of the ADA and its implementing regulation.  42 U.S.C. § 12188(b).

3

Title III imposes specific statutory and regulatory requirements to ensure that persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services. Under these provisions, public accommodations must furnish appropriate auxiliary aids and services where necessary for effective communication, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden. 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303. Auxiliary aids and services include qualified interpreters, notetakers, computer-aided transcription services, written materials, open and closed captioning, and accessible electronic and information technology, among other methods. 28 C.F.R. § 36.303(b).

**B. The Department's Rulemaking Under the ADA.**

The ADA charges the Attorney General with promulgating regulations to implement title III of the ADA. 42 U.S.C. § 12186. Pursuant to this charge, and following notice and comment rulemaking, DOJ issued its original title III regulation in 1991 and a revised title III regulation in 2010. In that same year, the Department issued an Advanced Notice of Proposed Rulemaking ("ANPRM") on Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations, announcing the Department's interest in developing more specific requirements or technical standards for website accessibility. 75 Fed. Reg. 43,460 (July 26, 2010). In the ANPRM, the Department reaffirmed its longstanding position that the ADA applies to websites of public accommodations, and reiterated, consistent with the preamble to the 1991 regulations, that the ADA regulations should be interpreted to keep pace with developing

4

technologies. *Id.* at 43,464 ("The Department has also repeatedly affirmed the application of title III to Web sites of public accommodations."). The Department recognized, however, that in light of inconsistent court decisions on website-related obligations and differing technical standards for determining web accessibility, further guidance was warranted. *Id.*

Through the ANPRM, the Department sought to explore whether rulemaking would be helpful in providing guidance as to how covered entities could meet preexisting obligations to make their websites accessible and in determining specific requirements or technical standards that could be adopted to provide the disability community consistent access. *Id.* at 43,464, 43,467. The comment period was open for 180 days after publication in the Federal Register on July 26, 2010. In response to the ANPRM, the Department received approximately 440 public comments. The Department is currently working on separate Notices of Proposed Rulemaking (NPRM) under titles II and III.[4] The title II NPRM, applicable to services, programs, and activities of public entities, was scheduled for publication in Spring 2015 but is not yet published. *Id.* The title III NPRM, applicable to public accommodations such as MIT, is scheduled for publication in Spring 2016. *Id.* After an NPRM is issued, the Department must solicit public comment and consider those comments in promulgating a final rule.

**C. Section 504 of the Rehabilitation Act of 1973.**

Section 504 provides that "[n]o otherwise qualified individual with a disability… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). MIT is a recipient of Federal financial assistance

---

[4] *See* Office of Information and Regulatory Affairs, Office of Management and Budget, Reginfo.gov, Unified Agenda, Spring 2015 Agency Statements of Regulatory Priorities (Department of Justice), title II, http://go.usa.gov/3XjKe and title III, http://go.usa.gov/3XjkV.

from the U.S. Department of Education. Section 504 defines "program or activity" to "mean[] all of the operations of … a college, university or other postsecondary institution." 29 U.S.C. § 794(b)(2)(A); 34 C.F.R. § 104.3(k)(2)(i). Therefore, MIT's online programming is part of a "program or activity" covered by Section 504. *Id.*

Under Section 504, recipients of Federal funding are required to provide qualified individuals with disabilities meaningful access to the benefits they offer. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985). In this context, a qualified individual with a disability is a person with a disability who meets the essential eligibility requirements for participating in MIT's online programming. 34 C.F.R. § 104.3 (*l*)(4). MIT offers its online programming to the general public. Thus *all* members of the general public, including Plaintiffs, are "qualified" to avail themselves of MIT's service. 34 C.F.R. § 104.3(*l*)(4).

As a recipient of federal funding, MIT has a duty to provide meaningful access to its online programming to individuals with disabilities.[5] This duty requires MIT to ensure that qualified individuals with disabilities are afforded the opportunity to participate in or benefit from an aid, benefit, or service that is equal to that afforded to others. 34 C.F.R. § 104.4(b)(1)(ii). In addition, MIT is prohibited from providing qualified individuals with disabilities with an aid, benefit, or service that is not as effective as that provided to others. 34 C.F.R. § 104.4(b)(1)(iii). MIT must ensure that equally effective aids, benefits, and services afford qualified individuals with disabilities the opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement. 34 C.F.R. § 104.4(b)(2). Section 504 also requires the provision of aids and services that are necessary to ensure individuals with disabilities have an equal opportunity to participate in MIT's programs or activities.

---

[5] The terms "individuals with disabilities" and "qualified individuals with disabilities" are used interchangeably in this motion.

## III. DISCUSSION

**A. The Primary Jurisdiction Doctrine Does Not Support a Stay or Dismissal.**

Defendant argues that the primary jurisdiction doctrine dictates that this Court should dismiss Plaintiffs' Complaint or stay the action until DOJ promulgates a final title III rule concerning website accessibility standards. (Motion at 9-10). But application of the doctrine is not warranted in this case, as Plaintiffs' Complaint alleges violation of existing and longstanding statutory and regulatory requirements to provide effective communication, and courts routinely decide these types of effective communication matters. Primary jurisdiction is further inappropriate given that the scope and timing of any final rule on web accessibility is speculative and far from imminent; although the title III proposed rule, or NPRM, is currently scheduled for a Spring 2016 publication, there is no scheduled date for publication of a final rule.

While there is no fixed formula for applying the primary jurisdiction doctrine, *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 64 (1956), the central inquiry is whether a court presented with an otherwise jurisdictionally-proper claim should nonetheless deferentially refer the matter to an administrative agency because the agency's input would provide required specialized expertise or ensure uniformity in a comprehensive regulatory scheme. *See, e.g., Am. Auto. Mfrs. Ass'n v. Massachusetts Dept. of Envt'l Prot.*, 163 F.3d 74, 80-82 (1st Cir. 1998); *U.S. Pub. Interest Research Grp. v. Atl. Salmon of Maine, LLC*, 339 F.3d 23, 34 (1st Cir. 2003). Primary jurisdiction is not applicable simply because a claim or issue may conceivably fall within an agency's purview. *See, e.g., Brown v. MCI WorldCom Network Services, Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002). Rather, courts must also weigh the advantages of invoking primary jurisdiction against the potential harm from judicial forbearance. *Am. Auto.*, 163 F.3d at 81-82. For these reasons, courts caution that primary jurisdiction should be invoked sparingly.

7

*See, e.g., U.S.P.I.R.G.*, 339 F.3d at 34*; Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334, 340 n.5 (1st Cir.), cert. denied, 400 U.S. 964 (1970); *Palmer Foundry, Inc., v. Delta-Ha, Inc.*, 319 F.Supp.2d 110, 112 (D. Mass. 2004).

In the First Circuit, courts consider the following factors to determine if primary jurisdiction should be invoked: (1) whether the agency determination lies at the heart of the task assigned the agency; (2) whether agency expertise is required to unravel intricate, technical facts; and (3) while not determinative, whether the agency determination would materially aid the court. *See Rymes Heating Oils Inc. v. Springfield Terminal Ry. Co.,* 358 F.3d 82, 91 (1st Cir. 2004); *see also Mass. v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992 (1st Cir. 1995). These factors are interrelated, and in this case strongly weigh against a stay or dismissal.

First, contrary to MIT's assertion, at the heart of this case is a straightforward claim that MIT failed to provide auxiliary aids or services necessary to ensure effective communication and equal access to MIT's online programming. The determination of Plaintiffs' claim lies with the Court, not with DOJ, which has no authority to administratively adjudicate the parties' dispute. Second, resolution of Plaintiffs' claim does not require the Court to "unravel intricate, technical facts," but rather involves consideration of facts within the conventional competence of the courts, *e.g.*, whether MIT offers online programming; whether Plaintiffs can access that programming; whether MIT furnished appropriate auxiliary aids or services to afford access to the online programming; and, if asserted, whether MIT can establish a fundamental alteration or undue burden defense. And because the title III rulemaking on website accessibility is not imminent, dismissal or stay of this case on primary jurisdiction grounds would not materially aid this Court and would significantly prejudice Plaintiffs and similarly situated persons with disabilities.

8

1.    **Primary Jurisdiction is Not Appropriate Because This Court is Well-Equipped to Apply the Current Law to Plaintiffs' Claim.**

The primary issue before this Court – whether MIT is required to provide auxiliary aids and services, such as captions, to its online programming to ensure equal access to individuals with disabilities – directly implicates the existing statutory requirements of title III and its longstanding regulation, which courts are well-placed to resolve.  As set forth above, the ADA and the title III regulation, since their enactment and promulgation, have always required that public accommodations provide effective communication to persons with disabilities through the provision of auxiliary aids and services, including, where appropriate, closed captioning. 42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303.  *See, e.g.*, *Arizona ex rel. Goddard v. Harkins Amusement Enters.*, 603 F.3d 666, 675 (9th Cir. 2010) (reversing district court finding that closed captioning and descriptive narration are not required), *Feldman v. Pro Football, Inc.,* 419 Fed. Appx. 381, 391-92 (4th Cir. 2011) (affirming district court decision requiring a football stadium to provide auxiliary aids such as captions to ensure that plaintiffs have full and equal access to music lyrics); *Ball v. AMC Entertainment, Inc.,* 315 F.Supp.2d 120, No. Civ. A.00-867 (D.D.C. May 3, 2004) (approving class settlement alleging a failure to provide reasonable accommodations including captioning).  And DOJ has similarly enforced title III's effective communication requirement, including, more recently, as to Internet and web-based goods and services.[6]  The requirement to provide effective communication applies to MIT's online

---

[6] Statement of Interest of the United States, *Nat'l Assoc. of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196 (D. Mass. 2012), www.ada.gov/briefs/netflix_SOI.pdf (addressing captioning of online streaming video service); Consent Decree, *Nat'l Fed. of the Blind, et al., United States of America v. HRB Digital LLC and HRB Tax Group, Inc.*, No. 1:13-cv-10799 (March 25, 2014), www.ada.gov/hrb-cd.htm (addressing the accessibility of H&R Block's website); Settlement Agreement, *The United States of America and Ahold U.S.A., Inc. and Peapod, LLC* (November 14, 2014), http://www.ada.gov/peapod_sa.htm (addressing the accessibility of Peapod's website); Settlement Agreement, *The United States of America and edX, Inc.* (April 2, 2015), http://www.ada.gov/edx_sa.htm (addressing the accessibility of an online learning platform); Statement of Interest of the United States, *New v. Lucky Brand Dungarees Stores, Inc.,*51 F.Supp.3d 1284 (S.D. Fla. 2014), www.ada.gov/briefs/lucky_brand_soi.pdf (addressing

programming.  As Congress expressly stated when passing the ADA, "…the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times[,]" and that technological advances "may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities."  *See* H.R. Rep. No. 485, pt. 2, at 108 (1990).

Moreover, since the ANPRM was issued in 2010, this Court and other courts have allowed litigation of title III claims alleging the failure to provide equal access to the web-based services of a public accommodation.  *See Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 205 n.2 (D. Mass. 2012); *Nat'l Fed'n of the Blind v. Scribd, Inc.,* 2015 U.S. Dist. LEXIS 34213 *26 (D. Vt. March 19, 2015).  The fact that the regulatory process is pending does not support MIT's claim that its online programming is not currently covered by title III requirements.  (Motion at 11).  Directly to the contrary, and as explained in the Department's ANPRM: "The Internet as it is known today did not exist when Congress enacted the ADA and, therefore, neither the ADA nor the regulations the Department promulgated under the ADA specifically addresses access to Web sites.  *But the statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on Web sites over the Internet."*  75 Fed Reg. 43,460, 46,463 (emphasis added).  *See also Netflix*, 869 F. Supp. 2d  at 200 (excluding web-based services would "run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the

---

the effective communication requirements of  the ADA to point-of-sale devices); Agreement Between the United States and Walt Disney World Co. (January 17, 1997), www.ada.gov/disney-sa.htm (requiring Walt Disney World to provide auxiliary aids and services necessary for deaf and hard of hearing individuals to enjoy its programs and services, including captioning).

goods, services, privileges, and advantages available indiscriminately to other members of the general public.") (quoting *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.*, 37 F.3d 12, 20 (1st Cir. 1994)).  This Court is thus well-equipped to resolve Plaintiffs' legal claim, and should therefore reject MIT's attempt to convert a clear-cut ADA claim into something dependent on future rulemaking.

In another title III effective communication claim, one district court, in analyzing a primary jurisdiction challenge, rejected its application because the relevant ADA determinations were within the conventional competence of the courts and because there was no administrative proceeding to which to refer the parties.  *See Arizona ex rel. Goddard v. Harkins Amusement Enterprises.*, 2011 U.S. Dist. LEXIS 127682 *12 (D. Ariz. Feb. 8, 2011).  In *Harkins,* plaintiffs alleged violations of the ADA against a movie theater chain that did not provide auxiliary aids and services, including closed captioning.  603 F.3d 666, 668 (9th Cir. 2010).  The movie chain argued that the case should be stayed under the primary jurisdiction doctrine, pending the promulgation of DOJ regulations regarding captioning at movie theaters.  *Harkins*, No. 07-00703, 2011 U.S. Dist. LEXIS 127682 at *4.  The district court disagreed, finding "there is no administrative proceeding to which [the court] can refer the parties; the parties will not directly participate in the DOJ's rulemaking; the parties will be forced to wait an indefinite duration for the DOJ NPRM and final rule; the DOJ is not capable of resolving the parties' entire dispute; and Courts routinely decide ADA cases involving accommodations and undue burden."  *Id.* at *12.  The court held that "[a]lthough the DOJ is responsible for issuing regulations for the ADA, this alone does not invoke primary jurisdiction."  *Id.* at *7-*8.  The *Harkins* Court's reasoning is equally applicable to this case, and MIT's primary jurisdiction contention should be rejected.

11

Likewise, other cases cited by MIT equally support that this Court should retain jurisdiction because the legal claim at issue is one that the Court is fully able to resolve. In *Massachusetts v. E*Trade Access, Inc.*, this Court denied defendant's motion for judgment on the pleadings on grounds that even though the desired remedy on inaccessible ATMs, voice-guidance technology, was not specifically required by current DOJ regulations, the plaintiffs had put forward a legally sufficient claim that the ATMs were not accessible or independently usable by individuals who are blind and that a remedy was required. No. 03-11206, 2005 U.S. Lexis 22621 *11-12 (D. Mass, Feb. 22, 2005). This Court stated, "Although their preferred remedy is not available under the existing regulations, the Plaintiffs can seek the necessary modifications to the ATMs … [E*Trade] operates…, so that blind people may have access to and independently use these ATMs." *Id.* Similarly, in this case, Plaintiffs have put forth a legally sufficient claim that MIT's online programming is inaccessible, and Plaintiffs can avail themselves of the current effective communication regulation to challenge their exclusion.

MIT's reliance upon *United States v. National Amusements, Inc.,* 180 F. Supp. 2d 251, 258 (D. Mass 2001) is also unavailing. In *National Amusements,* plaintiffs alleged that stadium-style theaters denied equal access to individuals who used wheelchairs and therefore violated the general nondiscrimination provisions of the ADA. Defendants argued that Congress intended the ADA to be enforced through a specific regulatory framework rather than through the broad language of the general prohibitions in the statute, and that since they had complied with the specific regulatory provision at issue, plaintiffs could not state a claim under the general prohibitions. This Court agreed with defendants and held that compliance with the specific regulations for new construction was sufficient to satisfy the title III requirements of the ADA. As in *National Amusements*, in this case there is a preexisting specific regulation that imposes

12

obligations upon MIT to furnish appropriate auxiliary aids and services where necessary to

ensure effective communication with individuals with disabilities. 28 C.F.R. § 36.303(c)(1).

However, unlike this Court's determination in *National Amusements*, MIT has not satisfied the

specific regulatory provision at issue in this case. Thus, the pending status of the website

accessibility rule does not preclude the enforcement of the current specific requirement.

      Moreover, the absence of administrative adjudication authority under the ADA, and thus

of any potential redress for Plaintiffs in an alternate forum, further weighs against a stay or

dismissal on primary jurisdiction grounds. MIT appears to argue that DOJ's pending

rulemaking on web accessibility is a "determination" that lies at the heart of the task assigned to

the agency by Congress and that this favors primary jurisdiction. However, most of the cases

MIT cites in support of this proposition are inapplicable because, in those cases, the

"determination" at issue was, in fact, the agency's ability to resolve the pending dispute through

an administrative adjudicative process.[7] DOJ enforces title III and promulgates the title III

regulation, but has no adjudicative procedures or authority.

      The few cases MIT cites that address pending rulemaking are also distinguishable. In

*Netflix,* this Court ordered a stay with respect to the FCC's pending first-time regulation

implementing a new statute, the Twenty-First Century Communications and Video Accessibility

Act ("CVAA"), because the issuance of the final regulation was imminent. No. 11-30168, 2011

U.S. Dist. LEXIS 130443, at *2-*3 (D. Mass. Nov. 10, 2011) (noting that court assumed the

regulation would be issued within two months of stay). The plaintiffs alleged that the failure to

provide closed captioning on Netflix's on demand web-based video service violated the ADA.

---

[7] *See, e.g., Mass v. Blackstone Valley Elec. Co,* 67 F.3d 981, 992-93, *Am. Tel & Tel. Co. v. IMR Capital Corp.,* 888
F. Supp. 221, 244-45 (D. Mass 1995) and *Clark v. Time Warner Cable*, 523 F.3d 110 (9th Cir. 2008).

The rule implementing the CVAA explained, for the first time, the requirement to caption certain content made available on Netflix. Thus, waiting two months for the CVAA final rule materially aided this Court because knowing the CVAA requirements allowed the Court to determine whether the application of title III to Netflix was also necessary to provide captioning on other content not covered by CVAA to ensure equal access.[8] Moreover, a stay of two months was minimal and was not prejudicial to plaintiffs. There is no equivalent issue in this case. Similarly, in *Kappelmann v. Delta Air Lines, Inc.,* appellants asked the court to rule that a new law, the Hazardous Materials Transportation Act of 1975, required airlines to warn passengers when a plane was carrying radioactive materials. 539 F.2d 165, 169-71 (D.C. Cir. 1976). In *Kappelmann*, the D.C. Circuit invoked primary jurisdiction because the case involved a new law, for which the agency was setting a new regulatory scheme. Here, in contrast, the ADA and its implementing regulations have been in effect for over two decades; and, relying on this established authority, courts have construed the ADA to require equal access to services provided online.

### 2. No Specialized Agency Expertise is Necessary to Address Plaintiffs' Claim.

Resolution of Plaintiffs' ADA claim does not require specialized expertise beyond the knowledge of federal courts. Applying a long-established civil rights law to the facts here does not require a specialized expertise typical of the agencies to which courts have deferred jurisdiction. For example, in *Kappelmann*, the court lacked the requisite expertise to apply a new law prior to the issuance of its implementing regulation and therefore deferred to the Federal Aviation Administration because its pending rule would explain for the first time, what

---

[8] In 2012, this Court denied a motion for judgment on the pleadings in the *Netflix* case alleging the failure to provide closed captions on a web-based video service. *See Netflix, Inc.*, 869 F. Supp. 2d at 205 n.2.

14

constituted unsafe radioactivity levels.  *Id.*  In contrast, in this matter, this Court can determine what auxiliary aids and services are necessary to ensure effective communication.  As explained above, courts routinely decide the extent to which auxiliary aids and services, such as closed captioning, are required under the ADA and whether a title III entity can show that providing auxiliary aids and services constitutes a fundamental alteration or an undue burden.  To be sure, the web accessibility rule under development will provide additional guidance and technical standards for web accessibility.  However, the projected publication date for the notice of proposed rulemaking is a year away, and the requirements will not become final until a final rule is published after an additional comment period.   The title III statute and existing regulation apply to Plaintiffs' claim.  Of course, in the absence of specific technical standards, the obligation to provide auxiliary aids and services to ensure effective communication is flexible and is dependent on the facts particular to the claim, not the agency's expertise.  *See* 28 C.F.R. Part 36, App. C, § 36.303 ("The auxiliary aid requirement is a flexible one.  A public accommodation can choose among various alternatives as long as the result is effective communication."); *see also* Statement of Interest of the United States at 8-9, *New v. Lucky Brand Dungarees Stores, Inc.,* 51 F.Supp.3d 1284 (S.D. Fla. 2014), www.ada.gov/briefs/lucky_brand_soi.pdf.  Such a determination falls squarely within this Court's purview.

Other federal courts, under analogous circumstances, have declined to exercise primary jurisdiction.[9]  For example, in *Disability Rights Council of Greater Wash. v. Wash. Metro. Area*

---

[9] *See e.g., Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575 at 580-81 (declining to invoke the primary jurisdiction doctrine where the matter was not "so technical as to be beyond the understanding of judges or juries," even where some consultation with experts was required); *Harkins,* 2011 U.S. Dist. LEXIS 127682 *12 (D. Ariz. Feb. 8, 2011) (declining to invoke primary jurisdiction because the parties will be forced to wait an indefinite duration for the DOJ final rule and courts routinely decide ADA cases involving accommodations and undue

15

*Transit Auth.*, a district court declined to invoke primary jurisdiction when considering whether paratransit services satisfied the ADA. 239 F.R.D. 9, 20 (D.D.C. 2006). The court reasoned that "Whether or not a practice limits the availability of a public service, particularly when availability is measured from the perspective of the user – as it must be measured here – is a question that can be answered by reference to the knowledge and experience of lay persons, including judges" and that "requires no particular technical, policy, or administrative expertise." *Id*. Similarly, this Court need only consider whether Plaintiffs are being provided equal access to MIT's online programming and whether MIT can avail itself of a defense to the provision of auxiliary aids and services. Such fact-based determinations are well within the conventional competence of the courts.[10]

In sum, Plaintiffs' claim does not require specialized agency expertise to unravel intricate, technical facts because the requirement to furnish auxiliary aids and services is flexible and is within the conventional competence of the courts. Moreover, Plaintiffs have a legitimate and important claim now under the current law, which requires equal access in the absence of a defense, and this Court is well-equipped to address Plaintiffs' civil rights claim. Accordingly, the Court should deny the motion to stay or dismiss the case.

---

burden); *Nader v. Allegheny Airlines*, 426 U.S. 290, 305-06 (1976) (referral to the FAA was inappropriate because fraudulent misrepresentation claims "are within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be helpful in the applications of these standards to the facts of the case").

[10]All of the cases upon which MIT relies in support of its argument that agency expertise is required are inapposite because they address referral to an agency's adjudicative process; as explained above, DOJ does not have such a process. *See Nader e.g.*, 426 U.S. at 305-07 (court addressed whether referral to the FAA for adjudication was appropriate); *see also Blackstone Valley Elec. Co.*, 67 F.3d at 992-93 (referred case to the EPA for an administrative determination); *N. Cnty. Comms. Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149, 1162 (9th Cir. 2010) (referred case to the FCC for an administrative determination); *American Tel. & Tel. Co v. IMR Capital Corp.* 888 F. Supp. 221, 245 (D. Mass 1995) (same).

**B. Plaintiffs State a Claim Under the ADA and Section 504.**

"The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio-Hernandez v. Fortuño-Burset,* 640 F.3d 1, 7 (1st Cir. 2011). A complaint must provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests" (*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted)) and must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

**1. MIT's Provision of Online Programming is Subject to Title III of the ADA.**

Plaintiffs' Complaint sufficiently pleads a violation of title III of the ADA. In moving to dismiss Plaintiffs' claim, MIT appears to ask this Court to ignore the express statutory and regulatory obligation under title III to provide auxiliary aids or services when necessary to ensure equal access to individuals with disabilities. Alternatively, MIT asks this Court to find, as a matter of law, that these obligations do not apply to MIT's online programming services. In support, MIT makes two arguments. First, MIT contends that the only ADA statutory and regulatory provisions applicable to MIT's online programming are the title III barrier removal requirements, which do not address websites and therefore, do not require MIT to remove the "barriers" Plaintiffs allegedly encountered. Second, MIT argues that it is not required to caption its online programming because title III does not require public accommodations to stock accessible or special goods. Both arguments fail.

17

### a. Specific Rules Governing Facility Construction, Alteration, and Barrier Removal Neither Apply to Nor Limit Plaintiffs' Request for Relief.

Contrary to MIT's assertions, the inaccessible online programming at issue in this matter is not a structural or architectural barrier subject to the ADA's new construction, alteration and barrier removal requirements; rather, it is a service provided by MIT, a public accommodation, subject to title III's general nondiscrimination and effective communication requirements. MIT's confusion on this point appears to stem from a misreading of the First Circuit's discussion and holding in *Carparts*, which held that a public accommodation under title III of the ADA is not limited to physical structures. 37 F.3d at 19. The Court specifically analyzed a "travel service," which is identified in the statute as a public accommodation, and concluded that Congress clearly intended to "include providers of services which do not require a person to physically enter an actual physical structure." *Id.* The *Carparts* holding goes only to establishing coverage under the ADA and certainly does not dictate, as MIT argues, that online services are subject to the ADA's construction requirements for physical facilities. (Motion at 29, n.15.) Here, of course, there can be no genuine dispute that MIT, as a private educational institution, is a public accommodation and thus subject to all applicable title III requirements, including the obligation to provide auxiliary aids and services to individuals with disabilities to ensure equal access to online programming.[11]

---

[11] Neither is there any support for MIT's argument that Plaintiffs' claims implicate communications barriers of a structural nature subject to Title III's barrier removal rules. (Motion at 30, n.15). Communication barriers that are "structural in nature" are barriers that are an integral part of the physical structure of a facility, such as conventional signage, which generally is inaccessible to people who have vision impairments, and audible alarm systems, which are inaccessible to people with hearing impairments. *See* Title III Technical Assistance Manual §III-4.4100. In contrast, the provision of auxiliary aids and services, including captioning, "is *not* a communication barrier that is structural in nature." *Id.*

18

### b. The Provision of Appropriate Auxiliary Aids Does Not Alter the Content of the "Goods or Services" Provided by a Public Accommodation.

MIT contends that the ADA does not require it to caption its online programming because it is not required to provide or create accessible or special goods. (Motion at 33). In support of this position MIT makes two related arguments: 1) the ADA does not require covered entities to change the content of their services or create a different good; and 2) the title III regulation's "inventory exception" at 28 C.F.R. § 36.307 does not require MIT to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities. (Motion at 33). These arguments fail because Plaintiffs do not request different or additional content; they seek only access to the same content that MIT makes available to the general public.

MIT first relies on a line of insurance cases in which individuals with disabilities challenged the substance of their insurance policies. Courts rejected plaintiffs' claims that the ADA requires insurance companies to alter or modify the content of the insurance services. *See, e.g., Ford v. Schering-Plough Corp.*, 145 F.3d 601, 613 (3d. Cir. 1998); *McNeil v. Time Ins. Co,* 205 F.3d 179, 188 (5th Cir. 2000); *Doe v. Mut. Of Omaha Ins. Co.,* 179 F.3d 557, 559-60 (7th Cir. 1999). These cases are inapposite because they are about altering the *substantive content* of insurance policies, *e.g.,* the amount of coverage available for a certain condition; they are not about the provision of auxiliary aids that would allow an individual with a disability *access* to the same content, *e.g.,* providing an individual the insurance policy in an alternative format, as in the matter before this Court.

Moreover, MIT's assertion that the provision of closed captions would result in a "different" good, and thus is not required, is incorrect. In *Harkins*, 603 F.3d at 671, the Ninth

Circuit rejected a similar argument where a defendant movie theater claimed it did not have to provide closed captioning because the ADA did not, in its view, require public accommodations to "offer different goods or services, just nondiscriminatory enjoyment of those that are provided." The Ninth Circuit held that defendant's cramped interpretation would effectively eliminate the duty of a public accommodation to provide auxiliary aids and services. *Id.* at 672 (quoting *Harkins* 548 F. Supp. 2d 723, 727-28 (D. Ariz. 2008)). As the court further explained, "[b]y its very definition, an auxiliary aid or service is an additional and different service that establishments must offer the disabled. For example, a courthouse that was accessible only by steps could not avoid ADA liability by arguing that everyone – including [individuals who use wheelchairs] – has equal access to the steps. And an office building could not avoid having to put Braille numbering on the buttons in its elevator by arguing that everyone – including [individuals who are blind] – has equal access to the written text." *Id.* As the *Harkins* decision demonstrates, providing auxiliary aids and services does not change the content of MIT's online programming or result in "different" online programming, but rather enables individuals with disabilities to access the content MIT already provides.

Second, MIT misapplies title III's regulatory "inventory exception," at 28 C.F.R. § 36.307, to its online programming services. Section 36.307 provides that a public accommodation is not required to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities. This regulatory provision is meant to excuse a retailer from stocking variations of a good for every conceivable disability because such a requirement would change the nature of the retailer's business. *See, e.g.* 28 C.F.R. Part 36, App. C § 36.302 ("the rule enunciated in § 36.307 is consistent with the 'fundamental alteration' defense to the reasonable modifications requirement of § 36.302").

DOJ's interpretive guidance on this provision explains that the purpose of the ADA's public accommodations requirements is to ensure accessibility to the goods offered by a public accommodation, not to alter the *nature or mix* of goods that the public accommodation has typically provided. 28 C.F.R. Part 36, App. C § 36.307. *See* Title III Technical Assistance Manual §III-4.2500 ("The ADA does not require the bookstore to *expand* its inventory to include large print books or audio tape.") (emphasis added). The inventory exception does not limit a public accommodation's obligation, however, to provide auxiliary aids and services under 28 C.F.R. § 36.303. A bookstore, for example, would not have to stock Brailled versions of books under § 36.307, but if the bookstore were hosting an author lecture on its website, it would have to provide auxiliary aids and services to participants who are deaf, such as closed captioning.

The cases relied on by MIT to support application of § 36.307 are distinguishable. In those cases, plaintiffs wanted to stock a *particular* kind of good in addition to what the retailer ordinarily provides. *See, e.g., Karczewski v. K Motors, Inc.*, No. 14-2701, 2015 U.S. Dist. LEXIS 45226 *7-*8 (S.D. Cal. March 23, 2015) (". . . a car dealership does not have to alter its inventory to include vehicles with special modifications for disabled drivers."). By contrast, Plaintiffs here are not asking MIT to create additional online programming; they are asking MIT to provide appropriate auxiliary aids and services so that they can access the same content that MIT makes available to individuals without disabilities.

### 2. Section 504 Requires that MIT Provide Meaningful Access to Its Online Programming.

Without auxiliary aids and services, Plaintiffs cannot meaningfully access MIT's online programming. Under Section 504, "Where the plaintiffs identify an obstacle that impedes their access . . . they likely have established that they lack meaningful access to the program or

21

benefit." *Am. Council of the Blind v. Paulson,* 525 F.3d 1257, 1267 (D.C. Cir. 2008).  In contrast, where the plaintiffs seek to "expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access." *Paulson,* 525 F.3d at 1267; *see also Alexander v. Choate*, 469 U.S. 287, 306 (1985) (plaintiffs not entitled to greater substantive privileges by eliminating the durational limit on inpatient coverage); *Am. Council of the Blind v. Astrue*, 2008 U.S. Dist. LEXIS 86524 *16 (N.D. Cal. April 23, 2008) (denying a motion to dismiss because plaintiffs were not challenging the substance of their benefits, they were challenging "only the methods through which individuals are notified of all manner of notices from [defendants]").[12]  In this case, Plaintiffs do not seek *more* online programming than that provided to individuals without disabilities, they seek meaningful access to the same online programming provided to individuals without disabilities.  In moving to dismiss Plaintiffs' Section 504 claim, MIT argues: (1) that it is only required to provide meaningful access to students with disabilities, not the general public; and (2) that the Section 504 regulation does not apply to website accessibility.  As explained below, both arguments fail.

MIT's argument that Section 504 does not govern Plaintiffs' claim is unsupported by the plain language and application of the Section 504 regulation and ED's interpretation of its regulation.  MIT incorrectly argues that Section 504 applies only to students, relying on the

---

[12] As explained above, MIT cannot rely on a fact-based defense such as fundamental alteration at this stage of the litigation. Accordingly, MIT's reliance on *Wynne v. Tufts University School of Medicine*, 932 F.2d 19, 27-28 (1st Cir. 1991) (en banc) is misplaced.  In *Wynne,* the First Circuit remanded a decision granting summary judgment to a university because it had failed to demonstrate that there was no reasonable way to accommodate a student's disability.  Here, the parties have not engaged in discovery and MIT's fact-based defenses are prematurely raised at this stage of the case.  Moreover, even if captioning certain programming would result in a fundamental alteration, MIT would still be obligated to provide auxiliary aids and services for online programming to the extent it would not result in a fundamental alteration.  Additionally, MIT's reliance on *Board of Education v. Rowley*, 458 U.S. 176 (U.S. 1982) is misplaced.  *Rowley* involves a claim brought pursuant to the Individuals with Disabilities Education Act, which only applies to elementary and secondary schools and has no application to universities, including MIT.

Section 504 postsecondary education rules in Subpart E, which, indeed, apply to students with disabilities.[13] (Motion at 21). 34 C.F.R. §§ 104.41-47. MIT fails to recognize, however, that non-students are also ensured meaningful access to online programming under ED's Section 504 general antidiscrimination provision, which applies to *qualified individuals with disabilities*, and is not limited to *students with disabilities*. 34 C.F.R. § 104.4 (emphasis added).

Specifically, § 104.4 requires that with respect to *qualified individuals with disabilities*, MIT must: (1) ensure they are afforded the opportunity to participate in or benefit from an aid, benefit, or service that is equal to that afforded to others (34 C.F.R. § 104.4(b)(1)(ii)); (2) ensure that equally effective aids, benefits, and services afford such individuals the opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement (34 C.F.R. § 104.4(b)(2)); and (3) prohibit the provision of an aid, benefit, or service that is not as effective as that provided to others (34 C.F.R. § 104.4(b)(1)(iii)). Where, as here, MIT offers its online programming to *all* members of the general public, Plaintiffs, are "qualified" to avail themselves of MIT's service because they "meet[] the essential eligibility requirements for the receipt of such services." 34 C.F.R. § 104.3(*l*)(4). In sum, ED's 504 regulatory provision 34 C.F.R. § 104.4 applies to all individuals with disabilities who wish to participate in MIT's online programming.

MIT's argument that Plaintiffs cannot rely on the nondiscrimination requirements of § 104.4 because the provision does not specifically address "website accessibility or captioning online video content" is equally flawed. (Motion at 25). The absence of the term "website

---

[13] MIT also incorrectly argues that the facilities access rules, 34 C.F.R. §§ 104.21-23, which apply to physical structures, apply to Plaintiffs' claims. While MIT devotes considerable argument (Motion at 20-21) to the interpretation and application of ED's facilities access rule, Plaintiffs do not allege such a violation.

accessibility or captioning online video content" from the regulation (which was promulgated nearly forty years ago, well before the Internet) does not support that such programming is excluded from Section 504 coverage. ED's interpretation of its regulation, as reflected in both its guidance and administrative enforcement, supports that Section 504 applies to online programming. Specifically, ED's guidance makes clear that when colleges and universities require the use of emerging technology, they must ensure that the technology is implemented in a way that affords persons with disabilities an equal opportunity to participate in and benefit from the technology.[14] Relying on 34 C.F.R. § 104.4, ED explained that requiring use of a certain technology that is inaccessible to individuals with disabilities is discrimination under Section 504 and the ADA, unless individuals with disabilities are provided accommodations or modifications that permit them to receive all the educational benefits provided by the technology in an equally effective and equally integrated manner. The guidance documents do not *only* address devices, as MIT suggests, but instead address the considerations at play when devices are used "*as part of the[] programs, services, activities, goods, advantages, privileges or accommodations*" of the

---

[14] *See e.g.,* U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter (June 29, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100629.html; U.S. Dep't of Educ., Frequently Asked Questions About the June 29, 2010, Dear Colleague Letter, at 1, 4 (May 26, 2011), http://www2.ed.gov/about/offices/list/ocr/docs/dcl-ebook-faq-201105.pdf. ("The principles in the DCL apply to the online programs that are part of the operations of the school, *i.e.,* provided by the school directly or through contractual or other arrangements."). In addition, MIT mischaracterizes the meaning of the guidance when it argues that FAQ 12 "explicitly eschews a 'caption or remove' approach" because schools may provide "traditional alternative media as an accommodation to provide equal access to educational opportunities and benefits provided to all students." (Motion at 26). Significantly, MIT omits that FAQ 12 addressed circumstances where a school uses emerging technology for students without disabilities but wants to avail itself of traditional alternative media for a student with a disability. In such a circumstance, "the alternative media must provide access to the benefits of technology in an equally effective and equally integrated manner." *Id.* at 7. Thus, FAQ 12 has no bearing on the circumstances at issue here, where MIT provides its service – online programming – through emerging technology and provides very limited access to Plaintiffs.

colleges or universities; and address the general requirements of colleges and universities with respect to individuals with disabilities and emerging technology.[15]

Further, in its enforcement of Section 504, ED's Office for Civil Rights ("OCR") has interpreted 34 C.F.R. § 104.4 to apply to online programs and activities available to the general public. OCR has consistently applied § 104.4 in its Letters of Finding and Resolution Agreements and in response to OCR's Compliance Reviews to require equal access for individuals with disabilities, and not solely students with disabilities, to recipients' websites and online programming.[16] In sum, MIT's argument that Section 504 does not govern Plaintiffs' claim is unsupported by case law requiring meaningful access, the plain language of the regulation, and ED's interpretation and enforcement of its regulation. *See Choate*, 469 U.S. at 301; *Am. Council of the Blind v. Paulson,* 525 F.3d at 1267; 34 C.F.R. §104.4. Plaintiffs' Complaint sufficiently pleads a violation of Section 504 and its implementing regulation, and this action should not be dismissed under Section 504.

## IV. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court consider this Statement of Interest in this litigation and deny Defendant MIT's Motion to Stay or Dismiss.

---

[15] U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter (June 29, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20100629.html (emphasis added).

[16] *See, e.g.,* OCR Letters and Resolution Agreements: University of Cincinnati (December 18, 2014), http://go.usa.gov/3XbQw and http://go.usa.gov/3XbQB (university's websites must be accessible to persons with disabilities, including students, prospective students, employees and visitors); Youngstown State University (December 12, 2014), http://go.usa.gov/3XbnJ and http://go.usa.gov/3XbQY (same); and South Carolina Virtual Charter Schools (March 20, 2014), http://www2.ed.gov/documents/press-releases/south-carolina-charter-school-letter.doc and http://www2.ed.gov/documents/press-releases/south-carolina-charter-school-agreement.doc (schools' external websites and schools' online learning websites must be accessible).

Respectfully submitted this 25th day of June, 2015.

LORETTA E. LYNCH
Attorney General for the United States

CARMEN M. ORTIZ
United States Attorney
District of Massachusetts

VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division

/s/Jennifer A. Serafyn
JENNIFER A. SERAFYN
STEPHEN P. HEYMANN
Assistant United States Attorneys
District of Massachusetts
John Joseph Moakley Federal Courthouse
One Courthouse Way, Suite 9200
Boston, MA  02210
Telephone: (617) 748-3188
jennifer.serafyn@usdoj.gov

EVE L. HILL
Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief
Disability Rights Section

KATHLEEN P. WOLFE
Special Litigation Counsel
Disability Rights Section

AMANDA L. MAISELS
Deputy Chief
Disability Rights Section

JAMES COLE, JR.
General Counsel
United States Department of Education

/s/ Charlotte Lanvers
CHARLOTTE LANVERS
Trial Attorney
Disability Rights Section
Civil Rights Division
Washington, D.C. 20202
United States Department of Justice
950 Pennsylvania Avenue, N.W., (NYA)
Washington, D.C. 20530
Telephone: (202) 305-0706
charlotte.lanvers@usdoj.gov

FRANCISCO LOPEZ
MICHELLE TUCKER
Attorneys
United Stated Department of Education
Office of General Counsel
400 Maryland Ave, S.W.
Washington, D.C.  20202

*Counsel for the United States*

## CERTIFICATE OF SERVICE

I hereby certify that Statement of Interest, filed through the CM/ECF system on this 25th day of June, 2015, will be sent electronically to the registered participates as identified on the Notice of Electronic Filing (NEF). I am not aware of any non-registered participants, so electronic filing is the sole means of service of this document.

Respectfully submitted,
*/s/ Charlotte Lanvers*
CHARLOTTE LANVERS
Trial Attorney
Disability Rights Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, N.W. (NYA)
Washington, D.C. 20530
Telephone: (202) 305-0706
charlotte.lanvers@usdoj.gov

*Counsel for the United States of America*