**EXHIBIT "E"**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATIONAL ASSOCIATION OF THE DEAF, | ) | |
| et al., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cv-30023-MGM |
| | ) | |
| HARVARD UNIVERSITY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION
REGARDING DEFENDANTS' MOTION TO STAY OR DISMISS
(Dkt. No. 23)

ROBERTSON, U.S.M.J.

I.      Introduction

The National Association of the Deaf ("NAD") and four individually named plaintiffs, C.

Wayne Dore, Christy Smith, Lee Nettles, and Diane Nettles (collectively, "Plaintiffs"), bring this

putative class action under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

("Section 504"), and Title III of the Americans with Disabilities Act of 1990, 29 U.S.C. §§

12181 – 12189 ("Title III" or "ADA"), against Harvard University and its governing board, the

President and Fellows of Harvard College (collectively, "Harvard" or "Defendants"), for failure

to provide equal access for deaf and hard of hearing individuals to much of the audio and

audiovisual content that Harvard makes available online to the general public for free by not

providing captioning.  Plaintiffs seek declaratory and injunctive relief requiring Harvard to

provide timely, accurate captioning of this content.

Invoking the doctrine of primary jurisdiction, Harvard has filed a motion seeking to

dismiss the action or stay it until the Department of Justice ("DOJ") issues regulations on

website accessibility under the ADA (Dkt. No. 23).  Alternatively, Harvard seeks dismissal of both counts of Plaintiffs' complaint for failure to state a claim (*id.*).  Plaintiffs oppose Harvard's motion (Dkt. No. 34).  The United States has filed a statement of interest in opposition to Harvard's motion as well (Dkt. No. 33).  Having reviewed all of the pleadings relating to this motion (Dkt. Nos. 1, 23, 24, 33, 34, 40, 46, 47, and 48) and having heard the parties at oral argument, for the reasons set forth below, the court recommends that Harvard's motion be denied in its entirety.

II.    <u>The Complaint</u>

Harvard, an undergraduate and postgraduate school and a recipient of federal funding, controls, maintains, and administers webpages, websites, and other internet locations on which it makes available to the general public, free of charge, a vast array of content, consisting of courses and other educational and general interest materials (Dkt. No. 1 at p. 1 ¶1, p. 7 ¶24, p. 8 ¶¶25-28).  Harvard creates and produces some, but not all, of the content (Dkt. No. 1 at p. 8 ¶28). Included within it are thousands of audio and audiovisual files, which communicate information aurally (Dkt. No. 1 at p. 1 ¶1).[1]  Millions of people around the world have accessed the online video content that Harvard makes freely available (Dkt. No. 1 at p. 1 ¶1, p. 8 ¶28, p. 12 ¶¶41-42).

NAD is a non-profit organization that advocates on behalf of the deaf and hard of hearing in the United States (Dkt. No. 1 at p. 5 ¶¶14-15, p. 6 ¶¶16-19).  Plaintiffs C. Wayne Dore, Christy Smith, Lee Nettles, and Diane Nettles are individuals who are limited in the major life activity of hearing; in order to receive the benefit of the online video content Harvard makes

---

[1] While Plaintiffs' complaint contains allegations and claims regarding both audio and audiovisual files, the court will follow the convention employed by the parties and will primarily refer to the audiovisual content as shorthand for both.  Harvard has acknowledged that NAD's request for relief as to audio content does not differ in any material way from its request as to audiovisual content, at least for purposes of this motion (Dkt. No. 24 at p. 4 n.1).

2

available, it must be in an accessible format, including captioning (Dkt. No. 1 at p. 7 ¶¶20-23). While some of the online video content is captioned, much of it has no captioning or has captioning that is inaccurate (Dkt. No. 1 at p. 2 ¶ 2, pp. 10-11 ¶¶ 31-39). As a result, the aural component is inaccessible to Plaintiffs and the approximately 48 million Americans who, like Plaintiffs, are deaf or hard of hearing (Dkt. No. 1 at p. 2 ¶2, p. 10 ¶ 31).

According to Plaintiffs, Harvard has long known that captioning is necessary to make its online video content accessible by the deaf and hard of hearing (Dkt. No. 1 at p. 22 ¶ 76). Moreover, beginning in December 2013, Plaintiffs repeatedly requested that Harvard ensure that its online video content had timely, accurate captioning (Dkt. No. 1 at p. 23 ¶ 80). Plaintiffs claim that Harvard's failure to provide the captioning necessary to ensure effective communication and an equal opportunity for the deaf and hard of hearing to benefit from the online video content violates the prohibitions against disability-based discrimination codified in Section 504 and Title III of the ADA (Dkt. No. 1 at pp. 25-29 ¶ 88-102).

    III.    <u>Discussion</u>

        A.  <u>Statutory and Regulatory Background</u>

"It is the purpose of both the ADA and the Rehabilitation Act to provide a coherent framework and consistent and enforceable standards for the elimination of discrimination against persons with disabilities." *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 133 (D. Mass. 1997) (citing *Thomas v. Davidson Acad.,* 846 F. Supp. 611, 620 (M.D. Tenn. 1994)). Section 504 and the ADA are "frequently read in sync." *Id.* Section 504, which is applicable to entities that receive federal funding, "was the first broad federal statute aimed at eradicating discrimination against individuals with disabilities." *Id.* (quoting *Helen L. v. DiDario*, 46 F.3d 325, 330 (3d Cir. 1995)). Through the ADA, Congress "extended the non-discrimination

principles required of institutions receiving federal funds by the Rehabilitation Act to a much wider array of institutions and businesses." *Id*. (citing *Easley v. Snider*, 841 F. Supp. 668, 672 (E.D. Pa. 1993), *rev'd on other grounds*, 36 F.3d 297 (3d Cir. 1994)). The ADA "as a whole is intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Olmstead v. Zimring*, 527 U.S. 581, 589 (1999) (quoting 42 U.S.C. § 12101(b)(1)).

Section 504 provides as its general rule that "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. § 794(a). A "program or activity" includes "all of the operations of – … a college, university, or other postsecondary institution." 29 U.S.C. § 794(b)(2)(A). One of the explicit policies underlying the enactment of Section 504 was to ensure that "all programs, projects, and activities receiving assistance … [are] carried out in a manner consistent with the principles of … respect for the privacy, rights, and equal access (including the use of accessible formats), of … individuals [with disabilities]." 29 U.S.C. § 701(c)(2).

Department of Justice[2] ("DOJ") and Department of Education[3] ("DOE") regulations flesh out Section 504's general rule. The regulations forbid federal fund recipients from "directly or [indirectly,] through contractual, licensing, or other arrangements, on the basis of handicap"

---

[2] DOJ is responsible for coordinating the implementation of Section 504 among the various federal agencies that extend financial assistance. Exec. Order No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980). It has issued regulations in furtherance of that responsibility. *See* 28 C.F.R. §§ 41.1 – 41.58.

[3] DOE has issued regulations implementing Section 504 as to the programs and activities to which it provides assistance. *See* 34 C.F.R. §§ 104.1 – 104.61. DOE's regulations must be consistent with the DOJ's coordination regulations. 28 C.F.R. § 41.4(a).

4

denying a qualified handicapped person "the opportunity to participate in or benefit from the aid, benefit, or service;" affording a qualified handicapped person "an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;" and providing a qualified handicapped person with an "aid, benefit, or service that is not as effective … as that provided to others."  28 C.F.R. § 41.51(b)(1)(i)-(iii); 34 C.F.R. § 104.4(b)(i)-(iii).  In line with Section 504's goal of promoting equal access, DOJ regulations require federal fund recipients to "take appropriate steps to ensure that communications with their applicants, employees, and beneficiaries are available to persons with impaired vision and hearing."  28 C.F.R. § 41.51(e).  DOJ regulations also require recipients of federal funds to "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program."  *Id*. § 41.53.  Both sets of regulations define a "qualified handicapped person" as "a handicapped person who meets the essential eligibility requirements for the receipt of such services."  28 C.F.R. § 41.32(b), 34 C.F.R. § 104.3(l)(4).

In the ADA, Congress set forth prohibitions against disability-based discrimination in employment (Title I, 42 U.S.C. §§ 12111-12117), public services furnished by governmental entities (Title II, 42 U.S.C. §§ 12131-12165), and public accommodations provided by private entities (Title III, 42 U.S.C. §§ 12181-12189).  This case concerns Title III, which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns … or operates a place of public accommodation."  42 U.S.C. § 12182(a).  Private schools, including undergraduate and postgraduate institutions, and other places of education, are public accommodations.  *Id*. §

12181(7)(J). Title III prohibits public accommodations from discriminating against the disabled by, "directly, or through contractual, licensing, or other arrangements," denying individuals on the basis of disability the opportunity "to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity," or providing them with an "opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." *Id*. § 12182(b)(1)(A)(i)-(ii). *See also* 28 C.F.R. § 36.202(a)-(b).

Among the various discriminatory effects Congress intended the ADA to remedy were those resulting from communication barriers faced by individuals with communication disabilities, including hearing, vision, and speech impairments. 42 U.S.C. § 12101(a)(5). The ADA uses the term "auxiliary aids and services" to refer to the means or methods by which public accommodations can effectively communicate with people who have communication disabilities. *Id*. § 12103(1). *See also* 28 C.F.R. § 36.303. The ADA establishes that it is discriminatory for a public accommodation to fail "to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). *See also* 28 C.F.R. § 303(a). DOJ implementing regulations equate "undue burden" with "significant difficulty or expense." 28 C.F.R. § 36.303(a). The regulations further provide that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). Even where the "provision of a

particular auxiliary aid or service by a public accommodation would result in a fundamental alteration in the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or in an undue burden, i.e., significant difficulty or expense, the public accommodation [still must] provide an alternative auxiliary aid or service, if one exists, that would not result in an alteration or such burden but would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive the goods, services, facilities, privileges, advantages, or accommodations offered by the public accommodation." *Id.* § 36.303(g). The regulations define the term "auxiliary aids and services" to include, among other things, "open and closed captioning, including real-time captioning; … or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing." *Id.* § 36.303(b).

   B. <u>Motion to Dismiss</u>

   To survive a motion to dismiss, a complaint must "'state[ ] a claim to relief that is plausible on its face,' accepting the plaintiff's factual allegations and drawing all reasonable inferences in the plaintiff's favor." *Maloy v. Ballori-Lage*, 744 F.3d 250, 252 (1st Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The complaint will survive as long as it pleads sufficient facts to warrant recovery on any cognizable theory of the case." *Tompkins v. United Healthcare of New England, Inc.*, 203 F.3d 90, 93 (1st Cir. 2000) (citing *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.,* 958 F.2d 15, 17 (1st Cir.1992)). *See also Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) ("Dismissal for failure to state a claim is appropriate if the complaint fails to set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal

theory.'" (quoting *Centro Médico del Turabo, Inc., v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005))).

In order to state a claim for violation of Section 504 and Title III, a plaintiff must allege (1) that he or she is disabled and otherwise qualified,[4] (2) that the defendant receives federal funding (for Section 504 purposes) and is a place of public accommodation (for ADA purposes); and (3) that the defendant discriminated against the plaintiff based on disability. *Argenyi v. Creighton Univ.*, 703 F.3d 441, 447 (8th Cir. 2013) (citing *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076-77 (8th Cir. 2006)); *el Kouni v. Trs. of Boston Univ.*, 169 F. Supp. 2d 1, 2-3 (D. Mass. 2001) (citing *Katz v. City Metal Co.*, 87 F.3d 26, 30 (1st Cir. 1996)). There are three discrete theories available to a disability discrimination plaintiff. "First, a plaintiff can assert disparate treatment on account of disability, i.e., that the disability actually motivated the defendant's challenged adverse conduct." *Nunes v. Massachusetts Dep't of Corr.*, 766 F.3d 136, 144 (1st Cir. 2014) (citing *Raytheon Co. v. Hernandez,* 540 U.S. 44, 52–53 (2003)). Second, a plaintiff can assert disparate impact, i.e. that a defendant's challenged conduct, even if not motivated by a discriminatory animus, disparately affects the disabled. *Id*. at 145. "Finally, a plaintiff can pursue a third path, claiming that [the defendant] has refused to affirmatively accommodate his or her disability where such accommodation was needed to provide

---

[4] While Title III of the ADA does not use the "qualified individual" language that Titles I and II and Section 504 use, the First Circuit has found "little difference in this distinction." *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 154 (1st Cir. 1998). This is so because "many of the issues that arise in the 'qualified' analysis, also arise in the context of the 'reasonable modifications' or 'undue burden' analysis. … [I]f more than reasonable modifications are required of an institution in order to accommodate an individual, then that individual is not qualified for the program." *Id. See also Alexander v. Choate*, 469 U.S. 287, 299 n.19 (1985) ("[T]he question of who is 'otherwise qualified' and what actions constitute 'discrimination' under the section would seem to be two sides of a single coin; the ultimate question is the extent to which a grantee is required to make reasonable modifications in its programs for the needs of the handicapped.").

'meaningful access ….'" *Id.* (citing *Henrietta D. v. Bloomberg,* 331 F.3d 261, 273–76 (2d Cir. 2003)).

Plaintiffs' complaint in the instant case recites the requisite elements. Plaintiffs allege (1) that they are deaf or hard of hearing and qualified to participate in Harvard's online content as members of the general public to whom Harvard makes that content available (Dkt. No. 1 at p. 1 ¶ 1, pp. 5-7 ¶¶ 14-19, p. 7 ¶¶ 20-23, p. 8 ¶ 28), (2) that Harvard receives federal funding and is a public accommodation (Dkt. No. 1 at pp. 3-4 ¶¶ 4-6, pp. 7-8 ¶¶ 24-27, p. 26 ¶ 90, p. 28 ¶ 98), and (3) that Harvard discriminates against them on the basis of disability by denying them access or providing them unequal access to its online audio and audiovisual content (Dkt. No. 1 at p. 10 ¶ 31, pp. 25-29 ¶¶ 88-102). Harvard does not seriously contest that Plaintiffs have adequately pleaded the first two elements.[5] Rather, Harvard argues that Plaintiffs have not put forth a theory of discrimination that is cognizable under either Section 504 or Title III.[6] The court disagrees.

1. Section 504

---

[5] Harvard alludes to some doubt as to whether Plaintiffs can prove the requisite public accommodation based on its apparent disagreement with the First Circuit's holding in *Carparts Distribution Center v. Auto Wholesaler's Ass'n of New England,* 37 F.3d 12 (1st Cir. 1994), that public accommodations are not limited to actual physical structures (Dkt. No. 24 at p. 29). Nonetheless, Harvard "assumes arguendo that Title III applies to its websites" for purposes of the present motion" (*id.*). Whether the *Carparts* holding has any applicability to Plaintiffs' Title III claim in this case is not clear; Plaintiffs suggest that it does not because they are not alleging that Harvard's websites are public accommodations, but rather that Harvard itself is a public accommodation, and its websites are benefits, services, or privileges offered by it to the general public (Dkt. No. 34 at pp. 27-28). This court need not grapple with this distinction at this time, however, given that Harvard is not raising it in this motion, and, in any event, whether Harvard agrees with it or not, *Carparts* is binding precedent in this Circuit. *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 200 (D. Mass. 2012) (extending the reasoning of *Carparts* to reject the defendant's argument that Title III does not apply to websites generally or to the defendant's "Watch Instantly" service on its website in particular).

[6] Even while challenging the viability of Plaintiffs' theory of discrimination, Harvard acknowledges that "[d]igital media and the Internet have not yet provided universal and immediate access to content by individuals with disabilities" (Dkt. No. 24 at p. 5).

"The essence of section 504 is a single sentence forbidding discrimination under federally assisted programs [or activities] against 'otherwise qualified' handicapped individuals 'solely by reason' of their handicap." *Rhode Island Handicapped Action Comm. v. Rhode Island Pub. Transit Auth.*, 718 F.2d 490, 494 (1st Cir. 1983).  The Supreme Court has interpreted Section 504's antidiscrimination rule as requiring that "otherwise qualified handicapped individual[s] … be provided with meaningful access to the benefit that the grantee offers." *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (discussing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397 (1979)).  "[T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Id*.

While what constitutes "meaningful access" is a fact-specific inquiry, the cases addressing the standard reflect a general pattern.  "Where the plaintiffs identify an obstacle that impedes their access to a … program or benefit, they likely have established that they lack meaningful access to the program or benefit." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1267 (D.C. Cir. 2008).  Indeed, the First Circuit has noted that this type of "exclusionary situation may fairly be described as the primary target of section 504." *Ruskai v. Pistole*, 775 F.3d 61, 79 (1st Cir. 2014) (citing *Alexander*, 469 U.S. at 297).  "By contrast, where the plaintiffs seek to expand the substantive scope of a program or benefit, they likely seek a fundamental alteration to the existing program or benefit and have not been denied meaningful access." *Paulson*, 525 F.3d at 1267.  Under a "meaningful access" standard, the focus is on whether handicapped individuals are afforded "evenhanded treatment and the opportunity … to participate in and benefit from programs receiving federal assistance," though Section 504 creates no guarantee of "equal results." *Alexander*, 469 U.S. at 304 (citing *Davis*, 442 U.S. at 410).

10

Plaintiffs' theory of discrimination – that the deaf and hard of hearing lack meaningful access to the aural component of the audiovisual content Harvard makes publicly available online – fits squarely within the parameters of Section 504 as delineated by the Court. There is nothing novel about premising Section 504 liability on a federal fund recipient's failure to provide the deaf and hard of hearing with meaningful access to aural communications. To the contrary, the theory has been recognized as a paradigmatic example of Section 504 liability. *Paulson*, 525 F.3d at 1268 ("For instance, … deaf individuals lack meaningful access to … activities or programs without the provision of interpretive assistance."); *United States v. Bd. of Tr. for Univ. of Alabama*, 908 F.2d 740, 748 (11th Cir. 1990) ("In the case of a deaf student, however, all access to the benefit of some courses is eliminated when no sign-language interpreter is present. In the context of a discussion class held on the third floor of a building without elevators, a deaf student with no interpreter is as effectively denied meaningful access to the class as is a wheelchair bound student."). Examples of cases in which the theory has been pursued abound. *See, e.g., Argenyi*, 703 F.3d at 451 (finding a genuine issue of material fact as to whether the defendant denied a hearing-impaired student meaningful access when it refused to provide real-time transcription for lectures and a cued speech interpreter for labs); *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999) (agreeing with the district court's assessment of the evidence as showing that a hearing-impaired inmate lacked meaningful access to prison medical care, educational training, and participation in disciplinary and classification proceedings where the defendants failed to provide a sign language interpreter); *Rothschild v. Grottenthaler*, 907 F.2d 286, 292-93 (2d Cir. 1990) (affirming the judgment of the district court that deaf parents were denied meaningful access to certain school activities under Section 504 when the school refused to provide sign language interpreters). While the alleged facts on which Plaintiffs seek

to premise Section 504 liability may be new (i.e. a university's provision of online video content to the public), the failure to accommodate theory is not.

Harvard raises a number of arguments in an effort to undermine the validity of Plaintiffs' Section 504 claim. Harvard characterizes the captioning Plaintiffs seek as "affirmative action," which the Court in *Davis* held Section 504 does not require (Dkt. No. 24 at pp. 18-20; Dkt. No. 40 at pp. 10-11). However, an examination of *Davis* and its progeny shows that whether a particular accommodation amounts to unnecessary "affirmative action" or a required "reasonable accommodation" is a question of fact not suitable for resolution on a motion to dismiss.

The question before the *Davis* Court was whether the defendant college had violated Section 504 when it denied a hearing-impaired applicant who relied on lip reading for effective communication admission into its nursing program. *Id.*, 442 U.S. at 400-04. Based on the record from the district court bench trial, the Court found that the college had established that the ability to understand speech without lip reading was necessary for participation in the clinical phase of its program. *Id.* at 407. The Court rejected the plaintiff's argument that Section 504 required the college to accommodate her by providing individual supervision for clinical courses and dispensing with certain required courses altogether, thereby obviating the need for effective oral communication. *Id.* The Court reasoned that the "extensive modifications" sought by the plaintiff crossed the line between "the evenhanded treatment of qualified handicapped persons," which Section 504 requires, and "affirmative efforts to overcome the disabilities caused by handicaps," which it does not. *Id.* at 410. Accordingly, the defendant had not violated Section 504 by denying the plaintiff admission into its program. *Id.* at 413.

Subsequently, in *Alexander*, the Court clarified the pivotal distinction it had drawn in *Davis*, stating that "it is clear from the context of *Davis* that the term 'affirmative action' referred

to those 'changes,' 'adjustments,' or 'modifications' to existing programs that would be 'substantial,' 442 U.S. at 410, 411 n.10, 413, or that would constitute 'fundamental alteration[s] in the nature of a program ...,' *id*. at 410, rather than to those changes that would be reasonable accommodations." *Alexander*, 469 U.S. at 300 n.20. *See also Wynne v. Tufts Univ. Sch. of Medicine*, 932 F.2d 19, 24 (1st Cir. 1991) ("The arguably absolutist principle[] of *Davis* – ... there is no affirmative action obligation on an institution – w[as] meaningfully qualified by the Court in *Alexander v. Choate*, 469 U.S. 287 (1985). The Court signalled [sic] its awareness of criticism that the *Davis* pronouncement on 'affirmative action' obscured the difference between 'a remedial policy for the victims of past discrimination' and 'the elimination of existing obstacles against the handicapped.' *Id*. at 300 n.20. It then distinguished 'substantial' and 'fundamental' changes (affirmative action) from 'changes that would be reasonable accommodations.' *Id*."); *Guckenberger*, 974 F. Supp. at 146 ("The lesson of *Davis* (and its progeny) is that 'while a grantee need not be required to make "fundamental" or "substantial" modifications to accommodate the handicapped,' under Section 504 and the ADA, 'it may be required to make "reasonable" ones.'"). An accommodation is reasonable if it does not impose "undue financial and administrative burdens." *Davis*, 442 U.S. at 412. The *Davis* Court acknowledged, however, that "the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons [will not] always ... be clear," and noted that technological advances could be expected to shift the line over time by reducing the burden imposed by available accommodations. *Id*.

Thus, after *Davis* and *Alexander*, the question boils down to "the rather mushy one of whether some 'reasonable accommodation' is available to satisfy the legitimate interests of both the grantee and the handicapped person." *Wynne*, 932 F.2d at 24 (quoting *Brennan v. Stewart*,

834 F.2d 1248, 1262 (5th Cir. 1988)).  Harvard may be correct that the captioning Plaintiffs seek would be so onerous a requirement as to fall on the unnecessary affirmative action side of the line, and Harvard is entitled to raise undue burden as an affirmative defense.  *Paulson*, 525 F.3d at 1266 (identifying undue burden as an affirmative defense); *Randolph*, 170 F.3d at 858 (same).  However, striking the appropriate balance between accommodating the rights of Plaintiffs and not unduly burdening Harvard requires a fact intensive inquiry that is not suitable for resolution on a motion to dismiss.  *Nunes*, 766 F.3d at 146 (affirming summary judgment where "no reasonable factfinder could find the department's accommodations were not a reasonable means of providing [the plaintiff] with meaningful access to his medication"); *Fulton v. Goord*, 591 F.3d 37, 44 (2d Cir. 2009) (noting that the determination of what is reasonable is a question of fact requiring inquiry "not only into the benefits of the accommodation but into its costs as well") (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995))); *Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279, 1282 (11th Cir. 2002) (noting that "the reasonableness of any proposed accommodations" and "whether any proposed accommodations or auxiliary services would constitute an 'undue burden'" are not part of the analysis on a motion to dismiss); *Nathanson v. Med. Coll. of Pennsylvania*, 926 F.2d 1368, 1386 (3d Cir. 1991) ("A district court's estimate of what is reasonable 'rests in large part upon factual determinations'" (quoting *Bd. of Trs. for Univ. of Alabama*, 908 F.2d at 750)).

Next, Harvard characterizes Plaintiffs' claim as a "paradigmatic example of the type of 'boundless-disparate impact showing' against which the Supreme Court warned" in *Alexander* (Dkt. No. 24, at pp. 18-20; Dkt. No. 40, at pp. 10-11).  But Plaintiffs' theory is not that the deaf and hard of hearing have been disparately impacted by Harvard's neutral provision to the general public of audiovisual online content.  Rather, their theory is that Harvard has discriminated

14

against them by denying them a reasonable accommodation – captioning – that they require in order to meaningfully access the aural component of that content.  As the First Circuit has noted, reasonable accommodation claims "can be seen as bearing many of the indicia of disparate impact or disparate treatment," *Nunes*, 766 F.3d at 145, because, "[w]hen a disabled person is denied a reasonable accommodation, that person lacks opportunities possessed by similar non-disabled people on account of disability," *id*. at 145 n.7.  Notwithstanding any facial similarities, however, failure to reasonably accommodate is a distinct and viable theory of discrimination under Section 504, and Plaintiffs' claim fits neatly with it.[7]  *Id*. at 144-45 (citing *Henrietta D.*, 331 F.3d at 273–76).

Harvard argues that Plaintiffs cannot base their claim on the general prohibitions against discrimination contained in 34 C.F.R. § 104.4 of DOE's regulations.[8]  Contrary to Harvard's assertion, the general provisions of DOE's regulations also support Plaintiffs' theory of discrimination.  Section 104.4 prohibits federal fund recipients from denying qualified handicapped persons the opportunity to participate in or benefit from provided aids, benefits, and

---

[7] Harvard's reliance on *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414 (9th Cir. 2014) ("*GLAAD*"), to characterize Plaintiffs' claim as one for disparate impact is inapposite (Dkt. No. 40 at p. 20-21).  In *GLAAD*, the plaintiff brought a claim not under Section 504, but under California's Unruh Civil Rights Act in connection with CNN's policy of displaying online video programming without captioning.  *Id*. at 420-21.  Because the Unruh Act contemplates "willful, affirmative misconduct on the part of those who violate the Act," the court held that a plaintiff must "allege, and show, more than the disparate impact of a facially neutral policy."  *Id*. at 425 (quoting *Koebke v. Bernardo Heights Country Club*, 115 P.3d 1212, 1228-29 (2005)).  Because CNN's policy applied equally to all CNN.com visitors, hearing impaired or not, it could not form the basis for an Unruh Act claim even if hearing-impaired individuals bore the brunt of the neutral policy.  *Id*. at 426.  In contrast to the Unruh Act, Section 504 encompasses claims for failure to reasonably accommodate and disparate impact, in addition to intentional discrimination.  *Nunes*, 766 F.3d at 144-45.

[8] Harvard also argues that Plaintiffs cannot state a claim under DOE's rules regarding facilities access, *see* 34 C.F.R. § 104.21 - 104.23, or postsecondary education, *see id*. §§ 104.41-104.47, but Plaintiffs have disavowed reliance on either of those sets of regulations (Dkt. No. 34 at p. 18).  Accordingly, the court need not, and does not, address them.

services; affording qualified handicapped persons an unequal opportunity to participate in or benefit from provided aids, benefits, or services; and providing qualified handicapped persons with aids, benefits, or services that are not as effective as those provided to others.  34 C.F.R. § 104.4(b)(1)(i)-(iii).  For aids, benefits, and services to be "equally effective," they "must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement."  *Id*. at § 104.4(b)(2).  In other words, these regulations are consistent with the requirement of "meaningful access," and, as set forth above, Plaintiffs have adequately pleaded a lack of meaningful access.  *Cf. K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1102 (9th Cir. 2013) ("[T]he 'meaningful access' standard incorporates rather than supersedes applicable interpretative regulations, and so does not preclude [plaintiffs] from litigating their claims under those regulations.").  Indeed, even while arguing that § 104.4 does not support Plaintiffs' theory, Harvard acknowledges that, to the extent the regulation is applicable, it obligates Harvard to provide "meaningful access" (Dkt. No. 40 at pp. 10-11).

The court declines to draw any inference from the fact that § 104.4 does not explicitly address the responsibilities of federal fund recipients vis-á-vis website accessibility.  Online content may not be specifically mentioned in the regulation, but neither is it specifically excluded.  *Cf. Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 200-01 (D. Mass. 2012) (observing that the ADA was passed in 1990 and could not have explicitly included web-based services, but that "the legislative history of the ADA makes clear that Congress intended the ADA to adapt to changes in technology").  Moreover, DOE's interpretation of its regulation supports the requirement of meaningful access with respect to aids, benefits, and services offered online.  DOE has stated in guidance that "equal opportunity, equal treatment, and the obligation to make modifications to avoid disability-based discrimination – are part of the general

16

nondiscrimination requirements of Section 504 and the ADA," and, therefore, "all school programs or activities – whether in a 'brick and mortar,' online, or other 'virtual' context – must be operated in a manner that complies with Federal disability discrimination laws."  U.S. Dep't of Educ., Frequently Asked Questions About the June 29, 2010, Dear Colleague Letter (2011) ("FAQ").  In offering this guidance, DOE was addressing the obligations of postsecondary institutions in connection with their use of electronic book readers that were inaccessible to blind or low vision students.  *Id*.; U.S. Dep't of Justice & U.S. Dep't of Educ., Joint "Dear Colleague" Letter: Electronic Book Readers (2010) ("DCL").  Thus, while not directly on point, the DCL and the FAQ nevertheless affirm "key principles of Federal disability discrimination law: the obligation to provide an equal opportunity to individuals with disabilities to participate in, and receive the benefits of, the educational program, and the obligation to provide accommodations or modifications when necessary to ensure equal treatment," in the context of the use of emerging technologies.  *Id*.

Harvard dismisses DOE's interpretations expressed in the DCL and the FAQ as "non-regulatory general pronouncements … not entitled to deference" (Dkt. No. 40, at p. 13).  While DOE's non-regulatory interpretations are not eligible for *Chevron* deference, it does not follow that they are entitled to no deference whatsoever.[9]  *Massachusetts v. FDIC*, 102 F.3d 615, 621 (1st Cir. 1996) ("[L]ess formal agency determinations may be accorded something less than full *Chevron* deference.").  To the contrary, a court must give controlling weight to an agency's interpretation of its own ambiguous regulation,[10] even if expressed in a legal brief, unless it is

---

[9] In *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), the Court held that if a statute is ambiguous and the implementing agency's construction of the statute in a regulation is reasonable, federal courts must accept the agency's construction.  *Id*. at 843-44.
[10] When a regulation is not ambiguous, no deference ensues because, otherwise, "adopting the agency's contrary interpretation would 'permit the agency, under the guise of interpreting a

"'plainly erroneous or inconsistent with the regulation,'" or there is "reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (quoting *Auer v. Robbins*, 519 U.S. 452, 461-62 (1997)). An agency's judgement may be called into doubt when the interpretation conflicts with one it advanced earlier, *id*. (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)), or it appears to be "nothing more than a 'convenient litigating position,'" *id*. (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988)), or a "*post hoc* rationalizatio[n] advanced by an agency seeking to defend past agency action against attack," *id*. (quoting *Auer*, 519 U.S. at 462).

DOE's interpretation of its existing regulations as applying to emerging technology, including online content, is neither plainly erroneous nor inconsistent with the text of 34 C.F.R. § 104.4. Nor is there any reason to suspect that DOE's interpretation reflects anything less than the agency's fair and considered judgment. Both the DCL and the FAQ are "significant guidance documents" as defined by the Office of Management and Budget (OMB) Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (January 25, 2007). As such, DOE was required to follow certain procedures to ensure that the documents were developed with appropriate review and public participation and were of high quality. *Id*. at 3443. Thus, the court is justified in granting *Auer* deference to DOE's interpretation. *Cf. Doe v. Univ. of Massachusetts-Amherst*, No. 14-30143-MGM, 2015 WL 4306521, at *7 and n.3 (D. Mass. July 14, 2015) (noting the requirement that the court accord "appreciable deference" to DOE's

---

regulation, to create *de facto* a new regulation.'" *Chase Bank USA, N.A., v. McCoy*, 562 U.S. 195, 211 (2011) (quoting *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000)). The word "discrimination" is "inherently" ambiguous. *Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 592 (1983).

interpretation expressed in a Dear Colleague Letter of what actions schools are to take in response to allegations of sexual violence in order to comply with Title IX (quoting *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993))); *Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 92-93 (D. Conn. 2010) (deferring to DOE's interpretation of its own regulation as expressed in a Dear Colleague Letter). Even if *Auer* deference is inapplicable, however, the court nevertheless would accept DOE's proposed interpretation as reasonable and consistent with the goal of Section 504 to ensure that "all programs, projects, and activities receiving assistance … [are] carried out in a manner consistent with the principles of … (2) respect for the privacy, rights, and equal access (including the use of accessible formats) of … individuals [with disabilities]." 29 U.S.C. § 701(c). To hold otherwise at a time when the internet has become "central to every aspect of the 'economic and social mainstream of American life,'" *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 575 (D. Vt. 2015) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)), would run directly counter to that goal.

The court also accords some weight to DOJ's interpretation expressed in its Statement of Interest filed in this case. While 34 C.F.R. § 104.4 is not DOJ's regulation, all of DOE's regulations must be consistent with DOJ's coordination regulations, which require, among other things, that federal fund recipients "take appropriate steps to ensure that communications with their applicants, employees, and beneficiaries are available to persons with impaired … hearing," 28 C.F.R. § 41.51(e), and "make reasonable accommodation to the known physical or mental limitations of an otherwise qualified handicapped applicant or employee unless the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program," *id*. § 41.53. The court finds that DOJ's interpretation of § 104.4 as applicable to emerging technology, including online content, is consistent with its coordinating regulations.

19

Moreover, it is neither plainly erroneous nor inconsistent with the regulation itself nor any earlier interpretation advanced by DOJ, and DOJ is not a party to this case, leaving the court no reason to suspect that the interpretation advanced by it is a "convenient litigating position," or a "*post hoc* rationalization." *United States v. Hoyt Cinemas Corp.*, 380 F.3d 558, 567 (1st Cir. 2004) (finding it proper to give some weight to DOJ's interpretation of its ADA regulation "even though the Department's gloss is offered only in a brief rather than in some more formal manner (e.g., an interpretative ruling)" (citing *Auer*, 519 U.S. at 461-62 and *Bowen*, 488 U.S. at 213)). Accordingly, Plaintiffs' claim is cognizable under the statute, as well as the general prohibitions against discrimination contained in 34 C.F.R. § 104.4.

Finally, the fact that Plaintiffs seek captioning as an accommodation for themselves and a class of similarly situated deaf and hard of hearing individuals, as opposed to on an individual basis, does not mandate dismissal of their claim as Harvard argues (Dkt. No. 40, at pp. 12-13). The four individually-named Plaintiffs each have averred that they require Harvard's online video content to be captioned in order to meaningfully access it, and they seek relief on behalf of themselves and a proposed class of deaf or hard of hearing individuals "who have been, or in the future will be, denied the full and equal enjoyment of [Harvard's] online content … because that content is not accurately captioned" (Dkt. 1, at p. 23 ¶ 82).  In other words, Plaintiffs have pleaded a lack of meaningful access and have identified captioning as the reasonable accommodation they require to gain that access.  This is sufficient to state a claim.  *See, e.g., Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 956 (N.D. Cal. 2006).  Any "flexibility [Harvard may have] to provide [some] reasonable accommodation [other than captioning] is an affirmative defense and not an appropriate basis upon which to dismiss the action."  *Id.*  Consideration of questions implicated by the defense, such as whether captioning

would provide deaf and hard of hearing individuals with meaningful access to Harvard's online audiovisual content, whether captioning would impose an undue burden on Harvard, and whether any other reasonable accommodations exist that do not impose an undue burden, require a developed factual record.  Harvard's insistence that such accommodation-related questions always must be answered on an individualized basis is wrong.[11]  Were Harvard correct, class actions under Section 504 would be categorically impossible, and such is not the case.  *See, e.g., Paulson*, 525 F.3d at 1259 (affirming the district court's grant of partial summary judgment where the plaintiffs had demonstrated that millions of visually impaired individuals lacked meaningful access to U.S. paper currency, the denominations of which, due to their uniformity to the touch, they could not ascertain without assistance from others or the use of expensive electronics and where the defendant had failed to meet its burden of proving that each accommodation identified by the plaintiffs – relating to color, size, and shape, as well as the addition of durable tactile features – would impose an undue burden).

In sum, Plaintiffs' allegations that much of Harvard's online video content is inaccessible to millions of deaf and hard of hearing individuals, and their identification of captioning as a reasonable accommodation that would afford them the meaningful access millions of non-hearing impaired individuals already enjoy, are sufficient to state a claim under Section 504.

### 2.  Title III of the ADA

Under the ADA, the obligation to reasonably accommodate arises from the statutory language itself.  Title III states that discrimination includes "a failure to take such steps as may

---

[11] Even while arguing that individualized inquiry is necessary, Harvard implicitly acknowledges the possibility of accommodating the deaf and hard of hearing as a group when it touts that it "already has made its Massive Open Online Courses accessible to individuals with hearing impairments," (Dkt. No. 48 at p. 3), by providing rolling transcripts (Dkt. No. 24 at p. 15).

be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii).  Regulations promulgated by DOJ implementing Title III require public accommodations to provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."  28 C.F.R. § 36.303(c)(1).  Captioning is a recognized auxiliary aid and service for making aurally delivered information available to individuals who are deaf or hard of hearing.  *Id*. at § 36.303(b)(1).

Again, Harvard's argument for dismissal is premised on the claim that Plaintiffs' theory of discrimination is not cognizable under the ADA.  Plaintiffs allege that Harvard – a public accommodation – has discriminated against deaf and hard of hearing individuals by failing to provide auxiliary aids and services – specifically, captioning – necessary to ensure effective communication and equal access to its online audiovisual content.  In other words, Plaintiffs' theory of disability-based discrimination under the ADA is for failure to reasonably accommodate.  This theory is cognizable under the ADA, as well as Section 504.[12]  *Nunes*, 766 F.3d at 145.

---

[12] The conclusion that the claim is tenable under both statutes should come as no surprise.  In enacting the ADA, Congress stated that "[e]xcept as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. § 790 *et seq*.) or the regulations issued by Federal agencies pursuant to such title," 42 U.S.C. § 12201(a), and federal courts routinely treat Section 504 and the ADA "as imposing parallel requirements" that are "interpreted substantially identically," *Bercovitch*, 133 F.3d at 151 n.13 (citing *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 143 (1st Cir. 1997) and quoting *Katz*, 87 F.3d at 31 n.4).

The court does not accept Harvard's argument that DOJ's regulations governing building accessibility and barrier removal under the ADA – found in the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG"), 36 C.F.R. Pt. 1191, App. B – control Plaintiffs' Title III claim and doom it because the ADAAG contain no website accessibility requirements. Harvard premises the applicability of the ADAAG on the First Circuit decision in *Carparts*. But the limited holding of *Carparts* – that the phrase "public accommodation" is not "limited to actual physical structures," *id*., 37 F.3d at 19, – does not mean *ipso facto* that the ADAAG govern the accessibility of non-physical structure public accommodations. The *Carparts* court certainly drew no such conclusion, as the ADAAG were not at issue in the case. Moreover, the ADAAG belie any such application to non-physical structures, given their stated purpose of providing "scoping and technical requirements for accessibility to sites, facilities, buildings, and elements [i.e. physical structures] by individuals with disabilities."[13] 36 C.F.R. Pt. 1191, Appendix B, § 101.1. Even if the ADAAG did apply, "the ADA 'guarantees the disabled more than mere access to … facilities; it guarantees them "full and equal enjoyment.""" *Argenyi*, 703 F.3d at 449 (quoting *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012)).

While acknowledging that some courts evaluate website accessibility under Title III's auxiliary aids standard, Harvard insists that the ADAAG must apply because of holdings like the one from this court in *Netflix* (Dkt. No. 24 at 39 n.15). Harvard misapprehends this court's holding in *Netflix*. The *Netflix* court denied the defendant's motion for judgment on the

---

[13] The ADAAG define these terms as follows: a "site" is "[a] parcel of land bounded by a property line or a designated portion of a public right of way;" a "facility" is "[a]ll or any portion of buildings, structures, site improvements, elements, and pedestrian routes or vehicular ways located on a site;" a "building" is "[a]ny structure used or intended for supporting or sheltering any use or occupancy;" and an "element" is "[a]n architectural or mechanical component of a building, facility, space, or site." 36 C.F.R. Pt. 1191, Appendix B, § 106.5.

pleadings in connection with the plaintiffs' Title III claim arising from the defendant's failure to provide closed captioning for its online streaming video content. *Id*., 869 F. Supp. 2d at 199. The court relied on *Carparts* to conclude that online businesses, such as the defendant's, could qualify as public accommodations despite not being actual physical structures, not because they are the equivalent of actual physical structures, as Harvard claims (Dkt. No. 24 at p. 29 n.15). *Id*. at 200. In fact, after finding that the defendant was a public accommodation because it fell within one or more of the general categories enumerated in the ADA, the court treated the plaintiffs' claim as arising under the auxiliary aids standard of the ADA, not under the ADAAG. *Id*. at 204 ("If the court finds that Defendant has a duty to provide closed captioning under the ADA, it may itself consider the appropriate time line for compliance, taking into account the technological and economic burdens on Defendant, under the ADA's 'undue burden' analysis after further discovery." (citing 42 U.S.C. § 12182(b)(2)(A)(iii))). Thus, the court concludes that Plaintiffs' Title III claim is neither governed, nor foreclosed, by the ADAAG.

The court is similarly unpersuaded that Plaintiffs' Title III claim must be dismissed because it deprives Harvard of the flexibility to choose an appropriate auxiliary aid. DOJ has identified the "auxiliary aid requirement [a]s a flexible one," insofar as the "public accommodation can choose among various alternatives as long as the result is effective communication." Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35544, 35566 (July 26, 1991). Here, Plaintiffs have alleged that Harvard is not providing effective communication and have requested captioning. The flexibility to choose an appropriate auxiliary aid does not extend so far as to allow a public accommodation to choose to provide no auxiliary aid when one is required for effective communication if a reasonable one exists. Moreover, as discussed above in connection with

24

Plaintiffs' Section 504 claim, "the flexibility to provide reasonable accommodation is an affirmative defense and not an appropriate basis upon which to dismiss the action." *Target*, 452 F. Supp. 2d at 956. "After [P]laintiffs state a claim – by alleging that [Harvard's online audiovisual content] is not accessible to the [deaf] – the burden then shifts to [Harvard] to assert, as an affirmative defense, that [it] already provide[s] the information … in another reasonable format…." *Id. See also Noll v. Int'l Business Machs. Corp.*, 787 F.3d 89, 98 (2d Cir. 2015) (affirming summary judgment in favor of the defendant employer where the factual record established that it already provided the deaf plaintiff with several "plainly reasonable" accommodations that resulted in effective communication with regard to intranet video and audio files, including on-demand access to ASL interpreters, transcripts upon request, and some captioning, thus dispensing with the need to consider the plaintiff's requested accommodations, consisting of captioning of all intranet videos and transcripts of all intranet audio files).

Finally, the court rejects Harvard's argument that Plaintiffs' theory of discrimination would run afoul of DOJ's "accessible or special goods" implementing regulation, which provides that a public accommodation is not required "to alter its inventory to include accessible or special goods that are designed for, or facilitate use by, individuals with disabilities," such as "Brailled versions of books, books on audio cassettes, closed-captioned video tapes, special sizes or lines of clothing, and special foods to meet particular dietary needs." 28 C.F.R. § 36.307(a), (c). Plaintiffs have alleged that Harvard provides the service of making audiovisual content publicly available for free online. Section 36.307 relates to goods, not services. *Ball v. AMC Entm't, Inc.*, 246 F. Supp. 2d 17, 24 (D.D.C. 2003) (finding DOJ's "accessible or special goods" regulation inapplicable to the plaintiffs' Title III claim arising from the defendant movie theater operators' failure to show closed captioned first run movies because the defendants provide the

"service" of screening first run movies, not a "good").  Harvard's reliance on the fairly recent

decision in *Jancik v. Redbox Automated Retail, LLC*, No. SACV 13-1387-DOC (RNBx), 2014

WL 1920751 (C.D. Cal. May 14, 2014), to support application of the "accessible or special

goods" exception to Plaintiffs' claim is, therefore, unavailing.  The *Jancik* court held only that

closed-captioned DVDs available for rent from self-service kiosks were "accessible" goods

within the meaning of 28 C.F.R. § 36.307, and, therefore, not mandated by the ADA.  *Id*. at *14.

DVD's, like video tapes, which are expressly identified in the regulation, are goods.  The holding

in *Jancik* does not apply to the service alleged in this case.[14]

    Harvard argues that § 36.307 applies to both goods and services, but the two cases it cites

do not support the claim (Dkt. No. 40 at pp. 18-19).  In *Doe v. Mut. of Omaha, Ins. Co.*, 179 F.3d

557 (7th Cir. 1999), the court held that "section 302(a) [of the ADA, 42 U.S.C. § 12182(a),] does

not require a seller to alter his product to make it equally valuable to the disabled and to the

nondisabled, even if the product is insurance."  *Id*. at 563.  Consequently, the court found that

the defendant insurance company's policy caps on AIDS and AIDS-related conditions did not

violate Title III.  *Id*.  The court did not rely on the "accessible or special goods" exception,

however; the single mention it made of the exception was the observation that, by its terms, it

exempts stores from altering inventory to stock specially designed goods, such as Braille books.

*Id*. at 559.  Rather, the court analyzed the issue before it by interpreting the general Title III

prohibition on discrimination, 42 U.S.C. § 12182, which, by its terms, applies to both "goods"

---

[14] The *Jancik* court did not address whether a captioning requirement with respect to the
defendant's internet-only streaming video programming would implicate 28 C.F.R. § 36.307,
because it held that the streaming service was not a place of public accommodation in line with
Ninth Circuit precedent limiting the definition of "place of public accommodation" to "actual,
physical places."  *Id*. at *8 (citing *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104,
1115 (9th Cir. 2000)).  As discussed, this is not the law in the First Circuit.  *Carparts*, 37 F.3d at
19; *Netflix*, 869 F. Supp. 2d at 200.

and "services" of public accommodations. *Id*. at 559-61. The observation that Title III overall applies to both goods and services does not mean that the DOJ's "accessible or special goods" exception also applies to both goods and services.

Harvard also relies on a Ninth Circuit decision in another insurance case, *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000), but *Weyer* also does not stand for the proposition that DOJ's "accessible or special goods" exception applies to both goods and services. *Weyer* did address the "general rule that public accommodations do not have to provide different services for the disabled," but the Ninth Circuit has explained that "the requirement that establishments provide auxiliary aids and services limits" that general rule. *Arizona ex rel. Goddard v. Harkins Admin. Enters., Inc.*, 603 F.3d 666, 672 (9th Cir. 2010) (discussing *Weyer*)). In other words, the auxiliary aid requirement functions as an exception to the general "accessible or special goods" rule because, "[b]y its very definition, an auxiliary aid or service is an additional and different service that establishments *must* offer the disabled." *Id.* (emphasis added).

Harvard argues that this case does not present the appropriate circumstances for the general rule that public accommodations need not provide different services for the disabled to give way to Title III's auxiliary aids standard, as described in *Harkins*, because it is not an auxiliary aids case (Dkt. No. 40 at p. 19). The court disagrees; this is a prototypical auxiliary aids case. Plaintiffs have alleged that Harvard provides a service – making online video content available to the public for free – which is inaccessible to the deaf and hard of hearing because of Harvard's failure to provide captioning.[15] The inapplicability of the "accessible or special

---

[15] The court does not disagree with Harvard's observation that Title III does not require it to create or publish accessible online videos *per se* (Dkt. No. 24 at p. 34). But that observation does not go far enough. If Harvard chooses to make videos available online as a service to the

goods" exception does not mean that Harvard must provide captioning as a matter of law.
Harvard nevertheless may be able to demonstrate that providing captioning, or any other
available auxiliary aid or service, "would fundamentally alter the nature" of its service or result
in an undue burden. 42 U.S.C. § 12182(b)(2)(A)(iii). These, however, are questions of fact,
unsuitable for resolution at the motion to dismiss stage. *E.g., Harkins*, 603 F.3d at 675.

Thus, neither Title III nor the DOJ implementing regulations foreclose Plaintiffs' theory
of liability as a matter of law.

### C. Primary Jurisdiction Doctrine

Having concluded that Plaintiffs' claims are not subject to dismissal for failure to state a
claim, the court turns to Harvard's request for dismissal or a stay under the doctrine of primary
jurisdiction.

### 1. The Legal Framework

The Supreme Court "recognized early in the development of administrative agencies that
coordination between traditional judicial machinery and these agencies was necessary if
consistent and coherent policy were to emerge." *Port of Boston Marine Terminal Ass'n v.
Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 68 (1970) (citing *Texas & P. Ry. Co. v. Abilene
Cotton Oil Co.*, 204 U.S. 426 (1907)). Accordingly, the doctrine of primary jurisdiction
developed to "promot[e] proper relationships between the courts and administrative agencies
charged with particular regulatory duties."[16] *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63

---

general public, then it cannot discriminate against deaf and hard of hearing individuals in the
"full and equal enjoyment" of that service. 42 U.S.C. § 12182(a).

[16] While the doctrine is referred to under the label "primary jurisdiction," "[t]he problem, strictly
speaking, is not one of jurisdiction. Indeed it comes into play only when both the court and the
agency have jurisdiction over at least portions of the dispute. Rather the problem is one of
harmony, efficiency, and prudence." *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 581
n.1 (1st Cir. 1979).

(1956).  "Broadly speaking, the doctrine, informed by principles of deference to agency decisionmaking, gives effect to the eminently sensible notion that 'in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over.'"  *Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 992 (1st Cir. 1995) (quoting *Far East Conference v. United States*, 342 U.S. 570, 574-75 (1952)).  *See also Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 580 (1st Cir. 1979) (noting that the doctrine "primarily serves as a means of coordinating administrative and judicial machinery," in order to "promote uniformity and take advantage of agencies' special expertise" (citations omitted)).  "The doctrine … should seldom be invoked unless a factual question requires both expert consideration and uniformity of resolution."  *Locust Cartgage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334, 340 n.5 (1st Cir. 1970).  When it is, "the judicial process is suspended pending referral … to the administrative body for its views."[17]  *W. Pac. R.R. Co., 352 U.S. at* 64 (citing *Gen. Am. Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433 (1940)).  Referral to the administrative agency does not deprive the court of jurisdiction; the court has discretion either to retain jurisdiction, or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice.  *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993) (citations omitted); *Am. Auto. Mfrs. Ass'n v. Massachusetts Dep't of Envtl. Prot.*, 163 F.3d 74, 82 (1st Cir. 1998).

---

[17] As this court has recognized, however, "'[r]eferral' is generally a misnomer because few statutes allow a court 'to demand or request a determination from [an] agency; that is left to the adversary system.'"  *Palmer Foundry, Inc. v. Delta-HA, Inc.*, 319 F. Supp. 2d 110, 113 (D. Mass. 2004) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268 n.3 (1993)).  "Instead, a court invokes the doctrine … by staying its proceedings to allow one of the parties to file an administrative complaint seeking resolution of a particular issue."  *Id*. (citing *Reiter*, 507 U.S. at 268 n.3).

"No fixed formula exists for appl[ication of] the doctrine …." *W. Pac. R.R. Co.*, 352 U.S. at 64. Rather, "[i]n every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Id. See also PHC, Inc. v. Pioneer Healthcare, Inc.,* 75 F.3d 75, 80 (1st Cir. 1996) ("The primary jurisdiction rubric is less an organized doctrine than a set of precedents that guide courts in deciding when an issue should be resolved in the first instance by an agency that has special competence to address it." (citing *W. Pac. R.R. Co., 352 U.S. at* 64)); *Brown v. Sec'y of Health & Human Servs.*, 46 F.3d 102, 114 (1st Cir. 1995) ("The doctrine[] of … primary jurisdiction … [consists of] judge-made rules to be applied on a case-by-case basis, taking into account the purposes of the doctrine[]." (citations omitted)). Notwithstanding the lack of a fixed formula, the First Circuit has "synthesized Supreme Court doctrine by identifying three principal factors which a court should consider in determining whether to defer: '(1) whether the agency determination lay at the heart of the task assigned the agency by Congress; (2) whether agency expertise was required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.'" *New England Legal Found. v. Massachusetts Port Auth.*, 883 F.2d 157, 172 (1st Cir. 1989) (quoting *Mashpee Tribe*, 592 F.2d at 580-81).

> The first factor reflects the doctrine's goals of avoiding disruption of an agency's regulatory regime and promoting uniformity in regulatory interpretation. It manifests the courts' respect for executive agencies' power to perform their core functions as assigned by Congress. The second two factors reflect the doctrine's goal of promoting judicial economy through an efficient allocation of courts' and agencies' overlapping duties. These factors ask, essentially, whether and how the court might benefit from an agency's fact-finding abilities.

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. and Sales Practices Litig.*, No. 12-md-2320-PB, 2013 WL 1124081, at *3 (D.N.H. March 18, 2013) (citing *United States v. Philip Morris USA Inc.*, 686 F.3d 832, 837 (D.C. Cir. 2012)). "These factors, however, must be balanced against the potential for delay inherent in the decision to refer an issue to an administrative agency." *Am. Auto. Mfrs. Ass'n*, 163 F.3d at 81 (citing *PHC, Inc.,* 75 F.3d at 80-81). Because of the "added expense and delay" attendant to invocation of the doctrine, it "is to be 'invoked sparingly.'" *Alpharma, Inc., v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005) (quoting *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 477 (8th Cir. 1988)). *Cf. Palmer Foundry*, 319 F. Supp. 2d at 112 (noting that the case presented a "rare instance" when invocation of the doctrine was appropriate). "In cases where the potential for delay is found to be too great to justify a straightforward referral, the court may, in its discretion, … choose not to refer the matter to the agency, or take such other action as it deems appropriate," such as referring a matter while "explicitly providing … that if the agency fails to rule within a reasonable amount of time, the court [will] … vacate the referral order and decide the matter itself …." *Am. Auto. Mfrs. Ass'n*, 163 F.3d at 81-82.

## 2. Application of the Framework to this Case

Harvard premises its primary jurisdiction argument on DOJ's publication on July 26, 2010, of an Advanced Notice of Proposed Rulemaking ("ANPRM") on Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations. 75 Fed. Reg. 43,460-01 (July 26, 2010). In the ANPRM, DOJ announced its consideration of revising its Title III regulations to "establish requirements for making the goods, services, facilities, privileges, accommodations, or advantages offered by public accommodations via the Internet, specifically at sites on the World Wide Web (Web), accessible to individuals with

disabilities," as well as its Title II regulations to establish "requirements for making the services, programs, or activities offered by State and local governments to the public via the Web accessible." *Id*. Harvard seeks dismissal of this action, or, alternatively, a stay pending either DOJ's issuance of proposed Title III requirements, which DOJ now anticipates occurring sometime in fiscal year 2018, or DOJ's issuance of proposed Title II requirements, which DOJ anticipates occurring in the first quarter of 2016.[18]  *See* U.S. Dep't of Justice, Statement of Regulatory Priorities (2015).

Based on consideration of the factors identified by the First Circuit, the court concludes that this case does not present one of those rare instances when the primary jurisdiction doctrine should be invoked. Neither of the twin purposes underlying the doctrine – the promotion of desirable uniformity in determining administrative questions and the resort to the specialized expertise of an agency in resolving highly technical questions of fact – would be aided by application of the doctrine in this case. On the other hand, the potential for a delay of unknown duration while the federal administrative rulemaking process proceeds on is great.

(a) <u>Does agency determination lie at the heart of the task assigned to DOJ by Congress?</u>

DOJ's mandate with respect to Title III of the ADA is "to issue implementing regulations, *see* 42 U.S.C. § 12186(b), to render technical assistance explaining the responsibilities of covered individuals and institutions, § 12206(c), and to enforce Title III in court, § 12188(b)." *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998). As such, it is certainly within DOJ's ambit to issue implementing regulations addressing website accessibility requirements for

_____

[18] The latter stay – pending DOJ's issuance of proposed Title II requirements – is essentially a fallback position Harvard assumed after oral argument, when Plaintiffs notified the court that DOJ had again pushed back the time when it expected to issue its proposed Title III regulations (Dkt. Nos. 47 and 48).

public accommodations, which, as evidenced by the ANPRM, it is considering doing.  But Plaintiffs are not asking this court to issue broadly applicable implementing regulations. Plaintiffs seek declaratory relief that Harvard has discriminated against the deaf and hard of hearing in its provision of online video content and injunctive relief requiring Harvard to provide captioning.  DOJ has the power to provide neither.  Rather, DOJ, like Plaintiffs, must turn to the courts for enforcement.  42 U.S.C. § 12186 (b)(1)(B) ("Potential Violation – If the Attorney General has reasonable cause to believe that – (i) any person or group of persons is engaged in a pattern or practice of discrimination under this subchapter; or (ii) any person or group of persons has been discriminated against under this subchapter and such discrimination raises an issue of general public importance, the Attorney General may commence a civil action in any appropriate United States district court.").  Whether a case is brought by a private citizen or the Attorney General, it is the function of the court to decide whether a particular defendant has violated the ADA's prohibition against disability-based discrimination.  This includes a determination of "the extent to which accommodations are required under the ADA and when such accommodations constitute an undue burden on [a particular defendant]."  *Arizona ex rel. Goddard v. Harkins Admin. Servs.*, No. CV-07-00703-PHX-ROS, 2011 U.S. Dist. LEXIS 127682, at * 8 (February 8, 2011) ("Referral to the DOJ will not resolve the question presented in this case:  to what extent, if at all, the ADA … require[s] *these Defendants* install captioning and video description devices in *their* movie theaters.  If and when the DOJ issues a final rule, the Court must still determine at what point, if at all, installing captioning and video description devices imposes an undue burden on *these Defendants*." (emphasis in original)).  Thus, determination of the issues raised by Plaintiffs' complaint does not lie at the heart of the task assigned to DOJ by Congress. *Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 691-92 (3d Cir. 2011) (concluding that the matter

before the court was not particularly within the discretion of the New Jersey Department of Environmental Protection (NJDEP) where neither the Resource Conservation and Recovery Act nor the Clean Water Act charged the agency with enforcement, instead authorizing federal courts to address environmental issues in citizen suits).

Nor would the court's determination of the issues raised by Plaintiffs' complaint and Harvard's potential defenses run the risk of undermining the consistency of DOJ's regulatory interpretation. Findings on the issues of undue burden and fundamental alteration would be specific to Harvard and the service it is alleged to be providing. Any declaratory and injunctive relief would apply only to Harvard. *Compare U.S. Pub. Int. Research Grp. v. Atl. Salmon of Me., LLC*, 339 F.3d 23, 34 (1st Cir. 2003) (noting that "the necessary focus upon the actions of two particular companies" weighed against referral on primary jurisdiction grounds), *Mashpee Tribe*, 592 F.2d at 581 ("The resolution will not affect rights of others than the parties except in the traditional legal effect that our opinion will have as precedent."), *and Heightened Indep. & Progress v. Port Auth. of New York and New Jersey*, No. 07-2982 (JAG), 2008 WL 5427891, at *5 (D.N.J. December 30, 2008) ("This case involves whether elevators should have been installed at one particular PATH station, so there is no broad implication for the overall ADA regulatory scheme."), *with Blackstone Valley*, 67 F.3d at 992-993 (referring to the EPA the question of whether ferric ferrocyanide constituted a "hazardous substance" within the meaning of the CERCLA statute, as the answer would have significant implications at facilities across the country), *Figy v. Amy's Kitchen, Inc.*, 37 F. Supp. 3d 1109, 1113 (N.D. Cal. 2014), *judgment set aside by*, No. C 13-03816-SI, 2014 WL 3362178, at *4 (N.D. Cal. July 7, 2014) (referring to the FDA the question of whether organic evaporated cane juice was the common or usual name of the ingredient in issue, a determination which would apply to every food product containing the

ingredient), *and Palmer Foundry*, 319 F. Supp. 2d at 114 (referring to OSHA the question of
"whether the alkyd resin, by way of its active ingredient linseed oil, was an 'oxidizer' pursuant to
OSHA regulations" because "the resin's active ingredient—linseed oil—is widely sold,
distributed, and used" and a regulatory classification from the court "could generate
inconsistency and disrupt ongoing commercial practices," whereas a determination by OSHA
"would insure national uniformity").

Even if the court ultimately were to impose captioning or other auxiliary aid or service
obligations on Harvard that turn out to be more exacting than DOJ's eventual implementing
regulations, it would not undermine the uniformity of DOJ's regulatory interpretation.[19] "The
issue is not how much more time or how many more resources [Harvard] may or may not be
required to expend as a result of an injunctive order by this court. Extra burden is not what the
doctrine is meant to circumvent; additional obligation is not incompatible with nor does it
undermine the agency-driven process." *Maine People's Alliance v. Holtrachem Mfg. Co., LLC*,
No. Civ. 00-69-B-C, 2001 WL 1602046, at *8 (D. Me. Dec. 14, 2001). *See also Baykeeper*, 660
F.3d at 692 ("In light of agency inaction … over the last several years, we see little danger of a
court-ordered remediation conflicting with NJDEP directives. Moreover, in the event the
District Court orders remediation that imposes an additional burden on [the defendant], 'a more
stringent remediation standard … is not a reason to invoke the primary jurisdiction doctrine.'"
(quoting *Interfaith Cmty. Org. Inc. v. PPG Indus.*, 702 F. Supp. 2d 295, 312 (D.N.J. 2010))).
While it might be inconvenient for Harvard to be held to a higher standard of accessibility than
the DOJ requires if it ever issues its regulations, convenience of the parties is not a relevant

---

[19] Of note, this potentiality is what Harvard identifies as the worst possible outcome of this
court's deciding this case (Dkt. No. 24, at p. 26).

consideration in the primary jurisdiction analysis. *Fontan-de-Maldonado v. Lineas Aereas Costarricenses, S.A.*, 936 F.2d 630, 632 (1st Cir. 1991) (citing *Distrigas of Massachusetts Corp. v. Boston Gas Co.*, 693 F.2d 1113, 1117-19 (1st Cir. 1982)). As long as the burden imposed on Harvard in the court's issuance of injunctive relief does not rise to the level of undue, it would not run afoul of the ADA.

Because determination of the issues raised by Plaintiffs' complaint does not lie at the heart of the task assigned to DOJ by Congress, this factor weighs against a stay.

(b) Is DOJ expertise required to unravel intricate technical facts?

Harvard's argument for invocation of primary jurisdiction is premised largely on the consequences that ostensibly would result from the court's imposition of a captioning requirement, and its assessment of the courts as being ill-equipped to unravel intricate technical facts relating to website accessibility that are necessary to fashion appropriate relief. As an initial matter, consideration of any possible remedy at the motion to dismiss stage is premature. Should the court find that the deaf and hard of hearing lack meaningful access to Harvard's online video content, there will be ample opportunity, after discovery, for Harvard to show that providing captioning will be so burdensome a task that it threatens scholarly use of the internet, under the ADA's "undue burden" and "fundamental alteration" analyses. Nevertheless, looking ahead, consideration of these defenses will not raise factual issues that call for any specialized expertise *of the DOJ*. These may include issues such as: the nature of the service Harvard provides, including whether that service varies depending on whether Harvard created the content or not, which website is in issue (e.g. websites under central administrative control versus third party websites), or how the content became publicly available (e.g. posted under central administrative control or by faculty, students, or alumni); the financial and administrative

36

burdens a captioning requirement would impose on Harvard, including how those burdens might vary based on all of the same factors; the availability of different technologies for captioning online audiovisual content; the availability of other auxiliary aids or services; and Harvard's resources. The court is well-equipped to address these questions. *Compare Mashpee Tribe*, 592 F.2d at 581 ("[T]he facts in this case, though developed and interpreted in part with the expert help of historians and anthropologists, are not so technical as to be beyond the understanding of judges or juries."), *and Romano v. SLS Residential Inc.*, 246 F.R.D. 432, 443 (S.D.N.Y. 2007) ("[T]he underlying factual questions, such as what treatment was given, and abuse suffered by the plaintiffs, are certainly within this Court's ability to evaluate, and would not be illuminated by the expertise of the [Office of Mental Health]."), *with Blackstone Valley*, 67 F.3d at 992 ("The judicial machinery is ill-suited to fashioning a workable rule for determining whether the substance [ferric ferrocyanide] by virtue of its chemical, structural, functional, and other qualities, falls within the properly conceived definition of 'cyanides.' That determination is much better left to the EPA."), *and Figy*, 37 F. Supp. 3d at 1113 (noting that the determination of whether "organic evaporated cane juice" was the common or usual name of the ingredient at issue involved technical questions, including "ECJ's method of production, the differences between ECJ and other sweeteners, and its basic characterizing properties"), *and Palmer Foundry*, 319 F. Supp. 2d at 114 (referring to OSHA the "highly technical question" of whether the alkyd resin was an "oxidizer" pursuant to OSHA regulations).

Harvard maintains that "DOJ has the expertise to 'unravel intricate, technical facts' governing website and online video accessibility" (Dkt. No. 24, at p. 25), but Harvard proffers no basis for the assertion, and there is no inherent reason for concluding that DOJ has any specialized technical expertise regarding internet accessibility. Moreover, the ANPRM counsels

37

the opposite conclusion. In it, DOJ seeks input from "experts in the field of computer science, programming, networking, assistive technology, and other related fields" to assist it in formulating regulations addressing website accessibility. 75 Fed. Reg. at 43,464. If DOJ had specialized technical expertise, it would not need to solicit it from the outside. Even if the DOJ has acquired some measure of expertise based on input from outside experts in response to the ANPRM issued nearly 6 years ago, "[t]he doctrine does not require that all claims touching on an agency's expertise first be decided by the agency." *See County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1251 (9th Cir. 2009), *rev'd on other grounds, Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011). To the extent that the court needs help unraveling intricate, technical facts governing website and online video accessibility, it, too, can hear from experts.

Should the court reach the point of considering injunctive relief, it is not limited to requiring Harvard to caption every audiovisual file posted on every Harvard-related website identified by Plaintiffs for the foreseeable future. There may be shades of gray, which the court is as capable of considering as DOJ. *See, e.g., Rothschild*, 907 F.2d at 293 (finding it reasonable to limit the requirement that the defendant provide a sign-language interpreter for deaf parents to school-initiated conferences incident to the academic and/or disciplinary aspects of their child's education, but not at the child's graduation or the plethora of extra-curricular activities their child might engage in). The court might consider such options as limiting injunctive relief to only certain websites or to content made available only by certain means, creating a timeline for compliance, and treating certain existing material under a grandfather clause. *E.g., Netflix*, 869 F. Supp. 2d at 204 ("If the court finds that Defendant has a duty to provide closed captioning under the ADA, it may itself consider the appropriate time line for compliance, taking into account the technological and economic burdens on Defendant, under the ADA's 'undue burden'

analysis after further discovery.").  The court may even consider the possibility of instituting injunctive relief that "provide[s] adequate flexibility to coordinate its decision with subsequent regulatory action."  *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 419 (5th Cir. 1976) (citing *Otter Tail Power Co. v. United States*, 410 U.S. 366, 375-76 (1973) (noting that the injunctive decree of the district court included language that "'[t]he defendant shall not be compelled by the Judgment in this case to furnish wholesale electric service or wheeling service to a municipality except … under terms and conditions which are filed with and subject to approval by the Federal Power Commission,'" and had an "open end by which th[e] court retain[ed] jurisdiction 'necessary and appropriate' to carry out the decree or 'for the modification of any of the provisions'")).

Because no specialized technical expertise of the DOJ is required to unravel intricate technical facts, this factor also weighs against a stay.  Having found that there is no "factual question [that] requires both expert consideration and uniformity of resolution," the court concludes that this is not an appropriate case for invocation of the doctrine of primary jurisdiction.  *Locust Cartage Co.*, 430 F.2d at 340 n.5.  Nevertheless, the court will address the remaining factors.

(c)  Would DOJ determination materially aid the court?

DOJ's issuance of its proposed rules pertaining to state and local government entities or public accommodations may be of some aid to the court.  However, this possibility is not determinative of the primary jurisdiction analysis.  *New England Legal Found.*, 883 F.2d at 172 (quoting *Mashpee Tribe*, 592 F.2d at 580).  Further, there is no reason that this case and the administrative process cannot proceed simultaneously on separate tracks.  Should DOJ issue

either set of proposed rules while this case is still pending, the parties can bring them to the attention of the court so that the court can have the benefit of whatever aid they may offer.

Moreover, while the proposed rules may be of some aid, that aid is likely to be quite limited. Even if DOJ issues proposed rules, they will be just that – proposed. The court would still have to consider how the proposed rules might shed light on the specific questions presented in this case – whether Harvard has violated the ADA's prohibition against disability-based discrimination and the extent to which Harvard is required to provide accommodations under the ADA, if at all.

Additionally, the court already has access to the views of DOJ to an appreciable extent. DOJ has filed an appearance as an interested party on behalf of the United States. *See TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 74 (2d Cir. 2002) ("Amicus briefs from an agency can serve much of the interest in consistency and uniformity of law that underlies the doctrine of primary jurisdiction, while avoiding some of the delay that sometimes results from dismissing on the ground of primary jurisdiction."). In its Statement of Interest, DOJ reiterates its long-standing position that "the ADA applies to the Internet and web-based goods and service providers," which it expressed beginning as far back as two decades ago. *Scribd*, 97 F. Supp. 3d at 574 (citing Letter from Deval L. Patrick, Assistant Att'y Gen., to Senator Tom Harkin (Sept. 9, 1996) ("Covered entities under the ADA are required to provide effective communication, regardless of whether they generally communicate through print media, audio media, or computerized media such as the Internet."); *Applicability of the Americans with Disabilities Act (ADA) to Private Internet Sites: Hearing before the House Subcommittee on the Constitution of the House Committee on the Judiciary,* 106th Cong., 2d Sess. 65–010 (2000) ("It is the opinion of the Department of Justice currently that the accessibility requirements of the Americans with

Disabilities Act already apply to private Internet Web sites and services."); 75 Fed. Reg. 43460–01 (July 6, 2010) ("The Department believes that title III reaches the Web sites of entities that provide goods or services that fall within the 12 categories of 'public accommodations,' as defined by the statute and regulations.")).  DOJ has not wavered from its view that the ADA's "broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on Web sites over the Internet."  75 Fed. Reg. 43,460-01, 43,463.  The plain language of Title III mandating "'full and equal enjoyment' requires nondiscrimination by a place of public accommodation in the offering of all its goods and services, including those offered via Web sites."  *Id.*  Given the consistency with which DOJ has expressed its views, the court does not view the DOJ's position that Plaintiffs have stated a claim under existing Title III statutory and regulatory requirements as being "tailored to and articulated specifically for purposes of this particular litigation."  *Blackstone Valley*, 67 F.3d at 991.

Indeed, the impetus for the ANPRM was not because the DOJ viewed the ADA as not already mandating website accessibility for the disabled.  Rather, as DOJ explained in the ANPRM, "[i]t has been the policy of the United States to encourage self-regulation with regard to the Internet wherever possible and to regulate only where self-regulation is insufficient and government involvement may be necessary."  75 Fed. Reg. 43,460-01, 43,463 (citation omitted).  While "[v]oluntary standards have generally proved to be sufficient where obvious business incentives align with discretionary governing standards as, for example, with respect to privacy and security standards designed to increase consumer confidence in e-commerce," "[i]t is clear that the system of voluntary compliance has proved inadequate in providing Web site accessibility to individuals with disabilities."  *Id.* at 43,463-64 (citations omitted).  By way of

example, DOJ identified "Web videos and other multimedia presentations that do not have captions," as inaccessible to the deaf. *Id*. at 43462.

Thus, the court credits the views of the DOJ as expressed in this case. Further, the DOJ's consistently stated position cannot be squared with the notion that, until DOJ issues specific regulations governing website accessibility, if it ever does, public accommodations such as Harvard may discriminate against the disabled in connection with the goods, services, facilities, privileges, accommodations, and advantages they offer via the internet.

(d) <u>What are the prospects for a timely resolution if the issue is referred?</u>

The prospects for timely action by DOJ are not good. DOJ has announced that it does not anticipate publishing its Notice of Proposed Rulemaking ("NPRM") regarding public accommodations under Title III until fiscal year 2018, two years away.[20] *See* U.S. Dep't of Justice, Statement of Regulatory Priorities (2015). This is not a case where agency action is imminent such that concerns of delay can be considered minimal. *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, No. 11-cv-30168-MAP, 2011 WL 5519883, at *1 (granting a three-month stay pending imminent rule-making action by the FCC).

In response to this development, Harvard suggests that the court nevertheless should stay this matter until DOJ issues its NPRM for websites operated by state and local government entities covered by Title II, which DOJ has slated to occur in the first quarter of 2016. Harvard's argument that this court should issue a stay pending the DOJ's issuance of proposed rules, which, even if they are ever enacted, would not apply to Harvard because they "should go a long way" toward addressing the validity of Plaintiffs' Title III claim, is attenuated (Dkt. No. 48 at p.

---

[20] This timeframe is not guaranteed.

42

3).  These circumstances do not present an appropriate case for delaying resolution of claims Plaintiffs have properly brought before this court.  There is a "'strong public interest in the prompt resolution' of the case," and it would be inappropriate to "defer to administrative action of uncertain aid and uncertain speed."  *Mashpee Tribe*, 592 F.2d at 581 ("[W]e cannot be sure how helpful the Department's ultimate decision might be.  We can, however, be certain that the decision will not be available soon.  The court was right to respect the 'strong public interest in the prompt resolution' of the case and not defer to administrative action of uncertain aid and uncertain speed.").

Harvard acknowledges that there is uncertainty as to when DOJ will act, but claims that federal courts have applied the doctrine of primary jurisdiction even where there is uncertainty as to the timing of agency action.  Harvard relies on *Heinrichs v. Wells Fargo Bank, N.A.*, No. C 13-05434 WHA, 2014 WL 2142457 (N.D. Cal. Apr. 15, 2014), where the district court granted a stay until the earlier of 6 months or the Federal Communication Commission's taking action on two petitions pending before it that would be dispositive on the issue of whether the plaintiffs had a viable theory of liability.  Id. at *2.  *Heinrichs*, however, counsels against a stay in these circumstances.  Six months after implementing the stay, the *Heinrichs* court dissolved it after determining that the FCC would not be issuing a final decision on the two petitions within the 6-month stay period and further, that the FCC was unable to predict when it might reach a final decision.  *See Heinrichs v. Wells Fargo Bank, N.A.*, No. C 13-05434 WHA, Dkt. No. 62, Order Lifting Stay and Setting Case Management Conference (issued October 16, 2014).  At least two subsequent courts have declined to issue stays based, in part, on *Heinrichs.  See Abrantes v. Northland Grp., Inc.*, No. 14-cv-05311-YGR, 2015 WL 1738255, at *4 (N.D. Cal. April 13,

43

2015); *Jordan v. Nationstar Mortg., LLC,* No. 14-cv-00787-WHO, 2014 WL 5359000, at *1

(N.D. Cal. October 20, 2014).

Finally, the court does not accept Harvard's claim that Plaintiffs will not be injured by

imposition of a stay. If Harvard is in violation of Title III as Plaintiffs allege, then Plaintiffs will

continue to be unlawfully harmed until this case is resolved. Thus, extending the period of time

Plaintiffs must wait for a possible remedy through imposition of a stay would be prejudicial.

*Compare PHC, Inc.*, 75 F.3d at 80 (noting in declining to defer based on primary jurisdiction

concerns that when a plaintiff's claim is for trademark infringement, there is "often some

urgency" because "[o]ngoing business conduct is likely to be involved and harm, possibly

irreparable, may be accruing), *with Blackstone Valley*, 67 F.3d at 993 n.16 (noting that, in

remanding the case to the district court for entry of a stay and referral to the Environmental

Protection Agency, the Commonwealth's interests were protected because the defendant had

placed the amount sought in damages in an interest bearing trust account).

IV.    Conclusion

For these reasons, it is this court's RECOMMENDATION that Defendant's Motion to

Stay or Dismiss be denied in its entirety.[21]

---

[21] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P.
59(b), any party who objects to these findings and recommendations must file a written objection
with the Clerk of this Court within fourteen (14) days of the party's receipt of this Report and
Recommendation. The written objection must specifically identify the portion of the proposed
findings or recommendations to which objection is made and the basis for such objection. The
parties are further advised that failure to comply with this rule shall preclude further appellate
review by the Court of Appeals of the District Court order entered pursuant to this Report and
Recommendation. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir.
1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702
F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park
Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980). *See also Thomas v. Arn*,
474 U.S. 140, 154-55 (1985). A party may respond to another party's objections within fourteen
(14) days after being served with a copy thereof.

/s/ Katherine A. Robertson
KATHERINE A. ROBERTSON
United States Magistrate Judge

DATED: February 9, 2016