# Exhibit A

**No.**

# In the Supreme Court of the United States

DOMINO'S PIZZA LLC, PETITIONER,

*v.*

GUILLERMO ROBLES, RESPONDENT.

*ON PETITION FOR A WRIT OF CERTIORARI
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI**

GREGORY F. HURLEY
SHEPPARD, MULLIN,
RICHTER & HAMPTON
LLP
   *650 Town Center Drive,
4th Floor
Costa Mesa, CA 92626
(714) 513-5100*

   *\*Admitted only in NY. Practice
supervised by D.C. Bar members pursuant to D.C. Court of
Appeals Rule 49(c)(8).*

LISA S. BLATT
   *Counsel of Record*
SARAH M. HARRIS
MENG JIA YANG
SURAJ KUMAR\*
WILLIAMS & CONNOLLY
LLP
   *725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
lblatt@wc.com*

**QUESTION PRESENTED**

Title III of the Americans with Disabilities Act (ADA) provides, in relevant part, that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." The question presented is:

Whether Title III of the ADA requires a website or mobile phone application that offers goods or services to the public to satisfy discrete accessibility requirements with respect to individuals with disabilities?

(I)

**CORPORATE DISCLOSURE STATEMENT**

Petitioner Domino's Pizza LLC, is a subsidiary of Domino's Pizza, Inc., a publicly held company. Domino's Pizza, Inc. has no parent corporation, and no publicly held company owns 10% or more of its stock.

(II)

TABLE OF CONTENTS

Page

OPINIONS BELOW ...................................................1

JURISDICTION...........................................................1

STATUTORY PROVISIONS INVOLVED....................1

STATEMENT...............................................................3

    A.  Statutory and Regulatory Framework...............7

    B.  Factual Background and Proceedings Below....11

REASONS FOR GRANTING THE PETITION.........14

    A.  The Decision Below Exacerbates a Circuit Split
        Over Whether Website Inaccessibility Violates
        Title III ............................................................15

    B.  The Question Presented Is Recurring and
        Important.........................................................25

    C.  The Ninth Circuit's Decision Is Wrong............31

CONCLUSION...........................................................35

**TABLE OF AUTHORITIES**

Cases:

    *Access Living of Metropolitan Chi. v. Uber
        Techs., Inc.*, 351 F. Supp. 3d 1141 (N.D. Ill.
        2018) ...................................................................23

    *Access Now, Inc. v. Sw. Airlines, Co.*, 227 F.
        Supp. 2d 1312 (S.D. Fla. 2002).............................23

    *Andrews v. Blick Art Materials, LLC*, 268 F.
        Supp. 3d 381 (E.D.N.Y. 2017).............................23

    *Carparts Distribution Ctr., Inc. v. Automotive
        Wholesaler's Ass'n of New England, Inc.*, 37
        F.3d 12 (1st Cir. 1994) ....................................16, 18

    *Del-Orden v. Bonobos*, No. 17 Civ. 2744, 2017
        WL 6547902 (S.D.N.Y. Dec. 20, 2017)................31

Page

Cases–continued:

*Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557 (7th Cir. 1999) ..................................... 16

*Ford v. Schering-Plough Corp.*, 145 F.3d 601 (3d Cir. 1998) ............................. 17, 19, 22

*Gil v. Winn-Dixie Stores, Inc.*, 257 F. Supp. 3d 1340 (S.D. Fla. 2017) ............................. 28

*Gomez v. Bang & Olufsen Am., Inc.*, No. 1:16-cv-23801, 2017 WL 1957182 (S.D. Fla. Feb. 2, 2017) ................................................ 23

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ........... 32

*Morgan v. Joint Admin. Bd., Ret. Plan*, 268 F.3d 456 (7th Cir. 2001) ............................. 16, 18, 23

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196 (D. Mass. 2012) ............................... 23

*Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28 (2d Cir. 1999) ................................................... 16, 18

*Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006 (6th Cir. 1997) (en banc) .................. 17, 20, 22

*Peoples v. Discover Fin. Servs., Inc.*, 387 F. App'x 179 (3d Cir. 2010) ........................... 17, 19, 22

*PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001) ......... 7

*Rendon v. Valleycrest Productions, Ltd.*, 294 F.3d 1279 (11th Cir. 2002) ................................... 21

*Reno v. ACLU*, 521 U.S. 844 (1997) ........................ 31

*Robles v. Yum! Brands, Inc.*, 2:16-cv-08211, 2018 WL 566781 (C.D. Cal. Jan. 24, 2018) .......... 12

*Stoutenborough v. Nat'l Football League, Inc.* 59 F.3d 580 (6th Cir. 1995) ................................... 20

*Walker v. Sam's Oyster House, LLC*, No. 18-193, 2018 WL 4466076 (E.D. Pa. Sept. 18, 2018) ................................................................... 23

(IV)

Page

Cases–continued:

*Weyer v. Twentieth Century Fox Film Corp.,*
   198 F.3d 1104 (9th Cir. 2000).........................17, 21
*Wilmette Park Dist. v. Campbell,* 338 U.S. 411
   (1949) ..................................................................... 32

Statutes and regulations:

Americans with Disabilities Act of 1990, Pub.
   L. No. 101-336, 104 Stat. 327. ...................... passim
28 U.S.C. § 1254(1) ......................................................1
42 U.S.C. § 12131(1) ...................................................7
42 U.S.C. § 12181(7) ..........................................7, 8, 32
42 U.S.C. § 12182(a) ................................. 8, 16, 32, 33
42 U.S.C. § 12182(b)(1)(B) .........................................8
42 U.S.C. § 12182(b)(2)(A)(iii) ..................................8
42 U.S.C. § 12182(b)(2)(A)(iv) ...................................8
42 U.S.C. § 12186(b) ....................................................9
28 C.F.R. § 36.104 .......................................................8
28 C.F.R. § 36.303(b)...................................................8

Miscellaneous:

Shannon Behnken, *Businesses 'sitting ducks'*
   *for lawsuits because websites aren't ADA*
   *compliant,* WLFA (Feb. 7, 2019),
   <https://tinyurl.com/y5eqvgvm> ...................... 26
Rebecca B. Bond, Disability Rights Section,
   Letter of Findings to Chancellor Nicholas
   B. Dirks et al. (Aug. 30, 2016) ............................ 30
Stephen E. Boyd, Assistant Attorney General,
   Letter to Rep. Ted Budd (Sept. 25, 2018) .......... 11
Iolanda Bulgaru, *4 Healthcare Companies*
   *Sued Over ADA Website Compliance (and*
   *Why it Matters?),* Healthcare Weekly (Jan.
   30, 2019), <https://tinyurl.com/y3w6ajrg>......... 25

(V)

Page

Miscellaneous–continued:

Jean-Paul Cart, *9th Circ. Has Made ADA Website Suits More Attractive*, Law360 (Mar. 11, 2019), < https://ti-nyurl.com/y5h49dz7>.........................................25

Comments of American Society of Travel Agents, Inc., Proposed Rulemaking, Docket No. 110 RIN 1190-AA61 (Jan. 24, 2011) .............28

Comments of Association of American Publishers, Inc., Docket No. 110 RIN 1190-AA61 (Jan. 24, 2011) ......................................................28

Comments of American Bankers Association, Proposed Rulemaking, Docket No. 110 RIN 1190-AA61 (Jan. 24, 2011) ...................................28

Comments of American Bar Association, Proposed Rulemaking, Docket No. 110 RIN 1190-AA61 (Jan. 21, 2011) ...............................28

Comments of eBay Inc., Proposed Rulemaking, Docket No. 110 RIN 1190-AA61 (Jan. 24, 2011) ................................................................29

Comments of National Small Business Association, Proposed Rulemaking, Docket No. 110 RIN-1190-AA61 (Jan. 24, 2011) ..........................28

Domino's, <https://www.dominos.com> (last visited Jun. 10, 2019) ..........................................12

Domino's AnyWare (last visited Jun. 11, 2019), <https://anyware.dominos.com> ......................11

Domino's Pizza, Inc., Annual Report (Form 10-K) (Feb. 20, 2018) .............................................11

Lisa Fickenscher, *Judges expand ADA rule to include more websites*, N.Y. Post (Aug. 14, 2017), <https://tinyurl.com/yyq6649l>................4

(VI)

Page

Miscellaneous–continued:

Nathaniel Vargas Gallegos & Jesse Sealey, *The Coming Ubiquity of ADA Compliance to the Internet and Its Extension to Online Education*, 20 J. Tech. L. & Pol'y 1 (2015)................24

Marisa Harrilchak, *ADA website lawsuits a growing problem for retailers*, Nat'l Retail Fed'n (Aug. 28, 2018), <https://tinyurl.com/ycpcslnz>...........................................26

Elizabeth A. Harris, *Galleries From A to Z Sued Over Websites the Blind Can't Use*, The N.Y. Times (Feb. 18, 2019) <https://tinyurl.com/y4ywjm9q> ...................4, 29

Bruce Horovitz, *Domino's to roll out tweet-a-pizza*, USA Today (May 12, 2015), <https://tinyurl.com/yxhgyzxt> ..........................11

Clyde Hughes, *Advocates, businesses say ADA causes trouble for disabled in digital world*, United Press Int'l (Mar. 19, 2019) <https://tinyurl.com/y3ftue2k>...........................25

Todd Hutchinson, *Burt's Bees Hit With Accessibility Suit Over Website*, Law360 (Oct. 15, 2018), <https://tinyurl.com/y4k2p99c> ..............25

Kristina M. Launey & Minh N. Vu, *Ninth Circuit Allow the* Robles v. Domino's *Website and Mobile App Accessibility Lawsuit to Move Forward*, Employment Law Lookout (Jan. 23, 2019), <https://tinyurl.com/y5ztmb2z> .........................................27

Carol C. Lumpkin & Stephanie N. Moot, *Hotels fight recurring website accessibility lawsuits*, Hotel Management (July 26, 2018), <https://tinyurl.com/y2m4ssja>.........................26

(VII)

Page

Miscellaneous–continued:

Dennis Maloney, *Why Domino's delivers more
than 15 ways to order pizza*, Think with
Google (Aug. 2017), <https://ti-
nyurl.com/yyf8hmc6> ........................................ 11

Charles S. Marion, *Attention businesses: Are
your websites and mobile apps ADA com-
pliant?*, Philadelphia Business Journal (May
10, 2019), <https://tinyurl.com/y58btvqr> ......... 25

Hugo Martin, *Lawsuits targeting business
websites over ADA violations are on the
rise*, L.A. Times (Nov. 11, 2018), <https://ti-
nyurl.com/y4tcarm9> ......................................... 27

Lindsay McKenzie, *50 Colleges Hit With ADA
Lawsuits*, Inside Higher Ed (Dec. 10, 2018),
<https://tinyurl.com/yd9t9ag5>. ........................ 26

Evan Minsker, *Beyoncé's Website Violates
Americans With Disabilities Act, Lawsuit
Claims*, Pitchfork (Jan. 4, 2019), <https://ti-
nyurl.com/y8v9mps6> ......................................... 5

Trevor Mogg, *Amazon Is Opening a New
Brick-and-Mortar Store with A Twist*, Digi-
tal Trends (Sept. 26, 2018), <https://ti-
nyurl.com/y9zo67lm> ......................................... 34

*Nondiscrimination on the Basis of Disability;
Accessibility of Web Information and
Services of State and Local Government
Entities and Public Accommodations*, 75
Fed. Reg. 43,460 (July 26, 2010) ................ 9, 10, 24

*Nondiscrimination on the Basis of Disability;
Notice of Withdrawal of Four Previously
Announced Rulemaking Actions*, 82 Fed.
Reg. 60,932 (Dec. 26, 2017) ............................ 9, 11

(VIII)

Page

Miscellaneous–continued:

 Ted North, *Domino's Pizza May Deliver the Supreme Court a Chance to Modernize the ADA*, Health L. & Pol'y Brief (Mar. 28. 2019), <https://tinyurl.com/y2ncgfdx> ..............24

 Deval L. Patrick, Assistant Attorney General, Letter to Senator Tom Harkin (Sept. 9, 1996) .....................................................................9

 Denise Power, *ADA Website Accessibility Lawsuits: How to Protect Your Business*, CO, U.S. Chamber of Commerce, (Apr. 18, 2019), <https://tinyurl.com/y2qvf8qt>..............25

 Sara Randazzo, *Lawsuits Surge Over Websites' Access for the Blind*, Wall St. J. (Feb. 17, 2019), <https://tinyurl.com/y5j4ooc9>. ..............27

 Drew Rawl & Minh Vu, *As Lawsuits Accumulate, Will We See Clarifying ADA Website Regulations?*, LexisNexis Corporate Law Advisory (Mar. 7, 2017), <https://tinyurl.com/y38jyvjx>...........................................24

 Carl Straumsheim, *Berkeley Will Delete Online Content*, Inside Higher Ed (Mar. 6, 2017), <https://tinyurl.com/zh4d22n> ..............30

 Understanding Success Criterion 1.1.1: Non-Text Content, <https://tinyurl.com/y47k8br4>...........................................29

 UsableNet, *ADA Web Accessibility Lawsuits*, (Feb. 20, 2019), <https://tinyurl.com/y2d8qlt6>...........................................29

 Minh N. Vu, et al., *Number of Federal Website Accessibility Lawsuits Nearly Triple, Exceeding 2250 in 2018*, ADA Title III: News & Insights (Jan. 31, 2019), <https://tinyurl.com/y3y7o3rg>....................................... 4, 26

Page

Miscellaneous–continued:

Minh N. Vu, et al., *Number of ADA Title III Lawsuits Filed in 2018 Tops 10,000*, ADA Title III: News & Insights (Jan. 22, 2019), <https://tinyurl.com/yyj9zfcv> .......................... 26

Web Content Accessibility Guidelines (WCAG) 2.0, Guideline 1.1, <https://tinyurl.com/jpqa733> ................................. 13

Web Content Accessibility Guidelines (WCAG) Overview, <https://tinyurl.com/ya9taclw> ........ 29

W3C, *F20: Failure of Success Criterion 1.1.1 & 4.1.2* (last visited Jun. 11, 2019), <https://tinyurl.com/yyvymcqc> ........................................ 13

1 Americans with Disabilities Act: Public Accommodations and Commercial Facilities § 2.04 (Nov. 2018) ................................................ 24

2 *Webster's Third New International Dictionary* (1986) ................................................ 32

(X)

## OPINIONS BELOW

The opinion of the court of appeals (App. 1a–21a) is reported at 913 F.3d 898.  The order of the district court granting petitioner's motion to dismiss (App. 22a–42a) is unreported and is available at 2017 WL 1330216.

## JURISDICTION

The judgment of the court of appeals was entered on January 15, 2019.  On March 6, 2019, Justice Kagan extended the time to file a petition for a writ of certiorari to June 14, 2019.  This Court has jurisdiction pursuant to 28 U.S.C. § 1254(1).

## STATUTORY PROVISIONS INVOLVED

Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181 et seq., provides, in relevant part:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

Section 301 of Title III, 42 U.S.C. § 12181, provides that "[t]he following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce":

> (A)   an inn, hotel, motel, or other place of lodging * * *;

(1)

2

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

3

(L)   a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

## STATEMENT

This case concerns whether Title III of the Americans with Disabilities Act (ADA) imposes accessibility mandates on the Internet. The ADA was enacted in 1990, in the age of landlines and snail mail. Congress designed Title III to ensure that individuals with disabilities obtain equal access to goods and services available at a wide range of physical places open to the public, which the statute terms "places of public accommodation." That mission has succeeded in no small part because Congress legislated at length and in hyper-specific detail about which physical places must be accessible, and how those "places of public accommodation" can ensure accessibility.

But Title III says nothing about the accessibility of websites or applications on smartphones, whether standing alone or in connection with restaurants, stores, or any other brick-and-mortar establishments that qualify as public accommodations. When Congress passed the ADA in 1990, websites were in their infancy, and apps did not yet exist.

Since then, the Internet has become ubiquitous, and courts have struggled to fit the square peg of the web into the round hole that is Title III. Federal courts of appeals have long split over whether Title III imposes accessibility requirements on web-only businesses with no fixed physical location. And the same line of cases has produced confusion in the circuits over whether Title III imposes discrete accessibility requirements on websites maintained by businesses whose brick-and-mortar locations constitute ADA-covered public accommodations.

4

The Department of Justice—the agency charged with implementing Title III—has expressed varying positions on its applicability to the online environment. In 2010, DOJ recognized that confusion reigns over whether Title III applies to websites. DOJ announced its intent to propose rules governing website accessibility, but acknowledged daunting challenges—including that companies would require at least two years to comply with any accessibility mandate. Seven years passed, but no proposed rule emerged, and DOJ abandoned the effort in 2017.

In the face of this uncertainty, plaintiffs have stepped in to fill the void. In 2018 alone, litigants filed over 2,250 federal lawsuits asserting ADA violations based on website inaccessibility, nearly tripling the number in 2017. Minh N. Vu, et al., *Number of Federal Website Accessibility Lawsuits Nearly Triple, Exceeding 2250 in 2018*, ADA Title III: News & Insights (Jan. 31, 2019), <https://tinyurl.com/y3y7o3rg>. Plaintiffs, often repeat litigants, have targeted nearly every type of industry and non-profit—including many websites maintained by businesses that also offer their goods or services at brick-and-mortar locations. Lisa Fickenscher, *Judges expand ADA rule to include more websites*, N.Y. Post (Aug. 14, 2017), <https://tinyurl.com/yyq6649l>.

Plaintiffs have pursued restaurants, retailers, grocery stores, car dealerships, hotels, banks, exercise studios, and universities. Their suits claim that these defendants' websites were inadequately accessible to individuals with disabilities, and that this alone triggers ADA liability. Plaintiffs have gone after New York's art galleries in alphabetical order, claiming that their websites inadequately describe the artwork and other products available at those places of public accommodation. Elizabeth A. Harris, *Galleries From A to Z Sued Over Websites the*

5

*Blind Can't Use*, N.Y. Times (Feb. 18, 2019), <https://tinyurl.com/y4ywjm9q>. Plaintiffs have even sued Beyoncé, alleging that her website is a public accommodation that is insufficiently accessible to visually impaired users. Evan Minsker, *Beyoncé's Website Violates Americans With Disabilities Act, Lawsuit Claims*, Pitchfork (Jan. 4, 2019), <https://tinyurl.com/y8v9mps6>.

Left undisturbed, the Ninth Circuit's decision would turn that flood of litigation into a tsunami. This case involves allegations that Domino's intentionally discriminated against respondent Guillermo Robles, who is blind, because he could not complete his custom pizza order using the Domino's website or mobile app. The Ninth Circuit recognized that a public accommodation under Title III must be a physical location, like a restaurant—reinforcing the existing circuit split over that question. But the court then held that, because Domino's physical restaurants are public accommodations, each method of ordering a pizza, in isolation, must be accessible to customers with disabilities. That holding effectively treated Domino's website and app as standalone public accommodations that must themselves comply with Title III.

Worse, the Ninth Circuit is the first circuit to expressly extend Title III to websites maintained by brick-and-mortar establishments, and the first to extend Title III to mobile apps. That holding conflicts with the rule in three other circuits, which hold that Title III requires equal access to the goods and services of a physical place of public accommodation based on the sum total of means to access those goods or services—so website or mobile app inaccessibility, in and of itself, is not unlawful.

This Court's review is imperative to stem a burdensome litigation epidemic. Title III has always required companies operating brick-and-mortar outposts within

6

the Ninth Circuit—which is to say, virtually any company with a national presence—to ensure that their physical locations were equally accessible to non-disabled and disabled customers. But the decision below has rendered the ADA applicable to websites and apps that offer access to companies' in-store goods and services. Those websites and apps must provide full accessibility, even if other means of accessing the same goods and services are readily available. No company or non-profit can design its website for the Ninth Circuit alone—so the ruling below effectively sets a nationwide mandate.

Businesses and non-profits have no interest in discriminating against potential customers or other individuals who happen to have disabilities. But these suits put their targets in an impossible situation. Unless this Court steps in *now*, defendants must retool their websites to comply with Title III without any guidance on what accessibility in the online environment means for individuals with the variety of disabilities covered by the ADA. Each defendant must figure out how to make every image on its website or app sufficiently accessible to the blind, how to render every video or audio file sufficiently available to the deaf, or how to provide content to those who cannot operate a computer or mobile phone. Businesses and non-profits must maintain that accessibility as their online content constantly changes and grows through links to other content.

Even if a business or non-profit tries to comply, nothing stops the next litigant from suing again by claiming that these attempts failed to satisfy elusive accessibility standards. This is a no-win scenario for the wide array of defendants facing these suits. And it is also a no-win scenario for individuals with disabilities, because defendants

7

faced with these suits overwhelmingly enter into piece-meal monetary settlements with individual plaintiffs or eliminate their online offerings instead of trying to keep up with moving-target compliance standards. If this Court has any doubts about the correctness of the decision below, it should grant review now to put an end to this untenable situation.

### A. Statutory and Regulatory Framework

1. Enacted in 1990, the ADA prohibits discrimination against disabled individuals in three "major areas of public life": "employment (Title I of the Act), public services (Title II), and public accommodations (Title III)." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).

To implement that prohibition, Congress throughout the ADA established specific rules governing which entities must comply, and how. For instance, Title II applies to state and local governments, their instrumentalities, the National Railroad Passenger Corporation, and "any commuter authority." 42 U.S.C. § 12131(1).

This case concerns Title III's mandates for public accommodations. The statute defines "public accommodation[s]" by providing an exhaustive and exclusive list of twelve specific categories of facilities that can qualify. *See PGA Tour, Inc.*, 532 U.S. at 675–76. Each category covers a "place" or "establishment" open to the public, 42 U.S.C. § 12181(7), including (as relevant here) "a restaurant, bar, or other establishment serving food or drink." *Id.* § 12181(7)(B). Other categories cover, for example, "an inn, hotel, motel, other place of lodging"; "a bakery, grocery store, clothing store, * * * or other sales or rental establishment"; and "a park, zoo, amusement park, or

8

other place of recreation." *Id.* § 12181(7). And a "[f]acility" means "buildings, structures, sites, complexes * * * or other real or personal property." 28 C.F.R. § 36.104.

Title III then prescribes how a "place of public accommodation" must accommodate disabled individuals. Its anti-discrimination provision begins with a "[g]eneral rule": any "person who owns, leases (or leases to), or operates a place of public accommodation" cannot discriminate "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). The statute then spells out specific types of conduct that Title III prohibits. For instance, public accommodations must provide their benefits in settings that integrate able-bodied and disabled individuals to the extent possible. *Id.* § 12182(b)(1)(B).

Title III also imposes highly detailed "[s]pecific prohibitions" to flesh out its anti-discrimination rule. One forbids "architectural barriers * * * in existing facilities." 42 U.S.C. § 12182(b)(2)(A)(iv). Another proscribes the "failure to take such steps as may be necessary to ensure that" no covered individual suffers discrimination "because of the absence of auxiliary aids and services." *Id.* § 12182(b)(2)(A)(iii). Such "auxiliary aids and services" include "Brailled materials and displays," "large print materials," "text telephones," and "telephones compatible with hearing aids." 28 C.F.R. § 36.303(b).

Despite its broad coverage and specific requirements, the ADA never mentions the Internet. Congress amended the ADA in 2008, well into the Internet age, but still never described online accessibility.

9

2.  Congress charged DOJ with issuing regulations to implement Title III.  42 U.S.C. § 12186(b).  But DOJ has never issued regulations regarding the accessibility of websites and online content.  Rather, DOJ recently abandoned a stalled proposal to consider rules in this area, suggesting that it was uncertain "whether promulgating regulations about the accessibility of Web information and services is necessary and appropriate."  *Nondiscrimination on the Basis of Disability; Notice of Withdrawal of Four Previously Announced Rulemaking Actions*, 82 Fed. Reg. 60,932, 60,932 (Dec. 26, 2017).  Meanwhile, DOJ has taken shifting positions in letters, litigation, and consent decrees that have exacerbated uncertainty over how (if at all) Title III applies to websites.

In 1996, DOJ stated that websites do not run afoul of Title III if there are alternative means of access to the information provided by a given website.  Deval L. Patrick, Assistant Attorney General, Letter to Senator Tom Harkin (Sept. 9, 1996).  Yet by 2000, DOJ had changed its mind, arguing that Title III applies to websites just like services offered in a physical place of public accommodation.  Brief of the United States as Amicus Curiae Supporting Appellant at 7–8, 20, *Hooks v. OKbridge, Inc.*, 232 F.3d 208 (5th Cir. 2000).

Ten years and several amicus briefs later, DOJ in 2010 issued an advance notice of proposed rulemaking "to begin the process of soliciting comments and suggestions with respect to what [a proposed rule] regarding Web access should contain."  *Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations*, 75 Fed. Reg. 43,460, 43,461 (July 26, 2010).  DOJ acknowledged that "[t]he Internet as it is known today did not exist when Congress enacted the

10

ADA and, therefore, neither the ADA nor the regulations the Department promulgated under the ADA specifically address access to Web sites." *Id.* at 43,463. Nonetheless, DOJ posited that "Web sites * * * operate as places of public accommodation," *id.* at 43,461, based on Congress's purported understanding "that the Department would apply the statute in a manner that evolved over time," *id.* at 43,463. DOJ conceded that "a clear requirement * * * does not exist." *Id.* at 43,464.

DOJ further indicated that any rule mandating website accessibility would likely need a two-year delay for existing websites to comply with whatever accessibility standards DOJ adopted, because "many Web sites have hundreds (and some thousands) of pages that will need to be made accessible." *Id.* at 43,466. DOJ also recognized the considerable "complexity and potential impact" of mandatory web accessibility, soliciting responses to difficult line-drawing questions. *Id.* at 43,464. For instance, DOJ was unsure which accessibility criteria (out of multiple options) would be best. *Id.* at 43,465. In light of these complications and the ever-changing nature of online content, DOJ asked whether compliance with any set of accessibility standards was even possible. *Id.* at 43,466.

Seven years passed. DOJ failed to issue any specific regulatory proposal, much less a final rule. Instead, DOJ took inconsistent positions in amicus briefs and consent decrees. In 2012, for example, DOJ argued that Netflix, a video streaming website, was itself a public accommodation. Statement of Interest at 5–7, *Nat'l Assoc. of the Deaf v. Netflix*, No. 11-30168 (D. Mass. May 15, 2012). But in 2015, DOJ deemed MIT's online programming merely a "service" of the university, which was a public accommodation. Statement of Interest at 18, *Nat'l Assoc. of the Deaf v. MIT*, No. 15-300024 (D. Mass. Jun. 25, 2015).

11

In 2017, DOJ withdrew the 2010 advance notice of proposed rulemaking and warned parties against "rely[ing] upon" the ANPRM "as presenting the Department of Justice's position on these issues." *Nondiscrimination on the Basis of Disability; Notice of Withdrawal of Four Previously Announced Rulemaking Actions*, 82 Fed. Reg. 60,932, 60,932, 60,933 (Dec. 26, 2017).

In 2018, DOJ contended that "the ADA applies to public accommodations' websites," again backing away from the notion that websites are themselves public accommodations. Stephen E. Boyd, Assistant Attorney General, Letter to Rep. Ted Budd (Sept. 25, 2018). DOJ also indicated that "noncompliance with a voluntary technical standard for website accessibility does not necessarily indicate noncompliance with the ADA." *Id.* In sum, despite decades of ad hoc pronouncements, DOJ has never coherently explained how Title III could extend to websites.

**B. Factual Background and Proceedings Below**

1. Petitioner Domino's operates one of America's most popular restaurants, which has grown into "the largest pizza company in the world." Domino's Pizza, Inc., Annual Report (Form 10-K) (Feb. 20, 2018). Domino's sells over 2.5 million pizzas daily, *id.*, in part by offering at least 15 ways to order pizza. Dennis Maloney, *Why Domino's delivers more than 15 ways to order pizza*, Think with Google (Aug. 2017), <https://tinyurl.com/yyf8hmc6>. Customers can visit a Domino's restaurant location. They can call for delivery or in-store pickup. They can also order pizza by sending a text message, using voice-activated devices such as Amazon Alexa, and even via Twitter. Bruce Horovitz, *Domino's to roll out tweet-a-pizza*, USA Today (May 12, 2015), <https://tinyurl.com/yxhgyzxt>; Domino's AnyWare (last visited Jun. 11, 2019), <https://anyware.dominos.com>.

12

Like many businesses, Domino's allows customers to order through its website and mobile app for delivery or in-store pickup. On the Domino's website, users first select a nearby restaurant location. They then choose the size, sauce, cheese, crust, and toppings for their pizza. To order, customers go to the website's "Checkout" page and choose their preferred payment option. Domino's, <https://www.dominos.com> (last visited Jun. 10, 2019). Customers follow a similar ordering process using the Domino's app on their mobile phones.

Since at least February 2017, both the Domino's website and its mobile app have included an accessibility banner, which directs visitors to a telephone hotline staffed by a live representative. App. 24a. The banner reads: "If you are using a screen reader and are having problems using this website, please call 800-252-4031 for assistance." *Id.*

2. In 2016, respondent Guillermo Robles, who is blind, sued Domino's in the U.S. District Court for the Central District of California. This case kicked off at least 14 suits that Robles would file against various businesses, including Pizza Hut. All of these suits rest on the theory that if a company's website or app is not fully accessible to Robles, the company has violated Title III, regardless of the effectiveness of the other means it offers to access those goods and services. *E.g.*, *Robles v. Yum! Brands, Inc.*, 2:16-cv-08211, 2018 WL 566781, at *3 (C.D. Cal. Jan. 24, 2018).

In particular, this suit alleges that Domino's website and mobile app were incompatible with the screen-reading software Robles uses to access the Internet, App. 57a-60a, which translates online content into verbal speech or a Braille display. Robles alleges that the Domino's website and app did not include adequate written descriptions

13

for every image and required users of screen-reading software to go through "additional navigation and repetition" when placing orders. App. 56a. Robles thus allegedly could not select toppings for his pizza or "add the pizza to checkout and complete a transaction" on the website. App. 56a–57a. Robles did not call for delivery or instore pickup from the Domino's store that would have received his order or try any of Domino's other available methods for ordering pizza.

According to Robles, the ADA demands that Domino's website and app comply with the Web Content Accessibility Guidelines, voluntary website-accessibility standards developed by the World Wide Web Consortium. App. 58a–59a. Version 2.0 of those guidelines ("WCAG 2.0") advises that websites and apps should provide written descriptions of all images, audio content, and videos that communicate the same information as the visual, audio, or video content. *Web Content Accessibility Guidelines (WCAG) 2.0, Guideline 1.1*, <https://tinyurl.com/jpqa733>. Further, these descriptions should be updated every time website or app content changes. *Id.*; W3C, *F20: Failure of Success Criterion 1.1.1 & 4.1.2* (last visited Jun. 11, 2019), <tinyurl.com/yyvymcqc>.

Robles sought a permanent injunction requiring Domino's to hire a "qualified consultant acceptable to Plaintiff" to ensure compliance with WCAG's voluntary standards. App. 60a–61a. The injunction would require Domino's to train employees on compliance with the WCAG 2.0 guidelines and would mandate regular tests to verify the accessibility of Domino's website and app. *Id.*

2. The district court granted Domino's motion to dismiss. App. 22a-42a. The court viewed the ADA as applying to the websites and mobile apps maintained by brick-and-mortar places of public accommodation. App. 27a-

14

29a.  But the court held that requiring Domino's website and mobile app to comply with Title III in the absence of any "meaningful guidance" from DOJ "flies in the face of due process." App. 34a.

3.   The Ninth Circuit reversed, holding that the Domino's website and mobile app are subject to Title III and that Domino's had fair notice of its Title III obligations.  App. 1a-21a.

The Ninth Circuit acknowledged that under its precedent, Title III covers only physical places.  App. 8a.  But the court held that Title III imposes standalone accessibility requirements on Domino's website and mobile app because they "connect customers to the goods and services of Domino's physical restaurants," which are places of public accommodation.  App. 8a-9a.  Because customers could "use the website and app to locate a nearby Domino's restaurant and order pizzas for at-home delivery or in-store pickup," the court reasoned, there was a sufficient "nexus" between the website and app and Domino's restaurants.  App. 8a.  Given that nexus, the court concluded, "the ADA applies to the Domino's website and app," App. 9a, which must therefore "provide the blind with effective communication and full and equal enjoyment of its products and services," App. 21a.

## REASONS FOR GRANTING THE PETITION

The Ninth Circuit's decision explodes the reach of Title III into the online world, in defiance of the holdings of three other courts of appeals and the statutory text.  The decision worsens a circuit split over whether Title III extends to companies that operate solely online.  It also furthers a divide over whether the statute applies to websites or mobile apps operated by businesses and non-profits

15

that maintain brick-and-mortar locations. And these inconsistent rulings affect virtually every enterprise in America. Companies across every industry are battling website-accessibility lawsuits with no consistent message from the courts on whether or how to comply. The Ninth Circuit's decision is also profoundly wrong. It conflicts with Title III's clear text and creates a nonsensical rule for when websites fall within Title III's ambit. This Court should intervene immediately so that Congress, not the courts, can decide whether or how to extend the statute it passed in 1990 to the Internet.

### A. The Decision Below Exacerbates a Circuit Split Over Whether Website Inaccessibility Violates Title III

The decision below deepens a circuit conflict over whether Title III imposes discrete accessibility obligations on websites. All courts agree that Title III imposes accessibility obligations on a brick-and-mortar business that offers its goods and services to the general public. But circuits have divided over whether Title III extends to enterprises that solely exist online, and whether Title III mandates discrete accessibility requirements for websites maintained by brick-and-mortar enterprises. That lack of clarity has become untenable for businesses, non-profit institutions, and other organizations, which face different rules in different jurisdictions depending on their web presence.

1. Start with web-only businesses. Within the First, Second, and Seventh Circuits, enterprises without any physical location—including web-only businesses—can face Title III liability based on alleged inaccessibility. In those circuits, something can be a "public accommodation" even if it does not offer its goods or services at a brick-and-mortar physical location. According to the

16

First Circuit, "[t]he plain meaning" of a public accommodation "is not limited to" "physical structures for persons to enter." *Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New Eng., Inc.*, 37 F.3d 12, 19 (1st Cir. 1994).

Similarly, the Second Circuit in *Pallozzi v. Allstate Life Insurance Co.*, 198 F.3d 28 (2d Cir. 1999), declined to limit Title III to discrimination happening at insurance offices, which are public accommodations. *Id.* at 33. Instead, relying on *Carparts*, the court read Title III to apply to the sale of insurance policies more broadly and to "guarantee * * * more than mere physical access" to where the policies are sold. *Id.* at 32.

Likewise, the Seventh Circuit has held that Title III covers any "owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (*whether in physical space or in electronic space*) that is open to the public." *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999) (emphasis added). Either way, the court reasoned, enterprises that offer their goods or services to the public "can no more refuse to sell [goods or services] to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store." *Morgan v. Joint Admin. Bd., Ret. Plan*, 268 F.3d 456, 459 (7th Cir. 2001).

In sum, in the First, Second, and Seventh Circuits, websites offering goods or services to the public are standalone public accommodations. And if those websites, as public accommodations, are inaccessible to individuals with disabilities, they necessarily fail to provide "full and equal enjoyment of the goods, services . . . or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

17

The Third, Sixth, and Ninth Circuits have openly disagreed with the above decisions, concluding that web-only enterprises cannot face Title III liability.

The en banc Sixth Circuit was the first to conclude that a "public accommodation" can only refer to "a physical place." *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1010 (6th Cir. 1997) (en banc). The Sixth Circuit emphasized that Title III's prohibition on discrimination is "restricted to 'places' of public accommodation," *id.* at 1011 (internal quotation marks omitted), and that all twelve categories of public accommodations listed in Title III refer to "a physical place open to public access," *id.* at 1014. The Sixth Circuit thus expressly "disagree[d] with the First Circuit's decision in *Carparts*." *Id.* at 1013.

The Third Circuit followed suit in *Ford v. Schering-Plough Corp.*, concluding that all the categories of public accommodations "refer to places with resources utilized by physical access." 145 F.3d 601, 614 (3d Cir. 1998). Thus, Title III does not "provid[e] protection from discrimination unrelated to [such] places." *Id.* at 613; *see Peoples v. Discover Fin. Servs., Inc.*, 387 F. App'x 179, 183 (3d Cir. 2010) ("Our court is among those that have taken the position that the term ["public accommodation"] is limited to physical accommodations.").

Finally, the Ninth Circuit has held that a public accommodation must be a physical location, meaning that a standalone website or mobile app does not count. *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000).

2. This same line of cases has created a significant, related divide over whether Title III imposes accessibility requirements on websites maintained by companies and

18

non-profits that also offer their goods and services at brick-and-mortar locations.

In the First, Second, and Seventh Circuits, the brick-and-mortar location and any online offerings are each considered a standalone "public accommodation" subject to Title III. Under the reasoning of those decisions, any forum offering goods or services to the public is a "place of public accommodation," whether that forum exists online or at a physical location. As the Seventh Circuit explained, "[t]he site of the sale is irrelevant to Congress's goal of granting the disabled equal access to sellers of goods and services. What matters is that the good or service be offered to the public." *Morgan*, 268 F.3d at 459; *accord Carparts*, 37 F.3d at 19; *Pallozzi*, 198 F.3d at 32–33. Thus, Title III applies to *each* means of offering goods and services to the public, whether in person, by telephone, by mail, or via a website. Each is a separate "place of public accommodation." So, if the same enterprise operates a store, website, and mobile app, all three must abide by Title III. And if an individual lacks equal access to a particular means on account of a disability, he or she could assert a Title III claim on that basis alone.

In the Third, Sixth, and Eleventh Circuits, however, defendants face Title III liability only if individuals with disabilities lack equal access to the goods or services of the *physical* place of public accommodation. There may be many means of accessing the benefits offered at that physical location—for instance, telephone ordering, website access, or an app. But the key is whether an individual with disabilities lacks equal access to the goods or services of the physical location, considering the aggregate effect of all methods of accessing those goods or services. The inaccessibility of a website or any other particular means of accessing the goods or services of a physical

19

place of public accommodation, standing alone, does not necessarily support a Title III claim. Had Robles sued in the Third, Sixth, or Eleventh Circuits, his Title III claim could not have proceeded solely based on the alleged inaccessibility of Domino's website or app, as the Ninth Circuit allowed.

Start with the Third Circuit's interpretation of Title III. "'[G]oods, services, facilities, privileges, advantages, or accommodations' concerning which a disabled person cannot suffer discrimination are not free-standing concepts but rather all refer to the statutory term 'public accommodation' and thus to what *these places* of public accommodation provide." *Ford*, 145 F.3d at 613 (emphasis added). Title III thus centers on the accessibility of the goods or services of a particular physical location. *Id.* (reasoning that the statute does not "provid[e] protection from discrimination unrelated to places"). Just because one means of accessing those goods or services is inaccessible does not mean that the *overall* goods or services of that physical location are inaccessible.

The Third Circuit's decision in *Peoples v. Discover Financial Services, Inc.* underscores the point. 387 F. App'x 179. There, a blind customer brought a Title III claim against a credit card company. He claimed that it failed to accommodate his blindness when considering a fraud claim arising from his use of his credit card to purchase services at a personal residence. That claim failed, the court held, because the credit card company's allegedly inadequate investigation of plaintiff's fraud claim did not affect his "equal enjoyment of goods, services, facilities, [etc.] * * * on physical property" that the company owns or operates. *Id.* at 184.

The Sixth Circuit similarly looks to whether plaintiffs lack equal access to goods or services offered by a physical

20

location. In *Parker v. Metropolitan Life Insurance Company*, the court found no "nexus" between an allegedly discriminatory employer-offered insurance policy and goods the insurance company offered at its physical office because the plaintiff "did not access her policy from MetLife's insurance office" and thus, "the good that plaintiff seeks is not offered by a place of public accommodation." 121 F.3d at 1011. Because "Title III covers only physical places," the court left open whether "a plaintiff must physically enter a public accommodation" or must "merely access[], by some other means, a service or good provided by a public accommodation." *Id.* at 1011 n.3. Either way, the Sixth Circuit's inquiry zeroes in on overall access to the goods the physical location provides.

*Stoutenborough v. National Football League, Inc.*, 59 F.3d 580 (6th Cir. 1995), is illustrative. There, hearing-impaired plaintiffs claimed discrimination based on the National Football League's "blackout rule," which banned live local broadcasts of home football games that are not sold out. Plaintiffs claimed that their disabilities prevented them from accessing football games any other way when the blackout rule was in effect, because they cannot, for instance, hear radio broadcasts. But the court held they failed to state a Title III claim. The court reasoned that a stadium where games take place is a public accommodation, so the relevant goods and services are those the stadium provided, i.e., in-person football games. Because the stadium itself did not offer the televised broadcast of games, plaintiffs were not deprived of equal access to any "service" offered by the stadium. *Id.* Again, the Sixth Circuit emphasized, the inquiry looks to overall access to goods or services offered by a place of public accommodation. *Id.*; *see Parker*, 121 F.3d at 1011.

21

The Eleventh Circuit likewise scrutinizes overall access to the goods or services at the place of public accommodation. In *Rendon v. Valleycrest Productions, Ltd.*, the court considered whether a telephone selection process connected with an in-person studio game show violated Title III. 294 F.3d 1279 (11th Cir. 2002). The studio qualified as a "tangible public accommodation," because it offered the public an opportunity to appear on the show. *Id.* at 1282. There was a sufficient "nexus between the [telephone selection process] and the premises of the public accommodation" because the telephone selection process was the *only* means of accessing the studio game show. *Id.* at 1284 n.8. Because that telephone process was inaccessible to individuals with certain disabilities, the ultimate benefit—participation in a game show at the studio—was not equally accessible to members of the public regardless of disability. *Id.* at 1286.

In short, the Third, Sixth, and Eleventh Circuits focus on whether a particular means of access, including a website or mobile app, impedes overall access to the benefits of a brick-and-mortar public accommodation.

3. The decision below is the ideal vehicle for resolving judicial confusion over Title III's applicability to websites and apps. This case concerns a company that operates both brick-and-mortar locations and an online presence—a ubiquitous combination across many industries. The Ninth Circuit below weighed in both on whether the website or app alone is a public accommodation and on whether either comes within Title III based on the connection to Domino's restaurants. The Ninth Circuit reiterated its prior holding that website-only businesses cannot face Title III liability. App. at 8a (citing *Weyer*, 198 F.3d at 1114). The Ninth Circuit thus doubled down on

22

the existing circuit split over whether Title III applies to
online-only businesses.

Critically, the decision below also articulated a new
rule for entities that operate both a website or app and a
brick-and-mortar location. The website or app, viewed in
isolation, must comply with Title III if either provides ac-
cess to what the physical public accommodation offers.
The Ninth Circuit thus extended Title III to Domino's
website and mobile app because they bear a sufficient
"nexus" to Domino's restaurants, namely they "facilitate
access" or "connect customers" to the restaurants' prod-
ucts. *Id.* at 9a–10a. Put differently, because the website
and app were two means of accessing Domino's products,
they each must adhere to Title III.

The Ninth Circuit's rule conflicts with that of the
Third, Sixth, and Eleventh Circuits. The Ninth Circuit
recognized a valid Title III claim even though Robles did
not allege overall inaccessibility of the goods and services
of Domino's restaurants. It was enough that the website
or app—taken in isolation—was allegedly inaccessible.

4. The enduring divide among the circuits over
whether Title III extends to websites has not gone unno-
ticed. Courts, the Department of Justice, and commenta-
tors have all recognized the conflict, now aggravated by
the decision below. As the Third Circuit put it: "The
Courts of Appeals are split on whether the term 'public
accommodation' . . . refers to an actual physical structure
or whether it has some broader meaning." *Peoples*, 387
F. App'x at 193. Indeed, when the Third and Sixth Cir-
cuits held that a "public accommodation" can only be a
physical location, they noted their express disagreement
with the First Circuit's contrary conclusion. *Ford*, 145
F.3d at 614; *Parker*, 121 F.3d at 1013. And, in joining the
First Circuit, the Seventh Circuit acknowledged that its

23

reasoning departed from the decisions of the Third and Sixth Circuits. *See Morgan*, 268 F.3d at 459.

District courts have likewise recognized that the circuits are in disarray over whether Title III applies to web-only businesses and non-profits. District courts within the First, Second, and Seventh Circuits consistently apply Title III to web-only enterprises. *Access Living of Metro. Chi. v. Uber Techs., Inc.*, 351 F. Supp. 3d 1141, 1155-56 (N.D. Ill. 2018) (following *Morgan* in rejecting the argument that a "public accommodation" must be a physical location); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 391-92 (E.D.N.Y. 2017) (reading *Pallozzi* to extend Title III to a website); *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 200 (D. Mass. 2012) (finding that "*Carparts's* reasoning applies with equal force to services purchased over the Internet").

But district courts within the Third Circuit follow that circuit's precedent and limit "public accommodations" to physical places. *E.g.*, *Walker v. Sam's Oyster House, LLC*, No. 18-193, 2018 WL 4466076, at *2 (E.D. Pa. Sept. 18, 2018). Likewise, taking cues from the Eleventh Circuit, some district courts within that region have refused to recognize a Title III claim where an inaccessible website did not impede access to the benefits of a physical location. *See, e.g.*, *Gomez v. Bang & Olufsen Am., Inc.*, No. 1:16-cv-23801, 2017 WL 1957182 at *4 (S.D. Fla. Feb. 2, 2017); *Access Now, Inc. v. Sw. Airlines, Co.*, 227 F. Supp. 2d 1312, 1321 (S.D. Fla. 2002).

DOJ, too, has repeatedly acknowledged a circuit split over whether Title III imposes accessibility requirements on "nonphysical establishments including websites or digital services." Brief for the United States as Amicus Curiae at 22, *Magee v. Coca-Cola Refreshments USA, Inc.*, 138 S. Ct. 55 (2017) (No. 16-668); *see* Statement of Interest

24

at 11–13, *Gil v. Winn Dixie Stores, Inc.*, No. 16-civ-23020 (S.D. Fla. Mar. 15, 2017).  Further, DOJ has deemed it irrelevant that circuit decisions rejecting a physical-location requirement for public accommodations did not involve web-only businesses.  "Although the First Circuit has not addressed specifically whether a [web-only business or non-profit] is a public accommodation" subject to Title III accessibility mandates, DOJ has insisted that "the [First Circuit's] analysis in *Carparts* clearly compels such a result"—and the Second and Seventh Circuits follow *Carparts*. *See* Statement of Interest at 6 & n.4, *Nat'l Assoc. of the Deaf v. Netflix*, No. 11-30168 (D. Mass. May 15, 2012).  In 2010, when announcing its ultimately abortive plans to develop rules for website accessibility, DOJ attributed "uncertainty regarding the applicability of the ADA to Web sites of entities covered by [T]itle III" in part to "inconsistent court decisions." 75 Fed. Reg. at 43,464.

Commentators as well regularly highlight the division among courts "as to how to apply the ADA to the internet in general and to websites in particular."  1 Americans with Disabilities Act: Public Accommodations and Commercial Facilities § 2.04 (Nov. 2018); *accord* Nathaniel Vargas Gallegos & Jesse Sealey, *The Coming Ubiquity of ADA Compliance to the Internet and Its Extension to Online Education*, 20 J. Tech. L. & Pol'y 1, 9 (2015); Drew Rawl & Minh Vu, *As Lawsuits Accumulate, Will We See Clarifying ADA Website Regulations?*, LexisNexis Corporate Law Advisory (Mar. 7, 2017) <https://tinyurl.com/y38jyvjx>.  Many have called on the Court to weigh in on the question presented—including in this very case. *See, e.g.*, Ted North, *Domino's Pizza May Deliver the Supreme Court a Chance to Modernize the ADA*,

25

Health L. & Pol'y Brief (Mar. 28, 2019) <https://tinyurl.com/y2ncgfdx>.[1]

**B. The Question Presented Is Recurring and Important**

1. Unless this Court steps in, the Ninth Circuit's decision will provoke endless litigation and impose immense costs on businesses and non-profits. The decision below squarely holds that the websites and apps of brick-and-mortar businesses are subject to Title III. That decision removes any ambiguity on this point within the nation's largest circuit. And because virtually every national business and non-profit offers its goods and services at physical locations within the Ninth Circuit, as well as offering those goods and services on websites or mobile apps, an immense range of organizations would have to conform to accessibility mandates or risk liability. The Ninth Circuit's rule will apply nationwide no matter what. No one can tailor their online presence to fit different rules in different circuits.

Plaintiffs are already targeting businesses in every sector of the economy, from retailers to hotels to health care companies.[2] Web accessibility litigation particularly

---

[1] See also Charles S. Marion, *Attention businesses: Are your websites and mobile apps ADA compliant?*, Philadelphia Business Journal (May 10, 2019) <https://tinyurl.com/y58btvqr>; Denise Power, *ADA Website Accessibility Lawsuits: How to Protect Your Business*, CO, U.S. Chamber of Commerce (Apr. 18, 2019), <https://tinyurl.com/y2qvf8qt>; Clyde Hughes, *Advocates, businesses say ADA causes trouble for disabled in digital world*, United Press Int'l (Mar. 19, 2019), <https://tinyurl.com/y3ftue2k>; Jean-Paul Cart, *9th Circ. Has Made ADA Website Suits More Attractive*, Law360 (Mar. 11, 2019), https://tinyurl.com/y5h49dz7.

[2] *E.g.,* Iolanda Bulgaru, *4 Healthcare Companies Sued Over ADA Website Compliance (and Why it Matters?)*, Healthcare Weekly (Jan. 30, 2019), <https://tinyurl.com/y3w6ajrg>; Todd Hutchinson,

26

affects small businesses that need an online presence to stay competitive. *E.g.*, Shannon Behnken, *Businesses 'sitting ducks' for lawsuits because websites aren't ADA compliant*, WLFA (Feb. 7, 2019), <https://tinyurl.com/y5eqvgvm>. And it harms non-profit institutions that provide free online resources to the public, including schools, libraries, museums, and art galleries. *See, e.g.,* Lindsay McKenzie, *50 Colleges Hit With ADA Lawsuits*, Inside Higher Ed (Dec. 10, 2018), <https://tinyurl.com/yd9t9ag5>. By requiring websites and mobile apps to satisfy all of Title III's requirements, the Ninth Circuit's rule will force companies and non-profits large and small to reconsider how they engage with the public online. These entities need to know now whether they must comply with the Ninth Circuit's rule. The importance of this issue alone warrants the Court's review.

2. If this Court fails to act, the alternative is de facto regulation by the plaintiffs' bar. Plaintiffs filed over 10,000 Title III cases last year. Minh N. Vu et al., *Number of ADA Title III Lawsuits Filed in 2018 Tops 10,000*, ADA Title III: News & Insights (Jan. 22, 2019), <https://tinyurl.com/yyj9zfcv>. Several thousand of those suits involved web accessibility—nearly triple the number from 2017, and almost ten times the amount filed in 2016. Minh N. Vu et al., *Number of Federal Website Accessibility Lawsuits Nearly Triple, Exceeding 2250 in 2018*, ADA Title III: News & Insights (Jan. 31, 2019) <https://tinyurl.com/y3y7o3rg>; Marisa Harrilchak, *ADA website lawsuits a growing problem for retailers*,

---

*Burt's Bees Hit With Accessibility Suit Over Website*, Law360 (Oct. 15, 2018), <https://tinyurl.com/y4k2p99c>; Carol C. Lumpkin & Stephanie N. Moot, *Hotels fight recurring website accessibility lawsuits*, Hotel Management (July 26, 2018), <https://tinyurl.com/y2m4ssja>.

27

Nat'l Retail Fed'n (Aug. 28, 2018), <https://tinyurl.com/ycpcslnz>.  And 20% of the web accessibility lawsuits plaintiffs filed last year—or approximately 450 suits—targeted companies that had been sued before. Sara Randazzo, *Lawsuits Surge Over Websites' Access for the Blind*, Wall St. J. (Feb. 17, 2019), <https://tinyurl.com/y5j4ooc9>.

Observers are already predicting that the Ninth Circuit's decision will open the floodgates further and steer web accessibility litigation to the Ninth Circuit.  Kristina M. Launey & Minh N. Vu, *Ninth Circuit Allow the* Robles v. Domino's *Website and Mobile App Accessibility Lawsuit to Move Forward*, Employment Law Lookout (Jan. 23, 2019), <https://tinyurl.com/y5ztmb2z>.  These cases often feature copy-and-paste allegations that the same plaintiffs' lawyers trot out for multiple lawsuits featuring the same plaintiffs.  The law firm representing Robles, for example, filed 355 ADA cases in twelve months, mostly in California federal and state courts.  Hugo Martin, *Lawsuits targeting business websites over ADA violations are on the rise*, L.A. Times (Nov. 11, 2018), <https://tinyurl.com/y4tcarm9>.  In addition to the 14 cases the firm filed on Robles' behalf, the firm filed more than three dozen lawsuits for the same Montana resident.  *Id.*

These suits are not just prolific; they are costly, and the costs are rising.  Plaintiffs' accessibility demands impose myriad costs.  Achieving online accessibility involves creating "alternative text" descriptions for every image and incorporating other features into websites and apps. Those upgrades often require retaining outside consultants to create and maintain websites.  *See* App. 60a (demanding that Domino's hire a "qualified consultant ac-

28

ceptable to Plaintiff"); Comment of National Small Business Association, Proposed Rulemaking, Docket No. 110 RIN-1190-AA61 (Jan. 24, 2011).

Compliance costs can run into the tens or hundreds of thousands of dollars. One grocery chain estimated it would need $250,000 to make its website accessible. *Gil v. Winn Dixie Stores, Inc.*, 257 F. Supp. 3d 1340, 1345–47 (S.D. Fla. 2017). For more complex websites with video content, interactive features, and links to other webpages, costs can reach even higher. Banks estimated that satisfying website-accessibility requirements could reach $3 million per website. *See, e.g.*, Comments of American Bankers Association, Proposed Rulemaking, Docket No. 110 RIN 1190-AA61 (Jan. 24, 2011). Publishers pegged their minimum estimate for interactive websites at $100,000, with possible costs of $ 1 million. Comments of Association of American Publishers, Inc., Docket No. 110 RIN 1190-AA61 (Jan. 24, 2011). This wide variation reflects not only differences in the complexity of websites, but uncertainty over what compliance even means.

Then there is the investment of time. The training required to ensure website accessibility is "the most expensive unquantifiable cost." Comments of American Bar Association, Proposed Rulemaking, Docket No. 110 RIN 1190-AA61 (Jan. 21, 2011). For instance, the American Bar Association estimated that overhauling the ABA website "would equate to around 450 hours of training." *Id.* Organizations simply lack "the financial and manpower resources to retrofit these sites." Comments of American Society of Travel Agents, Inc., Proposed Rulemaking, Docket No. 110 RIN 1190-AA61 (Jan. 24, 2011).

Unclear and shifting standards add to the cost. Multiple accessibility guidelines exist for websites and apps. The complaint in this case, for example, cited both WCAG

29

and Apple's accessibility guidelines for mobile apps.  App.
51a.  But those guidelines leave gaping holes for compli-
ance.  Take the WCAG requirement that each image have
an accompanying textual description.  The drafters of
WCAG provided the following example of an adequate de-
scription: "President X of Country X shakes hands with
Prime Minister Y of country Y."  *Understanding Success
Criterion   1.1.1:   Non-text   Content*,   <https://ti-
nyurl.com/y47k8br4>.

But not every image is so easy to describe.  As one gal-
lery owner asked, "How do you describe a black and white
Franz Kline? Or any abstract picture, how do you describe
it and to what depth of description does one need to put?"
Harris, *supra*.  Nor is it clear how to render online video
content fully accessible.  *See* Comments of eBay Inc., Pro-
posed Rulemaking, Docket No. 110 RIN 1190-AA61 (Jan.
24, 2011) ("[T]here is no viable technique for making cer-
tain content accessible," including "[e]merging technolo-
gies such as HTML5 and Flash.").  And, to the extent
there are identifiable standards, they are open-ended and
evolving, so compliance with one version may not protect
against the next lawsuit.  For instance, WCAG recently
published version 2.1, adding new accessibility criteria.
*Web Content Accessibility Guidelines (WCAG) Overview*,
<https://tinyurl.com/ya9taclw>.

These burdens encourage businesses and non-profits
to settle at an alarming rate—over 95 percent by one es-
timate.  UsableNet, *ADA Web Accessibility Lawsuits*,
(Feb. 20, 2019), <https://tinyurl.com/y2d8qlt6>.   Other
defendants eliminate online offerings instead of attempt-
ing compliance—a choice that ultimately hurts all con-
sumers, including people with disabilities.  Many busi-
nesses and non-profits lack the resources required to
overhaul their websites and mobile apps.  Faced with the

30

threat of ADA liability, they may decide to jettison online content. That is what the University of California, Berkeley did when DOJ in 2016 informed the university that its online educational content violated the ADA because it lacked adequate text descriptions, had poor color contrast, improper formatting, and lacked closed captions. Rebecca B. Bond, Disability Rights Section, Letter of Findings to Chancellor Nicholas B. Dirks et al. (Aug. 30, 2016). Citing the "extremely expensive measures" DOJ mandated for ADA compliance, Berkeley opted to instead remove public access to over 20,000 free online video and audio lectures. Carl Straumsheim, *Berkeley Will Delete Online Content*, Inside Higher Ed (Mar. 6, 2017), <https://tinyurl.com/zh4d22n>. By fostering yet further website accessibility lawsuits, the Ninth Circuit's decision threatens the availability of online content for everyone.

3. This case is an ideal vehicle for the Court to address whether and how Title III applies to websites, and that issue need not percolate any further. The question was squarely presented to and answered by the Ninth Circuit. There are no jurisdictional or procedural issues that would bar this Court's review.

The time is ripe for this Court to intervene. Courts have thoroughly aired the competing arguments over whether Title III applies to the Internet, and have chosen their sides. DOJ has muddied the waters further for decades. And the decision below has removed any doubt over whether the circuit split squarely applies to websites.

Time is also of the essence. As noted, most website accessibility suits settle. In the remaining cases, defendants are particularly unlikely to appeal adverse rulings in the First, Second, and Seventh Circuits, where a loss is virtually guaranteed. For example, after the Second Circuit "strongly suggest[ed] that" Title III "extends to

31

'places' on the Internet," at least five district court decisions have held that websites are subject to Title III. *Del-Orden v. Bonobos*, No. 17 Civ. 2744, 2017 WL 6547902, at *5 (S.D.N.Y. Dec. 20, 2017). Additional decisions in those circuits that make even clearer that Title III extends to both web-only businesses and the websites of brick-and-mortar establishments are unlikely, and in any event unnecessary because those circuits have already addressed the issue.

This Court should decide once and for all whether Title III applies to the Internet. Otherwise, the Ninth Circuit's decision will let serial plaintiffs impose a vague accessibility mandate on the entire country.

### C. The Ninth Circuit's Decision Is Wrong

The Ninth Circuit's decision below rests on contradictory logic. Standalone websites cannot qualify as public accommodations, because public accommodations are physical locations. Yet websites maintained by enterprises with brick-and-mortar locations are, in effect, standalone public accommodations. By maintaining a physical presence, companies somehow transform their websites into standalone public accommodations that must meet Title III accessibility requirements. That reasoning cannot be squared with the statutory text and produces illogical results.

1. Title III defines public accommodations as actual physical places. That is the antithesis of a website or mobile app, which is "located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet." *Reno v. ACLU*, 521 U.S. 844, 851 (1997).

32

a. Title III's plain text cabins the scope of public accommodations to tangible physical locations. For starters, Title III covers "any person who owns, leases (or leases to), or operates a *place of public accommodation*." 42 U.S.C. § 12182(a) (emphasis added). And the text forbids discrimination based on disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of *any place of public accommodation*." *Id.* (emphasis added). The ordinary meaning of the word "place" is a "physical environment" or "physical surroundings." 2 *Webster's Third New International Dictionary* 1727 (1986); *see Wilmette Park Dist. v. Campbell*, 338 U.S. 411, 415 (1949) (a "place" refers to a "specific location.").

Title III's definition of "public accommodation" confirms that reading. The definition sets forth twelve categories of public accommodations, all describing physical locations ("inn," "restaurant," "motion picture house," "auditorium," "bakery," "laundromat," and so on). 42 U.S.C. § 12181(7). "[A] word is known by the company it keeps." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). It would be particularly strange to conclude that Congress listed twelve sets of physical venues but forgot to include language covering intangible places. To read any one term to cover virtual spaces would "giv[e] unintended breadth" to the definition of "public accommodation." *Gustafson*, 513 U.S. at 575 (internal quotation marks omitted).

b. Websites and mobile apps do not become public accommodations simply by virtue of providing access to the goods and services of a brick-and-mortar enterprise. Title III does not demand full accessibility for each and every means of accessing the goods or services a public accommodation provides to the public. Instead, the Act

33

focuses on "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations *of any place of public accommodation*." 42 U.S.C. § 12182(a) (emphasis added).

The Ninth Circuit's contrary conclusion misconceives the nexus that Title III requires between means of accessing the goods or services of a public accommodation and the public accommodation itself. The decision below requires each means of access to comply with Title III accessibility requirements if that means "facilitates access" to goods and services on offer at a physical place. App. 8a–9a. But that reading rewrites Title III to effectively require "full and equal enjoyment of [every means of accessing]" the benefits a public accommodation offers.

Nothing in Title III requires that a public accommodation choose any particular means of accessing its goods and services. And nothing mandates that each chosen means be adequately accessible in isolation. Title III guarantees "full and equal enjoyment" of the goods and services offered at physical places of public accommodation, based on the combined means of access to those goods or services. If a website is insufficiently accessible, but the business or non-profit provides "full and equal enjoyment" to individuals with disabilities in person and through a telephone hotline, for example, there is no discrimination under Title III.

The Ninth Circuit's rule that every means of access must be equally accessible would have outlawed widespread practices used before and after the ADA's enactment. Since before the advent of the Internet, department stores have sent customers mail-order catalogues that allow them to order products available at the stores. Companies have also deployed door-to-door salesmen and

34

maintained telephone hotlines as additional ways for customers to place orders without having to visit their physical locations. Those methods parallel today's websites and mobile apps. Yet, under the Ninth Circuit's view, these longstanding methods would have violated Title III unless the mail-order catalogues were available in Braille, the door-to-door salesmen knew American Sign Language, and the telephone hotlines were equipped for the hearing-impaired. Had Congress intended such specific requirements, it would have said so in Title III. The omission of such specific language confirms that Title III concerns overall access to what a public accommodation provides, not each means of access it offers.

2. The Ninth Circuit's interpretation of Title III also makes little practical sense. On the one hand, the Ninth Circuit holds that all businesses or non-profits that operate solely online—like e-commerce, online entertainment, or social media—face no Title III accessibility mandates, no matter what or how much they provide to the public. On the other hand, as long as a company or organization operates even one brick-and-mortar location and its online offerings bear a connection to that one location, all the online offerings come within Title III's ambit. For instance, now that Amazon has built a few brick-and-mortar bookstores, the Ninth Circuit's decision suggests its gargantuan online platform must comply with Title III as long as it somehow facilitates access to the bookstores' products. Trevor Mogg, *Amazon Is Opening a New Brick-and-Mortar Store with A Twist*, Digital Trends (Sept. 26, 2018), <https://tinyurl.com/y9zo67lm>.

Congress, however, passed a statute to apply only to places of public accommodation, which must be physical locations, and only to ensure adequate overall access to

35

the benefits of those places.  Any different policy choice is up to Congress, not the judiciary.

## CONCLUSION

The Court should grant the petition.

Respectfully submitted,

GREGORY F. HURLEY
SHEPPARD, MULLIN, RICH-
TER & HAMPTON LLP
   *650 Town Center Drive,*
*4th Floor*
*Costa Mesa, CA 92626*
*(714) 513-5100*

   *\*Admitted only in NY. Practice*
*supervised by D.C. Bar mem-*
*bers pursuant to D.C. Court of*
*Appeals Rule 49(c)(8).*

LISA S. BLATT
   *Counsel of Record*
SARAH M. HARRIS
MENG JIA YANG
SURAJ KUMAR*
WILLIAMS & CONNOLLY LLP
   *725 Twelfth Street, N.W.*
*Washington, DC 20005*
*(202) 434-5000*
*lblatt@wc.com*

   *Counsel for Petitioner*

JUNE 13, 2019