# Exhibit B

Appeal No. 17-55504

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————◆———————————

GUILLERMO ROBLES,

*Appellant-Plaintiff,*

v.

DOMINO'S PIZZA LLC,

*Appellee-Defendant,*

———————————◆———————————

**Appeal from a Final Judgment of the United States District Court
for the Central District of California
Lower Court Case No. 2:16-cv-06599**

———————————◆———————————

**BRIEF OF THE RESTAURANT LAW CENTER; AMERICAN BANKERS
ASSOCIATION; AMERICAN HOTEL & LODGING ASSOCIATION;
AMERICAN RESORT DEVELOPMENT ASSOCIATION; ASIAN AMERICAN
HOTEL OWNERS ASSOCIATION; CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA; INTERNATIONAL COUNCIL OF SHOPPING
CENTERS; INTERNATIONAL FRANCHISE ASSOCIATION; NATIONAL
ASSOCIATION OF CONVENIENCE STORES; NATIONAL ASSOCIATION OF
HOME BUILDERS OF THE UNITED STATES; NATIONAL ASSOCIATION
OF REALTORS®; NATIONAL ASSOCIATION OF THEATRE OWNERS;
NATIONAL FEDERATION OF INDEPENDENT BUSINESS SMALL BUSINESS
LEGAL CENTER; NATIONAL MULTIFAMILY HOUSING COUNCIL;
NATIONAL RETAIL FEDERATION; AND RETAIL LITIGATION CENTER,
INC. AS *AMICI CURIAE* IN SUPPORT OF APPELLEE-DEFENDANT
DOMINO'S PIZZA LLC**

———————————◆———————————

| | |
|---|---|
| Joyce Ackerbaum Cox, Esq. | John B. Lewis, Esq. |
| Kevin W. Shaughnessy, Esq. | BAKER & HOSTETLER LLP |
| Mary Caroline Miller, Esq. | Key Tower, Suite 2000 |
| BAKER & HOSTETLER LLP | 127 Public Square |
| SunTrust Center, Suite 2300 | Cleveland, Ohio 44114 |
| 200 South Orange Avenue | (216) 621-0200 |
| Orlando, Florida 32801 | *Counsel of Record for Amici Curiae* |
| (407) 649-4000 | |
| *Counsel of Record for Amici Curiae* | |

Angelo I. Amador, Esq.
THE RESTAURANT LAW CENTER
2055 L Street, NW
Washington, D.C. 20036
(202) 331-5913
*Counsel for Amicus Curiae
  Restaurant Law Center*

Justin Vermuth, Esq.
AMERICAN RESORT DEVELOPMENT
  ASSOCIATION
1201 15th Street, NW
Washington, D.C. 20005
(202) 371-6700
*Counsel for Amicus Curiae
  American Resort Development
  Association*

Warren Postman, Esq.
Janet Galeria, Esq.
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, D.C. 20062
(202) 463-5337
*Counsel for Amicus Curiae
  Chamber of Commerce of the
  United States of America*

Christine Mott, Esq.
INTERNATIONAL COUNCIL OF
  SHOPPING CENTERS
1221 Avenue of the Americas
41st Floor
New York, New York 10020
(646) 728-3664
*Counsel for Amicus Curiae
  International Council of
  Shopping Centers*

Jeffrey B. Augello, Esq.
Felicia Watson, Esq.
NATIONAL ASSOCIATION OF HOME
  BUILDERS OF THE UNITED STATES
1201 15th Street, NW
Washington, D.C. 20005
(202) 266-8490
*Counsel for Amicus Curiae
  National Association of Home
  Builders of the United States*

Karen R. Harned, Esq.
Elizabeth Milito, Esq.
NATIONAL FEDERATION OF
  INDEPENDENT BUSINESS SMALL
  BUSINESS LEGAL CENTER
1201 F Street, NW
Washington, D.C. 20004
(202) 406-4443
*Counsel for Amicus Curiae
  National Federation of Independent
  Business Small Business Legal
  Center*

Stephanie Martz, Esq.
NATIONAL RETAIL FEDERATION
1101 New York Avenue, NW
Washington, D.C. 20005
(202) 626-8106
*Counsel for Amicus Curiae*
  *National Retail Federation*

Deborah White, Esq.
Kathleen McGuigan, Esq.
RETAIL LITIGATION CENTER, INC.
1700 N. Moore Street
Suite 2250
Arlington, Virginia 22209
(703) 600-2067
*Counsel for Amicus Curiae*
  *Retail Litigation Center, Inc.*

**Robles v. Domino's Pizza LLC**
**Appeal No. 17-55504**

<u>**CERTIFICATE OF INTERESTED PERSONS AND**</u>
<u>**CORPORATE DISCLOSURE STATEMENT**</u>

Pursuant to Fed. R. App. P. 26.1, *Amici* disclose the following:

1.    Ackerbaum Cox, Esq., Joyce

2.    Amador, Esq., Angelo I.

3.    American Bankers Association

4.    American Hotel & Lodging Association

5.    American Resort Development Association

6.    Asian American Hotel Owners Association

7.    Augello, Esq., Jeffrey B.

8.    Baker & Hostetler LLP

9.    Chamber of Commerce of the United States of America

10.   Domino's Pizza LLC

11.   Galeria, Esq., Janet

12.   Harned, Esq., Karen R.

13.   Hurley, Esq., Gregory F.

14.   International Council of Shopping Centers

15.   International Franchise Association

16.   Lewis, Esq., John B.

17.   Leimkuhler, Esq., Bradley J.

18.   Manning Law, APC

19.     Manning, Jr., Esq., Joseph R.

20.     Manning, Esq., Michael J.

21.     Martz, Esq., Stephanie

22.     McGuigan, Esq., Kathleen

23.     Milito, Esq., Elizabeth

24.     Miller, Esq., Mary Caroline

25.     Mott, Esq., Christine

26.     National Association of Convenience Stores

27.     National Association of Home Builders of the United States

28.     National Association of Realtors

29.     National Association of Theatre Owners

30.     National Federation of Independent Business Small Business Legal Center

31.     National Multifamily Housing Council

32.     National Retail Federation

33.     Postman, Esq., Warren

34.     Restaurant Law Center

35.     Robles, Guillermo

36.     Retail Litigation Center, Inc.

37.     Shaughnessy, Esq., Kevin W.

38.     Sheppard, Mullin, Richter & Hampton LLP

39.　　　Vermuth, Esq., Justin

40.　　　Watson, Esq., Felicia

41.　　　White, Esq., Deborah

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
  DISCLOSURE STATEMENT .................................................................. C-1

TABLE OF CONTENTS ............................................................................ i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF THE ISSUES ................................................................ 1

INTEREST OF *AMICI CURIAE* ............................................................. 1

STATEMENT OF AUTHORITY TO FILE .............................................. 7

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 7

ARGUMENT ............................................................................................. 10

I.    By Extending Title III To Websites, Courts Ignore The Statutory Language
    of Title III And Create A Patchwork Of Inconsistent Exposure To Liability
    For Nationwide Businesses ............................................................... 10

    A.    Under The Statutory Language Of Title III, Websites Are Not
        "Places Of Public Accommodation" .................................... 10

    B.    Courts Use A Variety Of Inconsistent Legal Analyses To Expand
        Title III's Coverage To Include Websites, Creating Uncertain
        Obligations For Businesses. ................................................. 13

        1.    The "Spirit Of The Law" Approach ......................... 14

        2.    The "Nexus" Approach ............................................ 15

        3.    Uncertain Lessons From *Netflix* ............................. 17

II.    To the Extent That Websites Are Places Of Public Accommodation Under
    Title III, Requiring Businesses To Comply With Nonexistent "Guidelines"
    Violates Basic Principles Of Administrative Law And Due Process .......... 17

    A.    The Department Of Justice Has Not Yet Implemented  Guidelines
        Addressing Website Accessibility For Private Businesses ................ 17

     B.    The Web Content Accessibility Guidelines Do Not Have The Force Of Law ............................................................................21

     C.    Non-Binding Private Sector Accessibility "Recommendations" Do Not Set Clearly Defined Accessibility Standards ...............................23

III.   Given The Lack Of Established Guidance In This Field, Dismissal Of Website Accessibility Litigation Under The Primary Jurisdiction Doctrine Is Both Appropriate And Necessary...................................................................26

CONCLUSION..........................................................................................27

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................31

CERTIFICATE OF SERVICE .......................................................................32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Access Now, Inc. v. Sw. Airlines, Co.*,
   227 F. Supp. 2d 1312 (S.D. Fla. 2002)....................................................13, 16, 25

*Alaska Prof'l Hunters Ass'n, Inc. v. F.A.A.*,
   177 F.3d 1030 (D.C. Cir. 1999).........................................................................20

*Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New
   England, Inc.*,
   37 F.3d 12 (1st Cir. 1994)..................................................................................15

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000)...........................................................................................22

*Christopher v. SmithKline Beecham Corp.*,
   635 F.3d 383 (9th Cir. 2011) .............................................................................22

*Clark v. Time Warner Cable*,
   523 F.3d 1110 (9th Cir. 2008) ...........................................................................26

*Cullen v. Netflix*,
   880 F. Supp. 2d 1017 (N.D. Cal. 2012).............................................................17

*Doe v. Mutual Omaha Ins. Co.*,
   179 F.3d 557 (7th Cir. 1999) .............................................................................14

*Earll v. eBay, Inc.*,
   No. 5:11-cv-00262, 2011 WL 3955485 (N.D. Cal. Sept. 7, 2011) ...................13

*Ford v. Schering–Plough Corp.*,
   145 F.3d 601 (3d Cir. 1998) ..............................................................................11

*Gomez v. Bang & Olufsen Am., Inc.*,
   No. 1:16-cv-23801, 2017 WL 1957182 (S.D. Fla. Feb. 2, 2017) ...............13, 15

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972)...........................................................................................20

*Guillermo Robles v. Domino's Pizza, LLC*,
  No. 2:16-cv-06599, 2017 WL 1330216 (C.D. Cal. Mar. 20, 2017)..... 6, 9, 24, 27

*J.H. by & through Holman v. Just for Kids, Inc.*,
  248 F. Supp. 3d 1210 (D. Utah 2017) ................................................ 13

*Jancik v. Redbox Automated Retail, LLC*,
  No. 8:13-cv-01387, 2014 WL 1920751 (C.D. Cal. May 14, 2014) .................. 15

*Nat'l Ass'n of the Deaf v. Netflix, Inc.*,
  869 F. Supp. 2d 196 (D. Mass. 2012).......................................... 14, 17

*Nat'l Fed'n of the Blind v. Scribd Inc.*,
  97 F. Supp. 3d 565 (D. Vt. 2015) .................................................. 14

*National Fed'n of the Blind v. Target Corp.*,
  452 F. Supp. 2d 946 (N.D. Cal. 2006)............................................. 16

*Ouellette v. Viacom*,
  No. 9:10-cv-00133, 2011 WL 1882780 (D. Mont. Mar. 31, 2011) .................. 16

*Parker v. Metro. Life Ins. Co.*,
  121 F.3d 1006 (6th Cir. 1997) ..................................................... 11

*PGA Tour. Inc. v. Martin*,
  532 U.S. 661 (2001).................................................................. 17

*Rendon v. Valleycrest Productions, Ltd.*,
  294 F.3d 1279 (11th Cir. 2002) .................................................... 15

*Rome v. MTA/New York City Transit*,
  No. 97-cv-2945 (JG), 1997 WL 1048908 (E.D.N.Y. Nov. 18,
  1997) ................................................................................. 13

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944).................................................................. 23

*Stoutenborough v. Nat'l Football League, Inc.*,
  59 F.3d 580 (6th Cir. 1995) ........................................................ 11

*U.S. v. AMC Entm't, Inc.*,
  549 F.3d 760 (9th Cir. 2008) ....................................................... 20

*United States v. Nat'l Amusements, Inc.*,
  180 F. Supp. 2d 251 (D. Mass. 2001) .................................................................. 18

*Weyer v. Twentieth Century Fox Film Corp.*,
  198 F.3d 1104 (9th Cir. 2000) ............................................................................. 15

*Young v. Facebook*,
  790 F. Supp. 2d 1110 (N.D. Cal. 2011) .............................................................. 16

**Federal Statutes**

42 U.S.C. § 12181(7) .................................................................................. 10, 11, 14

42 U.S.C. § 12182(a) ......................................................................................... 10

42 U.S.C. § 12186(b) ......................................................................................... 18

**Regulations**

28 C.F.R. § 36, Appendix A ........................................................ 12, 18, 22, 23

28 C.F.R. § 36.101 ............................................................................................ 18

28 C.F.R. § 36.104 ............................................................................................ 12

**Other Authorities**

*2.1: W3C Working Draft 07 December 2017*, WWW.W3.ORG,
  https://www.w3.org/TR/WCAG21/ (last visited December 19,
  2017) ................................................................................................................. 25

*About W3C*, WWW.W3.ORG https://www.w3.org/Consortium/ (last
  visited December 19, 2017) .............................................................................. 21

MERRIAM-WEBSTER.COM, https://www.merriam-
  webster.com/dictionary/place (last visited November 30, 2017) ..................... 10

*Nondiscrimination on the Basis of Disability; Accessibility of Web
  Information and Services of Public Accommodations*, 75 Fed. Reg.
  43460 (proposed July 26, 2010) ........................................................ 12, 19, 23, 24

*Technical Assistance Manual Covering Public Accommodations and
  Commercial Facilities*, ADA.GOV,
  https://www.ada.gov/taman3.html (last visited December 19, 2017) ............... 11

U.S. Department of Justice, Civil Rights Division, *Accessibility of
State and Local Government Websites to People with Disabilities*
(2003), https://www.ada.gov/websites2_prnt.pdf ...............................................25

*Web Content Accessibility Guidelines 1.0*, WWW.W3.ORG,
https://www.w3.org/TR/WAI-WEBCONTENT/ (last visited
September 29, 2017)............................................................................................21

*Web Content Accessibility Guidelines 2.0*, WWW.W3.ORG,
https://www.w3.org/TR/WCAG20/ (last visited December 19,
2017)...................................................................................................................21

## STATEMENT OF THE ISSUES

1.      Whether Internet websites are places of public accommodation under Title III of the Americans With Disabilities Act.

2.      Whether requiring businesses to comply with nonexistent regulations and non-binding private sector guidelines violates basic principles of administrative law and due process.

3.      Whether the Web Content Accessibility Guidelines have the force of law or deserve any judicial deference.

4.      Whether application of the primary jurisdiction doctrine is appropriate and/or necessary to resolve the current quagmire of website accessibility litigation.

## INTEREST OF *AMICI CURIAE*

The **Restaurant Law Center** (the "Law Center") is a public policy organization affiliated with the National Restaurant Association, the largest foodservice trade association in the world. The industry is comprised of over one million restaurants and foodservice outlets employing 15 million people.

The **American Bankers Association** (the "ABA") is the principal national trade association of the financial services industry in the United States. The ABA is the voice for the nation's $13 trillion banking industry and its millions of employees.

The **American Hotel and Lodging Association** ("AHLA") is the sole national association representing all segments of the United States lodging industry,

including iconic global brands, hotel owners, REITs, franchisees, management companies, independent properties, bed and breakfasts, and hotel associations.

The **American Resort Development Association** ("ARDA") is the non-profit trade association representing the interests of the time-share and vacation ownership industries. ARDA represents more than 700 time-share development and related service corporations.

The **Asian American Hotel Owners Association** ("AAHOA") is the largest association of hotel owners in the world. Representing more than 16,500 members nationwide, AAHOA members own 22,000 properties – nearly one out of two hotels in the United States.

The **Chamber of Commerce of the United States of America** (the "Chamber") is the world's largest business federation. It represents 300,000 direct members and indirectly represents the interests of over three million companies and professional organizations of every size, in every industry, and from every region of the country.

The **International Council of Shopping Centers** ("ICSC") is the global trade association of the shopping center industry. Its more than 70,000 members in over 100 countries include shopping center owners, developers, managers, investors, retailers, and brokers.

The **International Franchise Association** ("IFA") is the largest trade association in the world dedicated to the entire franchise industry. Its membership spans more than 300 different industries and includes more than 733,000 franchise establishments.

The **National Association of Convenience Stores** ("NACS") is an international trade association that represents both the convenience and fuel retailing industries, with more than 2,200 retail and 1,800 supplier company members.

The **National Association of Home Builders of the United States** ("NAHB") represents over 140,000 builder and associate members throughout the United States, including individuals and firms that construct and supply single-family homes, apartments, condominium, commercial, and industrial properties, as well as land developers and remodelers.

The **National Association of REALTORS®** ("NAR") represents residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in all aspects of the real estate industry. NAR's constituents include approximately 1100 local and 52 state associations of REALTORS®.

The **National Association of Theatre Owners** ("NATO") is the national trade association of the motion picture theater industry. Its membership, which includes the world's largest theater chains as well as numerous independent theaters, operates over 33,000 motion picture screens located in all 50 states.

The **National Federation of Independent Business Small Business Legal Center** (the "NFIB") is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues affecting small businesses.

The **National Multifamily Housing Council** ("NMHC") is the leadership of the trillion-dollar apartment industry. NMHC unites the prominent owners, managers, and developers who help create thriving communities by providing apartment homes for 35 million Americans.

The **National Retail Federation** ("NRF") is the world's largest retail trade association, representing discount and department stores, home goods and specialty stores, Main Street merchants, grocers, wholesalers, chain restaurants, and Internet retailers from the United States and more than 45 countries.

The **Retail Litigation Center, Inc.** (the "RLC") is a public policy organization whose members include many of the country's largest and most innovative retailers. The RLC's members employ millions of people, provide goods and services to tens of millions more, and account for tens of billions of dollars in annual sales.

Many of *Amici's* members operate websites in conjunction with their businesses. The members utilize these websites in a variety of ways and for a host of different reasons. Some websites simply provide information about a business'

location and hours of operation and, in doing so, only reiterate information available elsewhere (i.e., by calling the business or visiting in person). Other websites function more as advertisements, mirroring ads printed in newspapers or catalogues or shown on television. Still other websites are more interactive in nature, allowing visitors to purchase products or services online, submit questions to customer service departments, or communicate with fellow visitors on discussion forums. Some of these websites are static, whereas others change constantly. Moreover, many of these websites include content created and controlled by (or links to content created and controlled by) third parties like Google, YouTube, and Facebook. In sum, the websites operated by *Amici's* members are diverse in both form and functionality.

*Amici's* members endeavor to maintain their websites in keeping with all laws and regulations governing website form and functionality. Under the current legal landscape, however, there is great uncertainty regarding whether or under what circumstances Title III of the Americans With Disabilities Act ("Title III" or the "ADA") regulates commercial websites. Adding to this uncertainty is the fact that the Department of Justice (the "DOJ") has promulgated *no* guidance establishing the contours of website accessibility or otherwise indicating what measures businesses must take to ensure that their websites meet any supposed accessibility requirements that may exist under Title III.

In *Guillermo Robles v. Domino's Pizza, LLC*, No. 2:16-cv-06599, 2017 WL 1330216, at *1 (C.D. Cal. Mar. 20, 2017), the United States District Court for the Central District of California recognized the impossible situation businesses now face in determining their obligations under Title III and consequently dismissed a website accessibility case under the primary jurisdiction doctrine. In doing so, the lower court provided businesses with a sense of much-needed security that, at least in the Central District of California, they will not be required to conform to nonexistent website accessibility standards.

The disabled community, including those with visual impairments, are valued customers and stakeholders of *Amici*. Together, *Amici* strongly support the goals of Title III. However, if this Court overturns the lower court's decision at issue on this appeal, *Amici's* members will be forced to do the impossible and attempt to "comply" with nonexistent, undefined, and potentially ever-changing "standards" for website accessibility. This uncertainty only spawns unproductive litigation that, at best, results in ad hoc solutions. *Amici* have a strong interest in preventing such result.

As many of *Amici's* members are in the process of improving the accessibility of their websites while simultaneously facing an onslaught of lawsuits attacking such accessibility, *Amici* possess unique insight regarding the realities of website accessibility litigation and website modification efforts. With this interest

and insight, *Amici* submit this Brief to aid the Court in its consideration of the important questions at issue in this appeal.

## STATEMENT OF AUTHORITY TO FILE

*Amici* have prepared this Brief in Support of the Appellee-Defendant, Domino's Pizza LLC ("Domino's"). This Brief accompanies *Amici's* Motion for Leave to Participate as *Amici Curiae*, in which *Amici* seek this Court's permission to file the present Brief.

This Brief was not authored, in whole or in part, by counsel for either Party, nor did any Party, counsel for any Party, or any person other than *Amici*, their counsel, or their members contribute money intended to fund this Brief's preparation or submission.

## INTRODUCTION AND SUMMARY OF ARGUMENT

In recent years, the business community has faced a deluge of lawsuits, including the Complaint filed by Appellant-Plaintiff, Guillermo Robles ("Robles"), attacking the accessibility of companies' websites. Despite the sheer volume of these lawsuits, the various individual complaints filed are nearly identical in substance. Each complaint alleges that defendant-businesses' websites are "inaccessible" to blind and visually impaired individuals. Consequently, these complaints allege that businesses have denied disabled individuals "full and equal

access" to the goods and services of a "place of public accommodation" in violation of Title III.

Historically, and consistent with the statutory language of the ADA, claims under Title III have been limited to those directly related to *physical* places of public accommodation. Despite this limitation, various courts across the country have begun expanding Title III's application to non-physical "spaces" like websites. In doing so, these courts have established a variety of inconsistent standards imposing often shifting and unpredictable obligations on businesses. As a result, it is becoming increasingly difficult for businesses to determine, with any sort of meaningful finality, whether their websites fall within Title III's purview.

Adding to this uncertainty is the fact that these courts have failed to point to any discernable or clearly-defined regulations or other guidelines governing website accessibility. In truth, no binding standards exist. As a result, it is impossible for businesses to know how to ensure their websites meet whatever obligations – if any – are required by Title III. Businesses can try, as many have, to modify their websites in good faith to increase access for the disabled, but the lack of definitive regulations and agency guidance means that there is no clear path to or safe haven for compliance. This uncertainty not only violates basic principles of administrative law, but also contravenes fundamental notions of due process, as no definitive

guidance makes clear whether Title III applies to websites or, if so, instructs businesses how to institute and operate ADA-compliant websites.

The lower court's decision in *Robles*, in which the Central District of California dismissed a website accessibility lawsuit pursuant to the primary jurisdiction doctrine, explicitly recognizes the uncertainties businesses face in attempting to determine their legal obligations under Title III. In refusing to allow Robles' case to move forward in the absence of specific and enforceable accessibility guidelines, the court provided Domino's (and other businesses) with a much-needed sense of security amidst an otherwise uncertain legal landscape. Moreover, by "calling upon Congress, the Attorney General, and the Department of Justice to take action to set minimum web accessibility standards for the benefit of the disabled community, Title III, and the judiciary," the Central District of California has put the Title III law-making power back in the hands of those responsible for defining the contours of Title III. *Id.* at *9. In doing so, the lower court took an important step toward resolving the relentless onslaught of current website accessibility litigation. Until Congress or the DOJ takes action to clarify businesses' specific Title III obligations, businesses and disabled individuals will continue disagreeing about what (if any) guidelines govern website accessibility – and will continue to waste judicial resources in the process. As the *Robles* decision makes clear, the best way to stop this unproductive cycle is to seek guidance from the legislative and/or

executive branch.  Accordingly, *Amici* respectfully urge this Court to affirm the decision below.

## ARGUMENT

I. **By Extending Title III To Websites, Courts Ignore The Statutory Language Of Title III And Create A Patchwork Of Inconsistent Exposure To Liability For Nationwide Businesses.**

A. **Under The Statutory Language Of Title III, Websites Are Not "Places Of Public Accommodation."**

Title III provides that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any *place* of public accommodation." 42 U.S.C. § 12182(a) (emphasis added).

The most natural definition of the term "place" refers to "a physical environment."  *See*  MERRIAM-WEBSTER.COM,  https://www.merriam-webster.com/dictionary/place (last visited November 30, 2017) (defining "place" as "a physical environment;" "a particular region, center of population, or location to visit;" or "a building, part of a building, or area occupied").  In keeping with this definition, Title III defines the term "public accommodation" by listing twelve distinct categories of physical, brick-and-mortar establishments open to the public at a specific physical location. 42 U.S.C. § 12181(7).  In keeping with this definition, the ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities clarifies that a "place of public accommodation" is

10

limited to the twelve categories listed in the statute, while also equating the word

"place" with physical "facilities":

> Can a facility be considered a place of public accommodation if it does not
> fall under one of these 12 categories? No, the 12 categories are an exhaustive
> list. However, within each category the examples given are just illustrations.
> For example, the category "sales or rental establishments" would include
> many facilities other than those specifically listed, such as video stores, carpet
> showrooms, and athletic equipment stores.

*ADA Title III Technical Assistance Manual Covering Public Accommodations and*

*Commercial Facilities*, ADA.GOV, https://www.ada.gov/taman3.html (last visited

December 19, 2017).

Title III's statutory language reflects Congress's intent to limit the statute's

reach to physical establishments. Had Congress intended Title III to apply to all

businesses offering goods and services to the public, it would not have limited the

defined list of public accommodations to only those offered at a "place."  Following

this basic logic, both the Third and Sixth Circuits have refused to extend Title III to

non-physical locations or spaces.  *See Ford v. Schering–Plough Corp.*, 145 F.3d 601,

612–14 (3d Cir. 1998) ("[W]e do not find…the terms in 42 U.S.C. § 12181(7) to

refer to non-physical access or even to be ambiguous as to their meaning."); *Parker*

*v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1010–13 (6th Cir. 1997) ("As is evident by §

12187(7), a public accommodation is a physical place…"); *Stoutenborough v. Nat'l*

*Football League, Inc.*, 59 F.3d 580, 583 (6th Cir. 1995) (explaining that places of

public accommodation are limited to physical "facilities").

The DOJ's regulations implementing Title III also reinforce that places of public accommodation are limited to physical places. The regulations define the term "place of public accommodation" as "a facility," which is further defined as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." 28 C.F.R. § 36.104. This language confirms that places of public accommodation are only those spaces accessible at a specific physical location.[1] A website, by contrast, is simply a collection of data that one "accesses" by requesting a web server to transmit the data to his or her computer from another host source. Under any natural definition, collections of data are not "places of public accommodation."

---

[1] Despite the clear meaning of its own definition, the DOJ has noted – in statements not subject to notice-and-comment rulemaking – that "[a]lthough the language of the ADA does not explicitly mention the Internet, the Department has taken the position that title III covers access to Web sites of public accommodations." 28 C.F.R. § 36, Appendix A. These informal statements are not entitled to the force and effect of law. *See infra* Section II.B. Regardless, the DOJ has been inconsistent in its own "position" and has admitted that there is "uncertainty regarding the applicability of the ADA to Web sites." *See Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of Public Accommodations*, 75 Fed. Reg. 43460, 43464 (proposed July 26, 2010); *see also* 28 C.F.R. § 36, Appendix A (explaining businesses may meet website accessibility obligations "by providing an accessible alternative for individuals to enjoy its goods and services, such as a staffed telephone information line").

**B.** **Courts Use A Variety Of Inconsistent Legal Analyses To Expand Title III's Coverage To Include Websites, Creating Uncertain Obligations For Businesses**.

As described above, Title III and its implementing regulations do not apply to websites. *See Earll v. eBay, Inc.*, No. 5:11-cv-00262, 2011 WL 3955485, at *2 (N.D. Cal. Sept. 7, 2011) (holding that websites are not places of public accommodation under Title III). While Congress may "amend the ADA to define a website as a place of public accommodation," it has not yet done so (despite having amended the ADA since its passage in 1990). *Gomez v. Bang & Olufsen Am., Inc.*, No. 1:16-cv-23801, 2017 WL 1957182, at *4, n.3 (S.D. Fla. Feb. 2, 2017). By contrast, courts, having no legislative power, "cannot create law where none exists." *Id.*; *see also J.H. by & through Holman v. Just for Kids, Inc.*, 248 F. Supp. 3d 1210 (D. Utah 2017) ("[T]he law's remedial purpose cannot overcome its plain meaning as written."); *Access Now, Inc. v. Sw. Airlines, Co.*, 227 F. Supp. 2d 1312, 1318 (S.D. Fla. 2002) ("[C]ourts must follow the law as written and wait for Congress to adopt or revise legislatively-defined standards that apply to those rights…"); *Rome v. MTA/New York City Transit*, No. 97-cv-2945 (JG), 1997 WL 1048908, at *1 (E.D.N.Y. Nov. 18, 1997) ("[W]hile such reasoning [including non-physical spaces as places of public accommodation] may have a certain logic to it, it is contrary to the statute."). Despite the limited scope of the ADA, some courts – using vastly different approaches – have begun expanding Title III's reach to include websites.

13

### 1.    The "Spirit Of The Law" Approach

In considering whether Title III applies to non-physical spaces like websites, some courts – including those in the First and Seventh Circuits – construe  the language of Title III broadly "to effectuate its [remedial] purpose of providing a … national mandate for the elimination of discrimination against individuals with disabilities." *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 573 (D. Vt. 2015) (internal citation and quotations omitted).  According to these courts, the "core meaning of Title III's anti-discrimination provision is that the owner or operator of a store, hotel, restaurant, dentist's office, theater, website, or other facility (whether in physical space or in electronic space) that is open to the public cannot exclude disabled persons from entering the facility and using the facility in the same way that nondisabled persons do." *Doe v. Mutual Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999).

Courts using this "spirit of the law" approach do not limit consideration to whether businesses offer goods or services to the public *at a physical place*, but instead ask whether businesses offer goods or services to the public via *any* platform. Under this approach, several courts have held that purely online businesses – those with no connection to any physical storefront, theater, or any other type of "public accommodation" listed in Section 12181(7) – are nonetheless places of public accommodation covered under Title III.  *See Nat'l Ass'n of the Deaf v. Netflix, Inc.*,

869 F. Supp. 2d 196, 200 (D. Mass. 2012) ("[E]xcluding businesses that sell services through the Internet from the ADA would 'run afoul of the purposes of the ADA…'") (quoting *Carparts Distribution Ctr., Inc. v. Auto. Wholesaler's Ass'n of New England, Inc.*, 37 F.3d 12, 20 (1st Cir. 1994)).

## 2. The "Nexus" Approach

Other courts – including the Ninth and Eleventh Circuits – apply a narrower approach, holding that Title III imposes obligations on non-physical spaces or processes only when a sufficient "nexus" exists between the non-physical space or process in question and some other concrete, physical space. *See Rendon v. Valleycrest Productions, Ltd.*, 294 F.3d 1279, 1280-81, 1285 (11th Cir. 2002) (looking to nexus between remote technological eligibility process and access to concrete space); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000) (requiring "some connection between the good or service complained of and an actual physical place").

Under this approach, a website cannot form the basis of a Title III claim when it does not impede a disabled individual from accessing the goods or services at a related physical establishment. *See Gomez*, 2017 WL 1957182, at *2 ("Because Plaintiff has not alleged that Defendant's website impeded his personal use of [Defendant's] retail locations, his ADA claim must be dismissed."); *Jancik v. Redbox Automated Retail, LLC*, No. 8:13-cv-01387, 2014 WL 1920751, at *8–9

(C.D. Cal. May 14, 2014) (holding website was not place of public accommodation because there was insufficient nexus between website and physical space); *Young v. Facebook*, 790 F. Supp. 2d 1110, 1115 (N.D. Cal. 2011) ("Although Facebook's physical headquarters obviously is a physical space, it is not a place where the online services to which [the plaintiff] sought access are offered to the public."); *Ouellette v. Viacom*, No. 9:10-cv-00133, 2011 WL 1882780, at *4-5 (D. Mont. Mar. 31, 2011) (holding online theater websites were not physical places and were not sufficiently connected to any physical structure), *report and recommendation adopted*, No. 9:10-cv-00133, 2011 WL 1883190 (D. Mont. May 17, 2011); *Access Now*, 227 F. Supp. 2d at 1319-20 (refusing to apply Title III to website because it was not physical location nor means of accessing concrete space), *appeal dismissed,* 385 F.3d 1324 (11th Cir. 2004).

A business' website *can* run afoul of Title III under the "nexus" approach, however, when it impedes a disabled individual's "full and equal enjoyment" of the goods and services offered at that business' *physical* establishment(s). *See National Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 954-955 (N.D. Cal. 2006) (holding plaintiffs had alleged sufficient facts to state Title III claim when plaintiffs "alleged the inaccessibility of Target.com denie[d] the blind the ability to enjoy the services *of Target stores*") (emphasis added).

### 3. Uncertain Lessons From *Netflix*

As a result of the differing approaches taken by courts analyzing website accessibility claims under Title III, entities with a broad geographic presence now face inconsistent exposure based upon a plaintiff's domicile or a courthouse address. *Compare National Ass'n of the Deaf v. Netflix*, 869 F. Supp. 2d 196 (D. Mass. 2012) (following "spirit of the law" approach in holding Netflix's video streaming website *is* place of public accommodation, even though its web-based services are unrelated to any physical space); *with Cullen v. Netflix*, 880 F. Supp. 2d 1017 (N.D. Cal. 2012) (following "nexus" approach in holding Netflix's online streaming service *is not* place of public accommodation because Netflix's services are *only* available online). These *Netflix* decisions – under which the same website is a place of public accommodation in one judicial district but not another – demonstrate the uncertainty businesses now face in determining their obligations, if any, under Title III.

## II. To The Extent That Websites Are Places Of Public Accommodation Under Title III, Requiring Businesses To Comply With Nonexistent "Guidelines" Addressing Website Accessibility Violates Basic Principles Of Administrative Law And Due Process.

### A. The Department Of Justice Has Not Yet Implemented Guidelines Addressing Website Accessibility For Private Businesses.

To make a disability discrimination claim under Title III, a plaintiff must allege that the defendant engaged in one of the specifically prohibited actions described in the DOJ's implementing regulations. *See PGA Tour. Inc. v. Martin*,

532 U.S. 661, 681-82 (2001) (explaining that whether defendant has engaged in unlawful discrimination under Title III depends on whether it committed an act specifically prohibited by regulation). While the statute itself lists the broad categories of discrimination that are unlawful under Title III, it does not proscribe or mandate specific conduct. Instead, Title III requires the DOJ to issue implementing regulations that establish accessibility standards and put covered entities on notice of their specific obligations under the law. 42 U.S.C. § 12186(b); *see also* 28 C.F.R. § 36.101 (describing purpose of DOJ's regulations). Under this framework, absent a violation of a specific guideline established in the regulations, there can be no violation of Title III's general prohibitions. *See United States v. Nat'l Amusements, Inc.*, 180 F. Supp. 2d 251, 258-260 (D. Mass. 2001) ("The Attorney General argues that because the Cinemas' theaters are in violation of these general regulatory provisions, he should be able to state a claim…absent a violation of a specific regulation… The Court disagrees.").

The existing regulations contain *no* provisions governing the accessibility of websites or online content. Indeed, the DOJ admits that it has been "unable to issue specific regulatory language on Website accessibility." 28 C.F.R. § 36, Appendix A. In July of 2010, the DOJ issued an Advanced Notice of Proposed Rulemaking ("ANPR"), in which it explains that it was "*considering* revising the regulations implementing title III of the ADA in order *to establish requirements* for making the

goods, services, facilities, privileges, accommodations, or advantages offered by public accommodations via the Internet, specifically at sites on the World Wide Web ('Web') accessible to individuals with disabilities." *Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of Public Accommodations*, 75 Fed. Reg. 43460, 43460 (proposed July 26, 2010) (emphasis added). The ANPR does not set forth any proposed regulations or guidelines. Rather, it simply indicates the DOJ's desire to eradicate "remaining uncertainty regarding the applicability of the ADA to Web sites of entities covered by title III" and "make clear to entities covered by the ADA their obligations to make their Web sites accessible." 75 Fed. Reg. 43460, 43464. To this end, the ANPR explicitly explains that the DOJ has yet to adopt regulations regarding website accessibility and even questions whether the agency should adopt regulations in the first place. *Id.* at 43465.

Despite issuing the ANPR and collecting comments from the public nearly seven years ago, the DOJ has yet to take the next step in enacting an official regulation addressing website accessibility – issuing a Notice of Proposed Rulemaking ("NPRM"). After several delays, the DOJ indicated, under the Obama Administration, that it did not expect to publish a NPRM addressing this issue until 2018 at the earliest. More recently, the Trump Administration put the ANPR on its list of "inactive" regulations. *2017 Inactive Regulations*, REGINFO.GOV,

https://www.reginfo.gov/public/jsp/eAgenda/InactiveRINs_2017_Agenda_Update.pdf (last visited December 19, 2017). Thus, while the inactive status of the ANPR may reflect the DOJ's intention to promulgate binding regulations *in the future*, it in no way imposes *present* obligations on places of public accommodation.

Given that no regulations currently impose clearly-defined obligations regarding website accessibility, businesses are simply not on notice of what, if anything, Title III may require of them. Requiring businesses to comply with some undefined accessibility requirements violates fundamental principles of fairness and due process. *See U.S. v. AMC Entm't, Inc.*, 549 F.3d 760 (9th Cir. 2008); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning."); *Alaska Prof'l Hunters Ass'n, Inc. v. F.A.A.*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) (explaining that "those regulated by an administrative agency are entitled to know the rules by which the game will be played") (internal quotations omitted), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n,* 135 S. Ct. 1199 (2015).

### B. The Web Content Accessibility Guidelines Do Not Have The Force Of Law.

In an attempt to side-step the absence of applicable regulations addressing website accessibility, plaintiffs like Robles argue that the Web Content Accessibility Guidelines (the "WCAG"), a spectrum of private-sector accessibility recommendations, somehow help businesses understand their supposed obligation to provide websites accessible to visually impaired individuals. As an initial matter, the WCAG are a set of non-mandatory accessibility guidelines developed by the Web Accessibility Initiative (the "WAI"), a subgroup of the World Wide Web Consortium. The WAI is a private-sector "international community where Member organizations, a full-time staff, and the public work together to develop Web standards." *About W3C*, WWW.W3.ORG, https://www.w3.org/Consortium/ (last visited December 19, 2017). The WAI described the initial version of the WCAG as a "reference document for accessibility principles," and the WCAG 2.0 makes clear that its guidelines are merely "recommendations." *Web Content Accessibility Guidelines 1.0*, WWW.W3.ORG, https://www.w3.org/TR/WAI-WEBCONTENT/ (last visited December 19, 2017); *Web Content Accessibility Guidelines 2.0*, WWW.W3.ORG, https://www.w3.org/TR/WCAG20/ (last visited December 19, 2017). Consistent with these disclaimers, the WCAG are merely meant to assist people in understanding the technical tools that may be used to make websites more accessible. They do not create binding requirements.

21

In an appendix published along with the DOJ's 2010 revisions to its implementing regulations, the agency noted that it had not "issue[d] specific regulatory language on Website accessibility" but mentioned that "[a]dditional guidance is available in the [WCAG]…which are *developed and maintained by* the [WAI]." 28 C.F.R. § 36, Appendix A (emphasis added). Importantly, the fact that the DOJ has referenced the WCAG does not somehow transmute such non-binding guidance into mandatory rules under Title III. Similarly, such "references" are not entitled to any deference. Because the Appendix is more akin to an informal policy statement or guidance document and is in no way an authoritative determination, it does not warrant *Chevron* deference. *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all which lack the force of law – do not warrant *Chevron*-style deference.") (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)). *Auer* deference is also inappropriate, as any position that the WCAG are mandatory is plainly at odds with the actual language of the regulations themselves, which do not proscribe any website content, templates, or functionality. *See Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 395 (9th Cir. 2011) (refusing to defer to agency position under *Auer* because such position was "plainly erroneous and inconsistent with the regulation's unambiguous and obvious

meaning") (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)), *aff'd*, 567 U.S. 142, 132 S. Ct. 2156 (2012). Finally, the DOJ's passing references are not even entitled to *Skidmore* deference, as the agency has been inconsistent regarding its "position" on website accessibility and has explicitly admitted that there is "uncertainty regarding the applicability of the ADA to Web sites." *See* 75 Fed. Reg. 43460, 43464; 28 C.F.R. § 36, Appendix A (explaining that places of public accommodation may meet website accessibility obligations "by providing an accessible alternative for individuals to enjoy its goods and services, such as a staffed telephone information line"); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, *its consistency with earlier and later pronouncements*, and all those factors which give it power to persuade, if lacking power to control.") (emphasis added).

## C. Non-Binding Private Sector Accessibility "Recommendations" Do Not Set Clearly Defined Accessibility Standards.

Even if the WCAG were somehow binding, which they are not, it is unclear what steps a business must take to ensure compliance with these "recommendations." The WCAG 2.0 is divided into three different conformance levels – A, AA, and AAA. The criteria for complying with each of the three varying levels of "success criteria" differ greatly and indicate a different level of accessibility and design feasibility (with AAA being the most accessible but least feasible). Even

within the three levels, however, there are various terms or criteria that are vague or subject to different interpretations.

The DOJ has itself acknowledged the difference between the various conformance levels but has not clearly indicated which – if any – level of compliance may be required under Title III.  *See* 75 Fed. Reg. 43460, 43465 (seeking feedback regarding whether DOJ should adopt WCAG 2.0's Level AA success criteria or should consider adopting another success criteria level).  To this end, no court has indicated which level of success criteria is sufficient under Title III.  *See Robles*, 2017 WL 1330216, at *8 ("Indeed, the Court, after conducting a diligent search, has been unable to locate a single case in which a court has suggested, much less held, that persons and entities subject to Title III that have chosen to offer online access to their goods and services must do so in a manner that satisfies a particular WCAG conformance level.").

Under this framework, it is impossible for businesses to know if and when they have ensured sufficient accessibility.  If a business takes measures to comply with the WCAG Level A success criteria, a plaintiff may claim that Level AA compliance is required.  Once that business complies with Level AA, another plaintiff may insist upon Level AAA.  There is no limit to the compliance challenges businesses will face.  Even if a business achieves compliance with the WCAG Level AAA success criteria, another private interest group could promulgate another, more

24

exacting standard of accessibility.[2]  These infinite permutations, creating unending uncertainty about what *might* pass muster in one, or even many (but not all) courts, underscore the importance of creating website accessibility guidelines through proper notice-and-comment rulemaking and *not* through litigation.  *See Access Now*, 227 F. Supp. 2d at 1318 ("To expand the ADA to cover 'virtual' spaces would be to create new rights without well-defined standards.").  To maintain operationally feasible and legally compliant websites, businesses need – and are entitled to – a uniform set of accessibility guidelines that both put them on notice of their obligations under the law and also clearly define when compliance has been achieved.  The WCAG do neither.

---

[2]  The WAI's Accessibility Guidelines Working Group recently released a "working draft" of the WCAG 2.1 and is already at work developing the WCAG 3.0.  *See Web Content Accessibility Guidelines (WCAG) 2.1: W3C Working Draft 07 December 2017*, WWW.W3.ORG, https://www.w3.org/TR/WCAG21/ (last visited December 19, 2017).  Moreover, other "alternative" sources of website accessibility guidelines already exist.  For example, pursuant to Section 508 of the Rehabilitation Act of 1973, the "Electronic and Information Technology Accessibility Standards" impose binding website accessibility regulations on federal agencies.  U.S. Department of Justice, Civil Rights Division, *Accessibility of State and Local Government Websites to People with Disabilities* (2003), https://www.ada.gov/websites2_prnt.pdf. Apple, another private organization, has also promulgated its own accessibility standards.  There is considerable variance amongst these already-existing "standards" of accessibility.

III. **Given The Lack Of Established Guidance In This Field, Dismissal Of Website Accessibility Litigation Under The Primary Jurisdiction Doctrine Is Both Appropriate And Necessary**.

There is no consensus, among the parties regulated and protected by the ADA *or* this nation's federal courts, as to whether or under what circumstances Title III applies to websites. Even among those in favor of extending Title III's application, there is similar disagreement regarding what actions businesses must take to make their websites "accessible" to visually impaired individuals. Such disagreement and confusion make website accessibility cases ripe for dismissal under the primary jurisdiction doctrine, which "allows courts to stay proceedings or dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008). Application of this doctrine is appropriate when there is "(1) [a] need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Id.* at 1115 (internal citation and quotations omitted). The current morass of website accessibility cases, the inconsistent manner in which courts across the country deal with such cases, and "the DOJ's multi-year campaign to issue a final rule on this subject" all demonstrate

26

the need for an agency with particular knowledge and expertise to establish clearly-defined and easily-enforceable accessibility guidelines.

To the extent one concludes that Title III permits the application of accessibility requirements to websites, the application of the primary jurisdiction doctrine is not only appropriate in this case, it is *necessary*. As the past several years of contentious and unpredictable website accessibility litigation have demonstrated, until Congress or the DOJ clarifies businesses' web-related obligations under Title III, both the business community and the disabled community will continue to seek clarification as to their rights and obligations under the ADA. The only avenue for true resolution of the current uncertainty is the promulgation of *binding* workable standards. By calling on Congress and the DOJ to enact such standards (or to clarify that websites are in fact *not* places of public accommodation covered by Title III), the *Robles* court has taken a necessary step in resolving the relentless and unproductive wave of website accessibility litigation that is sweeping our nation's court system.

## CONCLUSION

In urging this Court to uphold the Central District of California's decision in *Robles*, *Amici* do not seek to undermine the ADA and its important purpose. Instead, *Amici* aim to highlight the need for clearly-defined website accessibility standards. Until such standards exist, complaints that attack the supposed inaccessibility of

commercial websites should not be allowed to move forward.  For this and the foregoing reasons, *Amici* respectfully request that this Court affirm the Central District of California's decision and find in favor of Domino's on this appeal.

Respectfully submitted this 27th day of December, 2017.

/s/ *Joyce Ackerbaum Cox*
Joyce Ackerbaum Cox, Esq.
Kevin W. Shaughnessy, Esq.
Mary Caroline Miller, Esq.
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, Florida 32801
(407) 649-4000
*Counsel of Record for Amicus Curiae*

John B. Lewis, Esq.
BAKER & HOSTETLER LLP
Key Tower, Suite 2000
127 Public Square
Cleveland, Ohio 44114
(216) 621-0200
*Counsel of Record for Amici Curiae*

Angelo I. Amador, Esq.
THE RESTAURANT LAW CENTER
2055 L Street, NW
Washington, D.C. 20036
(202) 331-5913
*Counsel for Amicus Curiae*
  *Restaurant Law Center*

Justin Vermuth, Esq.
AMERICAN RESORT DEVELOPMENT
  ASSOCIATION
1201 15th Street, NW
Washington, D.C. 20005
(202) 371-6700
*Counsel for Amicus Curiae*
  *American Resort Development*
  *Association*

Warren Postman, Esq.
Janet Galeria, Esq.
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, D.C. 20062
(202) 463-5337
*Counsel for Amicus Curiae*
  *Chamber of Commerce of the*
  *United States of America*

Christine Mott, Esq.
INTERNATIONAL COUNCIL OF
  SHOPPING CENTERS
1221 Avenue of the Americas
41st Floor
New York, New York 10020
(646) 728-3664
*Counsel for Amicus Curiae*
  *International Council of*
  *Shopping Centers*

Jeffrey B. Augello, Esq.
Felicia Watson, Esq.
NATIONAL ASSOCIATION OF HOME
 BUILDERS OF THE UNITED STATES
1201 15th Street, NW
Washington, D.C. 20005
(202) 266-8490
*Counsel for Amicus Curiae*
 *National Association of Home*
*Builders of the United States*

Karen R. Harned, Esq.
Elizabeth Milito, Esq.
NATIONAL FEDERATION OF
 INDEPENDENT BUSINESS SMALL
 BUSINESS LEGAL CENTER
1201 F Street, NW
Washington, D.C. 20004
(202) 406-4443
*Counsel for Amicus Curiae*
 *National Federation of Independent*
 *Business Small Business Legal*
 *Center*

Stephanie Martz, Esq.
NATIONAL RETAIL FEDERATION
1101 New York Avenue, NW
Washington, D.C. 20005
(202) 626-8106
*Counsel for Amicus Curiae*
 *National Retail Federation*

Deborah White, Esq.
Kathleen McGuigan, Esq.
RETAIL LITIGATION CENTER, INC.
1700 N. Moore Street, Suite 2250
Arlington, Virginia 22209
(703) 600-2067
*Counsel for Amicus Curiae*
 *Retail Litigation Center, Inc.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.      This document complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,170 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

/s/ *Joyce Ackerbaum Cox*
Joyce Ackerbaum Cox, Esq.
*Counsel for Amici Curiae*
December 27, 2017

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was served via electronic mail this 27th day of December, 2017, upon:

Joseph R. Manning, Jr., Esq.
Michael J. Manning, Esq.
MANNING LAW, APC
4667 MacArthur Boulevard
Suite 150
Newport Beach, California 92660
(949) 200-8755
ADAPracticeGroup@manninglawoffice.com
*Attorneys for Appellant-Plaintiff*

Gregory F. Hurley, Esq.
Bradley J. Leimkuhler, Esq.
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
650 Town Center Drive
Fourth Floor
Costa Mesa, California 92626
(714) 513-5100
ghurley@sheppardmullin.com
bleimkuhler@sheppardmullin.com
*Attorney for Appellee-Defendant*

/s/ *Joyce Ackerbaum Cox*
Joyce Ackerbaum Cox, Esq.
*Counsel for Amici Curiae*
December 27, 2017