Joseph R. Manning, Jr., Esq. (State Bar No. 223381)
**MANNING LAW, APC**
20062 S.W. Birch St., Suite 200
Newport Beach, CA 92660
Office: (949) 200-8755
Fax: (866) 843-8308
DisabilityRights@manninglawoffice.com

Eve L. Hill (pro hac vice)
Jessica P. Weber (pro hac vice)
**BROWN, GOLDSTEIN & LEVY, LLP**
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Office: (410) 962-1030
Facsimile: (410) 385-0869
ehill@browngold.com
jweber@browngold.com

Attorneys for Plaintiff
Guillermo Robles

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| GUILLERMO ROBLES,<br><br>Plaintiff,<br><br>vs.<br><br>DOMINO'S PIZZA LLC,<br><br>Defendant. | Case No. 2:16-cv-06599- JGB-E<br><br>**DECLARATION OF ROSEMARY MUSACHIO IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>**HON. JESUS G. BERNAL**<br><br>Date: October 26, 2020<br>Time: 9:00 a.m.<br>Dept.: 1 |

1

**DECLARATION OF ROSEMARY MUSACHIO**

I, Rosemary Musachio, declare as follows:

1. I am the President of REM Creative Communications, LLC, a consulting firm that provides advice and consultation to businesses for purposes of achieving compliance with the Americans with Disabilities Act ("ADA").

2. I was disclosed as an expert witness for Plaintiff Guillermo Robles in the above entitled matter on July 13, 2020.

3. I have extensive experience in the information technology industry, most particularly in testing and evaluating the accessibility of internet websites.

4. I qualify as an expert witness in the fields relevant to this action, based upon the education, experience, training, and knowledge I gained as described in my Resume, a true and correct copy of which is attached as **Exhibit 1**, which includes a list of my publications in the previous 10 years. My qualifications include the following:

   a. More than 18 years' experience as an IT analyst, including review and analysis of hundreds of internet websites for compliance and access issues which arise under the ADA;

   b. Many years of experience using the Level AA Success Criteria under version 2.0 of the Web Content Accessibility Guidelines ("WCAG 2.0"), published by the World Wide Web Consortium ("W3C"), which is the main international standards organization for the World Wide Web, and the more recent WCAG 2.1 guidelines;

   c. Certified Professional of Web Accessibility (CPWA), Certified Professional of Accessibility Core Competencies (CPACC)

   d. Extensive experience as an educator with the mission of educating others on digital accessibility and mainstream and assistive technology, conducting accessibility assessments of websites, documents and software, and remediation to ensure accessibility to websites for persons with disabilities who utilize screen-reading software or assistive technology (commonly known as "AT");

   e. More than 27 years' experience as a writer and researcher for many companies and publications;

2

**DECLARATION OF ROSEMARY MUSACHIO**

  f. A Bachelor's degree, Magna Cum Laude, in Communications from Cleveland State University, with an emphasis on communications issues that disabled persons encounter;

  g. Multiple engagements as an IT Accessibility Consultant for many companies;

  h. Dedicated Author of Columns for Audacity Magazine for two years;

  i. Editor of Newsletters for industry and for persons with disabilities; and,

  j. Lecturer and Speaker on communication barrier topics at various conferences, as listed on my Resume.

5. Visually-impaired people access websites using keyboards in conjunction with screen-reading software technology that vocalizes the visual information found on a computer screen.

6. Screen-reading software is currently the only method by which a blind person can fully and independently access the internet (except for blind individuals whose residual vision allows them to use magnification).

7. Blind and visually-impaired users of Windows computers and devices have several screen-reading software programs available to them. Job Access With Speech ("JAWS") is currently the most popular, separately-purchased screen-reading software program available for Windows.

8. If website content is not capable of being rendered into text, the blind or visually-impaired user is unable to access and navigate the same content on a website that is available to sighted users.

9. There are well-established industry guidelines for designing, constructing and maintaining websites so they are accessible to and provide effective communication for blind and visually-impaired persons who use screen-reading software programs.

10. These guidelines have existed for several years and are successfully

3

**DECLARATION OF ROSEMARY MUSACHIO**

followed by large business entities who want to ensure their websites are accessible to all people. The Web Accessibility Initiative, an initiative of the World Wide Web Consortium, developed guidelines on website accessibility.

11. The Web Content Accessibility Guidelines ("WCAG") 2.0 and 2.1 standards (available at https://www.w3.org/TR/WCAG20/ and https://www.w3.org/TR/WCAG21/, respectively), easily found on the Internet, recommend several basic components for making websites accessible, including, but not limited to: adding invisible alternative text ("alt-text") to graphics; ensuring all functions can be performed using a keyboard and not just a mouse; ensuring that image maps are accessible and by adding structured headings so blind and visually-impaired people can navigate websites just as sighted people do. WCAG 2.1 is the most recent version of the guidelines, which builds on, but does not contradict, WCAG 2.0. In particular, WCAG 2.1 contains additional guidance for creating accessible mobile applications.

12. Without these basic components, websites are inaccessible to a blind person using screen-reading software.

13. Numerous large business entities have used these guidelines, or have otherwise been able to make their websites accessible, including adding alt-text to graphics and ensuring that all functions can be performed using a keyboard.

14. In addition to being an expert on accessibility and assistive technology, I have cerebral palsy and require assistive technology when accessing the internet.

15. When evaluating websites for accessibility, I use the JAWS screen-reading software program, assistive technology, in conjunction with other testing tools such as Accessible Name and Description Inspector (ANDI) and browser developer tools.

16. I use JAWS as the recognized "gold-standard" screen-reading software program to evaluate services, such as websites and screen-reading software programs. JAWS allows me to test and evaluate the accessibility of services such as

4

**DECLARATION OF ROSEMARY MUSACHIO**

internet websites. I have been told that JAWS is the same software reading program which Plaintiff Guillermo Robles used to try to access the Defendant's website.

17. For blind and visually-impaired users of Apple operating system-enabled computers and devices, the screen-reading software available, pre-installed, and built into all Apple products is the VoiceOver screen reader. Apple's devices, including the iPhone, have the VoiceOver program integrated into their iOS operating system for use by blind and visually-impaired users.

18. The built-in screen reader by Google integrated into Android devices is the Talkback program. Android also offers methods to integrate accessibility features and services to improve an application's usability for users with disabilities. Accessibility resources for Android applications can be found through Android's development website (https://developer.android.com/guide/topics/ui/accessibility)

19. To form my opinions about the accessibility of Defendant's website and mobile application, I used my extensive knowledge and experience using the Level AA Success Criteria under WCAG 2.0 and 2.1 and the guidelines themselves, my experience as an IT analyst, including review and analysis of hundreds of internet websites and mobile applications for compliance and access issues which arise under the ADA, and by visiting the dominos.com website and using the Domino's mobile application.

20. Upon request from counsel for Plaintiff Guillermo Robles, at various times throughout this litigation, in September 2016, March 2017, May 2019, January 30, 2020, May 29, 2020, and most recently on September 16, 2020, I conducted assessments of webpages on dominos.com and on Defendant's mobile application, to determine its accessibility to those with visual impairments. In evaluating Defendant's website, I used assistive technology, including JAWS screen-reading software. In evaluating Defendant's mobile application, I used assistive technology, including the TalkBack screen reader.

21. Domino's website Dominos.com ("Website"), and Domino's Mobile

5

**DECLARATION OF ROSEMARY MUSACHIO**

Application ("Mobile App"), among other things, allow individuals to review menu items, customize orders, learn about coupons and promotional specials, sign up for and use rewards accounts, submit online orders, track orders, and find nearby Dominos' physical locations. When customers use the Domino's Website and Mobile App, they are viewing and/or purchasing the goods and services offered in connection with Domino's physical locations. Domino's Website allows consumers *without* a visual impairment to access the goods and services offered in connection with Domino's physical locations

22. I found a number of accessibility barriers and deficiencies in the Website that prevent blind individuals like Mr. Robles from accessing it on an equal basis as sighted users. Those accessibility barriers for blind and visually-impaired on May 19, 2019, included, but were not limited to, the following:

    a. On the "How Do You Want Your Domino's?" link, blind users encountered excessive "Order Carryout" links that did not contain heading commands to determine which "Order Carryout" link belonged to which listed brick-and-mortar location. When the "More Info" link listed for each location was activated, screen readers do not read the expanded content that appeared visually on the screen.

    b. Error messages listed on the "Tracker" link were inaccessible to screen-readers, preventing them from knowing which mistakes must be corrected before proceeding.

    c. Blind users could not build their own pizzas because the crust, size, sauce, and topping options were inaccessible to screen-readers.

    d. To complete an online order, customers must use an ordering system dialog box that pops out when on the main ordering page. Yet the Website was coded so that blind screen reader users read content on the main page, rather than in the ordering system dialog box. This prevented screen reader users from utilizing the ordering system.

    e. The "Special Instructions "+" links to expand options listed throughout the ordering system only read "plus" to screen reader

users, thus leaving them without an indication of what the "plus" was for.

f. When sighted users select buttons in the ordering system, messages appear in associated list boxes that contain lists of options to select. This did not occur for screen reader users, depriving them of necessary information for completing an order.

g. Order headings were inaccessible to screen readers, which prevented blind users from being able to skim and jump to specific content, as sighted users do with headings that are visually set off in bold or larger fonts. Without proper headings, words on the screen appear as one long unbroken chain of text, rather than in organized sections.

h. Button options could not be accessed with arrow keys after a selection was made. Because blind screen reader users do not use a mouse to navigate, instead relying on key strokes, this coding error effectively blocked blind users from accessing certain options.

i. List boxes that indicate quantity did not read in tandem with their associated products. Thus a blind user would hear that two of something had been selected, for example, but not know to which item this number referred. This issue also applied to the "Edit" and "Remove" links.

j. Defendant's checkout system contained mislabeled and unlabeled links, buttons, and headings, preventing a blind user from being able to complete their transaction.

k. The content in the "Step 1: Confirm Your Selections" section was not accessible for screen-reading technology.

l. Blind and visually-impaired users could not select a brick-and-mortar location as sighted users can do because of the inaccessible structure on various pages of the Defendant's Website.

m. Blind users could not tab out of the "Deals" banner, preventing them from tabbing anywhere else on the page.

n. Radio buttons (e.g. "Delivery", "Now") were not programmed so that screen readers announced the heading associated with them (i.e. "Service Method" or "Order Timing"). This left blind users

7

**DECLARATION OF ROSEMARY MUSACHIO**

guessing as to what each button was referring to, while sighted users had this information clearly displayed visually.

o. Dynamic error messages on the Website were not programmed to be announced by screen readers, leaving blind users unaware of errors that required correction before advancing through a transaction.

p. When sighted users select an item, they receive a visual notification that their selection has been added to their online shopping cart. Yet the Website provided no such notification for screen readers, requiring blind users to go through extra steps to determine if they had successfully added an order to their shopping carts.

q. The Website offers sighted users a dropdown calendar from which they can select a date for a future delivery. Yet this calendar was completely inaccessible to screen readers.

r. When sighted users activate the "Checkout" link, they see the "You Might Also Enjoy" dialog window, which suggests other items to the customer to complement their selections. Yet this dialog window was not accessible to screen reader users, who are thus not offered these suggestions.

s. After sighted users select a side, drink, or dessert, a dialogue window appears to select quantity, additional options or sides, and to add to the order. Yet the window was not coded to appear to screen readers, thus blind users could not access the window or any of the controls in it.

t. Radio buttons on all of the "Drinks" popup dialogs were unlabeled, leaving blind users to guess at what selections they may be making.

u. In the check-out section of the Website, the "Order Summary" data table was not coded correctly so screen reader users could associate column headers with the information, making the content of the summary largely unintelligible to blind users.

v. When users activated the "?" links, screen readers did not say that a tooltip appeared or read its contents.

w. The "Pay at Store" radio button simply reads as "Cash" to screen reader users. Screen readers also could read the note associated with this radio button.

8

**DECLARATION OF ROSEMARY MUSACHIO**

x. The first options for the "Month" and "Year" list boxes acted as temporary labels. When users selected other options, the form fields became unlabeled. This means that it was no longer clear to blind users what information should be entered in these form fields.

y. When users navigated to the "Confirm Password" edit box, the instructions that appear visually just below the edit field were not announced to screen reader users.

z. Although "Piece of The Pie Rewards," "Easy Order and Recent Order," "Payment and Personal Info" are visual headings, they were not coded as such for blind users to navigate to them and associate them with content.

23. My most recent review of Domino's Website on September 16, 2020, revealed new and continued barriers for blind and visually-impaired persons that include but are not limited to the following:

a. The Home page has several "Order Now" buttons that are not associated with items, leaving blind users with no idea of what they are "ordering now" if they select these buttons.

b. As screen reader users navigate through the "Order" links on the menu page, they cannot tell the menu items with which each link is associated. Screen reader users cannot use heading commands to determine the association since headings appear below and above each "Order" link.

c. The Store Locator options are simulated radio buttons that should be navigated with radio buttons but are not. Although screen reader users can invoke shortcuts for the radio buttons, they cannot navigate to the middle "Pickup" option.

d. The Location Results location names are visual headings that are not coded as such for screen reader users to navigate to them and associate them with content.

e. The Location Results page has many "Order Carryout" and "More info" links that are not programmatically associated with locations, leaving blind users to guess which information applies to which location.

f. When users activate a "More Info" link for a location, screen readers do not say it expands or reads the expanded content

9

**DECLARATION OF ROSEMARY MUSACHIO**

properly.

g. The "Add Items to This Coupon" dialog includes a "Pizza" button that does not work with keyboard access, thus preventing blind screen reader users from selecting the button.

h. In the "Build Your Own Pizza" dialog, the "Add to Cart" button, "Quantity" edit box, and the button that goes to the next section are in a difficult location for screen reader users to locate and should be below all the options.

i. In the "Build Your Own Pizza" dialog, when users navigate to the "Special Instructions +" link, screen readers say only "plus."

j. In the "Build Your Own Pizza" dialog, when users press the tab button, which aids users for faster navigation to the forms and links of a page, screen readers do not say the selection that the tab activated.

k. In the "Build Your Own Pizza" dialog, when a checkbox or radio button is selected, screen readers do not read the message that appears on the pizza image. For example, if "medium" under "Choose A Size" is chosen, screen readers do not announce the "Serves 3-5" message that appears visually on the screen.

l. In the "Build Your Own Pizza" dialog, when users select a checkbox or radio button, screen readers do not say an associated list box appears, depriving blind users of critical information that is presented visually to sighted customers.

m. In the "Build Your Own Pizza" dialog, screen reader users cannot use their keyboards to navigate "which side of pizza" radio buttons using arrow keys, the standard method of navigating for blind users like Mr. Robles.

n. After closing the "Build Your Own Pizza" dialog, when users navigate to a radio button (e.g. "Delivery", "Now"), screen readers do not say the heading that is associated with them (i.e. "Service Method" or "Order Timing").

o. After closing the "Build Your Own Pizza" dialog, screen reader do not read dynamic error messages and thus cannot tell where mistakes were made that must be corrected before continuing with the transaction.

p. After closing the "Build Your Own Pizza" dialog, when users select an item, screen readers do not say it is added to the cart,

even though this information is indicated visually for sighted customers. This omission requires blind users to go through extra steps to determine if they have successfully added an order to their shopping carts.

q. After closing the "Build Your Own Pizza" dialog, screen readers do not announce the "Build Your Own Pizza" option when users tab through the listed options.

r. After closing the "Build Your Own Pizza" dialog, although screen readers say "Quantity" for the list boxes, they do not say the product item associated with each form field, leaving blind users to guess which items correspond to which numbers.

s. After closing the "Build Your Own Pizza" dialog, the page has many "Change" and "Remove" links without programmatic information for screen readers to associate each link with the item. This means blind users do not know what they are being asked to "change" or "remove."

t. After closing the "Build Your Own Pizza" dialog, blind users cannot navigate to the "Future Date" field.

u. After closing the "Build Your Own Pizza" dialog, both the "Future Time" and "Future Date" fields have title attributes instead of *aria-label*, which can prevent screen readers from reading the fields' name.

v. In the "Classic Salad" dialog, the "Quantity" spinbuttons are not associated with side items, again leaving blind users to guess which items are associated with which quantities.

w. In the "You Might Also Enjoy" dialog, food item names are visual headings that are not coded as such for screen reader users to navigate to them and associate them with content.

x. In the "You Might Also Enjoy" dialog, there are several "Add to Cart" links that are not programmatically associated with product items.

y. In the Cart, although screen readers say "Quantity" for the list boxes, it does not say the product item associated with each form field. The issue also applies to the "Edit" and "Remove" links.

z. In the Cart, although the "Step 1: Confirm Your Selections" contents are visually structured as a data table, it is not coded as such so screen reader users can navigate through the information

11

**DECLARATION OF ROSEMARY MUSACHIO**

with headers (e.g. {header} Price {data} $1.99).

    aa. In the Cart, although screen readers say "Quantity" for the list boxes on the popup dialog, it does not say the product item associated with each form field.

    bb. In the Checkout, the "Order Summary" data table is not coded correctly so screen reader users cannot associate column headers with the information.

    cc. In the Checkout, when users activate the "?" links, screen readers do not read their content. Instead, screen readers continue to read payment options on the initial screen.

    dd. In the Checkout, keyboard users cannot navigate the "Tipping" radio buttons.

    ee. In the Checkout, the *aria-label* for "Pay at Store" radio button is "Cash", which misleads screen reader users.

    ff. In the Tracker page, screen readers do not say error messages about available orders because the code is not set to *aria-alert="atomic."* This leaves blind users guessing as to where they made an error that needs to be corrected before continuing, while sighted users receive this information visually.

    gg. In the Create A Pizza Profile, when users activate the "?" links in the payment section, screen readers do not read their contents.

    hh. In the Create A Pizza Profile, when users navigate to the "Confirm Password" edit box, screen readers do not announce the instructions that appear visually just below the edit field.

    ii. In the Create A Pizza Profile, although "Piece of The Pie Rewards," "Easy Order and Recent Order," "Payment and Personal Info" are visual headings, they are not coded as such for users to navigate to them and associate them with content.

    jj. On the Domino's Anywhere page, there are three "Learn More" links that are not programmatically associated with other information. Thus, blind users do not know what they are "learning more" about.

24. Thus, even while Domino's fixed certain barriers previously identified by Plaintiff, it introduced new barriers to its Website.

25. On January 30, 2020, I also evaluated the Domino's Mobile App and

12

**DECLARATION OF ROSEMARY MUSACHIO**

found a number of accessibility barriers and deficiencies that prevent blind individuals like Mr. Robles from access on an equal basis as sighted users. Those accessibility barriers for blind and visually-impaired individuals on the Mobile App on January 30, 2020, included, but were not limited to, the following:

a. The menu button was unlabeled, which prevented blind users from using it.

b. In the Address section, edit boxes were unlabeled. Because they were not labeled, blind users did not know which information was requested in each edit box.

c. In the Address section, the first option in the "State" list box acted as a label for the entire list box (where it should have been labeled "State" for screen readers). When users selected another option, the field became completely unlabeled.

d. In the Address section, the "Save this Address" edit box was unlabeled, leaving blind users to guess which information was required.

e. In the Pizza Profile section, the "E-mail" edit box was unlabeled, leaving blind users to guess which information was required.

f. In Create a New Profile section, edit boxes have placeholders that acted as labels. When placeholders were deleted, the fields became unlabeled.

g. In the Order Timing section, list boxes were unlabeled.

h. In the Details section, the screen had many "Tap to Add" buttons that were not programmatically associated with items, leaving blind users guessing as to what they were "tapping to add."

i. In the Details section, the "Adjust Amount" and "Select which pizza side" radio buttons were unlabeled.

j. In the Details section, when users activated a "Decrease" or "Increase" button, the screen reader did not read the new quantity.

k. In the Cart section, "Quantity" listboxes were unlabeled.

l. In the Checkout section, checkboxes and radio buttons were unlabeled.

m. In the Pay with Card section, edit boxes, listboxes, and checkboxes

were unlabeled.

26. On September 16, 2020, I reviewed the Mobile App again, which revealed the that the same barriers on the Mobile App remained the same as in January 2020.

27. Domino's Website and Mobile App need not be inaccessible to the blind. Domino's could implement well-established industry guidelines for designing, constructing and maintaining accessible websites, WCAG. Domino's could implement WCAG 2.1 for both the Website and Mobile App, which provides guidance for creating both accessible websites and mobile apps.

28. Numerous large business entities have used these guidelines, or have otherwise been able to make their websites and mobile applications accessible, including adding alt-text to graphics and ensuring that all functions can be performed using a keyboard and without having to use sight to manipulate objects on a mobile device screen.

29. It is my opinion, however, that Defendant has undertaken minimal to no effort over the last four years to make its Website and Mobile App accessible to persons who are blind or visually-impaired. Even as certain specific barriers that I identified in my expert report were corrected just this month, new barriers were introduced. This indicates that Domino's does not have the policies and procedures in place to maintain an accessible website.

30. Based upon my experience in the field of website accessibility, I estimate that it would cost between $5,000 and $20,000 to remediate Domino's website to provide an equal user experience to the blind, and another $5,000 to $20,000 to remediate the Mobile App.

31. However, given the dynamic nature of websites and mobile applications, a one-time fix of coding does not ensure long-term accessibility unless accompanied by policies and procedures to ensure that all involved in website and app coding and oversight consider accessibility in adding, editing, or maintaining

14

**DECLARATION OF ROSEMARY MUSACHIO**

content or features on these platforms. Accordingly, Domino's should adopt or alter any existing accessibility policies and procedures it may have to ensure that its online platforms become and continue to be accessible to persons with disabilities who rely on screen reader technology to access the internet.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on September 27, 2020, in Warrensville Heights, Ohio.

By: *Rosemary E. Musachio*

Rosemary Musachio

15

**DECLARATION OF ROSEMARY MUSACHIO**