SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
GREGORY F. HURLEY, Cal. Bar No. 126791
ghurley@sheppardmullin.com
BRADLEY J. LEIMKUHLER, Cal. Bar No. 261024
bleimkuhler@sheppardmullin.com
STACY M. DOMINGUEZ, Cal. Bar No. 279161
sdominguez@sheppardmullin.com
650 Town Center Drive, 10th Floor
Costa Mesa, California 92626-1993
Telephone:  714.513.5100
Facsimile:  714.513.5130

Attorneys for DOMINO'S PIZZA LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| GUILLERMO ROBLES,<br><br>              Plaintiff,<br><br>       v.<br><br>DOMINO'S PIZZA LLC,<br><br>              Defendant. | Case No. 2:16-cv-06599<br>Hon. Jesus G. Bernal<br><br>**DEFENDANT DOMINO'S PIZZA LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:    October 26, 2020<br>Time:   9:00 a.m.<br>Ctrm:   1<br><br>Action Filed:   September 1, 2016<br>Trial Date:   December 8, 2020 |

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ..................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................... 2

    A.   Plaintiff's Allegations. ..................................................................... 2

    B.   Background On Digital Accessibility. .............................................. 2

        1.   The Four Pillars Of Digital Accessibility. ............................. 2

        2.   Online ADA Compliance Is A "Flexible" Standard. ............. 5

        3.   The Effective Communications Mandate Of The ADA
            Does Not Mandate A Particular Form of Communication,
            So Long As It Is Effective. ...................................................... 8

III.    ARGUMENT ......................................................................................... 10

    A.   Plaintiff Has Not Established A "Nexus" Between The Subject
        Website/Mobile Application And An Actual, Physical Place Of
        Public Accommodation Owned, Operated, And/Or Leased By
        Defendant. ....................................................................................... 10

    B.   Plaintiff Cannot Put At Issue "Barriers" That He Failed To
        Identify In His Complaint. .............................................................. 12

    C.   At Minimum, Disputed Questions Exist Regarding Plaintiff's
        Alleged Inability To Use The Website. ........................................... 13

        1.   Plaintiff Destroyed Or Failed To Preserve Evidence That
            Would Support Or Dispute His Claims. ................................ 13

        2.   Defendant Disputes That The Website And/Or Mobile
            App Were Inaccessible And It Was Likely Due To User
            Error Or Outdated Software. .................................................. 14

    D.   Defendant's Website and Mobile Application Are Accessible. ........... 17

    E.   Plaintiff Admits That He Can Order Pizza By Phone. ........................ 19

    F.   There Is No Evidence Defendant Intentionally Discriminated
        Against Plaintiff. ............................................................................. 19

    G.   To The Extent The Court Does Not Dismiss Plaintiff's State-law
        Claims With Prejudice, It Should Decline To Exercise
        Supplemental Jurisdiction Over Them............................................. 20

IV.     CONCLUSION ..................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Alexander v. Kuok*
158 F. Supp. 3d 1012 (E.D. Cal. 2016) ...................................................... 8

*Anaya v. Marin Cnty. Sheriff*
2014 WL 7273544 (N.D. Cal. Dec. 22, 2014) .......................................... 9

*Camarillo v. Carrols Corp.*
2010 WL 2557209 (N.D.N.Y. Jun. 24, 2010) ........................................... 9

*Camarillo v. Carrols Corp.*
518 F.3d 153 (2nd Cir. 2008) .................................................................... 9

*Chapman v. Pier 1 Imports (U.S.) Inc.*
631 F.3d 939 (9th Cir. 2011) ................................................................... 17

*Collins v. Dartmouth-Hitchcock Med. Ctr.*
2015 WL 268842 (D.N.H. Jan. 21, 2015) ................................................ 9

*Diaz v. Kroger Co.*
2019 WL 2357531 (S.D.N.Y. June 4, 2019) .......................................... 18

*Dobard v. San Francisco Bay Area Rapid Transit Dist.*
1993 WL 372256 (N.D. Cal. Sept. 7, 1993) ............................................ 9

*Earll v. eBay, Inc.*
2011 WL 3955485 (N.D. Cal. Sept. 7, 2011), *aff'd* 599 Fed. Appx.
695 (9th Cir. 2015) ............................................................................ 10, 11

*Gasper v. Marie Callender Pie Shops*
2006 U.S. Dist. LEXIS 96929 (C.D. Cal. 2006) .................................... 18

*Harris v. Capital Growth Investors XIV*
52 Cal. 3d 1142 (1991) ............................................................................ 19

*Koebke v. Bernardo Heights Country Club*
36 Cal. 4th 824 (2005) ............................................................................ 19

*Lentini v. California Ctr. for the Arts, Escondido*
370 F.3d 837 (9th Cir. 2004) .................................................................. 11

*Long v. Playboy Enterprises Int'l, Inc.*
No. LA CV11–02128 JAK (AJWx), 2012 WL 12869314 (C.D. Cal.
Mar. 7, 2012), *aff'd*, 565 F. App'x. 646 (9th Cir. 2014) ...................... 19

*Montoya v. Orange Cty. Sheriff's Dep't*
No. SACV 11-1922 ............................................................................ 14, 16

*Munson v. Del Taco, Inc.*
46 Cal. 4th 661 (2009) ............................................................................ 19

*Neff v. American Dairy Queen Corporation*
  58 F.3d 1063 (5th Cir. 1995) .................................................................... 11

*Oliver v. Ralphs Grocery Co.*
  654 F.3d 903 (9th Cir. 2011) .......................................................... 12, 13, 17

*Robles v. Domino's Pizza LLC*
  913 F.3d 898 (2019) .................................................................................... 6

*Thurston v. FCA US LLC*
  2018 WL 700939 (C.D. Cal. Jan. 26, 2018) ............................................. 12

*Wander v. Kaus*
  304 F.3d 856 (9th Cir. 2002) ..................................................................... 18

*West v. Moe's Franchisor, LLC*
  2015 WL 8484567 ....................................................................................... 9

*White v. Square*
  7 Cal. 5th 1019 (2019) ......................................................................... 1, 20

*Young v. Facebook, Inc.*
  790 F. Supp. 2d ..................................................................................... 11, 12

<u>Statutes</u>

42 U.S.C. § 12188(a)(1) .............................................................................. 18

Americans With Disabilities Act ("ADA") ......................................... *passim*

Unruh Civil Rights Act ................................................................... 1, 19, 20

<u>Other Authorities</u>

28 C.F.R. § 26.303(c)(1) .............................................................................. 8

75 Fed. Reg. 43460-01, 2010 WL 2888003 (July 26, 2010) ........................ 5, 7, 19

82 Fed. Reg. 60932-01 (Dec. 26, 2017) ...................................................... 5

Federal Rules of Civil Procedure, Rule 8 ............................................ 12, 13

https://www.ebay.com/sch/1305/i.html?_from=R40&_nkw=Tickets
  (last visited September 30, 2020) ............................................................ 11

https://www.w3.org/WAI/standards-guidelines/uaag/ ................................. 7

1   Defendant Domino's Pizza LLC ("Defendant") hereby submits its opposition
2   to Plaintiff Guillermo Robles's ("Plaintiff") Motion for Summary Judgment.

3   **I.      INTRODUCTION**

4   Plaintiff's motion should be denied.

5   *First*, Plaintiff has utterly failed to satisfy the Ninth Circuit's requirement of
6   establishing a "nexus" between an online space and place of public accommodation
7   owned, operated, and/or leased by Defendant.  As discussed further in Defendant's
8   moving papers, Defendant does not own, operate and/or lease any physical
9   restaurant locations in California.

10   *Second*, the lack of any official technical standards governing websites and
11   mobile applications means that the focus of the Court should be on whether the
12   website and/or mobile application can be functional and usable by screen readers for
13   their core purpose – in this case ordering a pizza.  Whether a screen reader user is
14   able to access a website and/or mobile application depends on multiple factors
15   including (1) the user's level of training and experience with screen readers, (2) the
16   web browser/operating system/hardware a screen reader user is using, including
17   whether they are up-to-date, (3) the screen reading software the user is running,
18   including whether it is up-to-date, and (4) the programming of the subject website
19   and/or mobile application.  Plaintiff's singular focus on number four is misleading,
20   wrong and oversimplifies digital accessibility.

21   *Third*, Plaintiff has not submitted any evidence, nor could he, that Defendant
22   affirmatively and willfully discriminated against Plaintiff.  This is a necessary
23   element of an Unruh Civil Rights Act ("UCRA") claim independent of the ADA.
24   Plaintiff overstates the decision in *White v. Square*, 7 Cal. 5th 1019 (2019) which
25   exclusively addressed the question of standing under UCRA for plaintiffs alleging
26   discrimination in online spaces.  *White* then remanded the case for a determination
27   on the merits of the claim.

28   In sum, Plaintiff's motion should be denied, and Defendant's motion granted.

## II.  FACTUAL BACKGROUND

### A.  Plaintiff's Allegations.

The crux of Plaintiff's lawsuit is that Defendant's website, www.dominos.com (the "Website") and Defendant's mobile application (for iPhone) ("Mobile App") are inaccessible to blind and/or visually impaired individuals.  (*See generally* Dkt. 66).  Plaintiff does not dispute that he can (and has) communicated with Defendant using the telephone.  [AMF 135].  Instead, Plaintiff simply claims on a couple of occasions, years apart, he was unable to use the Website or the Mobile App.  [SUF 18].  Based on these alleged facts, Plaintiff seeks an injunction, $16,000 in statutory damages, and attorneys' fees.

As discussed below, Defendant disputes that its Website or Mobile Application was inaccessible or remains inaccessible to this day.  Plaintiff ignores all other relevant information that bear on accessibility. The question of whether a "website" or "mobile application" is "accessible" is significantly more complicated than how Plaintiff puts it.  Worse, Plaintiff has destroyed much of the only evidence that would prove or disprove his allegations.  [AMF 134, 157].

### B.  Background On Digital Accessibility.

#### 1.  The Four Pillars Of Digital Accessibility.

Providing digital accessibility to disabled persons in online spaces is a multifaceted challenge that takes into account a number of different factors.  This action concerns the ability of a totally blind and/or visually impaired person to be able to access a website using screen reading software.

In order for a blind user to be able to access a website, a number of prerequisites have to be met.  [AMF 136]. First, like any other user, the person needs to have access to a computer with internet access.  [AMF 137]. In addition, the computer must be running a reasonably modern operating system and web browser.  [AMF 138]. The user must also have the knowledge or training necessary to know how to use the computer, its software, and websites in general.  [AMF 139].

1    However, unlike a sighted user, a blind user is also subject to several additional

2    requirements.  [AMF 140].

3         For instance, a blind user must have an additional piece of software called a

4    screen reader installed on their computer. [AMF 141]. The purpose of a screen

5    reader is to interface with the web browser to convert the contents of websites that

6    the user visits into speech and/or braille.  [AMF 142]. Because screen reader users

7    are generally not able to use a mouse, the screen reader is also responsible for

8    enabling the user to generate mouse clicks and other actions from the keyboard.

9    [AMF 143].

10        Unfortunately, screen readers are rather complex pieces of software, and this

11   poses another barrier to blind users.  [AMF 144]. It generally requires several weeks

12   of training, and often months of frequent practice in order to become a skilled user.

13   [AMF 145]. A user can probably pick up the basics in a relatively short period, but

14   unfortunately, this is often not enough for such users to be able to navigate the

15   complexities of the modern web.  [AMF 146].

16        What is more, because the screen reader is so deeply intertwined with the web

17   browser and operating system, using an outdated screen reader can also cause

18   significant barriers to accessibility.  [AMF 147]. This happens because the screen

19   reader communicates with the web browser and operating system by means of an

20   application programming interface, and these interfaces tend to change over time.

21   [AMF 148].  As a result, eventually the old screen reader is not able to communicate

22   with the browser or operating system as well, or perhaps even at all.  [AMF 149].

23        Of course, the final requirement is that the website needs to be coded

24   correctly in order to support the use of screen readers.  [AMF 150].  If this is not

25   done, then the user may be unable to read the content, or interact with the various

26   parts of the user interface.  [AMF 151].

27        Further, it is important to draw a distinction between true barriers that prevent

28   a user from moving forward, versus things which are only inconveniences or

personal preferences.[1] [AMF 152].  For example, most accessibility experts would agree that marking up headings properly is pretty important to making a site accessible. Headings allow screen reader users to better understand the organization of content on the page, as well as enabling them to quickly jump to the content they are interested in.  [AMF 153].  But removing the heading markup from most pages would not make them unusable.  [AMF 154]. It would simply make them less convenient, and perhaps less intuitive.  However, a user would likely still be able to find the content that they were interested in. [AMF 155].  It just might take a little longer for them to do so.  Unfortunately, the less experience a user has, the more likely they are to struggle with things like this, or to overestimate their import. [AMF 156].

In other words, if a blind user using screen reading software attempts to interact with a website or other software program, a number of factors affect the user's experience:  (1) their level of skill, experience and training using screen reading software, (2) the choice of screen reading software (i.e. JAWS, NVDA, VoiceOver, Talkback, Google Chrome), including the version chosen and whether the screen reading software has been updated to keep pace technologically (i.e. screen readers are updated regularly and new versions are released periodically), (3) what operating system (Windows, Mac, iOS, Android), how modern it is, or device the user is relying upon (i.e. computer, tablet, phone) and how old it is, and what web browser they are using (i.e. Internet Explorer, Google Chrome, Edge, Safari, Firefox) and whether it has been updated to the latest version), and (4) how the website and/or mobile application itself has been programmed. Notably, many of

---

[1] The U.S. Department of Justice's ("DOJ") failure to issue technical standards regarding website accessibility has created this situation because users, screen reading software, operating systems, web browsers, and websites all make assumptions about programming issues that have to be harmonized to be accessible to persons with disabilities – often in the face of rapidly changing technology.

issues are *also* a consideration for a sighted user.  It is a common experience for websites to work better, differently, or not at all for a sighted user based on similar consideration

Plaintiff's myopic focus on the programming of the website and/or mobile application fails to take into account the other factors that potentially impacted his ability to use the website/mobile application.  As discussed below in section III(C), a number of facts call into question Plaintiff's allegations regarding his experience using Defendant's Website and Mobile App.

## 2.   Online ADA Compliance Is A "Flexible" Standard.

The DOJ is the agency tasked with promulgating regulations to provide concrete guidance for businesses on how they should provide access to the disabled community. In 2010, the DOJ issued a Notice of Proposed Rulemaking ("NOPR") wherein it announced it was "considering revising the regulations implementing Title III of the ADA in order to establish requirements for making the goods, services, facilities, privileges,  accommodations, or advantages offered by public accommodations via the Internet, specifically at sites on the [web], accessible to individuals with disabilities." Nondiscrimination on the Basis of Disability; Accessibility of Web Information and Services of State and Local Government Entities and Public Accommodations, 75 Fed. Reg. 43460-01, 2010 WL 2888003 (July 26, 2010).

In that same NOPR, the DOJ expressly noted that "a clear requirement that provides the disability community consistent access to Web sites and covered entities clear guidance on what is required under the ADA does not exist." *Id*. at *43464 (emphasis added).  The DOJ has since withdrawn their intent to issue rulemaking in this area.  *See* Nondiscrimination on the Basis of Disability, 82 Fed. Reg. 60932-01 (Dec. 26, 2017).

In the absence of any specific technical specifications, the DOJ has rejected the concept that a website must be programmed in accordance with the Web Content

1  Accessibility Guidelines ("WCAG").  To the contrary, the DOJ has taken the

2  position that:

> "Absent the adoption of specific technical requirements for websites
>
> through rulemaking, public accommodations have flexibility in how
>
> to comply with the ADA's general requirements of nondiscrimination
>
> and effective communication. Accordingly, noncompliance with a
>
> voluntary technical standard for website accessibility does not
>
> necessarily indicate noncompliance with the ADA."

9  *See* Letter Dated September 25, 2018 from Stephen E. Boyd, Assistant U.S.

10  Attorney, to the Hon. Ted Budd, House of Representatives. (RJN Exh. A).

11  Moreover, the Ninth Circuit in this case specifically determined that Plaintiff could

12  not establish "liability" through reference to the WCAG.  *See Robles v. Domino's*

13  *Pizza LLC*, 913 F.3d 898 (2019) ("Here, Robles does not seek to impose liability

14  based on Domino's failure to comply with WCAG 2.0."). Therefore, Plaintiff's

15  extensive and misleading discussion about "compliance" with the WCAG must be

16  disregarded for purposes of determining liability.

17  The WCAG 2.0 is a set of vague guidelines published by a third-party, non-

18  profit consortium called the World Wide Web Consortium.  These guidelines were

19  never intended to be "regulations" and no public review or formal rulemaking

20  procedure was undertaken.  The consortium that publishes the WCAG is free to

21  amend or change this guidance at any time, and has done so several times.  In fact,

22  in June 2018, the W3C announced that WCAG 2.1 was the new guideline

23  superseding WCAG 2.0.  In other words, midway through this litigation, the

24  guidelines changed.[2]

25  _____

26  [2] The same organization that publishes the WCAG also publishes the User Agent
Accessibility Guidelines that provide guidance to developers of web browsers,

27  browser extensions, media players, readers and other applications that render web

28  content on how to make them more accessible to persons with disabilities.  *See*

The WCAG standards were never intended as law and are intentionally and inherently vague.  The DOJ has never stated that private businesses that operate a website for the public to use must comply with these standards.  (*See* RJN, Exh. A).

For example, when the DOJ first announced it was considering whether or not the WCAG 2.0 guidelines should be imposed "the DOJ noted that "the WCAG 2.0 contains 12 guidelines addressing Web accessibility" and requires that a "Web page must satisfy the criteria for all 12 guidelines under one of three conformance levels: A, AA, or AAA," which "indicate a measure of accessibility and feasibility." 75 Fed. Reg. at *43465. Moreover, immediately below this discussion, the DOJ sought feedback regarding the following difficult-to-answer questions:

> Question 1. Should the Department adopt the WCAG 2.0's "Level AA Success Criteria" as its standard for Web site accessibility for entities covered by titles II and III of the ADA? Is there any reason why the Department should consider adopting another success criteria level of the WCAG 2.0? Please explain your answer.
>
> Question 2. Should the [DOJ] adopt the section 508 standards instead of the WCAG guidelines as its standard for Web site accessibility under titles II and III of the ADA? Is there a difference in compliance burdens and costs between the two standards? Please explain your answer.
>
> Question 3. How should the [DOJ] address the ongoing changes to WCAG and section 508 standards" and "[s]hould covered entities be given the option to comply with the latest requirements?

---

https://www.w3.org/WAI/standards-guidelines/uaag/.  This just reinforces the point that digital accessibility is about more than how a website or software is coded.

1  Question 4. Given the ever-changing nature of many Web sites,

2  should the Department adopt performance standards instead of any set

3  of specific technical standards for Web site accessibility?

4  In other words, the DOJ has expressly refused to adopt WCAG 2.0 (or 2.1) as

5  a strict technical standard and instead opted for a "flexible" approach pursuant to the

6  effective communication mandate of the ADA.  (*See* RJN, Exh. A).

7        3.    <u>The Effective Communications Mandate Of The ADA Does Not</u>

8  <u>Mandate A Particular Form of Communication, So Long As It Is Effective.</u>

9  The regulations implementing Title III of the ADA "requires places of public

10  accommodations to 'furnish appropriate auxiliary aids and services . . . to ensure

11  effective communication with individuals with disabilities.'"  *Alexander v. Kuok*,

12  158 F. Supp. 3d 1012, 1020 (E.D. Cal. 2016); 28 C.F.R. § 26.303(c)(1).  The type of

13  auxiliary aid or service necessary to ensure effective communication will vary in

14  accordance with the length and complexity of the communication involved; and the

15  context in which the communication is taking place.  28 C.F.R. § 36.303.  A public

16  accommodation should consult with individuals with disabilities whenever possible

17  to determine what type of auxiliary aid is needed to ensure effective communication,

18  but the ultimate decision as to what measure to take rests with the public

19  accommodation, provided that the method chosen results in effective

20  communication.  *Id*.  In order to be effective, auxiliary aids and services must be

21  provided in accessible formats, in a timely manner, and in such a way as to protect

22  the privacy and independence of the individual with a disability.  *Id*.  There is no

23  one size fits all solution to satisfy the ADA's effective communication requirement.

24  For example, it would be inappropriate for a hospital to make no effort to

25  communicate with a deaf individual, but it would not be a violation of the ADA for

26  the hospital to provide a deaf individual with a pen and paper to communicate

27  (assuming the individual could read and write English) and not an American Sign

28  Language Interpreter, even if the deaf individual preferred to communicate via sign

language.  In other words, the effective communication requirement does "not require that disabled persons be treated preferentially or necessarily given the accommodation of their choice."  *Collins v. Dartmouth-Hitchcock Med. Ctr.*, 2015 WL 268842, *4-5 (D.N.H. Jan. 21, 2015); *see also Dobard v. San Francisco Bay Area Rapid Transit Dist*., 1993 WL 372256, at *3-4 (N.D. Cal. Sept. 7, 1993) (dismissing an effective communication claim where the plaintiff demanded the public accommodation provide him with real-time captioning services because the ADA gave BART the discretion to achieve that goal and provided an alternative service in the regulation); *Anaya v. Marin Cnty. Sheriff*, 2014 WL 7273544, *5 (N.D. Cal. Dec. 22, 2014) ("The ADA does not require an entity to provide the best accommodations possible, only *reasonable* ones to ensure equal access to its services.").

As a further example, the ADA does not require restaurants to provide braille menus to blind customers.  *E.g. Camarillo v. Carrols Corp.*, 518 F.3d 153, 157 (2nd Cir. 2008) ("restaurants are not necessarily required to have on hand large print menus that Camarillo would be able to read, they are required to ensure that their menu options are effectively communicated to individuals who, like Camarillo, are legally blind.").  Having a server read the menu to blind individuals is sufficient to comply with the ADA.  *Camarillo v. Carrols Corp.*, 2010 WL 2557209, at *3 (N.D.N.Y. Jun. 24, 2010); *see also West v. Moe's Franchisor, LLC*, 2015 WL 8484567, at *2 ("A public accommodation can choose among various alternatives as long as the result is effective communication. For example, a restaurant would not be required to provide menus in Braille for patrons who are blind, if the waiters in the restaurant are made available to read the menu.").

In other words, the effective communications mandate of the ADA does not impose a requirement of "compliance" with any specific standards or guidelines.  In this case, as discussed below, Defendant's Website and/or Mobile App is accessible to blind and or visually impaired users because blind users can use the Website

and/or Mobile App to order a pizza, assuming the person using it has requisite skill, a modern web browser, and up to date screen reading software.  [AMF 122]. Defendant also provides alternative options, such as telephone support, to communicate with potential customers.  [AMF 123].  This satisfies the effective communications requirement.

## III.   ARGUMENT

### A.   Plaintiff Has Not Established A "Nexus" Between The Subject Website/Mobile Application And An Actual, Physical Place Of Public Accommodation Owned, Operated, And/Or Leased By Defendant.

Plaintiff agrees that, under Ninth Circuit precedent, he must establish a "nexus" between the subject website and/or mobile application and an actual, physical place.  *See, e.g., Earll v. eBay, Inc.*, 2011 WL 3955485 (N.D. Cal. Sept. 7, 2011), *aff'd* 599 Fed. Appx. 695 (9th Cir. 2015) (dismissing ADA/UCRA claim by deaf individual because ebay.com was not an actual, physical place).

However, Plaintiff is simply wrong that Defendant conceded the existence of this nexus.  To the contrary, the issue was not briefed previously.  Defendant merely acknowledged that there was a connection between the website and physical restaurant locations.  The core contention of Defendant's motion to dismiss was that the lack of officially technical standards for website accessibility precluded a finding that Defendant violated the ADA.[3]  (Dkt. 32).  In other words, it was unfair to hold Defendant to a technical standard while the DOJ itself had publicly announced it was planning to issue rulemaking on the issue.

The sole "evidence" Plaintiff presents to establish this fact is a declaration from his lawyer that has no foundation whatsoever and is factually incorrect.  Here, as discussed further in Defendant's moving papers, all "Domino's" restaurant

---

[3] When this lawsuit was filed, the DOJ's official position (and since withdrawn) was that it was in the process of creating standard.  It has since abandoned those rulemaking efforts.

locations in California are franchises.  (AMF 124-131).   Under well-established law, franchisors are not owners, operators, or lessors for the purposes of liability the ADA.  *Neff v. American Dairy Queen Corporation*, 58 F.3d 1063 (5th Cir. 1995); *Lentini v. California Ctr. for the Arts, Escondido,* 370 F.3d 837, 849 (9th Cir. 2004).

This position was implicitly affirmed by the Ninth Circuit in *Earll v. eBay, Inc.*, 2011 WL 3955485 (N.D. Cal. Sept. 7, 2011), *aff'd* 599 Fed. Appx. 695 (9th Cir. 2015).  In other words, it is not enough for the website have a connection to a physical location or even to sell services or goods for use at a physical location.

For example, ebay.com, the website at issue in *Earll*, sells tickets to sporting events, concerts, and other live entertainment experiences.[4]  As a result, there would be a connection between the online service (selling the ticket) and an, actual, physical place (the stadium or venue).  However, there was no "nexus" established because, while eBay owned and operated ebay.com, it did not own, operate, or lease the actual, physical place at issue – either via a brick and mortar ticket office or by owning the stadium where the event was held.

In *Young v. Facebook, Inc.*, the plaintiff similarly contended that Facebook's website sold gift cards for use at various retail stores across the country, and the alleged discrimination on Facebook's website deprived plaintiff of full and equal access to the goods and services provided by Facebook through physical retail stores. 790 F. Supp. 2d at 1115. The District Court rejected this claim because the ADA explicitly provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation *by any person who owns, leases (or leases to) or operates* a place of public accommodation." *Id*. (emphasis in original). In particular, the Court observed that

---

[4] *E.g.* https://www.ebay.com/sch/1305/i.html?_from=R40&_nkw=Tickets (last visited September 30, 2020).

"[w]hile the retail stores that sell Facebook gift cards may be places of accommodation, [plaintiff] does not allege that Facebook, Inc. "owns, leases (or leases to) or operates" those stores" and "Facebook's internet services thus do not have a nexus to a physical place of public accommodation for which Facebook may be liable under the statute." *Id*. at 1116.

The situation here is analogous and is fatal to Plaintiff's claim. *E.g. Thurston v. FCA US LLC*, 2018 WL 700939 at *5 (C.D. Cal. Jan. 26, 2018) (dismissing complaint because plaintiff could not demonstrate that defendant owned and operated a physical place of public accommodation in California). This case should be dismissed for the same reasons.

**B.** **Plaintiff Cannot Put At Issue "Barriers" That He Failed To Identify In His Complaint.**

In *Oliver v. Ralphs Grocery Co*., 654 F.3d 903 (9th Cir. 2011), the Ninth Circuit confirmed that a plaintiff must identify all alleged access barriers in his complaint in order to give the defendant fair notice under F.R.C.P. 8. There, the plaintiff attempted to hide the injunctive relief he was seeking to increase the nuisance value of his lawsuit and to prevent the defendant from actually remedying the barriers and mooting his claims at summary judgment. The plaintiff identified some barriers in his complaint, others in a proposed amended complaint, others in an ENE statement, and still others in his expert report. The Ninth Circuit chastised the plaintiff for his sharp tactics and adopted a bright-line rule that all barriers must be identified in the complaint:

> "Plaintiff's counsel later explained that his delays in identifying the barriers at the facility were part of his legal strategy: he purposefully 'forces the defense to wait until expert disclosures (or discovery) before revealing a complete list of barriers,' because otherwise a defendant could remove all the barriers prior to trial and moot the entire case…[F]or

1  　　　　　purposes of Rule 8, a plaintiff must identify the barriers that
2  　　　　　constitute the grounds for a claim of discrimination under the
3  　　　　　ADA in the complaint itself; a defendant is not deemed to have
4  　　　　　fair notice of barriers identified elsewhere."
5  *Id*. at fn. 7, 909.

6  　　　　Applying *Oliver*, Plaintiff cannot raise "new" barriers for the first time at
7  summary judgment.  Of course, this is precisely what he did.  *See* Opp. at 12 ("Ms.
8  Musachio's most recent review of the Website on September 16, 2020, revealed the
9  following <u>new</u> and continued barriers.").  This is improper under *Oliver*.[5]  If
10  Plaintiff wished to put "new" barriers at issue, he should have amended his
11  complaint.  Therefore, Plaintiff's claim is limited exclusively to those specific
12  barriers he identified in his First Amended Complaint.

13  　　**C.** 　　**At Minimum, Disputed Questions Exist Regarding Plaintiff's**
14  **Alleged Inability To Use The Website.**

15  　　　　The extent of Plaintiff's "evidence" that he was unable to use Defendant's
16  Website and Mobile App is effectively limited to his own declaration that he
17  submitted in support of his motion.  However, there are number of significant
18  problems with his testimony that is compounded by his inability to produce any
19  evidence that would support his allegations.

20  　　　　1. 　　Plaintiff Destroyed Or Failed To Preserve Evidence That Would
21  Support Or Dispute His Claims.

22  　　　　First, Plaintiff did not preserve his browsing history on his laptop that would
23  prove or disprove he actually attempted to visit the Website and indicate what
24  barriers he encountered.  [AMF 134].  As a result, Plaintiff cannot establish that he,

---

26  [5] Defendant also objects to this testimony because Plaintiff has not previously
disclosed this information.  Moreover, at deposition, when asked about what Ms.
27  Musachio found in her most recent report, counsel for Plaintiff stated that it was a
privileged "draft" and, therefore, not discoverable.  (SUF 58).

1   in fact, attempted to order pizza via the subject website or even what problems he

2   allegedly encountered. *Montoya v. Orange Cty. Sheriff's Dep't*, No. SACV 11-1922

3   JGB, 2013 WL 6705992, at \*11 (C.D. Cal. Dec. 18, 2013) ("spoliation of evidence

4   raises a presumption that the destroyed evidence goes to the merits of the case, and

5   further, that such evidence was adverse to the party that destroyed it.... [I]f

6   spoliation is shown, the burden of proof logically shifts to the guilty party to show

7   that no prejudice resulted from the spoliation because that party is in a much better

8   position to show what was destroyed and should not be able to benefit from its

9   wrongdoing.").

10      Second, Plaintiff did not preserve his cell phone that he allegedly used to

11   download and access the Mobile App in 2016.  [AMF 157]  As a result, Defendant

12   is completely unable to test this assertion, determine what version of iOS he had

13   downloaded on his iPhone, or know what settings his screen reading software was

14   set too.   This prejudices Defendant because the only testimony supporting his claim

15   is his own self-serving statements. *Montoya*, 2013 WL 6705992, at \*11.  Even

16   worse, Plaintiff did not maintain any records of his alleged "trade-in" of his iPhone.

17   [AMF 158]  As a result, Plaintiff cannot even establish how he allegedly discarded

18   the iPhone and it is possible that he simply destroyed it to avoid discovery.[6]

19      As a result, Plaintiff cannot establish that he ever even attempted to use

20   Defendant's Website or Mobile App.

21          2.   Defendant Disputes That The Website And/Or Mobile App Were

22   Inaccessible And It Was Likely Due To User Error Or Outdated Software.

23      A number of facts dispute Plaintiff's alleged inability to use Defendant's

24   Website and/or Mobile App because of how they were coded.  This includes:

25

26   _____

27   [6] As discussed in Defendant's motion for sanctions, Defendant explicitly asked
     Plaintiff to produce his iPhone for inspection.  (Dkt. 90, 90-4).  While the case was

28   on appeal, Plaintiff discarded this same phone.  (Dkt. 90, 90-8).

1)     Aaron Cannon, Defendant's expert and who is totally blind, was able to order a Domino's pizza on multiples occasions from Defendant's Website beginning in 2011.  [AMF 159].  This raises the question of whether Plaintiff's alleged struggles are entirely made up for the purposes of bringing a lawsuit, a result of the web browser or screen reading software he was using, or a lack of the requisite skill with a screen reader.

2)     Plaintiff made statements during his deposition that demonstrated a fundamental lack of knowledge of how screen readers operate.  For instance, Plaintiff made an erroneous assertion regarding how screen readers speak aloud background images.  [AMF 160].

3)     Plaintiff admits that in 2015 and 2016, when he claims to have visited Defendant's website, he was using Internet Explorer.  [AMF 161].  Plaintiff's own expert has admitted that Internet Explorer outdated for accessibility than other web browsers.  [AMF 162].  Plaintiff's expert also admits that the accessibility experience differs based upon what web browser is used.  [AMF 163].

4)     Plaintiff admits that, during his deposition, he was using the Microsoft Edge web browser.  [AMF 164].  Plaintiff's expert admitted that the Microsoft Edge browser does not work well with JAWS.  [AMF 165].

5)     Plaintiff admits that he installs the "free" updates for JAWS.  [AMF 166].  However, JAWS is a screen reading program that, if one does not purchase the new version every year, does not keep up with the latest technology and stops working correctly.  [AMF 167].  Plaintiff admits that updating JAWS improves the accessibility experience.  [AMF 168]

6)     Plaintiff admits that updating his iPhone to the latest iOS improved ability of his screen reader to access websites because it also updated his iPhone to the latest version of VoiceOver.  [AMF 169].  However, Plaintiff failed to preserve the iPhone he claims to have used to access the Mobile App, so it is impossible to

1   know what version of the iOS he was running when he tried to do so.  [AMF   157]

2   *Montoya*, 2013 WL 6705992, at *11

3       7)      During Plaintiff's deposition, he attempted to use Defendant's Website

4   using his JAWS screen reader.  The issue that he ran into was caused by a technical

5   bug in the JAWS screen reader as it was not replicated when a different screen

6   reader was used on the same website.  [AMF 170].

7       8)      The JAWS screen reader is not designed for use on Apple devices.

8   [AMF 171].  Apple devices are configured to work with the VoiceOver screen

9   reader that is built into the iOS.  Plaintiff used his JAWS screen reader using his

10  2012 MacBook Pro using a configuration where he ran Windows 10 on that device.

11  [AMF 172].  In other words, this was a MacBook attempting to run a Windows-

12  based screen reader using an outdated operating system.  This could be a reason why

13  Plaintiff encountered difficulty using the Website.  Plaintiff also admits that the

14  accessibility experience he gets using Safari is different than when he uses a

15  different web browser.  [AMF 173].

16      9)      Plaintiff's expert, Rosemary Musachio, when she "tested" Defendant's

17  website, used an outdated version of the JAWS screen reading software.  [AMF

18  174].  This calls into question all of her findings because it is not possible to know

19  whether she could have replicated, or bypassed, the alleged issues with a more

20  modern screen reader.  [AMF 175].

21      10)     Ms. Musachio's, who is sighted, methods and descriptions of how

22  screen readers work is fundamentally inaccurate and betray basic misunderstandings

23  of screen reader functionality.  [AMF 176].  This calls into question every single

24  finding that she has made regarding Defendant's Website and Mobile App.

25      11)     For example, Plaintiff has alleged that he had difficulty using

26  Defendant's Mobile App using his iPhone.  However, Ms. Musachio tested the

27  Android version of Defendant's Mobile App.  [AMF 177].  Even worse, Ms.

28  Musachio tested the mobile application on an "Android emulator" which raises

further questions regarding the reliability of her findings.  [AMF 178].  Of course, the Android version of the mobile application is based on an entirely different code base than the Mobile App that runs on an iPhone.[7]  [AMF 179].

12)    Ms. Musachio appears to be in the business of analyzing websites for Plaintiff's counsel and identifying alleged issues for the purposes of bringing lawsuits.  Ms. Musachio estimates that 80% of her total workload is simply reviewing websites for the Manning Law firm.  [AMF 180].  Additionally, of those websites she reviewed, *she cannot recall a single website that she believed to be accessible*.  [AMF 181].  A trier of fact should be allowed to weigh this evidence against Plaintiff's self-serving testimony.

In sum, Plaintiff simply cannot establish on undisputed facts, that Defendant's Website and Mobile App were inaccessible to him *through any fault of Defendant.*

### D.    Defendant's Website and Mobile Application Are Accessible.

As discussed in Defendant's moving papers, Defendant's Website and Mobile App are, in fact, accessible to screen reader users.  They are functional and usable by screen reading software.

In this case, Defendant's Website and Mobile App are presently usable and functional by persons using screen readers.  Individuals using screen readers are able to order a pizza from a Domino's franchise using either the Website or the Mobile App.  (AMF 182, 183).  None of the alleged barriers purportedly found by Plaintiff's expert in May of 2019 are present on the Website currently or are, in fact, not barriers to screen reader users.  (AMF 185).  In addition, Defendant actively ensures that its Website and Mobile App are accessible to screen reader users by

---

[7] Of course, Plaintiff lacks standing to make claims against the mobile application version on Android devices.  *E.g. Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 n.2 (9th Cir. 2011) (Plaintiff does not have standing to assert claims unrelated to disability).  Further, Plaintiff has not put the version of the mobile application on Android devices at issue in his complaint.  *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 909 n.7 (9th Cir. 2011).

1  continuously incorporating accessibility features into its constantly changing

2  Website and Mobile App.  (AMF 186).

3        As part of its further effort to accommodate its blind and visually impaired

4  customers, Defendant's Website contains an accessibility banner that direct users

5  who access the website or mobile application with a statement that "If you are using

6  a screen reader and are having problems using this website please call for

7  assistance" and provides a number.  (AMF 187).  This statement is able to be read

8  by screen readers.   (AMF 188).  If a blind individual calls that number, the person

9  can provide assistance with Defendant's Website.  (AMF 189).  Plaintiff does not

10  dispute that he can order a pizza from Domino's location without difficulty.  (AMF

11  135).

12        "The only remedy available for a violation of the Americans with Disabilities

13  Act under a private right of action is injunctive relief.  Accordingly, if no ADA

14  violations exist at the time the court is asked to provide injunctive relief, the ADA

15  claim is moot because there is no basis for relief and there is nothing for the court to

16  order the facility to change."  *Gasper v. Marie Callender Pie Shops*, 2006 U.S. Dist.

17  LEXIS 96929, *4 (C.D. Cal. 2006); *Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir.

18  2002) ("Damages are not recoverable under Title III of the ADA—only injunctive

19  relief is available for violations of Title III."); 42 U.S.C. § 12188(a)(1).

20        Defendant is already doing all it can to make its Website and Mobile App

21  accessible to screen reader users.  As discussed above and demonstrated by the

22  evidence, Defendant's Website and Mobile App *are* functional and usable by

23  persons using screen reading technology to order a pizza.  Therefore, Plaintiff's

24  claim for injunctive relief is "moot" and his ADA claim should be dismissed.  *E.g.*

25  *Diaz v. Kroger Co.*, 2019 WL 2357531, *4 (S.D.N.Y. June 4, 2019) ("Rather, the

26  Court believes that ADA cases involving websites are subject to the same mootness

27  standard as their "structural" counterparts.").

28

1     **E.**     **Plaintiff Admits That He Can Order Pizza By Phone.**

2     In the DOJ's announcement that it was intending to craft regulations to

3     govern websites, the DOJ specifically stated that providing a staffed telephone line

4     was an acceptable alternative if a covered entity had an inaccessible website.  *See*

5     NOPR, 75 Fed. Reg. 43460-01, 2010 WL 2888003 (July 26, 2010).  In that

6     announcement, the DOJ stated:

7          The Department has taken the position that covered entities with

8          inaccessible websites may comply with the ADA's requirement for

9          access by providing an accessible alternative, such as a staffed

10         telephone line, for individuals to access the information, goods, and

11         services of their Web site.

12     *Id.* at *43466.

13     In this case, Plaintiff has admitted that he is able to order pizza from a

14     Domino's restaurant using the phone.  [AMF 135]  Therefore, Defendant has

15     provided an option for him to "effectively communicate" independently with a

16     Domino's restaurant location.

17     **F.**     **There Is No Evidence Defendant Intentionally Discriminated**

18     **Against Plaintiff.**

19     In order to prove an UCRA claim *independent* of the ADA, Plaintiff must

20     plead and prove *intentional* discrimination.  The California Supreme Court has

21     repeatedly confirmed that the UCRA contemplates "willful, affirmative misconduct

22     on the part of those who violate the UCRA" and that a plaintiff must allege more

23     than the "disparate impact" of a facially neutral policy on a particular group.

24     *Koebke v. Bernardo Heights Country Club*, 36 Cal. 4th 824, 853-854 (2005);

25     *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 668 (2009) (quoting *Harris v. Capital*

26     *Growth Investors XIV*, 52 Cal. 3d 1142 (1991); *Long v. Playboy Enterprises Int'l,*

27     *Inc.*, No. LA CV11–02128 JAK (AJWx), 2012 WL 12869314, at *3 (C.D. Cal. Mar.

28     7, 2012), *aff'd*, 565 F. App'x. 646 (9th Cir. 2014).

1       Plaintiff ignores all of this authority and misleadingly relies upon *White v.*

2 *Square, Inc.*, 7 Cal. 5th 1019, 1023 (2019).  The sole, discrete certified question

3 before the California Supreme Court was whether "a plaintiff ha[s] standing to bring

4 a claim under the Unruh Civil Rights Act when the plaintiff visits a business's

5 website with the intent of using its services, encounters terms and conditions that

6 allegedly deny the plaintiff full and equal access to its services, and then leaves the

7 website without entering into an agreement with the service provider?" *Id*. at 1023.

8 The California Supreme Court's holding was limited to, and only addressed whether

9 plaintiff had standing to bring his UCRA claim. *Id*. at 1032-33.  At no point did the

10 *White* court address or modify the elements of a claim under UCRA that is

11 independent of the ADA.

12       There is no evidence that Defendant willfully and/or affirmatively

13 discriminate against Plaintiff by virtue of how the Website and/or Mobile App was

14 programmed.  Indeed, Plaintiff admits he never contacted Defendant before he filed

15 this lawsuit.  [AMF 190].  Therefore, Plaintiff's claim, to the extent it is not

16 predicated on a violation of the ADA (which he cannot for the reasons explained

17 above), it fails for this additional reason.

18     **G.**    **To The Extent The Court Does Not Dismiss Plaintiff's State-law**

19 **Claims With Prejudice, It Should Decline To Exercise Supplemental**

20 **Jurisdiction Over Them.**

21       For all of the reasons explained in Defendant's moving papers, the Court

22 should decline to exercise supplemental jurisdiction over Plaintiff's state-law claims

23 to the extent it does not dismiss them with prejudice.

24 **IV.**  **CONCLUSION**

25       For all of the foregoing reasons, Defendant respectfully requests that the

26 Court deny Plaintiff's motion in its entirety.

27

28

1  Dated:  October 5, 2020

2                          SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

3

4               By

5                              /s/ *Gregory F. Hurley*
                              GREGORY F. HURLEY

6

7                        Attorneys for DOMINO'S PIZZA LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28