# Exhibit B

Robles vs Domino's Pizza, LLC

Videotaped/Videoconference Deposition of

**ROSEMARY MUSACHIO**

*September 17, 2020*

ROCKET REPORTERS

888.832.0050
www.RocketReporters.com

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

GUILLERMO ROBLES, an individual,

Plaintiff,

vs.

DOMINO'S PIZZA LLC, a limited liability corporation,

Defendants.

Case No. 2:16-cv-06599 JGB(FFMx)

VIDEOTAPED/VIDEOCONFERENCE DEPOSITION OF

ROSEMARY MUSACHIO

TAKEN ON SEPTEMBER 17, 2020

AT 10:00 A.M.

REPORTED BY:
DENISE A. SPURLOCK
CSR No. 12324
JOB No. 601542

accessible to you?
MS. WEBER: Sorry. Just for clarification, you asked "accessible to you."
Do you mean accessible to Ms. Musachio or individuals with disabilities generally? I just want to make sure here. 10:30
MR. LEIMKUHLER: Well, I don't know the scope of Ms. Musachio's disability. And people's disabilities is a broad category. So let's limit this to blind and/or visually-impaired individuals. 10:31
MS. WEBER: Okay. Thanks.
THE WITNESS: Very few to users with visual impairments.
BY MR. LEIMKUHLER:
Q. Do you recall any website that you reviewed that was accessible to a user with a visual impairment? 10:32
A. None comes to mind at the moment.
Q. Are you compensated by the Manning Law Firm to conduct your reviews of the websites?
A. Yes. 10:33
Q. How much are you compensated?
A. $50 per hour.
Q. And how long does it take for you to review a website for accessibility issues?
A. It depends on how many issues, usually three to 10:34

track of the reviews I've done for the firm.
Q. Is it possible for you to give me an estimate?
A. Last year it was around 30,000. But, again, I need to check.
Q. When you say "last year," you mean the total in 2019 or the total through the end of last year? 10:45
A. On my 2019 tax returns.
Q. So do you know the total that you've been paid for all the work you've been doing for the Manning Law Firm?
MS. WEBER: Do you mean in previous years?
MR. LEIMKUHLER: I mean in total since she started working for them or working with them.
THE WITNESS: Again, I need to check.
THE INTERPRETER: The interpreter is uncertain if she's repeating -- no. The interpreter would restate the testimony. 10:47
THE WITNESS: Again, I need to check.
BY MR. LEIMKUHLER:
Q. When were you -- when did you first start working with the Manning Law Firm? 10:47
A. In 2018.
Q. Do you do any website accessibility work with any other law firms?
A. No. 10:48

issue; is that right?
MS. WEBER: Objection. Foundation and vagueness.
You can answer the question.
THE REPORTER: I'm sorry, Ms. Weber. What was your objection? I couldn't hear you. 12:03
MS. WEBER: Sure. Vagueness and foundation. And then I instructed the witness she could answer.
THE REPORTER: Thank you.
THE WITNESS: Correct. 12:04
BY MR. LEIMKUHLER:
Q. And when you identify an issue on a website that impacts accessibility, are you able to recommend a fix to that?
A. Yes. 12:04
Q. And so you would be able to offer suggestions on how to change the programming of a website to remedy that issue?
A. Correct.
Q. What is your background in web programming -- website programming? Excuse me. 12:05
A. I know how to interpret HTML -- L, CSS, ARIA, but it takes too much for me to program.
Q. So you have never programmed a website; is that right? 12:08

THE VIDEOGRAPHER: We have approximately five minutes left on this disk.

THE WITNESS: Correct.

MR. LEIMKUHLER: All right. Shall we switch tapes? 12:08

THE VIDEOGRAPHER: That would be a good idea.

MR. LEIMKUHLER: All right. Let's do that.

THE VIDEOGRAPHER: Videotaped deposition off record at 12:13 p.m. This also concludes video disk number one in today's deposition. 12:08

(A recess was taken.)

THE VIDEOGRAPHER: Videotaped deposition is now returning to record at 12:21 a.m. This is also the beginning of video disk number two in today's deposition. 12:16

BY MR. LEIMKUHLER:

Q. All right. Ms. Musachio, what device do you use to access the Internet?

A. Keyboard and a head pointer.

Q. Can you explain what a head pointer is? 12:17

A. It's a helmet with a stick attached to it. Mine has an eraser at the end of the stick.

Q. And you use the keyboard and head pointer when you access the Internet on your computer, right?

A. Correct. 12:20

Q. I'm asking what year is the computer, the -- what, like, what model year it is?
A. 2017.
Q. Is this the same computer that you used to evaluate the Domino's website in this case? 12:31
A. Yes.
Q. Is the computer you use for testing websites different than the computer you use for personal use?
A. No.
Q. And you said this computer runs Windows 10; is that right? 12:31
A. Correct.
Q. And do you know what version of Windows 10 you are using?
A. Windows 10 Home at 2019. 12:32
Q. And which -- when you're -- which Internet browser do you use when you're testing for website accessibility?
MS. WEBER: The interpreter's mute button is on.
THE INTERPRETER: The interpreter apologizes.
THE WITNESS: Chrome and Firefox when I sometimes think the issue is based on browser.
BY MR. LEIMKUHLER:
Q. So sometimes you have an accessibility issue 12:37

that is only apparent if you're using a particular Web browser; is that right?
A. Correct.
Q. What version of Chrome do you use?
THE INTERPRETER: The interpreter is checking to be certain the final "correct" that came after. I "think the issue is based on browser" was audible. 12:39
MR. LEIMKUHLER: Yes, I believe it was.
THE WITNESS: VV.85.
BY MR. LEIMKUHLER: 12:40
Q. And what version of Firefox do you use?
A. Version 80.
Q. Why do you choose to use the Google Chrome browser for when you're testing for website accessibility? 12:42
A. It's most compatible with JAWS.
Q. What is your opinion of the Internet Explorer web browser in terms of its compatibility with JAWS?
THE INTERPRETER: The interpreter is going to have to sign off. But I will check my texts and e-mails for an update. I am also willing to hop back on at 2:00 o'clock or whenever I finish to just check in, whichever you prefer. 12:45
Rosemary speaking now.
THE WITNESS: It's outdated; Microsoft Edge, 12:46

the upgraded version of IE, doesn't work well.
MR. LEIMKUHLER: Well, thank you for your assistance, Interpreter. I think from this point forward, we'll have Denise, the court reporter, read aloud the answers and then take them down on the official transcript. And we will let you know if we need you to return at 2:00 o'clock. 12:46
So thanks for your help today.
THE INTERPRETER: Of course. My pleasure. And I'm sorry for the confusion. 12:46
You're very welcome, Rosemary.
THE REPORTER: Okay. I'm ready to continue.
MR. LEIMKUHLER: Okay. Great. Thank you.
BY MR. LEIMKUHLER:
Q. On your computer today, are you -- you have the JAWS screen reader installed; is that right? 12:47
A. Correct.
Q. Sorry. Excuse me. And what version of JAWS?
A. JAWS Professional, V.18.
Q. And do you know when that version of JAWS was last updated? 12:48
A. I don't recall.
Q. My understanding is that JAWS gets updated in the terms of a new version is released, approximately every year; is that right? 12:49

MR. LEIMKUHLER: What was the last thing you heard?
THE REPORTER: The interpreter speaking.
BY MR. LEIMKUHLER:
Q. Okay. The settings on the JAWS screen reader are adjustable, right? 01:09
THE REPORTER: I would like the interpreter to repeat what she said.
THE WITNESS: I use default settings.
THE REPORTER: Oh, okay. Got it. Thank you. 01:10
THE WITNESS: Correct.
BY MR. LEIMKUHLER:
Q. My understanding is that screen-readers sometimes require combined key strokes such as pressing the control and shift button at the same time. 01:10
Is that something you experience?
MS. WEBER: Objection.
You can answer.
THE WITNESS: Correct. I use Windows Sticky Keys. That allows me to press keys simultaneously. 01:13
BY MR. LEIMKUHLER:
Q. Did you prepare an expert report in this case?
A. Yes, I have four expert reports. The last one was submitted yesterday.
Q. Well, we only received one, but I will start 01:15

with this one.
Did you draft these expert reports?
A. Yes, I did.
Q. How long did it take you to prepare your expert report? 01:15
A. I write it as I review the site. The last one took nine hours.
MS. WEBER: I'm happy to provide a little clarity if you'd like about the reports you're referring to. 01:18
There was the one we submitted to you. The other document you're referring to are drafts which are work product. So I just wanted to make that clear for the record.
MR. LEIMKUHLER: Okay. 01:18
BY MR. LEIMKUHLER:
Q. So when we're talking about this expert report, Ms. Musachio, we're talking about the one that we received in July of this year, for clarity.
So how long did it take you to prepare the one that was provided in July? I would give a date, but there is not a date on the report itself. 01:19
A. Please let me check, two minutes.
Six hours.
Q. Okay. So this first sentence of your report 01:21

with this one.
Did you draft these expert reports?
A. Yes, I did.
Q. How long did it take you to prepare your expert report? 01:15
A. I write it as I review the site. The last one took nine hours.
MS. WEBER: I'm happy to provide a little clarity if you'd like about the reports you're referring to. 01:18
There was the one we submitted to you. The other document you're referring to are drafts which are work product. So I just wanted to make that clear for the record.
MR. LEIMKUHLER: Okay. 01:18
BY MR. LEIMKUHLER:
Q. So when we're talking about this expert report, Ms. Musachio, we're talking about the one that we received in July of this year, for clarity.
So how long did it take you to prepare the one 01:19 that was provided in July? I would give a date, but there is not a date on the report itself.
A. Please let me check, two minutes.
Six hours.
Q. Okay. So this first sentence of your report 01:21

THE REPORTER: I received it, Counsel. Thank you.

MS. WEBER: Now I can't see the chat window. I got it.

THE WITNESS: Those are techniques to make iPhones accessible, not guidelines. Thus, WCAG 2.1 still applies. 03:17

BY MR. LEIMKUHLER:

Q. And then if you go a little bit above that in the report, you say, "JAWS is the same software reading program which Plaintiff Guillermo Robles used to try to access the Defendant's website." 03:17

Is that your understanding of the software program that Mr. Robles attempted to use?

A. From what I was told. 03:18

Q. Do you know what Internet browser Mr. Robles attempted to use when he tried to access the Defendant's website?

A. No, sir.

Q. Just so we don't have any issues, Ms. Musachio, do you recognize this report as the report that you prepared in this case? 03:19

MS. WEBER: I'm just scrolling through it so you can see the whole thing.

THE WITNESS: I provided the information and 03:21

signed it, and Manning Law prepared the document.
BY MR. LEIMKUHLER:
Q. Now, do you recognize -- did you draft this report or did Manning Law Firm draft this report?
A. I provided the information and signed it, and Manning Law prepared the document. I provided the information; they prepared it. 03:22
Q. What version of -- do you know -- excuse me.
Do you know what version of JAWS Mr. Robles used to try to access Defendant's website? 03:24
A. No.
Q. You also reviewed Defendant's mobile application; is that right?
A. Yes.
Q. What device did you use to review Defendant's mobile application? 03:25
A. Android Emulator called BlueStacks.
MS. WEBER: Do you want me to keep this document up? If not, I'd rather end the screen share.
MR. LEIMKUHLER: How about you can take the document down. And if we need to bring it back up, we can bring it back up. 03:26
MS. WEBER: Okay.
BY MR. LEIMKUHLER:
Q. Do you know what device Mr. Robles used to 03:26

attempt to access Defendant's mobile application?
A. No.
Q. What screen reader did you use to evaluate Defendant's mobile application?
A. TalkBack. It's the Android screen reader. 03:27
Q. Do you know what version of the mobile application that you reviewed?
A. No, I don't. But it automatically updates to the latest version.
Q. Do you know what version of TalkBack you used to review Defendant's mobile application? 03:31
A. No, I don't.
Q. Okay. In your report, you say that: Upon request from counsel for Plaintiff Guillermo Robles, in September '16, March 2017, on May 19, 2019, and May 29, 2020. I conducted assessments of Web pages on dominos.com and on Defendant's mobile application, to determine its accessibility of those with visual impairments; is that correct? 03:32
A. Yes. 03:32
Q. And then going a little further on the page, it states -- your report states those -- well, I guess the question is, did you find accessibility barriers on dominos.com?
A. Yes. 03:33

in the proceeding.

IN WITNESS WHEREOF, I have hereto subscribed my signature this 25th day of September, 2020.

Denise Spurlock

Denise Spurlock, CSR #12324