CERTIFIED ORIGINAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

- - -

| | |
|---|---|
| GUILLERMO ROBLES, an individual, | ) ) ) |
| Plaintiff, | ) ) Case No. |
| vs. | ) 2:15-cv-06599-JGB-E ) |
| DOMINO'S PIZZA LLC, a limited liability corporation, | ) Reporter's ) Affidavit of Nonappearance ) ) |
| Defendants. | ) |

I, LISA T. OWEN, CSR No. 4475, do hereby declare as follows:

That pursuant to the request of Manning Law, APC, representing the Plaintiff, I did appear remotely via Zoom videoconference, on Tuesday, September 15, 2020, at 10:30 a.m., for the purpose of placing under oath and reporting the deposition of the Person Most Knowledgeable in Accordance with FRCP 30(b)(6); that

1  there was present Babak Hashemi, Manning Law APC; that

2  the above person and the reporter remained on the Zoom

3  videoconference until approximately 10:46 a.m., by which

4  time the aforementioned witness had not appeared for the

5  purpose of having his or her deposition taken, at which

6  time the following proceedings were had:

7          "MR. HASHEMI:  Good morning.  My name is Babak

8  Hashemi.  I'm counsel to the Manning Law Office in the

9  case of Guillermo Robles vs. Domino's Pizza LLC, Case

10 No. 2:16-cv-06599-JGB-E, now pending in the Central

11 District of California.

12         "The time is now 10:46.  And we have been here

13 on the Zoom meeting for this deposition since 10:30.  A

14 notice of deposition was served on defendant's counsel,

15 which was entitled or captioned Plaintiff's Second

16 Notice of Taking Deposition of Defendant's Person Most

17 Knowledgeable in Accordance With FRCP 30(b)(6).

18         "We have not received any indication that a

19 witness is coming today.  So, therefore, I will request

20 that the court reporter issue a Certificate of

21 Nonappearance.  I will attach the notice of deposition

22 to the record as Exhibit 1.")

23         (Exhibit 1 was marked for identification and is

24         attached.)

25                  *       *       *

1    I declare under penalty of perjury that the

2    foregoing is true and correct.

3    DATED at Long Beach, California, this 15th day

4 of September, 2020.

5

6

7

8    _____
     LISA T. OWEN
9    CSR No. 4475

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joseph R. Manning, Jr., Esq. (State Bar No. 223381)
**MANNING LAW, APC**
20062 S.W. Birch St., Suite 200
Newport Beach, CA 92660
Office: (949) 200-8755
ADAPracticeGroup@manninglawoffice.com

Attorneys for Plaintiff
GUILLERMO ROBLES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

| | |
|---|---|
| GUILLERMO ROBLES, an individual,<br><br>Plaintiff,<br><br>v.<br><br>DOMINO'S PIZZA LLC, a limited liability corporation,<br><br>Defendant. | Case No.: 2:16-cv-06599-JGB-E<br><br>**PLAINTIFF'S SECOND NOTICE OF TAKING DEPOSITION OF DEFENDANT'S PERSON OR PERSONS MOST KNOWLEDGEABLE IN ACCORDANCE WITH FRCP 30(b)(6)**<br><br>DATE: September 15, 2020<br>TIME: 10:30 A.M.<br>PLACE: Through remote electronic means |



EXHIBIT 1
9-15-20

1

PLEASE TAKE NOTICE that In accordance with Federal Rule Civil Procedure 30(b)(6), Plaintiff Guillermo Robles ("Plaintiff") will take the remote deposition Of one or more directors, managers, or other persons to testify on behalf of Defendant Domino's Pizza, LLC who is most knowledgeable with respect to the matters listed in the attached Schedule A, whose address and telephone are known to Defendant's attorneys, on **September 15, 2020 at 10:30 a.m.** by electronic deposition before a certified shorthand reporter authorized to administer oaths in the State of California who is present at the specified time and place. An electronic invitation by the court reporter will be transmitted prior to the deposition.

The deposition may also be videotaped or recorded digitally and may be used at trial. Said deposition will continue from day to day except on Saturdays, Sundays and holidays, until completed.

Dated: September 10, 2020          MANNING LAW, APC

                                   By: /s/ Joseph R. Manning Jr., Esq.
                                       Joseph R. Manning Jr., Esq.
                                       Attorneys for Plaintiff

# SCHEDULE A

## Definitions

1. "PLAINTIFF" shall mean and refer to Plaintiff GUILLERMO ROBLES.

2. "YOU" or "YOUR" refers to Defendant DOMINO'S PIZZA LLC, a Delaware corporation and its agents, successors, assigns, employees, members, investigators, representatives and all PERSONS or entities acting on its behalf or in its interest whether present or former attorneys, advisors, agents, partners, associations, employees, accountants, auditors, representatives or other persons acting or purporting to act on YOUR behalf.

3. "DEFENDANT" refers to DOMINO'S PIZZA LLC, a limited liability company and its agents, employees, members, investigators, representatives and all PERSONS acting on its behalf or in its interest.

4. "ACTION" means and refers to the lawsuit PLAINTIFF filed as referenced in the above-referenced caption, Case No 2:16-cv-06599-SJO-FFM.

5. "PERSON" or "PERSONS" means all individuals and entities, including without limitation, individuals, representatives, associations, companies, corporations, partnerships, limited partnerships, joint ventures, trusts, estates, public agencies, departments, divisions, bureaus and boards.

6. "DOCUMENT" means all written, printed means all written, printed, typed, graphic or otherwise recorded matter, however produced or reproduced (including non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise); preliminary, intermediary and final drafts; writings, drawings, records and recordings of every kind and description, whether inscribed by hand or by mechanical, electronic, microfilm, photographic or other means (including information stored on computer storage device or media, as well as audio, such as tape recordings, or visual means); reproductions of statements,

conversations or events; and all agreements, bids, bonds, calendars, change orders, checks, contracts, correspondence, statements, receipts, returns, summaries, data books, accounting records, work sheets, spread sheets, computer print-outs, information storage media, diary entries, drawings and charts (including additions and revisions), estimates, evaluations, financial statements and records, inter- and intra-office COMMUNICATIONS, invoices, job site reports, logs, memoranda of any type minutes of all meetings, notes of all types, orders, including purchase orders, photographs, records, schedules, including additions and revisions, surveyor's notes, reports or calculations, reports and studies of any kind, tape recordings, (including any form of recording of any telephone or other conversation, interview, conference, or meeting), and all working drawings, papers and files. Note: If any computer software is necessary to read, print or utilize information contained in any DOCUMENT, as defined hereinabove, such software shall be identified together with the DOCUMENT or storage media to which it pertains.

7. "COMMUNICATIONS" means any instance in which words or information is transferred or transmitted between two or more PERSONS by whatever manner or means, and regardless of how or by whom the communication was initiated, including but not limited to, correspondence, conversation, instructions, meetings, requests, demands, and conferences, and including postings on social media and texts sent or received from any device.

8. "REPORT(S)" shall include the above definition "DOCUMENT" and include any such writing that reflects or refers to any oral, verbal, spoken or written conveyance of any information to any "PERSON" as defined below.

9. "REFLECT OR REFER TO" as used herein shall mean constituting, consisting of, or pertaining to, evidencing, supporting, contradicting, reflecting, or resulting from the matter specified, including in each instance, Documents now, or previously attached or appended to or used in the preparation of any Document

called for by each request.

10. "RELATING TO" and "RELATES TO" mean, without limitation, relating to, constituting, concerning, mentioning, referring to, describing, summarizing, evidencing, listing, relevant to, demonstrating, tending to prove or disprove, or explain.

11. "CONCERNING" means, in whole or in part, directly or indirectly, referring to, relating to, connected with, commenting on, responding to, showing, describing, analyzing, reflecting, and constituting.

12. "AND" and "OR" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed outside of the request.

13. "POLICY" or "POLICIES" means any practice, procedure, directive, routine, guideline, rule, course of conduct or code of conduct, written or unwritten, formal or informal, recorded or unrecorded, which were or have been recognized, adopted, issued or followed by YOU.

14. The term "WEBSITE" means:
   a. All web pages, web applications, resources, and services within the www.dominos.com domain, its subdomains, and related domains;
   b. All of the information, resources, files, databases, images, graphics, text, audio, video, multimedia, services, code (including Hypertext Markup Language ("HTML"), .Net Framework, C#, etc., Dynamic HTML (including Cascading Style Sheets ("CSS")), and any other communications sent by or retrieved from www.dominos.com to members of the public accessing them; and
   c. Links owned, operated, branded or paid for by Defendant

Domino's Pizza LLC.

15. The term "MOBILE APP" means Defendant Domino's Pizza LLC's mobile application for iPhone that is the subject of this action.

16. "ACCESSIBLE" and "ACCESSIBILITY" refer to:
    a. whether the WEBSITE or MOBILE APP is designed, created, implemented, released, maintained, operated, and controlled in a manner that allows individuals with disabilities to obtain and use the information, goods, and services provided on or through the WEBSITE OR MOBILE APP; and
    b. conformance of the WEBSITE or MOBILE APP content with WCAG 2.1 LEVEL AA.

17. "SCREEN READING SOFTWARE PROGRAMS" refers to programs that vocalize visual information on the screen of an electronic device, magnify visual information on the screen of an electronic device, or display the content on a refreshable Braille display such that blind persons can independently access the Internet and associated computer software programs.

18. "WCAG 2.1 LEVEL AA" refers to the standards of Internet website and mobile application accessibility published by the World Wide Web Consortium and available at https://www.w3.org/TR/WCAG21/.

## Topics

The deposition of one or more officers, directors, managing agents, or other persons designated by Defendant Domino's Pizza LLC will cover the following topics relating to the period from January 1, 2014 to the present unless another period is specified:

1. The design, creation, implementation, release, maintenance, ownership, operation, and control of the WEBSITE. This topic includes:
    a. The coding, design, and format of the WEBSITE;

    b. How, when, where, and by whom (including third parties) the WEBSITE (including the content thereon) is or was designed, created, implemented, released, maintained, operated, and controlled; and

    c. How, when, where, and by whom "bugs" or other defects of the WEBSITE are addressed or resolved.

  2. The design, creation, implementation, release, maintenance, ownership, operation, and control of the MOBILE APP. This topic includes:

    a. The coding, design, and format of the MOBILE APP;

    b. How, when, where, and by whom (including third parties) the MOBILE APP (including the content thereon) is or was designed, created, implemented, released, maintained, operated, and controlled; and

    c. How, when, where, and by whom "bugs" or other defects of the MOBILE APP are addressed or resolved.

  3. The purpose, function, and use of YOUR WEBSITE.

  4. The purpose, function, and use of YOUR MOBILE APP.

  5. All marketing, consumer, and cost/benefit studies of YOUR WEBSITE.

  6. All marketing, consumer, and cost/benefit studies of YOUR MOBILE APP.

  7. All marketing plans for YOUR WEBSITE.

  8. All marketing plans for YOUR MOBILE APP.

  9. All efforts planned or contemplated to heighten the enjoyment and ease of use of YOUR WEBSITE to visitors.

  10. All efforts planned or contemplated to heighten the enjoyment and ease of use of YOUR MOBILE APP to users

  11. The actions taken to market goods and services available at YOUR

retail locations through YOUR WEBSITE.

12. The actions taken to market goods and services available at YOUR retail locations through YOUR MOBILE APP.

13. YOUR POLICY or POLICIES regarding ACCESSIBLITY of the WEBSITE in effect in 2015, including:

    a. All POLICY or POLICIES YOU developed or purported to follow regarding procurement of accessible information technology products and services that YOU use to communicate with or interact with the public, including copies of any such documents;

    b. All POLICY or POLICIES YOU developed or purported to follow regarding making and maintaining the WEBSITE in an ACCESSIBLE state, including copies of any such documents;

    c. All POLICY or POLICIES YOU developed or purported to follow for processing ACCESSIBILITY and other complaints from users of the WEBSITE; and

    d. All POLICY or POLICIES YOU developed or purported to follow regarding service level agreements or other bug fix priority levels for the WEBSITE.

14. YOUR POLICY or POLICIES regarding ACCESSIBLITY of the MOBILE APP in effect in 2015, including:

    a. All POLICY or POLICIES YOU developed or purported to follow regarding procurement of accessible information technology products and services that YOU use to communicate with or interact with the public, including copies of any such documents;

    b. All POLICY or POLICIES YOU developed or purported to follow regarding making and maintaining the MOBILE APP in an ACCESSIBLE state, including copies of any such documents;

c. All POLICY or POLICIES YOU developed or purported to follow for processing ACCESSIBILITY and other complaints from users of the MOBILE APP; and

d. All POLICY or POLICIES YOU developed or purported to follow regarding service level agreements or other bug fix priority levels for the MOBILE APP.

15. YOUR POLICY or POLICIES regarding ACCESSIBLITY of the WEBSITE in effect from 2016 to the present, including:

a. All POLICY or POLICIES YOU have developed or purported to follow regarding procurement of accessible information technology products and services that YOU use to communicate with or interact with the public, including copies of any such documents;

b. All POLICY or POLICIES YOU have developed or purported to follow regarding making and maintaining the WEBSITE in an ACCESSIBLE state, including copies of any such documents;

c. All POLICY or POLICIES YOU have developed or purported to follow for processing ACCESSIBILITY and other complaints from users of the WEBSITE; and

d. All POLICY or POLICIES YOU have developed or purported to follow regarding service level agreements or other bug fix priority levels for the WEBSITE.

16. YOUR POLICY or POLICIES regarding ACCESSIBLITY of the MOBILE APP in effect from 2016 to the present, including:

a. All POLICY or POLICIES YOU have developed or purported to follow regarding procurement of accessible information technology products and services that YOU use to communicate with or interact with the public, including copies of any such documents;

b. All POLICY or POLICIES YOU have developed or purported to follow regarding making and maintaining the MOBILE APP in an ACCESSIBLE state, including copies of any such documents;

c. All POLICY or POLICIES YOU have developed or purported to follow for processing ACCESSIBILITY and other complaints from users of the MOBILE APP; and

d. All POLICY or POLICIES YOU have developed or purported to follow regarding service level agreements or other bug fix priority levels for the MOBILE APP.

17. YOUR efforts to make and maintain the WEBSITE in an ACCESSIBLE state. This topic includes:

    a. What reviews, evaluations, or audits have been done of the WEBSITE, including how, when, where, why, and by whom the reviews, evaluations, or audits were done and results reported and transmitted;

    b. Challenges to making the WEBSITE ACCESSIBLE, including any security or cost concerns and any necessary "fundamental alterations";

    c. What actions are necessary to make the WEBSITE ACCESSIBLE;

    d. The amount of time necessary to make the WEBSITE ACCESSIBLE;

    e. The personnel assigned and money allocated to make the WEBSITE ACCESSIBLE both prior and subsequent to the filing of this ACTION;

    f. Training of YOUR employees, partners, or contractors in methods and practices of making and maintaining websites in an

accessible state;

 g. Those SCREEN READING SOFTWARE PROGRAMS that YOU own, lease, or for which YOU have a licensee;

 h. Those automated testing tools for determining the level of ACCESSIBILITY of websites for persons with disabilities that YOU own, lease, or for which YOU have a licensee and when that tool(s) has been utilized; and

 i. Testing YOU have conducted or caused to be conducted on the WEBSITE with individuals with disabilities.

18. YOUR efforts to make and maintain the MOBILE APP in an ACCESSIBLE state. This topic includes:

 a. What reviews, evaluations, or audits have been done of the MOBILE APP, including how, when, where, why, and by whom the reviews, evaluations, or audits were done and results reported and transmitted;

 b. Challenges to making the MOBILE APP ACCESSIBLE, including any security or cost concerns and any necessary "fundamental alterations";

 c. What actions are necessary to make the MOBILE APP ACCESSIBLE;

 d. The amount of time necessary to make the MOBILE APP ACCESSIBLE;

 e. The personnel assigned and money allocated to make the MOBILE APP ACCESSIBLE both prior and subsequent to the filing of this ACTION;

 f. Training of YOUR employees, partners, or contractors in methods and practices of making and maintaining mobile applications

in an accessible state;

  g. Those SCREEN READING SOFTWARE PROGRAMS that YOU own, lease, or for which YOU have a licensee;

  h. Those automated testing tools for determining the level of ACCESSIBILITY of mobile applications for persons with disabilities that YOU own, lease, or for which YOU have a licensee and when that tool(s) has been utilized; and

  i. Testing YOU have conducted or caused to be conducted on the MOBILE APP with individuals with disabilities.

19. The reasons YOU did not have an ACCESSIBLE WEBSITE in 2015.

20. The reasons YOU did not have an ACCESSIBLE MOBILE APP in 2015.

21. YOUR reports, reviews, evaluations, or audits that measure or evaluate ACCESSIBILITY of the WEBSITE and/or compliance with YOUR POLICY or POLICIES regarding ACCESSIBLITY of the WEBSITE.

22. YOUR reports, reviews, evaluations, or audits that measure or evaluate ACCESSIBILITY of the MOBILE APP and/or compliance with YOUR POLICY or POLICIES regarding ACCESSIBLITY of the MOBILE APPLICATION.

23. Any and all alternatives to the WEBSITE YOU contend provide equal or greater access to YOUR goods, services, facilities, privileges, advantages, or accommodations than the WEBSITE.

24. Any and all alternatives to the MOBILE APP YOU contend provides equal or greater access to YOUR goods, services, facilities, privileges, advantages, or accommodations than the MOBILE APP.

25. The training provided to personnel who answer calls to YOUR 800-252-4031 customer service line, including the training provided customer service operators in how to assist blind callers.

26. Complaints or inquiries about or notice of the WEBSITE not being ACCESSIBLE or otherwise difficult for persons with disabilities to use.

27. Complaints or inquiries about or notice of the MOBILE APP not being ACCESSIBLE or otherwise difficult for persons with disabilities to use.

28. The operational costs relating to YOUR WEBSITE and the revenues and profits received by YOU as a result, directly or indirectly, of the operation of YOUR WEBSITE.

29. The operational costs relating to YOUR MOBILE APP and the revenues and profits received by YOU as a result, directly or indirectly, of the operation of YOUR MOBILE APP.

30. The factual bases for each affirmative defense YOU assert in this ACTION.